**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

```
-------------------------------------------------------------x
                                        :
                                        :
                                        :
THE COLONIAL BANCGROUP, INC.,           :
                                        :
        Plaintiff,                      :
                                        :
v.                                      :        Case No.  2:10-cv-00198
                                        :
FEDERAL DEPOSIT INSURANCE               :
CORPORATION, as receiver for            :        JURY TRIAL DEMANDED
Colonial Bank,                          :
                                        :
                                        :
        Defendant.                      :
                                        :
-------------------------------------------------------------x
```

**PLAINTIFF'S BRIEF IN OPPOSITION TO MOTION OF DEFENDANT**
**FDIC-RECEIVER FOR PARTIAL JUDGMENT ON THE PLEADINGS**

THE COLONIAL BANCGROUP, INC. ("BancGroup") files this brief and accompanying appendix

(the "Appendix") in opposition to the *Motion of Defendant FDIC-Receiver for Partial Judgment on the*

*Pleadings* [Doc. No. 44] pursuant to Rule 12(c) of the Federal Rules of Civil Procedure and the memorandum

of law submitted in support thereof [Doc. No. 45] (collectively, the "Motion") filed by the Federal Deposit

Insurance Corporation (the "FDIC"), in its capacity as receiver for Colonial Bank (the "FDIC-Receiver").[1]

## I.    OVERVIEW

On March 5, 2010, BancGroup filed against the FDIC-Receiver the complaint initiating this civil

action (as amended on May 28, 2010, the "Complaint") [Doc. No. 20].  In the Complaint, BancGroup seeks,

among other things, to avoid under Sections 547 and 548 of the Bankruptcy Code and under applicable state

law (which is incorporated into the Bankruptcy Code by Section 544) certain pre-bankruptcy transfers that

---

[1]  References to the "FDIC-Receiver" should be distinguished from references to the "FDIC," which means the
Federal Deposit Insurance Corporation in its corporate capacity.

were made by BancGroup to its wholly-owned subsidiary, Colonial Bank (the "Avoidable Transfers").  The aggregate amount of the transfers at issue total in excess of $1.2 billion.  A trial is scheduled in October 2011, with a discovery deadline presently set at August 5, 2011.

BancGroup was obligated to file the Complaint pursuant to the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") within 60 days after the date on which the FDIC-Receiver disallowed BancGroup's proof of claim in the receivership proceedings of Colonial Bank (the "Receivership Proof of Claim").  The FDIC-Receiver disallowed BancGroup's Receivership Proof of Claim on January 6, 2010, and, therefore, the Complaint was timely filed within 60 days thereafter.

Even if BancGroup prevails on the claims stated in the Complaint, the receivership estate of Colonial Bank will not have sufficient assets to pay any part of the claims, as the FDIC's priority claim in the receivership is eight times larger than the amount of available receivership assets.[2]  Accordingly, BancGroup's purpose in seeking the relief prayed for in the Complaint is to utilize the avoidance recoveries as defenses to and offsets against claims asserted by the FDIC-Receiver in its proof of claim filed in BancGroup's Chapter 11 bankruptcy case (the "Bankruptcy Proof of Claim").[3]  In the Bankruptcy Proof of Claim, the FDIC-Receiver has asserted an alleged priority claim arising under Sections 365(o) and 507(a)(9) of the Bankruptcy Code totaling approximately $1 billion (which claim was denied by the Bankruptcy Court and is on appeal to this Court) and other contingent and unliquidated claims that allegedly total $2.2 billion.[4]

---

[2]  As will be discussed below, the receivership estate has assets of approximately $750 million against a priority claim held by the FDIC (which must be paid in advance of payments to other receivership creditors of Colonial Bank, including BancGroup) of over $5.8 billion.

[3]  Although BancGroup believes that it would be authorized under the Bankruptcy Code to assert the same defenses to and offsets against the FDIC-Receiver's Bankruptcy Proof of Claim without the necessity of prosecuting the causes of action for Avoidable Transfers stated in the Complaint, BancGroup is pursuing the relief requested in the Complaint out of an abundance of caution, as the FDIC-Receiver will surely contend that the failure to do so will extinguish all of those causes of action not only in the receivership proceeding but also for purposes of BancGroup's Chapter 11 case.

[4]  These other contingent and unliquidated claims asserted by the FDIC-Receiver are described in detail in a motion filed by the FDIC-Receiver with the Bankruptcy Court for an estimation of these claims for purposes of voting upon BancGroup's pending Chapter 11 plan of liquidation [Bankr. Doc. No. 1136].  These contingent and unliquidated claims, according to the FDIC-Receiver, arise only if the FDIC-Receiver does not prevail on its defenses to the Complaint.

The sections of the Bankruptcy Code that provide defenses to and offsets against the Bankruptcy Proof of Claim are Sections 502(d) and 502(h).  If BancGroup prevails in its Complaint with respect to the Avoidable Transfers, Section 502(h) confers upon the FDIC-Receiver a claim in the amount of the avoided transfer <u>only if</u> the FDIC-Receiver returns the property that was the subject of the Avoidable Transfer to BancGroup's Chapter 11 estate or pays to BancGroup, under Section 550 of the Bankruptcy Code, the value of the avoided Avoidable Transfers.  Section 502(d) requires the disallowance of the entirety of the FDIC-Receiver's Bankruptcy Proof of Claim until such time (if ever) as the FDIC-Receiver has "paid the amount, or turned over any such property" that is the subject of the Avoidable Transfers.  The merits of these defenses and offsets are not at issue in this Motion and will ultimately be resolved in connection with BancGroup's objections to the FDIC-Receiver's Bankruptcy Proof of Claim.  *See* <u>In re The Colonial BancGroup, Inc.</u>, Case No. 2:10-cv-00409 (MHT) (M.D. Ala.).

The instant Motion asserts that the claims for Avoidable Transfers asserted in the Complaint are barred by 12 U.S.C. § 1828(u) to the extent that they occurred on or after December 15, 2008; the Avoidable Transfer of certain REIT preferred securities to Colonial Bank did not involve any interest in property of BancGroup; and the Complaint does not allege with requisite specificity the elements of a preference claim or the insolvency of either BancGroup or Colonial Bank at the time of each Avoidable Transfer.

## II.   <u>STANDARD OF REVIEW</u>

The standard of review applicable to a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure mirrors the standard for a Rule 12(b)(6) motion to dismiss.  *See* <u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 243 (4th Cir. 1999);  <u>Bolton v. Fed. Home Loan Mortg. Corp.</u>, 2010 U.S. Dist. LEXIS 84498, at *3 (M.D. Ala. 2010).  Thus, under Rule 12(c), a motion for judgment on the pleadings should only be granted in the event that the plaintiff does not plead "enough facts to state a claim to relief that is plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 547 (2007).  When considering such a motion, a court must accept the allegations in the plaintiff's complaint as true and construe them in the

light most favorable to the plaintiff.  M.T.V. v. DeKalb County Sch. Dist., 446 F.3d 1153, 1156 (11th Cir. 2006) (citation omitted).

Furthermore, a complaint is not required to contain "detailed factual allegations," Twombly, 550 U.S. at 555 (2007); it must only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, ___ U.S. ___, 129 S. Ct. 1937, 1949 (2009) (citing Twombly, 550 U.S. at 570).  To prove "plausibility" under this standard, a plaintiff does not need to prove "probability," but must merely show "more than a sheer possibility that defendant has acted unlawfully." Id.  Moreover, a court is permitted to make reasonable inferences from facts alleged to meet this plausibility standard.  Id.

In considering a motion for a judgment on the pleadings, a court generally should not consider matters outside the pleadings other than documents that are "integral to or explicitly relied upon in the complaint," without converting the motion to a motion for summary judgment.  Mele v. Federal Reserve Bank of New York, 359 F.3d 251 (3d Cir. 2004).  Accord, Horsley v. Feldt, 304 F.3d 1125 (11th Cir. 2002).  In addition, the Court may consider judicially noticed facts in ruling on the motion, including facts that are a matter of public record.  See, e.g., Hart v. Hodges, 587 F.3d 1288, 1294 n.4 (11th Cir. 2009);  Faibisch v. University of Minnesota, 304 F.3d 797 (8th Cir. 2002).[5]

Even if the Court were to determine that the Motion should be granted in whole or in part, the Eleventh Circuit has held, time and again, that "[o]rdinarily, a party must be given at least one opportunity to amend before the district court dismisses the complaint."  Corsello v. Lincare, Inc., 428 F.3d 1008, 1014 (11th Cir. 2005).  See also Bryant v. Dupree, 252 F.3d 1161, 1163 (11th Cir. 2001);  Stevens v. Premier Cruises, Inc., 215 F.3d 1237, 1239 (11th Cir. 2000).  "Generally, 'where a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice.'"  Bryant, 252 F.3d at 1163.  Thus, in the unlikely event the Court grants the Motion, the Court should allow BancGroup an opportunity to amend the Complaint.

---

[5] Both the FDIC-Receiver in its Motion and BancGroup in this brief direct the Court's attention to matters outside the record of this case.  In doing so, BancGroup has endeavored to support its statements with citations to pleadings and other documents of which the Court is entitled to take judicial notice.

### III.   BACKGROUND

#### A.   Overview of BancGroup and its Chapter 11 Case

BancGroup, a Delaware corporation, was a publicly traded bank holding company that was headquartered and conducted business at 100 Colonial Bank Boulevard, Montgomery, Alabama.  BancGroup owned Colonial Bank and certain non-banking subsidiaries.  Colonial Bank was BancGroup's most significant asset and the primary source of funds with which BancGroup could service in excess of $350 million in bond indebtedness incurred by BancGroup for the benefit of Colonial Bank.

As a result of the failure of Colonial Bank and its receivership on August 14, 2009, BancGroup filed for Chapter 11 relief on August 25, 2009 (the "Petition Date").  At the time of BancGroup's Chapter 11 filing, substantially all of its officers and employees had been dismissed and all of its records and those of Colonial Bank (both tangible and electronic) had been seized by the FDIC-Receiver (the "Seized Records").  As is apparent from pleadings filed in BancGroup's Chapter 11 case, including the disclosure statement to creditors accompanying its plan of liquidation [Bankr. Doc. No. 1111-1], a significant part of BancGroup's efforts during the pendency of its Chapter 11 case has been to gain possession of material portions of these Seized Records in order properly to administer the Chapter 11 case; file financial, accounting and other reports with the Bankruptcy Court; prepare and file its tax returns (including a tax refund claim in the amount of $253 million); and respond to various informational and litigation discovery requests of interested parties, including the FDIC-Receiver.

In addition to lacking substantially all of its business records, BancGroup was initially without any cash.  The FDIC-Receiver not only asserted dominion and control over BancGroup's $37 million in deposit account balances at BB&T and rights of offset with respect to them (which the Bankruptcy Court has since denied), but also asserted a nearly $1 billion priority claim that would trump all but secured and a few higher priority claims in the case (which was also denied by the Bankruptcy Court).

BancGroup has now filed a Chapter 11 plan of liquidation with the Bankruptcy Court, which provides for the distribution to creditors (in accordance with their statutory entitlements) of all net assets of BancGroup's estate.  The confirmation hearing with respect to the plan is scheduled for May 11, 2011.

### B.      Overview of Colonial Bank

Colonial Bank, once the 22nd largest bank in the nation with some 346 branch offices located in five states, was an Alabama state-charted, non-member bank that was regulated by the Alabama State Banking Department (the "Alabama Banking Department") and the FDIC.  A significant part of Colonial Bank's business (and supposed profits) revolved around its relationship with Taylor, Bean & Whitaker Mortgage Corp. ("TBW").

TBW is currently a debtor under Chapter 11 of the Bankruptcy Code in a case commenced in the United States Bankruptcy Court for the Middle District of Florida.  Prior to its demise, TBW was one of the largest mortgage lenders in the United States.  Colonial Bank's relationship with TBW was extensive.  In addition to serving as TBW's primary depository bank, Colonial Bank had significant loan exposure to TBW, from time to time sold a substantial amount of mortgage loans to TBW and from time to time purchased substantial volumes of mortgage loans or participations therein from TBW.  As will be discussed below, certain employees of both TBW and Colonial Bank conspired to defraud both Colonial Bank and BancGroup.  *See generally*, Final Reconciliation Report of Debtor Taylor, Bean & Whitaker Mortgage Corp. [Doc. No. 1644], filed on July 1, 2010 in In re Taylor, Bean & Whitaker Mortgage Corp., Case No. 3:09-bk-07047-JAF (Bankr. M.D. Fla.), Appendix, Exhibit 5.

Having suffered significant operating losses (in large part attributable to the TBW/Colonial Bank fraud), Colonial Bank came under increasing scrutiny by bank regulators and was ultimately closed and placed into receivership by the Alabama Banking Department on August 14, 2009.  On the same date, the FDIC-Receiver sold substantially all of the assets of Colonial Bank to Branch Banking & Trust Company ("BB&T") and placed BB&T in possession of a significant portion of the Seized Records (but with the FDIC-Receiver purporting to retain ultimate authority regarding the transfer and disposition of the Seized Records).

### C.      BancGroup's Attempts to Access Seized Records

As noted earlier, the FDIC-Receiver seized substantially all of the business and accounting records of both Colonial Bank and BancGroup, which consisted of multiple millions of pages of tangible and electronic documents.  As a result of that seizure, the dismissal of substantially all knowledgeable officers and

- 6 -

employees of Colonial Bank, and the employment by BB&T of substantially all of Colonial Bank's former employees, BancGroup (under the leadership of a newly hired chief recovery officer, with no prior involvement with BancGroup or Colonial Bank) was, during the initial stages of its Chapter 11 case, incapable of performing an accurate assessment of the assets, liabilities, financial condition or identity of creditors and equity security holders of BancGroup.

BancGroup promptly embarked upon an effort to gain access to the Seized Records through negotiations with the FDIC-Receiver and BB&T. Against this backdrop, BancGroup faced a November 19, 2009 deadline to file the Receivership Proof of Claim -- a filing that would necessitate access to significant parts of the Seized Records and a comprehensive analysis of the information therein, all within 85 days after the commencement of the Chapter 11 case.[6] At the time of the filing of the Receivership Proof of Claim, and thereafter at the time of the filing of the Complaint, BancGroup still did not have in its possession critical portions of the Seized Records to provide a high level of detail regarding certain of the Avoidable Transfers and other claims against the FDIC-Receiver.[7]

### D.      Deteriorating Condition of Colonial Bank and BancGroup

During calendar years 2007, 2008 and 2009, Colonial Bank's financial condition (and therefore BancGroup's) deteriorated as the result of a number of factors. In addition to operating losses resulting from a heavy concentration in real estate loans,[8] Colonial Bank had significant unrealized losses on its balance sheet as a result of the fraudulent activities engaged in between employees of TBW and Colonial Bank. Among

---

[6] It is somewhat ironic that the FDIC-Receiver disallowed the Receivership Proof of Claim, without any reference to the Avoidable Transfers, for the reason that the claims were submitted "without sufficient supporting documentation and have not been proven to the satisfaction of the Receiver." Complaint, Exhibit A at 25 of 29. *See also* Motion at 9 of 35.

[7] The FDIC-Receiver has been less than cooperative in assisting the Debtor in obtaining any of the Seized Records from BB&T over which the FDIC-Receiver exerts significant control. For example, the FDIC-Receiver even objected to BancGroup's *Motion for an Order Authorizing Rule 2004 Examination of BB&T* and accompanying request for production of documents [Bankr. Doc. No. 788].

[8] *See generally*, Office of Inspector General, *Material Loss Review of Colonial Bank, Montgomery, Alabama* (Report No. MLR-10-031), Appendix, Exhibit 2 (the "Loss Report").

other things, those employees defrauded both Colonial Bank and BancGroup by concealing overdrafts in TBW's main banking account at Colonial Bank (which grew to hundreds of millions of dollars) and sold mortgage loans from TBW to Colonial Bank that had already been sold to other investors. The fraud resulted in damages to Colonial Bank and BancGroup in excess of $400 million.[9]

In December of 2008, BancGroup obtained preliminary approval of an application through the Capital Purchase Program to the Troubled Asset Relief Program ("TARP") for approximately $553 million in TARP funds for Colonial Bank. The approval was conditioned on raising $300 million in additional private equity which BancGroup attempted to source from a number of potential investors. In March of 2009, TBW (in concert with other alleged private parties) entered into a purchase agreement with BancGroup to provide the

---

[9]   From February 24, 2011 through March 16, 2011, four separate people plead guilty to criminal conspiracy to defraud relating to the TBW/Colonial Bank fraud. *See* Appendix, Exhibits 6-7, 9-10, 13-16. On March 2, 2011, Catherine Kissick, a senior vice president of Colonial Bank and the head of the mortgage warehouse lending operation, agreed to a statement of facts in connection with her plead guilty that admitted her participation in a conspiracy over the period of 2002 through 2009. Appendix, Exhibits 9 and 10. Paragraph 2 of her statement of facts states as follows:

> From in or about 2002 through in or about August 2009, co-conspirators, including the defendant, engaged in a scheme to defraud various entities and individuals, including Colonial Bank, a federally insured bank; Colonial BancGroup, Inc.; shareholders of Colonial BancGroup; the Troubled Asset Relief Program (TARP); and the investing public. One of the goals of the scheme to defraud was to obtain funding for Taylor, Bean & Whitaker (TBW) to assist it in covering expenses related to operations and servicing payments owed to third-party purchasers of loans and/or mortgage-backed securities. Although the defendant did not personally receive funds paid out by Colonial Bank to TBW as a result of the scheme to defraud, she knowingly and intentionally placed Colonial Bank and Colonial BancGroup at significant risk of incurring losses as a result of the scheme and, in fact, caused Colonial Bank to purchase assets from TBW **of substantially more than $400 million that in fact had no value and were held on Colonial Bank's and Colonial BancGroup's books as if they had actual value**.

Appendix, Exhibit 9 at 1-2 of 11, ¶ 2 (emphasis added).

On the same day, the Securities and Exchange Commission filed a civil action against Kissick for violations of various securities laws to which she stipulated judgment. Appendix, Exhibits 11 and 12. In the complaint, she was accused of the following:

> From approximately March 2002 through August 2009, Defendant Catherine L. Kissick ("Kissick"), together with Lee B. Farkas ("Farkas") and Desiree E. Brown ("Brown"), **engaged in a pattern of fraudulent conduct for the purpose of selling at least $1.5 billion of fictitious and impaired residential mortgage loans** from Farkas' company, Taylor, Bean and Whitaker Mortgage Corp. ("TBW") to Colonial Bank, and for Colonial Bank, and its publicly traded parent company, The Colonial BancGroup, Inc. ("BancGroup"), to falsely record these fictitious and impaired mortgage loans as high quality assets.

Appendix, Exhibit 11 at 1 of 22, ¶ 1. Similar complaints have also been filed against other alleged co-conspirators. *See* Appendix, Exhibits 8 and 17.

required equity capital as part of a stock purchase of BancGroup's stock. Ultimately, TBW failed to close the transaction (which it had hoped would conceal its own fraudulent activities). Shortly after the agreement was terminated in July of 2009, the Special Inspector General for the Troubled Asset Relief Program commenced a criminal investigation of TBW and on August 3, 2009, executed search warrants at TBW's headquarters, seized all of TBW's records and froze TBW's bank accounts at Colonial Bank. Colonial Bank was placed into receivership 11 days thereafter.

In April 2010, after the filing of the Complaint in this civil action, the Office of the Inspector General issued its Loss Report on Colonial Bank. Appendix, Exhibit 2.[10] Among other things, the Loss Report notes that the FDIC-Receiver estimated the loss to the Deposit Insurance Fund at October 24, 2009 to be $2.7 billion, which is the magnitude of Colonial Bank's inability to pay its outstanding deposit obligations (a claim having priority status within the receivership). This deficiency alone exceeds the amount of equity on the 2007 and 2008 consolidated financial statements filed by BancGroup with the Securities and Exchange Commission (the "SEC") and is compelling evidence of Colonial Bank's insolvency as early as late 2007.[11] The Loss Report goes on to state that, as of March 31, 2010, the estimated loss to the Deposit Insurance Fund had increased to $3.8 billion. Appendix, Exhibit 2 at 2 of 37.

In June of 2010, Lee B. Farkas, the former chairman of TBW, was charged in a 16-count indictment for his alleged role in the $1.9 billion fraudulent scheme that ultimately contributed to the failure of Colonial Bank and the resulting bankruptcy of BancGroup. Appendix, Exhibit 3. On the same date, the SEC filed a similar complaint against Farkas alleging similar actions of wrongdoing, including the fraudulent scheme that

---

[10] Under Section 38(k) of the Federal Deposit Insurance Act, the Office of Inspector General is required to conduct a material loss review of the failure of a bank within a defined period of time and issue a report. Among other audit objectives is the determination of the causes of the financial institution's failure and the resulting material loss to the deposit insurance fund. Appendix, Exhibit 2 at 30 of 37.

[11] As indicated in the Appendix at Exhibit 1, the consolidated financial statements show that, for calendar years ending 2007 and 2008, BancGroup had a consolidated net worth of $2.23 billion and $1.3 billion, respectively, with "loan loss allowances" of approximately $239 million and $325million, respectively. Appendix, Exhibit 1 at 29 of 64.

was perpetrated upon BancGroup from March 2002 through August 2009.  <u>Appendix, Exhibit 4</u> at 1 of 28, ¶ 1.[12]

On July 1, 2010, TBW's chief restructuring officer issued a final report regarding the affairs of TBW.  <u>Appendix, Exhibit 5</u>.  The report describes in detail how officers of TBW -- in conspiracy with high ranking officers of Colonial Bank -- caused damages to BancGroup in excess of $400 million.  In particular, it describes how TBW acquired mortgages from Colonial Bank without paying for them while Colonial Bank officers assisted in the fraud by falsely reporting continued ownership of mortgage loans that either never existed or no longer existed as mortgage loans.  This lengthy and detailed report is supportive of the fact that the fraud and its impact date as early as 2007 and that the consolidated financial statements of BancGroup were not accurate and would have reflected a lack of solvency during some point in time as early as 2007 had all of the facts been known by BancGroup.

At the end of the calendar year 2010, the FDIC-Receiver filed its Colonial Bank Receivership Balance Sheet Summary (Unaudited) for the Period Ending December 31, 2010 (the "<u>FDIC Balance Sheet</u>").[13]  The FDIC Balance Sheet shows an even greater shortfall of over $4 billion relating to the Deposit Insurance Fund.  According to this document, the Colonial Bank receivership has $754,453,000 in total assets.  The FDIC Balance Sheet further shows that the FDIC holds a "FDIC Subrogated Deposit Claim" of $5,826,813,000 (the "<u>FDIC Deposit Claim</u>").  Under Section 1821(d)(11)(A) of Title 12, the FDIC asserts that the FDIC Deposit Claim is entitled to priority in distribution and must be paid before any general unsecured claim in the receivership can receive any payment.  By the FDIC-Receiver's own calculations, receivership assets fall short of satisfying even the FDIC Deposit Claim by more than $4 billion and there are no funds

---

[12] On April 4, 2011, Farkas' trial on his criminal indictment commenced in the United States District Court for the Eastern District of Virginia.  The trial is currently anticipated to be lengthy and will produce additional evidence regarding the fraud allegedly perpetrated on BancGroup and the financial condition of BancGroup and Colonial Bank over the period from 2005 to 2009.

[13] *See* http://www2.fdic.gov/drrip/bal/balancesheet.asp for a publicly available copy of the FDIC Balance Sheet.

available to pay any alleged claim held by BancGroup or others, regardless of the merits of their claims. Accordingly, no payment will be made to BancGroup or any other unsecured claimant in the receivership.

### E.     Summary of Avoidable Transfers

#### 1.     Downstreaming of Funds

From August 24, 2007 through the Petition Date, BancGroup "downstreamed" substantial monies to Colonial Bank.  Those transfers, which are described on <u>Exhibit B</u> to the Complaint, represent the first category of Avoidable Transfers and are summarized as follows:

|  | 8/24/2007 - 12/31/2007 | 1/1/2008 - 12/31/2008 | 1/1/2009 - 8/24/2009 |
|---|---|---|---|
|  |  |  |  |
| Cash | - | $375,000,000.00 | $50,880,867.00 |
| Citrus & Chemical Acquisition | $216,281,627.40 | - | - |
| Loans | - | - | 70,664,037.05 |
| Securities | - | - | 21,041,254.55 |
| Tax Refunds | - | - | 166,000,000 |
|  | $216,281,627.40 | $375,000,000.00 | $308,586,158.60 |
| Total: |  |  | $899,867,786.00 |

BancGroup obtained funds to make these transfers in a variety of ways, including the public offering of debentures in 2008 in the approximate principal amount of $250 million and the receipt of a tax refund in 2009 of $166 million.  Additional transfers from BancGroup to Colonial Bank occurred over this period as a part of intercompany transfers that are not reflected in the above numbers because they are not reported as a part of public filings with the SEC.  However, because of BancGroup's lack of access to certain of its Seized Records, BancGroup has not been able to obtain all of the details of the date, timing and amount of all of those intercompany transfers.[14]

---

[14]  BancGroup is aware from interviews with the former chief financial officer of BancGroup and a review of certain Seized Records that intercompany accounts between BancGroup and Colonial Bank were settled on a periodic (and often monthly) basis.

### 2.      Transfer of REIT Preferred Securities

The second category of Avoidable Transfers is BancGroup's alleged transfer to Colonial Bank of certain preferred stock issued by CBG Florida REIT Corp. (the "REIT Preferred Securities") on or about August 10, 2009.[15] If the transfer did occur, BancGroup avers in the Complaint that the transfer was voidable in that it was made while BancGroup was insolvent (or thereby rendered insolvent) to a creditor (*i.e.*, Colonial Bank), the transfer was made on account of an antecedent obligation owed by BancGroup to Colonial Bank pursuant to an exchange agreement that required BancGroup to effectuate the transfer upon the happening of certain contingencies, and the effect of the transfer was to enable Colonial Bank to recover a greater percentage of its claim than it would have been entitled to receive if the transfer had not been made and a Chapter 7 bankruptcy case had been filed by BancGroup.

The FDIC-Receiver purported to sell the REIT Preferred Securities to BB&T as part of the receivership sale on August 14, 2009, and BB&T purports to own all of the REIT Preferred Securities.  If the transfer of the REIT Preferred Securities is found to be an Avoidable Transfer as alleged in the Complaint, then Section 550(a) of the Bankruptcy Code authorizes recovery of the securities themselves or their value from either the initial transferee or any subsequent transferee who did not take for value or took with knowledge of the voidability of the transfer.

### F.      Bank Regulatory Supervisory Action

Prior to its closing and receivership, Colonial Bank was the subject of two supervisory actions by bank regulators.

The first such action was the execution by Colonial Bank's board of directors of a memorandum of understanding with the Alabama Banking Department and the FDIC on or about December 15, 2008 (the "Bank MOU").  The Bank MOU represented an undertaking by Colonial Bank's board of directors "to move in good faith to comply with the requirements" of the Bank MOU and "eliminate the problems of the Bank"

---

[15]  There remains a question whether the REIT Preferred Securities were in fact transferred.  If they were not transferred in law and in fact, then BancGroup has reserved its alternative argument that it is the owner of those securities.

pursuant to a "program of corrective action" as described in the Bank MOU.  Pursuant to FDIC regulations, memoranda of understanding are informal, confidential and unenforceable documents.  FDIC, COMPLIANCE EXAMINATION MANUAL § II-8.1 (June 2009).[16]

The second supervisory action was the issuance of a stipulated cease and desist order on June 15, 2009, among the Alabama Banking Department, the FDIC and Colonial Bank (the "Bank C&D").  The Bank MOU was terminated, as confirmed in a letter dated June 5, 2009 to Colonial Bank from the FDIC, and the Bank C&D remained as the sole supervisory action in effect from and after the date of its issuance.[17]

## III.   ARGUMENT AND CITATION OF AUTHORITY

### A.   Elements of Avoidable Transfer Claims

#### 1.   Preference Claims

Section 547 of the Bankruptcy Code empowers a trustee (or debtor-in-possession) to "avoid any transfer of an interest of the debtor in property" if the transfer is:

(1)   to or for the benefit of a creditor;

(2)   for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3)   made while the debtor was insolvent;

(4)   made—

    (A)   on or within 90 days before the date of the filing of the petition; or

    (B)   between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

---

[16]  *See* http://www.fdic.gov/regulations/compliance/manual/index_pdf.html for a publicly available copy of the FDIC's Compliance Examination Manual.

[17]   The Bank C&D itself was terminated by the FDIC on September 29, 2009.  *See* http://www.fdic.gov/bank/individual/enforcement/2009-09-48.pdf for a publicly available copy of the letter terminating the Bank C&D.

(5)      that enables such creditor to receive more than such creditor would receive if—

    (A)      the case were a case under chapter 7 of this title;

    (B)      the transfer had not been made; and

    (C)      such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547.

The term "insolvent," when used in the context of an avoidable transfer, means that the sum of the debtor's debts is greater than all of its property, at a fair valuation.  11 U.S.C. § 101(32)(A).

BancGroup has clearly averred all of the required elements of a preference claim in the Complaint, with the requisite degree of specificity and based upon facts that are well known to the FDIC-Receiver and that are substantiated by the Seized Records under the FDIC-Receiver's control.

### 2.      Constructive Fraudulent Conveyance Claims

Section 548 of the Bankruptcy Code empowers a trustee (or debtor-in-possession) to avoid any transfer of "an interest of the debtor in property" that was made on or within two years before the date of the filing of the petition, if the debtor "voluntarily or involuntarily":

(1)      received less than "a reasonably equivalent value in exchange for such transfer"; and

(2)      one or more of the following financial condition tests applied to the debtor on the date of the transfer applies:

    (A)      the debtor was "insolvent" on the date that such transfer was made or became insolvent as a result of the transfer;

    (B)      was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was "an unreasonably small capital"; or

    (C)      intended to incur, or believed that the debtor would incur, "debts that would be beyond the debtor's ability to pay as such debts matured."

- 14 -

11 U.S.C. § 548.[18]

Significantly, a constructively fraudulent transfer is not avoidable solely upon a showing of insolvency, and both avoidance and recovery are allowable if either of the other two financial condition tests are met.

BancGroup has properly averred in the Complaint all of the requisite elements of an avoidable transfer under Section 548 and with a requisite degree of specificity for the FDIC-Receiver to understand all of the essential facts and elements of the Avoidable Transfers in question.[19]

### 3.    Recovery of Fraudulently Transferred Property or its Value

Section 550(a) of the Bankruptcy Code provides that, to the extent a transfer is avoided under Section 544, 547 or 548 of the Bankruptcy Code, the trustee (or debtor-in-possession) may recover for the estate the property transferred or, if so ordered by the court, the value of the property from the initial transferee of the transfer (or the entity for whose benefit such transfer was made) or any subsequent transferee who did not receive the transfer "for value," in good faith and without knowledge of the voidability of the transfer avoided.  11 U.S.C. § 550(a).

It is possible, therefore, for a transfer to the initial transferee to be avoided, but recovery of the transferred property or its value to be obtained from a subsequent transferee.  With respect to the REIT Preferred Securities, the FDIC-Receiver fails to appreciate the distinction between mere avoidance of a transfer (which, alone, does not implicate any monetary liability) and recovery of the transfer or its value (which does).

---

[18] Section 544(b)(1) of the Bankruptcy Code empowers a trustee (or debtor-in-possession) to avoid transfers that are avoidable under applicable non-bankruptcy law, including state fraudulent transfer laws.  Alabama has adopted the Uniform Fraudulent Transfer Act, under which the elements of a fraudulent transfer cause of action are substantially the same as the elements under Section 548.  Alabama Code § 8-9A.4 and A.5.

[19] BancGroup does not have any credible evidence at this juncture that any transfers were made by it to Colonial Bank prior to the Petition Date that were made with "intent to hinder, delay or defraud" any of its creditors and thereby be recoverable under the intentional fraud prong of either Section 548 or the Alabama fraudulent conveyance statute.

**B.      Section 1828(u) Does Not Bar Avoidance of Avoidable Transfers**

**1.      FDIC-Receiver's Challenge to Post-December 15, 2008 Transfers**

The FDIC-Receiver contends that partial judgment on the pleadings should be granted as to all Avoidable Transfers that occurred <u>after</u> December 15, 2008 by virtue of Section 1828(u) of Title 12. Although that section forecloses affirmative recovery from the FDIC-Receiver for claims in connection with certain avoidable transfers, the bar is considerably more limited than suggested by the FDIC-Receiver, both in its literal wording and its application to the facts of this case.

Section 1828(u) provides, in pertinent part, as follows:

(u)      Limitation on claims

(1)      In general

No person may bring a **claim** against any Federal banking agency (including in its capacity as conservator or receiver) for the **return of assets** of an affiliate or controlling shareholder of the insured depository institution transferred to, or for the benefit of, an insured depository institution by such affiliate or controlling shareholder of the insured depository institution, or a claim against such Federal banking agency **for monetary damages or other legal or equitable relief in connection with such transfer**, if at the time of the transfer—

(A)      the insured depository institution is subject to any **direction** issued in writing by a Federal banking agency to increase its capital…

12 U.S.C. § 1828(u) (emphasis added).

The term "claim" is defined to mean "a cause of action based on federal or state law that (i) provides for the avoidance of preferential or fraudulent transfers or conveyances; or (ii) provides similar remedies for preferential or fraudulent transfers or conveyances," but expressly excludes any claim based on actual intent to hinder, delay, or defraud pursuant to such a fraudulent transfer or conveyance law.  12 U.S.C. § 1828(u)(2).

Section 1828(u) provides narrow and measured protection to federal banking agencies from causes of action under state or federal transfer avoidance laws that seek as a remedy the "return of assets," the payment of "monetary damages" or other "legal or equitable relief," but only if the transfer is made at a time when the insured depository institution is subject to a written "directive" issued by a federal banking agency to increase

- 16 -

the capital of the insured depository institution. The section does not purport to eliminate the avoidability of the transfer itself or defensive use of an avoidable transfer (by way of setoff, recoupment or other defense to the transferee's claim). Furthermore, Section 1828(u) does not override the provisions of other federal law, including Sections 502(d) and 502(h) of the Bankruptcy Code that disallow recipients of avoidable transfers from asserting claims against a debtor's estate. To the extent that Section 1828(u) is found to be applicable at all to the facts and circumstances of this case, it would prevent BancGroup from obtaining an affirmative recovery in the receivership of Colonial Bank (and, as previously noted, it is a near certainty that no unsecured claimant in the receivership will receive anything on account of their claims); but BancGroup would not be precluded from using the Avoidable Transfers as a "shield" against the Bankruptcy Proof of Claim asserted by the FDIC-Receiver.

This interpretation of Section 1828(u) dovetails with the statutory distinction between "avoidance" and "recovery" under the Bankruptcy Code. The concept of "recovery" in avoidable transfer law is separate and distinct from avoidability. This distinction between an avoidance of a transfer and recovery of the property transferred should not be foreign to the FDIC-Receiver because it is embodied in Section 1821 of Title 12, a provision that sets forth the "powers and duties" of the FDIC as conservator or receiver. Section 1821(d)(17)(A) defines what the receiver may "avoid" as a "fraudulent transfer." 11 U.S.C. § 1821(d)(17)(A). Section 1821(d)(17)(B) then separately sets forth the FDIC's "right to recovery" to the extent a transfer is avoided. 11 U.S.C. § 1821(d)(17)(B). In each case, avoidance and recovery are separate and distinct concepts.

Congress has shown that it appreciates the distinction between avoidability and recovery and that it knows how to eliminate avoidability (and not just recovery) when it desires to do so. For example, Sections 546(e), (f), (g), (i) and (j) of the Bankruptcy Code each provides that a debtor is altogether prohibited from avoiding certain, specific transfers that would otherwise be avoidable under other sections of the Bankruptcy Code. Congress did not elect to adopt this approach in crafting the recovery protections in Section 1828(u). That section should not be read to eliminate avoidability of a transfer for all purposes, but only restrict monetary recoveries and other similar relief in the receivership case under the limited circumstances set forth

- 17 -

therein.  This reading is consistent with the House Conference Report for this provision, which confirms that

the purpose of Section 1828(u) is to protect the Deposit Insurance Fund from claims brought by a bankruptcy

trustee of a depository trustee holding company "for the return of capital infusions" and not for the avoidance

of transfers.  H.R. Rep. No. 106-434, at 183 (1999) (Conf. Rep.), *reprinted in* 1999 U.S.C.C.A.N. 245, 276.

In addition, related statutes addressing fraudulent conveyances recognize a distinction between avoiding a

transfer or obligation and barring claims based solely on transfers of assets.  *Compare* 12 U.S.C. §

1821(d)(17)(A) ("The Corporation... may avoid a transfer of any interest of an institution-affiliated party... or

any obligation incurred by such party or person...") *with* 12 U.S.C. § 1828(u) (only barring claims based on

transfers of assets).  *See* Wolkowitz v. FDIC (In re Imperial Credit Indus.), 527 F.3d 959 (9th Cir. 2008)

(appeals court rejected FDIC contention that § 1828(u) barred trustee from challenging a capital maintenance

commitment under § 365(o) of the Bankruptcy Code as a fraudulent obligation, noting the distinction between

fraudulent obligations and fraudulent transfers, with § 1828(u) addressing only the latter).[20]

        The importance of this distinction is highlighted in the context of the disputes between the FDIC-

Receiver and BancGroup and their objections to each other's claims in their respective insolvency

proceedings.  Section 502(d) of the Bankruptcy Code mandates the disallowance of any claim of any entity

"that is a transferee of a transfer that is avoidable" under Sections 544, 547 or 548 of the Bankruptcy Code

unless the transferee has paid the amount or turned over the property for which the transferee is liable under

Section 550 of the Bankruptcy Code.  11 U.S.C. § 502(d).  It is irrelevant that a debtor has, or even can, seek

recovery against the alleged transferee on the basis of the avoidable transfer.  For example, a majority of

courts have consistently held that Section 502(d) disallows claims against the bankruptcy estate even if a

statute of limitations would otherwise bar the debtor from seeking recovery of the fraudulent transfer.  *See*

United States Lines, Inc. v. United States (In re McLean Indus., Inc.), 196 B.R. 670, 675 (S.D.N.Y. 1996);  In

re Mid Atlantic Fund, Inc., 60 B.R. 604, 609-11 (Bankr. S.D.N.Y. 1986).  *See also* El Paso v. America West

_____

        [20] BancGroup is unaware of any decision, and the FDIC-Receiver has cited none in its Motion, that has addressed
the question whether Section 1828(u) bars avoidance in addition to recovery under the conditions set forth in that
section.

Airlines, Inc. (In re America West Airlines, Inc.), 217 F.3d 1161, 1165-66 (9th Cir.2000);   Committee of

Unsecured Creditors v. Commodity Credit Corp. (In re KF Dairies, Inc.), 143 B.R. 734 (9th Cir. BAP 1992)

(finding § 549(d)'s limitation period inapplicable to claim objection under § 502(d) of the Bankruptcy Code);

In re Badger Lines, 199 B.R. 934, 939-40 (Bankr. E.D. Wis. 1996), *rev'd on other grounds*, 202 F.3d 945 (7th

Cir. 2000);   In re Stoecker, 143 B.R. 118 (Bankr. N.D. Ill.), *aff'd in part and rev'd in part and remanded*, *on

other grounds*, 143 B.R. 879 (N.D. Ill. 1992), *aff'd in part and vacated in part and remanded*, 5 F.3d 1022

(7th Cir. 1993). *But see* In re Marketing Assocs. of Am., Inc., 122 B.R. 367, 369-71 (Bankr. E.D. Mo. 1991)

(stating minority position that § 546(a) applies to claim objection under § 502(d) of the Bankruptcy Code

based on an alleged preference).

      It is important to note that an avoidable transfer may serve as a basis for affirmative recovery against

both the initial transferee and a subsequent transferee from the initial transferee.  To the extent that affirmative

recovery is not directed against the FDIC-Receiver as an initial transferee, but rather against a subsequent

transferee as is the case with respect to the REIT Preferred Securities, Section 1828(u) has no applicability.[21]

Thus, where there have been a number of parties that have received or benefited from the avoidable transfer,

the debtor may elect to recover either the property transferred or damages equal to the value thereof from any

one of the entities.  *See* In re Int'l Admin. Servs., Inc., 408 F.3d 689, 706 (11th Cir. 2005) ("once the plaintiff

proves that an avoidable transfer exists he can then skip over the initial transferee and recover from those next

in line," because "[n]othing in the language of Section 550 requires a plaintiff in . . . [an] adversary

proceeding to avoid the transfer received by the initial transferee before continuing with avoidance actions

down the line of transfers.") (internal citations and quotations omitted).

      As previously observed, there is no hope of any recovery from the receivership proceeding of

Colonial Bank.  BancGroup seeks to use the Avoidable Transfers as a shield against the substantial claims

asserted against BancGroup in the Bankruptcy Proof of Claim.  Section 1828(u) should not be construed to

---

[21] Section 550 of the Bankruptcy Code allows a debtor to seek recovery based on an avoidable transfer against the
initial transferee, the entity for whose benefit such transfer was made and "any immediate or mediate transferee."

allow the FDIC-Receiver to escape avoidance of clearly Avoidable Transfers and at the same time assert claims against BancGroup's estate free of the restrictions and limitations of Sections 502(d) and 502(h) of the Bankruptcy Code.  There is no manifestation of Congressional intent in either FIRREA or the Bankruptcy Code to achieve that result, which otherwise would be unfairly prejudicial to unsecured claimants in BancGroup's Chapter 11 case.

In the final analysis, Section 1828(u) is a limited defense that the FDIC-Receiver may assert to thwart affirmative recovery by BancGroup from the FDIC-Receiver if such recovery is based on an avoidable transfer that falls within the subject matter proscription in the statute.  If the avoidable transfer is subject to the proscription, then, by logic, it is not an affirmative claim to be adjudicated in this FIRREA action and is a justiciable issue between the FDIC-Receiver and BancGroup only as a part of BancGroup's pending objection to the FDIC-Receiver's Bankruptcy Proof of Claim.  If the avoidable transaction is not within the proscription and affirmative recovery is possible (even if it will never be paid), then it should be adjudicated as a part of this FIRREA Complaint.  The question remains as to whether the FDIC-Receiver has established this defense as to any of the Avoidable Transfers that occurred after December 15, 2008.

### 2. Section 1828(u) is Applicable Only to Transfers After June 15, 2009

The FDIC-Receiver argues that Section 1828(u) bars all claims for Avoidable Transfers that occurred on or after December 15, 2008.  The basis for this contention is that the Bank MOU was dated December 15, 2008 and, in the view of the FDIC-Receiver, constitutes a written "directive" within the meaning of Section 1828(u).

Neither the language of Section 1828(u) nor its legislative history provides any insight into what constitutes a "directive" from a federal banking agency for an insured depository institution to increase its capital.  The term "directive" is not defined in the statute and the legislative history uses the term without explanation.  As there appears to be no decisional law on point, the issue before this Court is one of first impression.

The Bank MOU does not qualify as a "directive" entitled to application and enforcement under Section 1828(u) given the nature of the document.  A memorandum of understanding is a form of "informal

action" and, as stated in the FDIC's Compliance Examination Manual, is neither publicly disclosed nor legally enforceable.  FDIC, COMPLIANCE EXAMINATION MANUAL § II-8.1 (June 2009).  Such memoranda are entered into by the board of directors of a financial institution with the FDIC and are to be distinguished from "formal enforcement actions," which are taken by the FDIC pursuant to Section 8 of the Federal Deposit Insurance Act and are enforceable.  Id.  In the area of capital maintenance or enhancement, a "directive" is defined as "a final order issued to a bank that fails to maintain capital at or above the minimum leverage capital requirement" as set forth in Sections 325.3 and 325.4 of the Code of Federal Regulations.  12 C.F.R. § 325.6(a).  To be a "directive," the action must be equivalent in formality and enforceability to a cease and desist order under 12 U.S.C. § 1818(b).  Id. ("A directive issued pursuant to this section… is enforceable in the same manner and to the same extent as a final cease-and-desist order issued under 12 U.S.C. 1818(b)).  The Bank MOU, as previously observed, purports to be nothing more than an agreement by Colonial Bank's directors to "move in good faith" to cause Colonial Bank to comply with the corrective program set forth in the Bank MOU.  Therefore, by its regulatory design and wording, the Bank MOU does not rise to the level of a "directive" of any type, much less one to increase an insured depository institution's capital within the meaning of Section 1828(u).

BancGroup concedes that the Bank C&D constitutes a "directive" within the meaning of Section 1828(u).  BancGroup is prepared to stipulate that it may not obtain an affirmative recovery from the FDIC-Receiver based on the Avoidable Transfers that occurred from June 15, 2009 through August 25, 2009, but BancGroup reserves the right to utilize such Avoidable Transfers as a defense to or offset against claims asserted in the Bankruptcy Proof of Claim of the FDIC-Receiver and to recover the subject matter of those Avoidable Transfers (or their value) under Section 550 of the Bankruptcy Code from any immediate transferee from Colonial Bank (or from the FDIC-Receiver as its successor).

## C.    Avoidance of REIT Preferred Transfer Not Barred by § 1828(u)

The FDIC-Receiver separately argues that any claim for avoidance of the transfer of the REIT Preferred Securities in August of 2009 should be dismissed on the ground that "BancGroup agreed years in advance that it would be a mere conduit for such a transfer."  Motion at 18 of 35.  Of course, there is nothing

in the documentation related to the exchange of preferred securities issued by BancGroup for the REIT Preferred Securities that states that BancGroup is to serve as a mere conduit to receive and pass on the REIT Preferred Securities to Colonial Bank.  To be sure, BancGroup undertook a contractual obligation to effectuate both the issuance of its own preferred stock to the former holders of the REIT Preferred Securities and to downstream the REIT Preferred Securities to Colonial Bank.  However, that contractual obligation does not mean that BancGroup had no interest in the REIT Preferred Securities when they were transferred to it as the *quid pro quo* for the issuance of its preferred stock, and, indeed, the mutual exchange of newly issued preferred stock for the REIT Preferred Securities reinforces the argument that BancGroup did acquire such an interest.

The conduit argument of the FDIC-Receiver is based on a judicially created defense to an otherwise meritorious fraudulent transfer claim, as reflected by the cases cited in the Motion.  Nordberg v. Societe Generale (In re Chase & Sanborn Corp.), 848 F.2d 1196 (11th Cir. 1988) (involving fraudulent transfer claim against *non-creditor* bank that received funds and forwarded them to a third-party);  Nordberg v. Sanchez (In re Chase & Sanborn Corp.), 813 F.2d 1177 (11th Cir. 1987) (involving fraudulent transfer claim when third party *non-creditor* transferred funds to debtor with instructions to the debtor to further transfer them to a *non-creditor of debtor* to pay third party's obligation);  3V Capital Master Fund Ltd. v. Official Comm. of Unsecured Creditors of Tousa, Inc. (In re Tousa, Inc.), 2011 U.S. Dist. LEXIS 14019 (S.D. Fla. Feb. 11, 2011) (fraudulent transfer claim where a lender to parent company of debtor sent money to another lender of the parent company ( *which was a non-creditor of the debtor*) to pay of parent company debt and debtor subsidiary never received the funds or had an interest therein).  However, the conduit theory and the fraudulent transfer cases cited by the FDIC-Receiver are inapposite to the avoidance of a "preferential transfer" of the type implicated with respect to the transfer of the REIT Preferred Securities.

As the FDIC-Receiver contends, the transfer of the REIT Preferred Securities was in satisfaction of an antecedent obligation owed by BancGroup to Colonial Bank.  The FDIC-Receiver does not dispute that there was a "transfer" by BancGroup of the REIT Preferred Securities or that that transfer was made at a time when BancGroup was clearly insolvent.  A presumption exists in such a situation that a debtor does indeed have a

property interest in property that it transfers to satisfy its own obligation. Nordberg v. Sanchez (In re Chase & Sanborn Corp.), 813 F.2d 1177, 1181-1182 (11th Cir. 1987) (noting the difference in presumptions as to property interest between preferential transfers by a debtor to an actual creditor and fraudulent transfers by a debtor to a non-creditor). This presumption as to the debtor having a property interest in the property transferred is particularly appropriate in the present circumstance where BancGroup actually issued its own preferred stock to the former holders of the REIT Preferred Securities in the first instance to obtain in exchange for the REIT Preferred Securities and, after this exchange occurred, effected the transfer to Colonial Bank in satisfaction of its contractual obligation.[22]

The FDIC-Receiver contends that BancGroup never had "control" over the property, and therefore no interest in the property, because BancGroup had no ability to assert dominion and make decisions with respect to the REIT Preferred Securities other than to see to it that they were transferred to Colonial Bank. There is no evidence to that effect and the FDIC-Receiver cites to none. To the contrary, if prior to taking the necessary steps to effectuate the transfer of the REIT Preferred Securities that were received by BancGroup in exchange for its own, newly issued preferred stock, a bankruptcy filing by BancGroup had intervened, there can be little doubt that the REIT Preferred Securities would have constituted property of BancGroup's bankruptcy estate under Section 541 of the Bankruptcy Code.

It bears emphasis that BancGroup does not seek an affirmative recovery from the FDIC-Receiver based on the preferential transfer of the REIT Preferred Securities because that transfer occurred after the entry of the Bank C&D and Section 1828(u) admittedly bars a monetary recovery from the receivership estate. While barred from any affirmative recovery from the receivership estate with respect to the Avoidable Transfer of the REIT Preferred Securities, BancGroup is not barred from the avoidance in the first instance and recovery of the REIT Preferred Securities (or their value) under Section 550 of the Bankruptcy Code from

_____

[22]   The contractual obligation of BancGroup to Colonial Bank, if breached, would give rise to a claim against BancGroup. Prior to that breach, Colonial Bank would hold a contingent claim against BancGroup. Contingent claims are nevertheless "claims" under Section 101(5) of the Bankruptcy Code. Pursuant to Section 101(12) of the Bankruptcy Code, a "debt" is nothing more than a "liability on a claim." Accordingly, the transfer by BancGroup was in satisfaction of a contingent claim, and therefore a "debt" within the meaning of Section 547(b) of the Bankruptcy Code.

immediate or mediate transferees from Colonial Bank (or from the FDIC-Receiver as its successor) or from using the Avoidable Transfer as a defense to or offset against the Bankruptcy Proof of Claim of the FDIC-Receiver.

### D.   Insolvency Allegations Are Adequate

The FDIC-Receiver also seeks partial judgment on the pleadings with respect to all Avoidable Transfers that are alleged to have occurred <u>before</u> December 15, 2008, because the FDIC-Receiver maintains that the allegations of insolvency are insufficient under the pleading standards enunciated in the Supreme Court's <u>Twombly</u> and <u>Iqbal</u> decisions.

As support for its position, the FDIC-Receiver relies upon <u>Branch v. FDIC</u>, 825 F. Supp 384 (D. Mass. 1993), in which the court ruled against the FDIC in its efforts to dismiss fraudulent transfer claims of a bank holding company against the FDIC.  While the district court in <u>Branch</u> acknowledged the general rule that "transfers to a solvent subsidiary are considered to be for reasonably equivalent value," that rule is presumptive only and may be rebutted by evidence to the contrary.  825 F. Supp at 399-400.  In all events, the fact that a transfer is made by a parent to its subsidiary is not *per se* a transfer for reasonably equivalent value. Indeed, there is ample authority for the proposition that a downstreaming of funds from a parent to a subsidiary may constitute a fraudulent transfer when the subsidiary is insolvent and the parent is therefore deemed not to have received any benefit from the transfer.  *See*, *e.g.*, <u>In re Alberto Duque Rodriguez</u>, 895 F.2d 725 (11th Cir. 1990) (in which payments made by a corporate parent on behalf of an insolvent wholly-owned subsidiary within one year of the parent's bankruptcy were held to be voidable transfers because had the subsidiary been solvent the parent would have realized a dollar for dollar benefit via the improvement in the subsidiary's net worth; but since the subsidiary was insolvent even after the parent's payments, the payments merely reduced the losses of the subsidiary's creditors, without creating a positive value in the parent's investment in the subsidiary).  *See also* <u>In re Marquis Prod., Inc.</u>, 150 B.R. 487 (Bankr. D. Me. 1993).

An allegation of insolvency of an entity is not the type of allegation that is susceptible to factual elaboration at the pleading stage.  It is neither typical nor reasonable to expect a litigant to include in averments regarding insolvency with the level of detail that is required to carry the burden of proof at trial,

often through a battle of expert witnesses.  In establishing insolvency, financial experts often employ a method of analysis known as "retrogression," by which the expert starts with the balance sheet of a company at a point in time (such as the Petition Date in this case) when insolvency is admitted and works backwards to reconstruct the probable financial condition of BancGroup on the basis of provable historical facts.  In this case, those historical facts would include Colonial Bank's unquestioned insolvency as of the date of the receivership in an amount the FDIC-Receiver admits is in excess of $4 billion dollars; the substantial impact on the 2007 and 2008 consolidated financial statements of BancGroup after factoring in the then unknown (but now more clearly understood) level of conspiratorial fraud perpetrated upon BancGroup by employees of TBW and Colonial Bank (details of which are just now coming fully to light with the guilty pleas entered by TBW and Colonial Bank employees and the pending criminal trial involving Lee B. Farkas); and the operating losses suffered by Colonial Bank in its real estate lending business, in part as a result of the real estate market collapse in 2007 and 2008.  Clearly, a litigant is not obligated to provide in a notice pleading details of insolvency concerning which the FDIC-Receiver is intimately familiar and based upon records that have been seized by the FDIC-Receiver and withheld from BancGroup when it had pressing deadlines under FIRREA to file the Receivership Proof of Claim and thereafter the Complaint.

The objective of Twombly and Iqbal is to determine if the asserted cause of action is "plausible."  BancGroup submits that under these circumstances, BancGroup's allegations regarding its insolvency and the avoidability of the Avoidable Transfers is more than plausible.  Whether a shortfall in excess of $4 billion as of the receivership of Colonial Bank arose solely in the waning months of the existence of Colonial Bank (as the FDIC-Receiver suggests) or dates as far back as August 24, 2007, is an issue for the trier of fact to determine and should not be foreclosed by motion practice through the use of a strained application of Twombly and Iqbal.

### E.   FDIC-Receiver Should be Estopped by its Conduct to Contest Alleged Inadequate Detail in Complaint

The FDIC-Receiver challenges the adequacy under Twombly and Iqbal of the detail provided in the Complaint for certain of the Avoidable Transfers.  The FDIC-Receiver posits that, for the Avoidable Transfer

averments to pass the <u>Twombly</u> and <u>Iqbal</u> test, BancGroup is obliged to set forth in detail the date, amount, method of transfer and purpose of each of the Avoidable Transfers alleged.[23]

Having assumed control of and denied BancGroup access to a substantial part of the Seized Records during the period that BancGroup was under statutory deadlines to file claims in the receivership estate (or forever be barred from asserting those claims in the receivership estate), the FDIC-Receiver should not be heard to complain about the alleged inadequacy of the detail that BancGroup was able to provide in the Complaint with respect to certain of the Avoidable Transfers. In particular, the Court should know that BancGroup has still not received from either the FDIC-Receiver or BB&T electronic records containing historical financial information regarding BancGroup and Colonial Bank (including intercompany transactions between them) that, if made available, would allow BancGroup to provide the level of detail in pleadings as insisted upon by the FDIC-Receiver. The irony here should not be overlooked -- it is the FDIC-Receiver that is in possession and control of the information that it now insists BancGroup should provide. An additional irony is that the FDIC-Receiver has repeatedly asserted, when confronted with filing deadlines of its own in BancGroup's Chapter 11 case, that it reserves the right to amend its pleadings as its investigation of facts continue -- reserving such rights even though the FDIC-Receiver has control of and access to the Seized Records. *See* <u>Addendum to Proof of Claim, The Federal Deposit Insurance Corporation, as Receiver for Colonial Bank, Montgomery, Alabama</u>, 2:10-cv-00409-MHT (M.D. Ala.), Doc. No. 2-3, at 8 of 106, ¶¶ 22-23 ("*Although its investigation only recently has commenced*, the FDIC-Receiver may avoid and recover

---

[23] As support for this proposition, the FDIC-Receiver cites to <u>Valley Media, Inc. v. Borders, Inc. (In re Valley Media, Inc.)</u>, 288 B.R. 189 (Bankr. D. Del. 2003), while acknowledging that other courts have applied a more lenient pleading standard, citing <u>Angell v. Ber Care, Inc. (In re Caremerica, Inc.)</u>, 409 B.R. 737 (Bankr. E.D.N.C. 2009). What the FDIC-Receiver fails to point out is that a number of courts, including those in the District of Delaware, have disagreed with the <u>Valley Media</u> case and its progeny. *See*, *e.g.*, <u>In re The IT Group, Inc.</u>, 313 B.R. 370, 373 (Bankr. D. Del. 2004) ("While plaintiffs should be encouraged to provide specific information in support of their claims whenever possible, to require them to do so in their initial pleading in all cases, particularly with the specificity demanded by <u>Valley Media</u>, is in this court's view inappropriate and unnecessarily harsh."); <u>Butler v. Anderson (In re C.R. Stone Concrete Contractors, Inc.)</u>, 434 B.R. 208, 220-21 (Bankr. D. Mass 2010) (agreeing with the <u>IT Group</u> case and decling to apply <u>Valley Media's</u> heightened pleading standard despite lack of specificity in trustee's preference complaint); <u>Gold v. Nova Industries (In re NM Holdings Company, LLC)</u>, 376 B.R. 194, 202-204 (Bankr. E.D. Mich. 2007). *See also* <u>Limor v. Buerger (In re Del-Met Corp.)</u>, 33 B.R. 781 (Bankr. M.D. Tenn. 2005); <u>Ice Cream Liquidation, Inc. v. Calip Dairies, Inc. (In re Ice Cream Liquidation, Inc.)</u>, 319 B.R. 324 (Bankr. D. Conn. 2005).

fraudulent transfers within five years before the receivership… and in some instances longer periods under state law. *The FDIC-Receiver reserves all rights to recover property transferred, or the value of such property…* Similarly, to the extent the FDIC-Receiver's claims relate to unlawful dividends paid, or other unlawful distributions made by Colonial Bank, *the FDIC-Receiver reserves the right to recover such amounts* as provided for under applicable state laws.") (emphasis added).

Nevertheless, BancGroup has provided considerable detail in the Complaint regarding known intercompany transfers that have occurred, including those listed on Exhibit B to the Complaint (as further described herein), the transfer of the REIT Preferred Securities, and the transfer of approximately $166 million that BancGroup received as a refund from federal taxing authorities. These specifically identified transfers make up the bulk of the alleged Avoidable Transfers known to BancGroup. Under the circumstances, the allegations in the Complaint are more than adequate under Twombly and Iqbal and fairly put the FDIC-Receiver on notice of "plausible claims."

BancGroup also submits that the Motion should be denied based on the relative unlevel playing field between the parties with respect to access to critical information. In ruling upon challenges to the adequacy of pleadings, courts have taken into consideration "fairness factors," such as an understandable lack of access to information. *See, e.g.,* In re Randall's Island Family Golf Ctrs., Inc., 290 B.R. 55 (Bankr. S.D.N.Y. 2003) (applying lesser pleading standard to a bankrupt debtor's complaint in part because entities in bankruptcy often inherit incomplete or inaccurate books and records and may not have full cooperation from pre-petition parties); In re Chari, 276 B. R. 206 (Bankr. S.D. Ohio 2002) (stating that the court "understands" trustee's decision to include general averments in an avoidance action complaint because of trustee's "limited ability to access information at the pleading stage" and court would not require the trustee to "include in [his] pleadings information only available from the defendants through discovery.") (internal citations omitted).

## IV.    <u>CONCLUSION</u>

For all of the reasons set forth in this brief, BancGroup respectfully requests that the Motion be denied.  Alternatively, if the Court is favorably disposed to grant the relief requested in the Motion, BancGroup respectfully requests leave to amend the Complaint to provide the additional detail claimed to be required by the FDIC-Receiver, subject to the FDIC-Receiver making available to BancGroup access to the financial records of BancGroup and Colonial Bank, including access to electronic records that contain such information.

Dated:  April 8, 2011                                  _/s/ Rufus T. Dorsey, IV_____
                                                                 One of the Attorneys for The Colonial BancGroup, Inc.


                                                                 C. Edward Dobbs, Esq.
                                                                 Rufus T. Dorsey, IV, Esq.
                                                                 PARKER, HUDSON, RAINER & DOBBS LLP
                                                                 1500 Marquis Two Tower
                                                                 285 Peachtree Center Avenue NE
                                                                 Atlanta, Georgia 30303
                                                                 (404) 523-5300
                                                                 (404) 522-8409
                                                                 edobbs@phrd.com
                                                                 rdorsey@phrd.com

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that a true and correct copy of the foregoing document was electronically served on April 8, 2011, by transmission of Notices of Electronic Filing generated by CM/ECF to persons registered as of issuance of filing as set forth below:

C. Edward Dobbs (ced@phrd.com)

Jeremy R. Johnson (jeremy.johnson@dlapiper.com)

John J. Clarke, Jr. (john.clarke@dlapiper.com)

J. Dorman Walker, Jr. (dwalker@balch.com)

Michael A. Fritz, Sr. (bankruptcy@fritzandhughes.com)

Michael D. Hynes (michael.hynes@dlapiper.com)

Spencer D. Stiefel (spencer.stiefel@dlapiper.com)

Thomas R. Califano (thomas.califano@dlapiper.com)

W. Clark Watson (cwatson@balch.com)

Dated:  April 8, 2011

*/s/ Rufus T. Dorsey, IV*
One of the Attorneys for The Colonial BancGroup, Inc.

C. Edward Dobbs, Esq.
Rufus T. Dorsey, IV, Esq.
PARKER, HUDSON, RAINER & DOBBS LLP
1500 Marquis Two Tower
285 Peachtree Center Avenue NE
Atlanta, Georgia 30303
(404) 523-5300
(404) 522-8409
edobbs@phrd.com
rdorsey@phrd.com