# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| **THE COLONIAL BANCGROUP, INC.,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 2:10-cv-0198 (MHT)** |
| **FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Colonial Bank,** | |
| **Defendant.** | |

## MEMORANDUM OF LAW IN SUPPORT OF FDIC-RECEIVER'S MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS

Michael A. Fritz, Sr.
michael@fritzandhughes.com
Fritz, Hughes & Hill LLC
1784 Taliaferro Trail, Suite A
Montgomery, Alabama  36117
(334) 215-4422

John J. Clarke, Jr.
Thomas R. Califano
Michael D. Hynes
Spencer Stiefel
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York  10020-1104
(212) 335-4500

Attorneys for the
 Federal Deposit Insurance Corporation,
 as Receiver for Colonial Bank

Dated:  August 15, 2011

## Table of Contents

Page

TABLE OF AUTHORITIES ................................................................ V

PRELIMINARY STATEMENT ........................................................... 1

BACKGROUND ............................................................................. 4

    A.    The Parties and this Action .................................................. 4

    B.    The Claims Asserted in the Amended Complaint.................................. 5

        1.    Claims to Ownership of Tax Refunds and Insurance Proceeds................ 5

        2.    Claims Relating to REIT Preferred Securities ......................... 6

        3.    Other Claims for Allegedly Avoidable Transfers...................... 7

        4.    Other Miscellaneous Claims ........................................ 9

    C.    Procedural Background....................................................... 10

        1.    Proceedings in this Action ....................................... 10

        2.    The 0409 Proceeding ............................................. 11

        3.    Tax Returns and Tax Escrow Account ................................ 12

STATEMENT OF UNDISPUTED FACTS ................................................. 13

APPLICABLE LEGAL STANDARD ..................................................... 13

ARGUMENT --  SUMMARY JUDGMENT SHOULD BE ENTERED IN FAVOR OF THE FDIC-RECEIVER ON ALL CLAIMS

I.    THE FDIC-RECEIVER IS ENTITLED TO JUDGMENT IN ITS FAVOR  ON ALL OF BANCGROUP'S TAX-RELATED CLAIMS............................................. 15

    A.    BancGroup Does Not Have Any Property Interest in Federal Income Tax Refunds Arising From Its Role as Agent for the Affiliated Group .................... 15

        1.    The "Taxpayer" on a Consolidated Federal Income Tax Return Acts as Agent and Fiduciary in Receiving Refunds for Group Members ........................................................ 17

        2.    The *Bob Richards* Rule Has Special Importance for Banks and Holding Companies, Including BancGroup and Colonial Bank............. 20

Page

3.   BancGroup Acted as the Agent for Colonial Bank in Paying Taxes and Receiving Tax Refunds .................................................................. 23

   a.   Colonial Bank Funded the Entire Tax Liability Paid By the Group for Every Relevant Year ...................................... 23

   b.   Colonial Bank Sustained 2009 Operating Losses Sufficient to Claim All of the Available Federal Refunds ........................... 26

   c.   Colonial Bank Paid BancGroup Every Quarter for the Use of BancGroup's Losses ........................................ 27

   d.   BancGroup and Colonial Bank Treated Federal Income Tax Refunds as Assets of the Bank .......................... 29

      i.    Amended Returns for 2004 and 2005 ............................ 29

      ii.   Tax Overpayments for 2008 ............................................ 30

      iii.  NOL Carryback Refunds Based on 2008 Losses............. 30

   e.   Anticipated 2009 Carryback Refunds Were Recorded as Assets of Colonial Bank........................................ 32

4.   The Internal Tax Allocation Policy Is Not a "Differing Agreement" That Would Alter the *Bob Richards* Rule .................................. 33

5.   12 U.S.C. § 1823(e) Prohibits BancGroup's Argument Based on the Unsigned Tax Allocation Policy ...................................... 39

6.   BancGroup's Contract Argument Is Not Available as a Matter of Applicable Bankruptcy Law .................................. 41

B.   BancGroup's Other Tax-Related Claims Are Not Supported by the Evidence ...................................................... 42

II.   THE FDIC-RECEIVER IS THE OWNER OF INSURANCE PROCEEDS FOR FIDELITY BOND CLAIMS ................................................. 43

A.   Colonial Bank Purchased the Fidelity Insurance and Was the Insured Entity That Suffered "Loss"................................ 44

B.   BancGroup's Role as Agent Does Not Give Rise to Property Rights in the Fidelity Insurance Proceeds ...................................... 47

1.   BancGroup's Role as "Sole Agent" Under the Policies ......................... 48

Page

      2.    The Joint Assured Provision Does Not Create Property Rights in the Fidelity Bond Proceeds for the BancGroup Bankruptcy Estate ......... 50

      3.    The Subrogation Clauses in the Bonds Would Be Meaningless if Payment Were Not Made to the FDIC-Receiver, as Colonial Bank's Successor ..................................................................................... 52

III.    BANCGROUP'S CLAIMS TO THE REIT PREFERRED SECURITIES ARE WITHOUT BASIS IN FACT OR LAW ............................................... 53

    A.    The Undisputed Evidence Establishes that the REIT Preferred Securities Were Contributed to Colonial Bank on August 11, 2009 ................... 54

      1.    BancGroup Irrevocably Committed to Contribute the Securities to Colonial Bank if an Exchange Event Occurred ...................................... 54

      2.    BancGroup Contributed the Securities to Colonial Bank When an Exchange Event Was Declared ................................................................ 57

    B.    BancGroup's Avoidance Claims Regarding Its Contribution of REIT Preferred Securities to Colonial Bank Are Not Actionable ...................... 59

IV.    JUDGMENT SHOULD BE ENTERED FOR THE FDIC-RECEIVER ON BANCGROUP'S OTHER AVOIDANCE CLAIMS ...................................... 61

    A.    Section 1828(u) Bars Avoidance Claims for Any Transfers Made  On or After December 15, 2008 ................................................................... 62

    B.    The Undisputed Facts Demonstrate that Colonial Bank Was Solvent at All Times Prior to December 15, 2008 .............................................. 64

    C.    BancGroup's Claim With Respect to the 2007 Citrus & Chemical Transaction Fails for Additional Reasons ........................................................... 68

Page

V.   NONE OF BANCGROUP'S OTHER MISCELLANEOUS CLAIMS
PRESENTS AN ISSUE FOR TRIAL..................................................................70

A.   BancGroup Cannot Establish Its Claim for an Intercompany Receivable
Allegedly Owing from Colonial Bank................................................70

B.   Deposit Claims..............................................................................71

C.   Placeholder Claims .......................................................................73

D.   Interest.........................................................................................75

E.   Payment on Equity Interest in Colonial Bank....................................76

CONCLUSION.....................................................................................................77

# Table of Authorities

Page

## Cases

*3V Capital Master Fund Ltd. v. Official Committee of Unsecured Creditors (In re TOUSA, Inc.)*, 444 B.R.613 (S.D. Fla. 2011) ...................................................................61, 65

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).........................................................................................13, 14, 71

*Benchmark Med. Holdings, Inc. v. Rehab Solutions, LLC*,
307 F. Supp. 2d 1249 (M.D. Ala. 2004) .......................................................................49

*Bd. of Water & Sewer Comm'rs of City of Mobile v. Bill Harbert Constr. Co.*,
870 So. 2d 699 (Ala. 2003)............................................................................................37

*Bonner v. City of Prichard*,
661 F.2d 1206 (11th Cir. 1981) (*en banc*) ...................................................................51

*Branch v. F.D.I.C.*,
825 F. Supp. 384 (D. Mass. 1993) ..........................................................................65, 66

*Brandt v. Fleet Capital Corp. (In re TMCI Elecs.)*,
279 B.R. 552 (Bankr. N.D. Cal. 1999) .........................................................................18

*BSD Bancorp, Inc. v. F.D.I.C. (In re BSD Bancorp, Inc.)*,
No. 94-1341-IEG, slip op. (S.D. Cal. Feb. 28, 1995) ...........................................18, 33, 34, 38

*Capital Bancshares, Inc. v. F.D.I.C.*,
957 F.2d 203 (5th Cir. 1992) ............................................................................18, 19, 26

*CareerCom Corp. v. United States Dep't of Educ. (In re CareerCom Corp.)*,
215 B.R. 674 (Bankr. M.D. Pa. 1997) ..........................................................................65

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)........................................................................................13, 14, 43

*CIT Group/Equip. Fin., Inc. v. Roberts*,
885 So.2d 185 (Ala. Civ. App. 2003) ...........................................................................49

*Citizens Bank of Md. v. Strumpf*,
516 U.S. 16 (1995).........................................................................................................72

*Clay v. Cummins*,
77 So. 328 (Ala. 1917)............................................................................................18, 49

Page

*Cohen v. Un-Ltd. Holdings, Inc. (In re Nelco, Ltd.),*
 264 B.R. 790 (Bankr. E.D. Va. 1999) ..............................................................18, 19, 26, 33, 34

*Commercial Nat'l Bank v. Armstrong,*
 148 U.S. 50 (1893) .........................................................................................................50

*F.D.I.C. v. Brandt (In re Florida Park Banks, Inc.),*
 110 B.R. 986 (Bankr. M.D. Fla. 1990) ...........................................................................19, 33

*Fid. & Dep. Co. of Md. v. Jefferson County Commission,*
 756 F. Supp. 2d 1329 (N.D. Ala. 2010) ...........................................................................37

*First Union Nat'l Bank of Fla. v. Hall,*
 123 F.3d 1374 (11th Cir. 1997) ......................................................................................40

*Garrett v. Falkner (In re Royal Crown Bottlers of N. Alabama, Inc.),*
 23 B.R. 28 (Bankr. N.D. Ala. 1982) ...............................................................................65

*Gen. Elec. Cred. Corp. v. Murphy (In re Duque Rodriguez),*
 895 F.2d 725 (11th Cir. 1990) ......................................................................................65

*Golden Pac. Bancorp v. F.D.I.C.,*
 375 F.3d 196 ..............................................................................................................75

*Hall v. Perry (In re Cochise College Park, Inc.),*
 703 F.2d 1339 (9th Cir. 1983) ......................................................................................42

*Hammonds v. Hyundai Motor Mfg. Ala., LLC,*
 No. 2:10–cv–103-TFM, 2011 WL 2580168 (M.D. Ala. June 28, 2011)...............................14

*In re Adelphia Communications Corp.,*
 298 B.R. 49 (S.D.N.Y. 2003)..........................................................................................50

*In re Allied Digital Techs. Corp.,*
 306 B.R. 505 (Bankr. D. Del. 2004) ...............................................................................50

*In re Augie/Restivo Baking Co.,*
 87 B.R. 242 (Bankr. E.D.N.Y. 1988)...............................................................................65

*In re Auto Dealer Servs., Inc.,*
 96 B.R. 360 (Bankr. M.D. Fla. 1989) ..............................................................................42

*In re CHS Elecs., Inc.,*
 261 B.R. 538 (Bankr. S.D. Fla. 2001) .............................................................................50

Page

*In re Medex Reg'l Laboratories, LLC,*
   314 B.R. 716 (Bankr. E.D. Tenn. 2004) ....................................................................50

*In re Newlin,*
   370 B.R. 870 (M.D. Ga. 2007) .................................................................................42

*In re Sun Runner Marine, Inc.,*
   945 F.2d 1089 (9th Cir. 1991). ..............................................................................42

*Indep. BankGroup, Inc. v. F.D.I.C. (In re Indep. BankGroup, Inc.),*
   217 B.R. 442 (Bankr. D. Vt. 1998)..........................................................18, 19, 39, 40

*Johnson v. Bd. of Regents of Univ. of Ga.,*
   263 F.3d 1234 (11th Cir. 2001) ................................................................................13

*Jump v. Manchester Life & Cas. Mgmt. Corp.,*
   579 F.2d 449 (8th Cir. 1978) ..................................................................17, 18, 19

*King v. Porter,*
   230 Ala. 112, 160 So. 101 (1935)............................................................................72

*Lawrence Paperboard Corp. v. Arlington Tr. Co. (In re Lawrence Paperboard Corp),*
   76 B.R. 866 (Bankr. D. Mass. 1987) ......................................................................65

*Louisiana World Expo., Inc. v. Contractors Creditors Comm. (In re Louisiana World*
   *Expo., Inc.),*832 F.2d 1391 (5th Cir. 1987)............................................................50

*Lowe v. Am. Med. Int'l,*
   494 So.2d 413 (Ala. 1986)......................................................................................52

*Lubin v. F.D.I.C.,*
   No. 1:10-cv-00874-RWS, 2011 WL 825751 (N.D. Ga. Mar. 2, 2011) ................33, 34, 38, 41

*Lubin v. Skow (In re Integrity Bancshares, Inc.),*
   382 F. App'x 866 (11th Cir.), *rehearing denied*, 408 F. App'x 345 (11th Cir. 2010) ...........44

*Lumbermen's Mut. Cas. Co. v. Norris Grain Co.,*
   343 F.2d 670 (8th Cir. 1965) ..................................................................................51

*Malone v. Parker,*
   953 F. Supp. 1512 (M.D. Ala. 1996), *aff'd*, 130 F.3d 444 (11th Cir. 1997)..........................13

*Manufacturers Cas. Ins. Co. v. Martin-Lebreton Ins. Agency,*
   242 F.2d 951 (5th Cir. 1957) ..................................................................................49

Page

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)..................................................................................................13, 14

*Mellon Bank, N.A. v. Metro Comms, Inc.*,
  945 F.2d 635 (3d Cir. 1991), *cert. denied*, 503 U.S. 937 (1992)..............................................66

*Mindis Metals, Inc. v. Transp. Ins. Co.*,
  209 F.3d 1296 (11th Cir. 2000) ...................................................................................13

*Mize v. Jefferson City Bd. of Educ.*,
  93 F.3d 739 (11th Cir. 1996) ......................................................................................14

*Naviera Despina, Inc. v. Cooper Shipping Co., Inc.*,
  676 F. Supp. 1134 (S.D. Ala. 1987).............................................................................49

*New Amsterdam Cas. Co. v. W.D. Felder & Co.*,
  214 F.2d 825 (5th Cir. 1954) ......................................................................................51

*Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*,
  813 F.2d 1177 (11th Cir. 1987) ...................................................................................61

*Official Comm. of Unsecured Creditors v. PSS SS. Co. (In re Prudential Lines Inc.)*,
  928 F.2d 565 (2d Cir. 1991)........................................................................................17

*Pennington v. Bigham*,
  512 So. 2d 1344 (Ala. 1987)........................................................................................65

*Protective Life Ins. Co. v. Moore*,
  228 Ala. 476, 153 So. 751 (1934)...........................................................................51, 52

*Rubin v. Mfrs. Hanover Tr. Co.*,
  661 F.2d 979, 991 (2nd Cir. 1981)...............................................................................65

*Scott v. Harris*,
  550 U.S. 372 (2007).....................................................................................................14

*Scottsdale Ins. Co., v. Nat'l Sec. Fire & Cas. Ins. Co.*,
  741 So.2d 424 (Ala. Civ. App. 1999) ..........................................................................48

*Twin City Fire Ins. Co. v. Alfa Mut. Ins. Co.*,
  817 So.2d 687 (Ala. 2001)...........................................................................................48

*Twin Constr., Inc. v. Boca Raton Inc.*,
  925 F.2d 378 (11th Cir. 1991) .....................................................................................40

Page

*United States v. Revco D.S., Inc. (In re Revco D.S., Inc.),*
    11 B.R. 631 (Bankr. N.D. Ohio 1990) ............................................................................18, 19

*United States v. Whiting Pools, Inc.,*
    462 U.S. 198 (1983)..........................................................................................................19, 20

*W. Dealer Mgmt., Inc. v. England (In re Bob Richards Chrysler-Plymouth Corp.),*
    473 F.2d 262 (9th Cir.), *cert. denied*, 412 U.S. 919 (1973)............................................ *passim*

*Westport Ins. Corp. v. Tuskegee Newspapers, Inc.,*
    402 F.3d 1161 (11th Cir. 2005) .................................................................................................48

*White v. Brookley Fed. Credit Union,*
    283 Ala. 597, 219 So.2d 849 (1968)..............................................................................51, 52

### Statutes, Rules and Regulations

11 U.S.C. § 365 .....................................................................................................33, 41, 42

11 U.S.C. § 541(b)(1) ...........................................................................................................19, 20

11 U.S.C. § 544(b) .................................................................................................................64, 68

11 U.S.C. § 547(b) .................................................................................................................64, 65

11 U.S.C. § 548(a) .................................................................................................................64, 68

11 U.S.C. § 550 ............................................................................................................................69

11 U.S.C. § 553(a) .................................................................................................................71, 72

12 U.S.C. § 60 ..............................................................................................................................67

12 U.S.C. § 371c .........................................................................................................................20

12 U.S.C. § 371c-1 .................................................................................................................20, 21

12 U.S.C. § 1821(d)(2)(A) .......................................................................................................1, 4

12 U.S.C. § 1821(d)(6)(A) ............................................................................................................5

12 U.S.C. § 1821(d)(9) ................................................................................................................39

12 U.S.C. § 1821(d)(10) ..............................................................................................................75

Page

12 U.S.C. § 1821(d)(11) .......................................................................76

12 U.S.C. § 1823(e) ................................................................33, 39, 40, 41

12 U.S.C. § 1828(j) ................................................................................21

12 U.S.C. § 1828(u) ..........................................................................*passim*

26 U.S.C. § 172 ....................................................................................15

26 U.S.C. § 172(a) ..........................................................................15, 31

26 U.S.C. § 1501 ..................................................................................17

26 U.S.C. § 6402(k) .............................................................................26

Ala. Code § 5-5A-21 ...........................................................................67

Ala. Code § 8-9A.4(c) .........................................................................68

Ala. Code § 8-9A.5(a) .........................................................................68

Ala. Code § 10-2B-6.40 ......................................................................67

Ala. Code § 27-14-17 ..........................................................................48

Worker, Homeownership and Business Assistance Act of 2009,
    Pub. L. No. 111-92, 123 Stat. 2984, 2992-95 .................................15

12 C.F.R. § 5.64(c) ..............................................................................67

12 C.F.R. § 223.14 ...............................................................................21

12 C.F.R. § 223.51 ...............................................................................21

12 C.F.R. § 223.52 ...............................................................................21

26 C.F.R. § 1.1502-6 ............................................................................17

26 C.F.R. § 1.1502-11 ..........................................................................17

26 C.F.R. § 1.1502-13 ..........................................................................17

26 C.F.R. § 1.1502-77 ...............................................................26, 30, 37

26 C.F.R. § 301.6402-7 ........................................................................26

<u>Page</u>

Fed. R. Civ. P. 17(a) ......................................................................................51

Fed. R. Civ. P. 56 ...............................................................................1, 13, 77

Board of Governors of the Federal Reserve System,
    Holding Company Manual, § 2070.1.4.................................................36

Board of Governors of the Federal Reserve System, Final Rule, "Risk-Based Capital
    Standards: Trust Preferred Securities and the Definition of Capital,", 70 Fed. Reg.
    11827 (Mar. 10, 2005) .......................................................................55

Board of Governors of the Federal Reserve System, "Transactions Between Member
    Banks and Their Affiliates,"67 Fed. Reg. 76560 (Dec. 12, 2002)..........................20

Board of Governors of the Federal Reserve System *et al.*, "Interagency
    Policy Statement on Income Tax Allocation in a Holding Company Structure,"
    Fed. Reg. 64757 (Nov. 23, 1998)................................................... *passim*

Office of Thrift Supervision, Holding Company Regulatory Handbook, § 400 .........................36

<u>Other Authorities</u>

Restatement (Third) of Agency § 1.01 (2006)................................................18

Restatement (Third) of Agency § 8.01 (2006)...........................................18, 49

Restatement (Third) of Agency § 8.12 (2006)...........................................19, 49

Defendant Federal Deposit Insurance Corporation, as receiver for Colonial Bank (the "FDIC-Receiver"), respectfully submits this memorandum of law in support of its motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure as to all claims asserted against it in the amended complaint in this action. [1]

## PRELIMINARY STATEMENT

The FDIC-Receiver succeeded to all "rights, titles, powers, and privileges" of Colonial Bank when it was appointed receiver following the Bank's well-publicized failure. *See* 12 U.S.C. § 1821(d)(2)(A). Until the Bank failed, plaintiff The Colonial BancGroup, Inc. ("BancGroup") was its holding company and regularly acknowledged that Colonial Bank comprised virtually all of its consolidated assets and was the source of all of its income. But for Colonial Bank, there would have been no BancGroup, and the holding company filed for bankruptcy protection soon after regulators closed the Bank.

BancGroup and its bondholder constituents would prefer the Court to ignore these fundamental truths. Through this action, BancGroup is seeking to misappropriate assets of Colonial Bank worth hundreds of millions of dollars that rightfully belong to the FDIC-Receiver, including, most significantly, pending federal income tax refunds valued at roughly $253 million and insurance proceeds of as much as $50.5 million.

Before the Bank's failure, income tax refunds uniformly were recorded (and were reported to regulators) as assets of Colonial Bank, not of BancGroup, and when refunds were

---

[1] On February 24, 2011, the FDIC-Receiver moved to dismiss all of the alleged avoidance claims asserted in the amended complaint pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted. [Doc. No. 45] Briefing on that motion was completed on April 18, 2011. No decision has been issued on that motion. The Court's scheduling order requires the FDIC-Receiver to file its summary judgment motion at this time, but in doing so the FDIC-Receiver does not waive, but expressly reserves, all arguments set forth in its pending motion for partial dismissal.

paid they were always deposited directly into accounts of Colonial Bank, as accounting records and the deposition testimony of BancGroup's chief accounting officer confirm.   There is no dispute that Colonial Bank paid the tax liability and suffered the operating losses that give rise to the refund claims that are at issue here.   But in this action, BancGroup contends that the $253 million in pending federal income tax refunds somehow have been transformed into property of the bankrupt holding company rather than of its operating subsidiary, Colonial Bank, by virtue of BancGroup's bankruptcy filing and a contorted reading of an unsigned and unenforceable internal policy.

Similarly, Colonial Bank (not BancGroup) paid the premiums for fidelity insurance to protect itself against loss from bank employee fraud or embezzlement.   BancGroup now claims, however, that the bankrupt holding company, not the Bank, is the owner of up to $50.5 million in insurance proceeds for loss sustained by Colonial Bank that arose from a fraud committed by employees of the Bank.

Contrary to BancGroup's arguments, the filing of a bankruptcy petition does not empower a debtor to alter facts or to claim ownership of property that is owned by others.   Both of these claims to ownership of the FDIC-Receiver's property fail as a matter of law and undisputed fact.

Other claims asserted in the amended complaint seek to rewrite history.   BancGroup contends, for example, that its August 2009 contribution to Colonial Bank of $300 million in REIT preferred securities never happened even though that transaction was recorded in its own financial records.   BancGroup's own general counsel, its chief accounting officer and its chief financial officer all testified during their depositions that the contribution of securities was completed, just as its general counsel had certified to bank regulators at the time.   Likewise, the

now-bankrupt BancGroup contends that various other capital contributions it made to its wholly-owned subsidiary Colonial Bank over a two-year period somehow were "fraudulent" even though, according to the deposition testimony of BancGroup's chief financial officer, both the Bank and its holding company were "solvent" at the time of every relevant transfer and therefore the holding company necessarily received "reasonably equivalent value" for its capital contributions in the form of an increase in its equity investment in Colonial Bank.

Yet another category of claims are obvious placeholders that BancGroup has never even attempted to substantiate.  These include claims, among others, for alleged preferential transfers to Colonial Bank, for alleged "vendor contracts" paid by BancGroup and for allegedly improper sales of BancGroup assets by the FDIC-Receiver.  BancGroup's discovery responses establish that it has no basis to assert any of these claims and that the claims should be voluntarily withdrawn.

The FDIC-Receiver could have sought summary judgment much sooner in this litigation based on the documentary record alone.  But to eliminate any challenge that BancGroup might have raised to entry of judgment on that basis, the FDIC-Receiver waited to file this motion until it had taken the deposition testimony of knowledgeable BancGroup senior officers, including BancGroup's chief financial officer, its chief accounting officer and its general counsel as well as the Colonial Bank tax manager who was responsible for preparing the relevant income tax returns.  BancGroup strenuously resisted the scheduling of all of those depositions, and at BancGroup's behest the depositions had to be rescheduled several times.  The reason for BancGroup's resistance is clear: the deposition testimony resoundingly supports the documentary evidence and demonstrates the absence of any material issue of disputed fact that would prevent the entry of judgment in favor of the FDIC-Receiver on all claims.

No trial is necessary to extinguish BancGroup's spurious claims. For the reasons provided below, summary judgment should be entered in favor of the FDIC-Receiver on all of the claims asserted by BancGroup in this action.

## BACKGROUND

### A.    The Parties and this Action

BancGroup is a Delaware corporation with its principal place of business in Montgomery, Alabama. It was organized in 1974 as a bank holding company and elected to become a financial holding company. *See* FDIC-Receiver's Statement of Undisputed Facts dated August 15, 2011 ("Stmt. Facts"), ¶ 1.

BancGroup's principal operating subsidiary was Colonial Bank, from which it derived substantially all of its income (in the form of dividends). In its Form 10-K for 2008, BancGroup reported that Colonial Bank accounted for "approximately 99.3% of [its] consolidated assets." Stmt. Facts, ¶ 2.

By order of the Alabama State Banking Department dated August 14, 2009, Colonial Bank was closed and the FDIC-Receiver was appointed as its receiver. Stmt. Facts, ¶ 3. Upon its appointment, the FDIC-Receiver succeeded by operation of law to "all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution." 12 U.S.C. § 1821(d)(2)(A).

As of the closing date, the FDIC-Receiver entered into a Purchase and Assumption Agreement dated as of August 14, 2009 (the "P&A Agreement") with Branch Banking and Trust Company ("BB&T"), under which BB&T purchased certain assets and assumed certain liabilities of Colonial Bank from the FDIC-Receiver. Stmt. Facts, ¶ 5. At the time of the

closing, the FDIC estimated that the loss to its deposit insurance fund arising from the resolution of Colonial Bank would be approximately $2.8 billion. As of December 31, 2010, the FDIC had increased its loss estimate to $4.186 billion. *Id.*

On August 25, 2009, BancGroup filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Alabama. Compl., ¶ 12. In an order entered on June 2, 2011, the bankruptcy court confirmed BancGroup's plan of liquidation. A plan trustee was appointed pursuant to that plan and administers certain ongoing litigation, including this action.

### B.    The Claims Asserted in the Amended Complaint

In accordance with the Federal Deposit Insurance Act, the FDIC-Receiver set November 19, 2009 as the last day to file claims in the receivership for purposes of the exclusive receivership claims process set forth in that statute. BancGroup filed a claim with the FDIC-Receiver. In a letter dated January 6, 2010, the FDIC-Receiver disallowed BancGroup's claim because it had not been proven to the satisfaction of the receiver. BancGroup thereafter filed this action seeking a *de novo* judicial determination of its disallowed receivership claim. *See* 12 U.S.C. § 1821(d)(6)(A). BancGroup filed its amended complaint on May 28, 2010, in which it asserts a variety of claims.

### 1.    Claims to Ownership of Tax Refunds and Insurance Proceeds

In two claims, the amended complaint asserts that BancGroup, rather than the FDIC-Receiver as successor to Colonial Bank, has a superior claim to ownership of significant assets, specifically (1) federal income tax refunds in the amount of approximately $253 million, and (2) insurance proceeds expected to be recovered under fidelity insurance policies in the amount of up to $50.5 million.

With respect to tax refunds, the amended complaint alleges that BancGroup was the designated taxpayer for the affiliated group that includes Colonial Bank and that "[o]n account of BancGroup's payment of federal, state and local taxes for the consolidated tax group, BancGroup is entitled to tax refunds in amounts to be determined . . . ."  Compl., ¶¶ 28, 34. BancGroup contends that an unsigned, undated internal tax allocation policy was, in reality, a "tax sharing agreement" under which BancGroup has "rights" to recover tax refunds even though the refunds are based on the earnings and loss history of Colonial Bank and the Bank's subsidiaries rather than of the holding company.  Compl., ¶ 36.

As for its claim to insurance proceeds, the amended complaint alleges only that BancGroup has "the right to recover any proceeds of the insurance policies received by Colonial Bank or the FDIC-Receiver, including, without limitation, the proceeds of any director and officer liability policies and any fidelity and crime policy."  Compl., ¶ 85.  The amended complaint does not actually identify the specific policies as to which this claim is asserted or any loss suffered by BancGroup that would be covered by that insurance, and BancGroup previously informed the bankruptcy court that it was not aware of any fidelity insurance claims.  *See* Stmt. Facts, ¶ 49.  The only relevant loss under the fidelity insurance policies arose from criminal misconduct by employees of Colonial Bank, not of BancGroup, which was the subject of a proof of loss prepared by the FDIC-Receiver and a subsequent lawsuit against the insurer that is pending.  Stmt. Facts, ¶¶ 46-48.

## 2.  Claims Relating to REIT Preferred Securities

BancGroup asserts two different claims with respect to a $300 million series of securities (the "REIT Preferred Securities") that was issued in May 2007 by CBG Florida REIT Corp, an indirect subsidiary of Colonial Bank.  The terms of the securities provided that the REIT

6

Preferred Securities were subject to conversion into shares of BancGroup preferred stock if the federal regulator for Colonial Bank declared that an "Exchange Event" had occurred, which would happen if Colonial Bank experienced certain types of financial difficulty.  If that happened, BancGroup committed to immediately contribute the REIT Preferred Securities to Colonial Bank.  Stmt. Facts, ¶¶ 56-59.

BancGroup admits that an Exchange Event was declared and that a "Conditional Exchange" of the REIT Preferred Securities occurred as of August 11, 2009, meaning that investors' securities were automatically converted into shares of BancGroup preferred stock. Compl., ¶ 48.  However, BancGroup asserts that the promised contribution of the securities to Colonial Bank never happened and that the REIT Preferred Securities therefore are its property. *See* Compl., ¶ 49.  The undisputed evidence shows otherwise.  In the alternative, BancGroup claims that its contribution of the REIT Preferred Securities should be avoided as a preference or a fraudulent transfer.  Compl., ¶ 51.

### 3.    Other Claims for Allegedly Avoidable Transfers

BancGroup seeks avoidance and recovery with respect to "capital contributions and certain other transfers" to Colonial Bank, in an aggregate amount of $899,867,786.00, that allegedly were made during the two year period before BancGroup filed its bankruptcy petition. *See* Compl., ¶¶ 39-43.  The allegations of the amended complaint concerning these claims are especially conclusory.

According to Exhibit B to the amended complaint, $308,586,158.60 of these challenged transfers were made during 2009.  Among these transfers was the alleged transfer to Colonial Bank in June 2009 of federal tax refunds in the amount of $166 million, which (as will be discussed elsewhere) unquestionably was the property of Colonial Bank.   Compl., ¶ 41.

BancGroup also seeks to avoid the December 2008 sale of $120,605,200 of loans from Colonial Bank to CBG Real Estate LLC, a BancGroup subsidiary.  Compl., ¶ 42.  This subset of alleged transfers all occurred after December 15, 2008, when Colonial Bank first became subject to a written direction from its federal regulator to increase its capital.  As a result, all of BancGroup's claims for these transfers are barred by 12 U.S.C. § 1828(u).

BancGroup also challenges as an alleged fraudulent transfer to Colonial Bank the 2007 acquisition *by BancGroup* of another bank holding company, called Citrus & Chemical Bancorporation, Inc., for which BancGroup asserts an avoidance claim of $216 million.  *See* Compl., Exh. B.  As the undisputed evidence establishes, the cash consideration for that holding company merger was provided by Colonial Bank, and BancGroup unquestionably received its own benefits from completing the acquisition, both of which undisputed facts in addition to Colonial Bank's solvency defeat any fraudulent transfer claim against the FDIC-Receiver.

Further, without any elaboration or supporting allegations, BancGroup seeks to avoid alleged cash contributions by BancGroup to Colonial Bank of $375 million during 2008.  Compl., Exh. B.  However, Colonial Bank's quarterly Call Reports, and the testimony of BancGroup's chief financial officer Sarah Moore, establish that Colonial Bank was solvent at the time of each of these alleged contributions and therefore BancGroup necessarily received reasonably equivalent value for those contributions in the form of increased equity in its wholly-owned subsidiary.  Stmt. Facts, ¶¶ 78-81.

Finally, BancGroup alleges without any specificity that "on numerous occasions" BancGroup transferred property to, or caused its property to be transferred to, Colonial Bank or to third parties for the benefit of Colonial Bank on account of antecedent obligations.  Compl., ¶ 52.  In response to the FDIC-Receiver's discovery requests, BancGroup failed to identify a

single "preferential transfer" that it allegedly intended to include in this conclusory claim.  Stmt. Facts, ¶ 87.

### 4.   Other Miscellaneous Claims

The final category is a variety of mostly speculative and unsubstantiated potential claims that BancGroup guessed it might have against the Colonial Bank receivership.  These include claims for:  (i) intercompany receivables in the alleged amount of $514,420.78, Compl., ¶¶ 24-26; (ii) amounts allegedly paid by BancGroup under unspecified vendor contracts, Compl., ¶¶ 57-59; (iii) allegedly "improper asset possession and sales" by the FDIC-Receiver, Compl., ¶¶ 60-63 (also separately asserted as a claim for "conversion" without identifying any BancGroup property that allegedly was "converted," *see* Compl., ¶¶ 117-18); (iv) alleged "costs and expenses that inured to the sole or primary benefit of Colonial Bank subsequent to the Receivership Date," Compl., ¶¶ 75-76; (v) "employee related costs," Compl., ¶¶ 77-81; (vi) reimbursement for amounts paid by BancGroup in indemnification to former Colonial Bank officers or directors, Compl., ¶¶ 86-88; and (vii) other unspecified contingent, unliquidated claims, Compl., ¶ 89.

In addition, BancGroup asserts claims relating to balances held in certain demand deposit accounts that have been the subject of separate proceedings in the bankruptcy court and a pending appeal before this Court.  *See F.D.I.C. v. The Colonial BancGroup, Inc. (In re The Colonial BancGroup, Inc.)*, No. 2:11-cv-0133 (MHT) (M.D. Ala.).  These include not only a claim to the deposit balances themselves, Compl., ¶¶ 64-74, but also claims for fees and expenses incurred in BancGroup's bankruptcy case, Compl., ¶¶ 90-91.

BancGroup also asserts an impermissible claim for prejudgment interest on its disallowed receivership claim, Compl., ¶ 96, and a claim for any surplus in the Colonial Bank receivership based on BancGroup's equity interest in the failed bank, Compl., ¶ 97.[2]

## C.   **Procedural Background**

### 1.   **Proceedings in this Action**

BancGroup filed its original complaint in this action on March 5, 2010 and an amended complaint on May 28, 2010.  The FDIC-Receiver filed its answer on June 25, 2010, and its first amended answer on October 26, 2010.

On February 24, 2011, the FDIC-Receiver moved for partial judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) as to all of BancGroup's alleged avoidance claims.  Briefing on that motion was completed on April 18, 2011.  That motion remains pending.

In accordance with the Court's original scheduling order, discovery commenced in July 2010.  BancGroup did not seek any discovery from the FDIC-Receiver then or for a year thereafter.  At the same time, BancGroup resisted or ignored the FDIC-Receiver's discovery requests, requiring the FDIC-Receiver to file several motions to compel.

On April 26, 2011, BancGroup filed an emergency motion to stay discovery in order to forestall depositions of several of its former officers that had been scheduled by the FDIC-Receiver.  The bankruptcy court, sitting as a magistrate judge, granted a three-week stay of discovery, requiring several depositions to be postponed that the FDIC-Receiver already had

---

[2] The amended complaint also asserted a claim concerning the ownership of real estate where a Colonial Bank branch had been located in Orlando, Florida.  Compl., ¶¶ 92-95.  By agreement, that dispute was subject to litigation in a separate adversary proceeding in the bankruptcy court, and a settlement of that dispute recently was approved by that court.  *See Colonial BancGroup, Inc. v. F.D.I.C.*, Adv. Proc. No. 10-3019 (DHW) (Bankr. M.D. Ala.).

arranged.  On June 10, 2011, newly retained lawyers for BancGroup filed another motion seeking to further delay the very same depositions.  Over the FDIC-Receiver's objection, the bankruptcy court again granted a short stay of discovery, requiring the depositions to be rescheduled again.

Since the second stay of discovery ended, the FDIC-Receiver has taken the depositions of:  David B. Byrne, Jr., the former general counsel of BancGroup and of Colonial Bank; T. Brent Hicks, the former chief accounting officer of BancGroup and of Colonial Bank; and David Reimer, the former tax manager of Colonial Bank.  The FDIC-Receiver took the deposition of Sarah H. Moore, the former chief financial officer of BancGroup and Colonial Bank, before the bankruptcy court's first order staying discovery.  As will be discussed at length below, these depositions conclusively establish that BancGroup's claims are without merit.

This action currently is scheduled for the Court's trial term beginning on December 5, 2011.

### 2.    The 0409 Proceeding

On November 30, 2009, the FDIC-Receiver filed a protective proof of claim in the BancGroup's chapter 11 case, which it amended on February 19, 2010.  On March 4, 2010, BancGroup filed an objection to the FDIC-Receiver's proof of claim in an effort to establish bankruptcy court jurisdiction over disputes that it knew would be the subject of its complaint in this action, which a federal statute required to be filed by no later than the next day.

The FDIC-Receiver moved for withdrawal of the reference of BancGroup's objection to its proof of claim and to several other actions that BancGroup had filed against the FDIC-Receiver in the bankruptcy court.  On May 10, 2010, this Court granted the FDIC-Receiver's motion to withdraw the reference, and the contested matter concerning BancGroup's claim

objection is now pending in this Court as *In re The Colonial BancGroup, Inc.*, No. 2:10-cv-0409 (MHT) (M.D. Ala.) (the "0409 Proceeding").  The schedule for pretrial and trial proceedings is the same in the 0409 Proceeding as in this action.

### 3.        Tax Returns and Tax Escrow Account

Recognizing that there would be disputes between them concerning tax refunds, on February 24, 2010 the FDIC-Receiver and BancGroup entered into a stipulation under which both parties agreed that any tax refunds received by either of them would be deposited into an escrow account pending a final determination of the issue of ownership of the refunds.  The bankruptcy court approved that stipulation in an order entered on March 10, 2010.  Since that time, certain federal and state tax refunds have been deposited into the escrow account and its balance as of July 29, 2011 (the last statement date) was $675,002.17.  *See* Stmt. Facts, ¶ 8.

Substantial potential income tax refunds exist in addition to the refunds held in the escrow account.  In September 2010, as permitted under the Internal Revenue Code and applicable regulations, and in accordance with an order of the bankruptcy court, both BancGroup and the FDIC-Receiver filed competing tax returns for the 2009 tax year under which each party claimed federal income tax refunds of approximately $250 million.  The FDIC-Receiver's refund requests sought total refunds of $253 million based on a five-year carryback of the Bank's net operating losses for the 2009 tax year against taxes paid by the Bank for the 2004, 2005, 2006 and 2007 tax years.  *See* Stmt. Facts, ¶¶ 10-11.

The Internal Revenue Service ("IRS") has not yet paid refunds based on either party's filings.  The FDIC-Receiver's filings with the IRS request that any such payment be made directly into the parties' tax escrow account.

## STATEMENT OF UNDISPUTED FACTS

In accordance with Rule 56(c) of the Federal Rules of Civil Procedure and section 2 of the Court's Uniform Scheduling Order in this action, as amended, the FDIC-Receiver has set forth the undisputed facts supporting this motion, with appropriate citations to the record, in its accompanying Statement of Undisputed Facts in Support of FDIC-Receiver's Motion for Summary Judgment.  The FDIC-Receiver incorporates that separate filing by reference rather than restating its contents here.

## APPLICABLE LEGAL STANDARD

Summary judgment is granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1242 (11th Cir. 2001).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Mindis Metals, Inc. v. Transp. Ins. Co.*, 209 F.3d 1296, 1298 (11th Cir. 2000) (internal quotation and citation omitted).

The moving party bears the initial burden of identifying "particular parts of materials in the record" showing that that there is no genuine dispute as to any material fact, Fed. R. Civ. P. 56(c)(1)(A), or that the non-moving party has "failed to make a sufficient showing on an essential element of her case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see* Fed. R. Civ. P. 56(c)(1)(B).

The burden then shifts to the non-moving party to "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Malone v. Parker*,

953 F. Supp. 1512, 1515 (M.D. Ala. 1996) (quoting *Celotex*, 477 U.S. at 324), *aff'd*, 130 F.3d 444 (11th Cir. 1997). The non-moving party "must do more than simply show that there is a metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original). Neither speculation nor unsupported, conclusory allegations in affidavits opposing the motion are sufficient. *See Hammonds v. Hyundai Motor Mfg. Ala., LLC*, No. 2:10–cv–103-TFM, 2011 WL 2580168, at *2 (M.D. Ala. June 28, 2011) (citing *Lejaun v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888 (1990)).

Further, while the Court must grant the non-moving party the benefit of "justifiable" inferences, *Anderson*, 477 U.S. at 255, this requirement extends only to inferences that are "supportable by the record." *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007); *see Matsushita,* 475 U.S. at 588 (inference of conspiracy must be "reasonable in light of the competing inferences of independent action or collusive action"). Trial is not appropriate "when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996) (citing *Matsushita*, 475 U.S. at 592-94).

**ARGUMENT**

**SUMMARY JUDGMENT SHOULD BE ENTERED IN FAVOR
OF THE FDIC-RECEIVER ON ALL CLAIMS**

I.   **THE FDIC-RECEIVER IS ENTITLED TO JUDGMENT IN ITS FAVOR
ON ALL OF BANCGROUP'S TAX-RELATED CLAIMS**

Two categories of tax-related claims are asserted in the amended complaint.  First,

BancGroup claims that pending income tax refunds are property of its bankruptcy estate even

though the refunds are the product of the earnings and loss history of Colonial Bank and its

subsidiaries.  Second, BancGroup has asserted that the FDIC-Receiver owes BancGroup for

taxes and related expenses that BancGroup allegedly paid on behalf of Colonial Bank without

being reimbursed.  No trial is needed for the Court to enter judgment in favor of the FDIC-

Receiver on both of these claims.

A.   **BancGroup Does Not Have Any Property Interest in Federal Income Tax
Refunds Arising From Its Role As Agent for the Affiliated Group**

Approximately $253 million in federal income tax refunds were claimed in returns and

refund requests filed by the parties in September 2010 that have not yet been paid by the IRS.

*See* Stmt. Facts, ¶¶ 10-12.  Those substantial refunds result from a special, five-year carryback of

net operating losses from 2009, the year that Colonial Bank was closed by its regulators, and

their payment will result in the recovery of federal taxes paid for the 2004, 2005, 2006 and 2007

tax years.[3]  *See* Stmt. Facts, ¶ 11.  (The affiliated group sustained a net operating loss in 2008.

*See* Stmt. Facts, ¶ 21, Figure 1.)

_____

[3] Historically, the Internal Revenue Code has permitted a taxpayer to carry back net
operating losses to recover taxes paid in the two preceding tax years only.  *See* 26 U.S.C.
§ 172(a).  Three months after Colonial Bank was closed, however, in November 2009, the tax
code was amended to permit a special, one-time election under which taxpayers could carry back
net operating losses sustained during either the 2008 or 2009 tax years to recover taxes paid in
the preceding five years.  *See* Worker, Homeownership and Business Assistance Act of 2009,
§ 13, Pub. L. No. 111-92, 123 Stat. 2984, 2992-95 (amending 26 U.S.C. § 172).

As will be shown below, the undisputed evidence establishes that Colonial Bank paid the entire tax liability for the relevant years based on taxable income earned by Colonial Bank and its subsidiaries; Colonial Bank by itself sustained sufficient net operating losses to claim the entire amount of those tax liabilities as refunds now; BancGroup was paid quarterly by Colonial Bank for the use of BancGroup's regular operating losses to reduce Colonial Bank's tax liability; federal tax refund receivables were recorded in the general ledger as assets of Colonial Bank, not of BancGroup; and, when federal tax refunds were paid, they were always deposited directly into accounts of Colonial Bank, not of BancGroup, even though the refunds were payable to BancGroup as the "taxpayer" for the affiliated group.

General ledger accounts for Colonial Bank were credited for the refund payments, and no entries were made in BancGroup's accounting records to reflect those transactions.  None was necessary.  The refunds were assets of Colonial Bank, and they were viewed and recorded as such by BancGroup and Colonial Bank accountants.  *See* Hicks Tr. 54:22-71:12.  These undisputed facts are consistent with only one conclusion:  that BancGroup acted as Colonial Bank's agent, and only as agent, in performing its role as "taxpayer" for the group and that federal income tax refunds were, and are, assets of Colonial Bank, not of BancGroup.

Notwithstanding these undisputed (and indisputable) facts, BancGroup asserts that the pending $253 million in federal income tax refunds are BancGroup's property, not Colonial Bank's, solely based on BancGroup's appointment as "taxpayer" for the affiliated group under the IRS consolidated return regulations and on an unsigned and undated internal tax allocation policy that BancGroup contends gives rise to a debtor-creditor relationship between BancGroup and Colonial Bank.  BancGroup's arguments would transform the FDIC-Receiver from the owner of the refunds into a mere creditor in BancGroup's bankruptcy case who must share in its

recoveries with bondholders holding over $350 million in bankruptcy claims.   Neither the relevant law nor the overwhelming and undisputed evidence supports BancGroup's arguments.

### 1.   The "Taxpayer" on a Consolidated Federal Income Tax Return Acts as Agent and Fiduciary in Receiving Refunds for Group Members

Under the Internal Revenue Code, affiliated groups of corporations may elect to file a consolidated federal income tax return.   26 U.S.C. § 1501.   Making such an election has tax benefits, including that losses suffered by one member of the group can be used to offset income earned by another member of the group resulting in a reduction of the group's consolidated tax liability.[4]  *See* Treas. Reg. §§ 1.1502-11(a), 1.1502-13.

If a group elects to file a consolidated return, only one return may be filed on behalf of all of the affiliated corporations.   The regulations designate the common parent corporation to act as "sole agent" for the members of the group with respect to "all matters" relating to the tax liability for that consolidated return year, which includes the receipt of refunds owed to any member of the group.   *See* Treas. Reg. § 1.1502(a)-77(a).   However, this does not mean the parent corporation has a property interest in any tax refunds that are paid to it.  To the contrary:

> The only reason the tax refunds are not being paid directly to the subsidiary is because income tax regulations require that the parent act as the sole agent, when duly authorized by the subsidiary, to handle all matters relating to the tax return . . . .  But these regulations are basically procedural in purpose and were adopted solely for the convenience and protection of the federal government.

*W. Dealer Mgmt., Inc. v. England (In re Bob Richards Chrysler-Plymouth Corp.)*, 473 F.2d 262, 265 (9th Cir.), *cert. denied*, 412 U.S. 919 (1973); *see Official Comm. of Unsecured Creditors v. PSS SS. Co. (In re Prudential Lines Inc.)*, 928 F.2d 565, 571 (2d Cir. 1991) ("The fact that a subsidiary's NOL ultimately may be used to offset another corporation's income does not mean

---

[4] Each member of the affiliated group remains severally liable for the full amount of the consolidated tax liability.  Treas. Reg. § 1.1502-6(a).

that the subsidiary loses any interest in its NOL.  The common parent acts as an agent on behalf of all the members of the consolidated group 'for the convenience and protection of [the] IRS only.'") (citation omitted); *Jump v. Manchester Life & Cas. Mgmt. Corp.*, 579 F.2d 449, 452 (8th Cir. 1978) (agency relationship established under consolidated return regulations "is for the convenience and protection of the IRS only and does not extend further").

"An agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship."  Restatement (Third) of Agency, § 8.01 (2006); *see id.*, § 1.01; *Clay v. Cummins*, 77 So. 328, 329 (Ala. 1917) ("Loyalty to [the principal's] trust is the first duty which the agent owes to his principal.").  Consistent with this established legal principle, courts have recognized that allowing a parent corporation "to keep any refunds arising solely from a subsidiary's losses simply because the parent and subsidiary chose a procedural device to facilitate their income tax reporting unjustly enriches the parent."  *Bob Richards*, 473 F.2d at 265; *see also Capital Bancshares, Inc. v. F.D.I.C.*, 957 F.2d 203, 208 (5th Cir. 1992) (same).

As a result, the general rule is that "a tax refund resulting solely from off-setting the losses of one member of a consolidated filing group against the income of that same member in a prior or subsequent year should inure to the benefit of that member."  *Bob Richards*, 473 F.2d at 265; *see Capital Bancshares*, 957 F.2d at 208 (refund was property of FDIC as receiver for failed bank, not bankrupt holding company, where "Bank could have generated the refund on its own had it filed income taxes separately from the group"); *BSD Bancorp, Inc. v. F.D.I.C. (In re BSD Bancorp, Inc.)*, No. 94-1341-IEG, slip op. at 4 (S.D. Cal. Feb. 28, 1995) (attached as Exhibit A); *Jump v. Manchester Life & Cas. Mgmt. Corp.*, 438 F. Supp. 185, 189 (E.D. Mo. 1977), *aff'd in relevant part*, 579 F.2d 449, 452 (8th Cir. 1978); *Brandt v. Fleet Capital Corp. (In re TMCI*

*Elecs.*), 279 B.R. 552, 558 (Bankr. N.D. Cal. 1999); *Cohen v. Un-Ltd. Holdings, Inc. (In re Nelco, Ltd.)*, 264 B.R. 790, 810 (Bankr. E.D. Va. 1999) ("To allow a member of a consolidated group to receive a tax refund when the member did not contribute to the tax payment would result in the unjust enrichment of that member."); *Indep. BankGroup, Inc. v. F.D.I.C. (In re Indep. BankGroup, Inc.)*, 217 B.R. 442, 448 (Bankr. D. Vt. 1998) (refund owned by FDIC as receiver for failed bank rather than bankrupt holding company); *United States v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 11 B.R. 631, 639 (Bankr. N.D. Ohio 1990) (refund was owned by subsidiary that had earned income and was charged for tax liability by common parent); *F.D.I.C. v. Brandt (In re Florida Park Banks, Inc.)*, 110 B.R. 986, 989 (Bankr. M.D. Fla. 1990) (FDIC as receiver, not bankrupt holding company, was entitled to entire refund attributable to taxes paid and losses sustained by failed bank).[5]

Because it is acting as an agent, a common parent that receives a tax refund that is attributable to the earnings history of a subsidiary member of the affiliated group holds the refund "as trustee of a specific trust," and the parent is under a duty to turn over the refund to the member that owns it. *Bob Richards*, 473 F.2d at 265; *see Capital Bancshares*, 957 F.2d at 208 (endorsing holding that specific trust is created); *Jump*, 438 F. Supp. at 189 (subsidiary's refund held by parent "is not a debt owed . . . but rather, a fund which Management Corp. holds in a specific trust" for the subsidiary).

Both the common law and the Bankruptcy Code are entirely consistent with this rule. *See* Restatement (Third) of Agency, § 8.12 (agent has duty "not to deal with the principal's property

---

[5] This general rule only can be altered by a "clear and explicit agreement" to the contrary. *Nelco*, 264 B.R. at 809; *see Capital Bancshares*, 957 F.2d at 207-08; *Bob Richards*, 473 F.2d at 265 ("Absent any differing agreement . . . a tax refund resulting solely from offsetting the losses of one member of a consolidated filing group against the income of that same member in a prior or subsequent year should inure to the benefit of that member.").  As will be discussed further below, no such clear and explicit agreement to the contrary exists here.

so that it appears to be the agent's property"); 11 U.S.C. § 541(b)(1) ("Property of the estate does not include any power that the debtor may exercise solely for the benefit of an entity other than the debtor."); *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n.10 (1983) ("Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition" from property of the bankruptcy estate) (citing 11 U.S.C. § 541(b)).

> ### 2. The *Bob Richards* Rule Has Special Importance for Banks and Holding Companies, Including BancGroup and Colonial Bank

Banks and their affiliates are subject to extensive federal statutory and regulatory restrictions on their activities. One of the fundamental reasons for this strict regulatory framework is the existence of federal deposit insurance, since the harm from abusive transactions affecting an insured bank ultimately might be borne by the FDIC's deposit insurance fund in the event of the bank's failure.

Sections 23A and 23B of the Federal Reserve Act are among the most fundamental federal restrictions on the activities of banks and their "affiliates," including holding companies. *See* 12 U.S.C. §§ 371c, 371c-1. These statutes are "designed to protect against a depository institution suffering losses in transactions with affiliates. They also limit the ability of a depository institution to transfer to its affiliates the subsidy arising from the institution's access to the Federal safety net." Board of Governors of the Federal Reserve System, "Transactions Between Member Banks and Their Affiliates," 67 Fed. Reg. 76560 (Dec. 12, 2002) (adopting Federal Reserve Board's Regulation W).

Section 23A limits the aggregate amount of "covered transactions" that an insured bank or its subsidiaries may enter into with their non-bank affiliates and requires that such transactions be on "terms and conditions that are consistent with safe and sound banking practices." 12 U.S.C. § 371c(a). Under this section, any extension of credit, in whatever form, that is made

from a bank to its holding company must be secured by collateral from the holding company equal to at least 100%, and as much as 130%, of the amount of the extension of credit. *See* 12 C.F.R. § 223.14. Under section 23B, any transaction between an insured bank and its "affiliates" must be "on terms and under circumstances, including credit standards, that are substantially the same, or at least as favorable to [the bank] as those prevailing at the time for comparable transactions with or involving other nonaffiliated companies." 12 U.S.C. § 371c-1(a). Thus, for example, a market rate of interest is required for any extension of credit from an insured bank to its holding company. *See* 12 C.F.R. §§ 223.51, 223.52.[6]

BancGroup and Colonial Bank adopted internal policies intended to ensure that they complied with these fundamental federal banking laws. Under the Affiliate Transactions Policy, which was adopted regularly by the boards of BancGroup and Colonial Bank, an internal committee tracked and approved every transaction that might be covered by sections 23A and 23B or their implementing regulations. *See* Byrne Tr. 74:16-75:3. In his deposition, BancGroup's general counsel confirmed his understanding that even a temporary, intra-day extension of credit from Colonial Bank to BancGroup would be subject to these restrictions. Byrne Tr. 80:13-81:2.

These statutory and regulatory restrictions also were a factor in the issuance of the "Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure," which was promulgated jointly in November 1998 by the Federal Reserve Board, the FDIC, the Office of the Comptroller of the Currency and the Office of Thrift Supervision. *See* 63 Fed. Reg.

---

[6] Sections 23A and 23B apply by their literal terms to "member banks" and their subsidiaries, *i.e.* banks that are members of the Federal Reserve system. Under 12 U.S.C. § 1828(j), however, the restrictions of those statutes were extended to "every nonmember insured bank in the same manner and to the same extent as if the nonmember insured bank were a member bank."

64757, at 64758 (Nov. 23, 1998) (the "Interagency Policy Statement") (citing sections 23A and 23B).  In the Interagency Policy Statement, the federal regulators reaffirmed "that intercorporate tax settlements between an [insured depository] institution and the consolidated group should result in *no less favorable treatment* to the institution than if it had filed its income tax return as a separate entity."  *Id.* (emphasis added).

This meant that a bank in a holding company structure could not be required to pay a greater tax liability, or recover a smaller tax refund, than it would have paid or received had it filed its own return. *Id.*, 63 Fed. Reg. at 64758 ("the amount and timing of payments or refunds should be no less favorable to the subsidiary than if it were a separate taxpayer").  In order to ensure that this occurred, "[e]ach depository institution's applicable income taxes, reflecting either an expense or benefit, should be recorded as if the institution had filed on a separate entity basis."  *Id.*, 63 Fed. Reg. at 64758.

Most significantly for purposes of the present motion, the regulators made clear that:

> a parent company that receives a tax refund from a taxing authority obtains these funds *as agent for the consolidated group on behalf of the group members*.  Accordingly, an organization's tax allocation agreement or other corporate policies should not purport to characterize refunds attributable to a subsidiary depository institution that the parent receives from a taxing authority as the property of the parent.

*Id.*, 63 Fed. Reg. at 64759 (emphasis added).  The Interagency Policy Statement set forth the regulators' expectation that banks and holding companies would comply with it, warning that "[a]ny practice that is not consistent with this policy statement may be viewed as an unsafe and unsound practice prompting either informal or formal corrective action."  *Id.*, 63 Fed. Reg. at 64758.

BancGroup and Colonial Bank were familiar with the Interagency Policy Statement and, according to the testimony of their general counsel David Byrne, made sure that their internal tax

allocation policy (the "<u>Tax Allocation Policy</u>") complied with it.   Byrne Tr. 94:4-101:2. Mr. Byrne testified that he understood the internal Tax Allocation Policy complied with the requirement of the Interagency Policy Statement that BancGroup would receive any tax refunds only as the designated agent for the consolidated group and would obtain no property interest in the refunds as a result.  *Id.* at 97:8-99:22.  Further, chief accounting officer Brent Hicks testified that the requirement of the Interagency Policy Statement that Colonial Bank record its tax liability and tax benefits as if it were filing returns as a separate entity was consistent with requirements under Generally Accepted Accounting Principles ("GAAP") and was a requirement that Colonial Bank followed in its accounting practices.  Hicks Tr. 20:14-22:9.

### 3.   BancGroup Acted as the Agent for Colonial Bank in Paying Taxes and Receiving Tax Refunds

#### a.   Colonial Bank Funded the Entire Tax Liability Paid By the Group for Every Relevant Year

Colonial Bank provided all of the funds used to pay the group's tax liability because Colonial Bank and its subsidiaries were the source of all of the group's reported net income.[7] The following table, reflecting figures that are included in the consolidated tax returns that were filed with the IRS, shows the total taxable income that originally was reported for the consolidated group and the breakdown of that taxable income between BancGroup, its non-bank subsidiary Colonial Brokerage and the Colonial Bank sub-group (that is, Colonial Bank and all of its subsidiaries):

---

[7] Although BancGroup was the common parent for the entire affiliated group for which consolidated returns were filed for the tax years 2004 through 2009, most of the corporations that were members of that group were, in fact, subsidiaries of Colonial Bank.  Only two corporations were not part of the Colonial Bank sub-group:  BancGroup itself and its non-bank subsidiary Colonial Brokerage, Inc.  *See* Stmt. Facts, ¶¶ 20-21.

**Figure 1**

| Year | Group Taxable Income | BancGroup | Colonial Brokerage, Inc. | Colonial Bank & Subsidiaries[8] |
|------|---------------------|-----------|--------------------------|----------------------------------|
| 2004 | $252,860,878 | $ (9,918,246) | $ 13,612 | $264,861,853 |
| 2005 | $351,298,288 | $(16,026,142) | $(1,275,376) | $369,410,153 |
| 2006 | $383,267,978 | $(25,970,167) | $ (184,517) | $410,082,778 |
| 2007 | $345,675,587 | $(19,209,834) | $ 1,031,636 | $364,513,901 |
| 2008 | $(473,876,365) | $(32,164,996) | $ (502,821) | $(441,782,542) |

*See* Stmt. Facts, ¶¶ 20-21.[9]  As Figure 1 reflects, BancGroup never had any taxable income in those years.[10]  The *de minimis* taxable income earned by its subsidiary Colonial Brokerage in 2004 and 2007 was dwarfed by the operating losses experienced by BancGroup in those years.

During his deposition, Colonial Bank's tax manager David Reimer testified that every quarter he would calculate the tax liability of Colonial Bank and its subsidiaries and his staff would then prepare a request for payment from Colonial Bank for the full amount of the group's federal tax liability.  Reimer Tr. 17:4-37:4.  The payments were made by Colonial Bank to BancGroup, which would, within one or two days, pay the same amount over to the IRS.  *See* Stmt. Facts, ¶¶ 23-24, Figure 2.  (In Mr. Reimer's own mind, he thought of the payments as being made directly from Colonial Bank to the IRS.  Reimer Tr. 17:24-25; 22:3-5).  Figure 2

---

[8] In 2008, Colonial Bank on its own had a net operating loss of $898,838,489.  On the consolidated return, that loss was reduced by net income earned by Colonial Bank subsidiaries during that tax year.

[9] Returns later were amended for most of these years for different reasons, resulting in the payment of refunds that are discussed below.

[10] Sarah Moore, BancGroup's former chief financial officer, explained in her deposition that BancGroup normally reported operating losses because it had no business of its own but had significant annual expenses in the form of interest on BancGroup's outstanding public debt and overhead expenses such as rent and salaries of its few employees, all of which were paid for with funds provided to BancGroup by its operating subsidiary, Colonial Bank.  *See* Moore Tr. 205:20-206:8.

shows the amount and timing of the quarterly payments from Colonial Bank to BancGroup and then from BancGroup to the IRS for the period 2005 through 2008.[11]

**Figure 2**

**Payment of Quarterly Federal Income Tax Liabilities (2005 to 2008)**

| Date | A/P Request Amount | Reason for Request | Deposit | Colonial BancGroup Date In | Date Out | Payment |
|---|---|---|---|---|---|---|
| 4/12/05 | $12,000,000 | IRS Q1 EST Tax | $12,006,000.00 | 4/14 | 4/15 | $12,000,000.00 |
| 6/13/05 | $29,000,000 | IRS Q2 EST Tax | $29,000,000.00 | 6/14 | 6/15 | $29,000,000.00 |
| 9/13/05 | $33,000,000 | IRS Q3 EST Tax | $33,000,000.00 | - | - | $33,000,000.00* |
| 12/13/05 | $33,000,000 | IRS Q4 EST Tax | $33,000,000.00 | - | - | $33,000,000.00* |
| 3/09/06 | $2,000,000 | IRS Extension | $2,681,716.04 | 3/13 | 3/15 | $2,000,000.00 |
| 4/11/06 | $34,000,000 | IRS Q1 EST Tax | $34,000,000.00 | 4/12 | 4/14 | $34,000,000.00 |
| 6/13/06 | $37,000,000 | IRS Q2 EST Tax | $37,000,000.00 | 6/14 | 6/15 | $37,000,000.00 |
| 9/12/06 | $30,000,000 | IRS Q3 EST Tax | $30,000,000.00 | 9/13 | 9/15 | $30,000,000.00 |
| 12/11/06 | $33,000,000 | IRS Q4 EST Tax | $33,139,912.50 | 12/13 | 12/15 | $33,000,000.00 |
| 4/03/07 | $31,000,000 | IRS Q1 EST Tax | $31,000,000.00 | 4/09 | 4/13 | $31,000,000.00 |
| 6/12/07 | $17,000,000 | IRS Q2 EST Tax | $17,000,000.00 | 6/14 | 6/15 | $17,000,000.00 |
| 9/11/07 | $29,000,000 | IRS Q3 EST Tax | $29,000,000.00 | 9/12 | 9/14 | $29,000,000.00 |
| 12/11/07 | $43,000,000 | IRS Q4 EST Tax | $43,000,000.00 | 12/12 | 12/13 | $43,000,000.00 |
| 3/06/08 | $4,000,000 | IRS Extension | $4,020,000.00 | 3/10 | 3/12 | $4,000,000.00 |
| 4/11/08 | $10,000,000 | IRS Q1 EST Tax | $10,037,145.49 | 4/14 | 4/14 | $10,000,000.00 |
| 6/10/08 | $8,000,000 | IRS Q2 EST Tax | $8,009,977.97 | 6/12 | 6/12 | $8,000,000.00 |

*missing statements from 9/05, 12/05

*See* Stmt. Facts, ¶¶ 23-24, Figure 2.  As Figure 2 reflects, the payments by BancGroup to the IRS (except for one which involved an intervening Easter holiday weekend) were made no later than two days after payments of identical amounts from Colonial Bank to BancGroup (or, in some instances, slightly greater amounts).

---

[11] The FDIC-Receiver was unable to locate disbursement requests and account statements for payments in 2004.  However, BancGroup has served an expert report that acknowledges that the payments for that year were made in the same manner and that the funds used to pay the group's consolidated tax liability came from Colonial Bank.

The fact that Colonial Bank made its tax payments to the IRS through BancGroup is legally irrelevant.  *See Capital Bancshares*, 957 F.2d at 207 ("The fact that the group remitted their taxable income to Bancshares each year so that it could make a consolidated tax payment and receive a consolidated return does not imply an allocation scheme."); *Nelco*, 264 B.R. at 810 ("the court concludes that the fact that [parent] actually paid the IRS is immaterial for calculating a member's participation in a tax refund" since parent did not itself fund any tax payments).  Since BancGroup was the "taxpayer" and "sole agent" under the IRS consolidated return regulations, Colonial Bank was required to pay its tax liabilities in this manner.  Treas. Reg. 1.1502-77(a).  The procedural arrangement had no effect on the parties' ownership interests in future refunds of these tax payments.  *See Bob Richards*, 473 F.2d at 265.

> **b.** **Colonial Bank Sustained 2009 Operating Losses Sufficient to Claim All of the Available Federal Refunds**

During 2008 and continuing into 2009, Colonial Bank experienced significant operating losses as the result of deteriorating performance in its loan portfolio.  Through the second quarter of 2009, Colonial Bank reported a net loss of $727 million, according to its Call Report for the period ending June 30, 2009.  *See* Stmt. Facts, ¶ 25.  The loss for 2009 later increased greatly.  Indeed, even according to the competing 2009 federal income tax return filed by BancGroup, Colonial Bank experienced an operating loss of $2.783 billion in 2009.[12]  *See Id.*

This one-year operating loss for Colonial Bank alone is more than twice as great as the aggregate net income reported by the entire consolidated group for the tax years 2004 through

---

[12] Under section 6402(k) of the Internal Revenue Code and IRS regulations thereunder, the FDIC-Receiver was permitted to file a competing return and claim for refund as the receiver for Colonial Bank.  *See* 26 U.S.C. § 6402(k); Treas. Reg. § 301.6402-7.  As a result, both BancGroup and the FDIC-Receiver filed returns for the consolidated group for 2009.  The 2009 return filed by the FDIC-Receiver reflects an operating loss for Colonial Bank of $2.8 billion. The difference in the amount is immaterial for purposes of claiming refunds since substantially less net income was reported by the consolidated group for all of the carryback years combined.

2007, which was $1,333,102,731 before deducting the consolidated net operating loss of $474 million that already had been reported in 2008.  *See supra* Figure 1.  As a result, there can be no dispute that if it were filing its own return, Colonial Bank would have reported sufficient net operating losses based on its own operations to claim refunds from the IRS of the full amount of the federal tax liability that was paid for the relevant years and that has not already been recovered.

**c.     Colonial Bank Paid BancGroup Every Quarter for the Use of BancGroup's Losses**

In addition to making a quarterly payment in satisfaction of its federal income tax liability, Colonial Bank also made a separate quarterly payment to BancGroup for the use of BancGroup's regular operating losses in order to reduce Colonial Bank's taxes.  Mr. Reimer testified that this payment was calculated based on the amount of taxes that Colonial Bank and its subsidiaries saved by offsetting the loss of BancGroup (and in many instances, also Colonial Brokerage) against the net income of Colonial Bank and its subsidiaries.  *See* Reimer Tr. 39:20-25.  Figure 3 sets forth the dates and the amounts of the payments from Colonial Bank to BancGroup for the use of BancGroup's losses during the relevant tax years.

**Figure 3**
**Colonial Bank Payments for Use of BancGroup Losses (2004 to 2009)**

| Date | Payment Amt. |
| --- | --- |
| 6/30/2004 | $2,425,321 |
| 10/4/2004 | $1,537,839 |
| 1/13/2005 | $1,489,106 |
| 7/1/2005 | $1,544,097 |
| 9/30/2005 | $562,067 |
| 1/18/2006 | $1,487,346 |
| 5/15/2006 | $4,346,053 |
| 7/12/2006 | $2,267,844 |
| 10/11/2006 | $1,901,683 |
| 1/5/2007 | $1,949,777 |
| 5/1/2007 | $1,440,450 |

| Date | Payment Amt. |
|------|-------------|
| 7/24/2007 | $4,147,777 |
| 10/2/2007 | $2,757,963 |
| 1/11/2008 | $769,934 |
| 4/29/2008 | $1,722,059 |
| 7/31/2008 | $3,271,163 |
| 9/29/2008 | $1,810,902 |
| 12/16/2008 | $9,517,629 |
| 5/13/2009 | $4,534,988 |
| 6/24/2009 | $4,680,515 |

*See* Stmt. Facts, ¶ 26, Figure 3.

BancGroup's receipt of contemporaneous payments for the value of its operating losses further demonstrates the unjust windfall that BancGroup is seeking by claiming to own the refunds here, for which it already was paid its share years ago. Moreover, the undisputed facts show that Colonial Bank continued to pay BancGroup for use of its losses even during the second half of 2008 and in 2009, when it was clear that Colonial Bank and the consolidated group would have no taxable income and therefore had no need to use BancGroup's losses to reduce their tax liability. Mr. Reimer testified during his deposition that he recognized this anomaly but was told to continue to make the quarterly payments to BancGroup even though BancGroup's losses were worthless to Colonial Bank. Reimer Tr. 146:9-19.

The 2008 and 2009 payments from Colonial Bank to BancGroup were improper under any legal framework. BancGroup was unjustly enriched in the amount of at least $20,544,034 through the unnecessary payments for its losses that it received during the third and fourth quarters of 2008 and the first and second quarters of 2009, when Colonial Bank had net losses and the consolidated group was paying no estimated taxes.[13]

---

[13] On December 15, 2008, Colonial Bank entered into a Memorandum of Understanding with its bank regulators, the FDIC and the Alabama State Banking Department. *See* Stmt. Facts, ¶ 65. The memorandum of understanding imposed a number of restrictions on Colonial Bank, including a prohibition against the payment of any dividends to BancGroup. *See* Clarke Decl.,

### d. BancGroup and Colonial Bank Treated Federal Income Tax Refunds as Assets of the Bank

Long before the present controversy, the affiliated group applied for federal income tax refunds on three separate occasions. First, in late 2007 BancGroup filed amended consolidated returns for 2004 and 2005 to correct an error in the calculation of Colonial Bank's interest income which had resulted in a tax overpayment for each of those three years. Second, in 2008 BancGroup applied for refunds of tax overpayments made earlier in that year and in 2007 once it became clear that the group would have a net operating loss for the year. Third, in 2008 Colonial Bank and its subsidiaries experienced a significant net operating loss which was the basis for NOL carryback claims in May 2009 for refunds from the 2005, 2006 and 2007 tax years.

*All* of these refunds – roughly $190 million in total – were deposited directly into accounts of Colonial Bank when payments were made by the IRS, even though all of the refunds were paid in the name of BancGroup as the "taxpayer" for the group under the consolidated return regulations. *See* Stmt. Facts, ¶¶ 29-34. As BancGroup's chief accounting officer Brent Hicks testified during his deposition, this was because the refunds were assets of Colonial Bank, not of BancGroup. *See* Hicks Tr. 63:3-64:16.

### i. Amended Returns for 2004 and 2005

In the original consolidated returns for the 2004 and 2005 tax years, Colonial Bank mistakenly included interest income for loans that had been included in error in its calculation of non-accrual loan interest. As a result, this income was counted twice in the taxable income reported in the original returns. *See* Stmt. Facts, ¶ 28. On or about December 17, 2007, BancGroup filed amended returns for 2004 and 2005 to correct this error, which reflected an

---

Exh. 45, ¶ 15. BancGroup appears to have evaded this restriction by obtaining funds from its regulated subsidiary through these unjustified quarterly payments for tax losses instead.

overpayment of tax liability for those years in connection with the original returns of $743,299 and $462,009 for 2004 and 2005, respectively. Stmt. Facts, ¶ 28.

In 2009, the IRS issued refund checks in the amounts of $887,385.13 and $530,413.87 for 2004 and 2005 respectively, which constituted the amounts of the overpayment in each year plus accumulated interest. *See* Stmt. Facts, ¶ 29. Each of the checks was made payable to The Colonial BancGroup, Inc., as expected because it was the "sole agent" for the affiliated group under the IRS consolidated return regulations. *See* Treas. Reg. 1.1502-77(a). But the undisputed evidence establishes that the checks were deposited directly into accounts of Colonial Bank. *See* August 15, 2011 Declaration of John J. Clarke, Jr. ("Clarke Decl."), Exh. 15; Hicks Tr. 184:7-188:22.

### ii.   Tax Overpayments for 2008

Colonial Bank and the group experienced net operating losses for the 2008 tax year. As a result, the group claimed a refund of two estimated tax payments that had been made earlier in 2008 as well as of a credit from a $13 million overpayment of tax liability for 2007. *See* Clarke Decl., Exh. 14. In April 2009, the IRS issued a check in the amount of $25,069,448 as a refund of these overpayments. *See* Clarke Decl, Exh. 15. The check was made payable to BancGroup, as "sole agent" for the group under the IRS regulations, but it was deposited directly into accounts of Colonial Bank. *See id.*; Hicks Tr. 186:17-187:14.

### iii.   NOL Carryback Refunds Based on 2008 Losses

During 2008, Colonial Bank experienced substantial operating losses as a result of a rising number of nonperforming loans. *See* Hicks Tr. 46:17-47:11; Moore Tr. 81:16-82:12. The Bank's losses for the year were nearly $900 million, and a consolidated net operating loss of approximately $474 million was reported on the consolidated federal return. Stmt. Facts, ¶ 31.

The Internal Revenue Code (as it was in effect at the time) permitted this 2008 NOL to be used to claim refunds of taxes that had been paid in the preceding two years.  *See* 26 U.S.C. § 172(a).  In May 2009, BancGroup filed an application for a tentative refund claiming refunds of $1,625,438, $122,860,853 and $42,222,815 in taxes that had been paid in the 2005, 2006 and 2007 tax years, respectively.[14]  *See* Stmt. Facts, ¶ 32.  The refund request directed the IRS to pay the requested refunds directly into a Colonial Bank account.  *See* Stmt. Facts, ¶ 33; Hicks Tr. 65:23-70:18.

Colonial Bank recorded these refunds as an asset (receivable) of the Bank as of December 31, 2008 as reflected in the quarterly Call Report filed by Colonial Bank with federal bank regulators for the periods ending December 31, 2008 and March 31, 2009.  *See* Stmt. Facts, ¶¶ 35-37.  During his deposition testimony, Mr. Hicks confirmed that no similar receivable was recorded in BancGroup's financial statements.  Hicks Tr. 60:5-21, 61:16-62:2.  He also confirmed that the Colonial Bank asset reflected a receivable that was due from the IRS, not from BancGroup.  Hicks Tr. 56:15-17.

On June 12, 2009, the IRS wired $1,625,438 as a refund from taxes paid for 2005, and on June 18, 2009, the IRS wired three payments totaling $165,083,668 as refunds for taxes paid in 2007 and 2008.  Hicks Tr. 65:23-70:18.  Each of the wire transfers was sent to the Colonial Bank account that had been specified in the refund request.  *Id.*  After the money was received, debits and credits were made in several Colonial Bank general ledger accounts, ultimately reflecting a credit to (reduction of) the general ledger account for "Federal Income Tax Receivable" that had

---

[14] Even though NOL carrybacks were limited to the two preceding years, a modest refund of 2005 taxes was available as the result of freeing up 2006 tax attributes through the use of the NOL carryback to that year.  *See* Stmt. Facts, ¶ 32, n.7.

been carried on the balance sheet of Colonial Bank.   Hicks Tr. 70:19-74:3.   None of the accounting entries involved any general ledger account for BancGroup.   *Id.*

### e.   Anticipated 2009 Carryback Refunds Were Recorded as Assets of Colonial Bank

Colonial Bank was closed by its regulators on August 14, 2009.   By that date, the Internal Revenue Code had not yet been amended to permit the special, one-time election to take a five-year carryback of NOLs for either the 2008 or 2009 tax years that was enacted in November 2009.   Nevertheless, through June 30, 2009, Colonial Bank had experienced significant operating losses and anticipated that it would be able to claim refunds of unrecovered taxes paid for the 2007 tax year based on the two-year carryback that was permitted as of that time.   As a result, as of June 30, 2009 Colonial Bank had recorded an asset of $65,429,000 in its general ledger account for "Federal Income Tax Refunds Receivable."   *See* Hicks Tr. 115:15-116:22.   Colonial Bank also reported that amount as an asset in its Call Report filed with bank regulators for the quarter ending June 30, 2009.   *Id.*

On November 6, 2009, the Internal Revenue Code was amended to permit the five-year carryback for 2008 or 2009 that was previously discussed.   As a result, taxes paid in 2004, 2005 and 2006 would now be available for refund in addition to taxes paid in 2007.   Based on the 2009 consolidated return and related filings that were filed by the FDIC-Receiver, the total amount of refunds available from those years is $253 million, including the $65,429,000 that Colonial Bank already had recorded as an asset as of the date of its failure.   *See* Stmt. Facts, ¶ 38. There is no basis to conclude that any different accounting treatment would have been appropriate for the additional anticipated refunds that arose as the result of a subsequent change in law.

### 4. The Internal Tax Allocation Policy Is Not a "Differing Agreement" That Would Alter the *Bob Richards* Rule

The *Bob Richards* decision and cases that have applied it recognize that the members of an affiliated group can "override" the presumptive rule that the group member that paid the taxes and generated the losses owns the resulting tax refund by entering into a "differing agreement." *Bob Richards*, 473 F.2d at 265; *Lubin v. F.D.I.C.*, No. 1:10-cv-00874-RWS, 2011 WL 825751, at *6 (N.D. Ga. Mar. 2, 2011); *BSD Bancorp, Inc. v. F.D.I.C. (In re BSD Bancorp, Inc.)*, No. 94-1341-IEG, slip op. at 4; *Florida Park Banks*, 110 B.R. at 988-89 (rejecting bankruptcy trustee's argument that internal allocation policy statements in minutes of holding company and failed bank constituted an agreement that altered the *Bob Richards* rule).

In this case, BancGroup contends that an internal Tax Allocation Policy constitutes a "differing agreement" within the meaning of *Bob Richards*. According to BancGroup, the internal policy gives BancGroup "rights" to tax refunds and the FDIC-Receiver's claim to own those refunds would interfere with those "rights." *See* Compl., ¶¶ 27, 36. As will be discussed at further length below, neither federal banking law nor applicable bankruptcy law permits BancGroup to seek enforcement of the unsigned internal policy in the circumstances presented here. *See infra* at 39-41 (discussing, *inter alia*, 12 U.S.C. § 1823(e) and 11 U.S.C. § 365(c)(2)) Even if it were enforceable (which it is not), however, the Tax Allocation Policy does not alter the *Bob Richards* presumption that Colonial Bank is the owner of the federal tax refunds at issue as the entity that paid the taxes and sustained the losses.

Cases applying *Bob Richards* have recognized that any "differing agreement" must be "clear and explicit" in order for it to modify the presumptive rule that the corporation that paid the taxes and generated the losses owns the tax refunds. *Nelco*, 264 B.R. at 809 (collecting cases). The decision in *BSD Bancorp* illustrates the narrowness of this exception. In that case, a

holding company and its bank subsidiary had entered into a tax sharing agreement that expressly provided for the possibility that refunds received by the parent on unusual occasions might be retained as "loans" from its bank subsidiary.  In this regard, the agreement stated:

> Refunds due subsidiaries from the Company which cannot be fully funded when due then will be carried on the subsidiary's books as a "loan to parent" and will accrue interest at not less than the Federal Funds Rate. The occurrence of this event is unusual and its likelihood of happening is considered remote.  All loans between parent and subsidiary will be in accordance with applicable federal regulations regarding affiliate transactions.

*Id.*, slip op. at 5.  After the bank failed and the holding company filed for bankruptcy, a federal income tax refund was paid to the holding company, which claimed the refund as property of its bankruptcy estate.  Examining the "economic reality" of the arrangements and the agreement as a whole, the court concluded that the tax sharing agreement did not alter the *Bob Richards* presumption that the holding company had received the refund as agent and therefore held it in trust for the failed bank.  *Id.*, slip op. at 10-12.

Similarly, in *Lubin*, the district court considered a tax sharing agreement that provided for a holding company to pay its bank subsidiary any refund the holding company received "in an amount no less than the amount the Bank would have been entitled to receive as a separate entity."  *See Lubin*, 2011 WL 825751, at *5.  As in *BSD Bancorp*, the *Lubin* court concluded that the language itself demonstrated an agency relationship, which was consistent with "[t]he economic reality of the arrangement between [the holding company] and the Bank . . . ."  Accordingly, the court dismissed the holding company's claim to ownership of tax refunds that were attributable to the earnings and loss history of the failed bank.  *Id.*

BancGroup's argument that the Tax Allocation Policy somehow alters the *Bob Richards* presumption flies in the face of the undisputed evidence for a number of different reasons.  First, the language of the Tax Allocation Policy and the testimony of BancGroup's general counsel

make clear that the internal policy was intended to comply with the requirements of the Interagency Policy Statement, including its instruction that a parent holding company acts solely as an agent in receiving tax refunds for its subsidiary bank.  *See* Byrne Tr. 95:7-99:22 ("It's my understanding that what I presented in the form of a resolution in 2007 and 2008 was consistent with the requirements under the Federal Register."); *see also* Hicks Tr. 20:10-22:9, 106:10-108:9.

The Tax Allocation Policy provides that the "end result" of its allocation guidelines should be "that each member of the group having a tax liability is allocated their respective tax liability on a separate return basis, as though each subsidiary were dealing directly with State or Federal taxing authorities."   Clarke Decl., Exh. 19.  This principle is entirely consistent with the central requirement of the Interagency Policy Statement that "the amount and timing of payments or refunds should be no less favorable to the [depository institution] subsidiary than if it were a separate taxpayer."   *See* Interagency Policy Statement, 63 Fed. Reg. at 64758.  Mr. Hicks, the chief accounting officer for BancGroup during the relevant years, testified that this principle also was consistent with his understanding of GAAP and is how Colonial Bank recorded its tax liability and tax benefits in its accounting records.  Hicks Tr. 20:14-22:9.

Second, the undisputed evidence discussed above shows that Colonial Bank's "applicable income taxes, reflecting either an expense or benefit, [were] recorded as if the institution had filed on a separate entity basis," just as would be required by the Interagency Policy Statement. *See* 63 Fed. Reg. at 64758.  Mr. Hicks testified that he understood that this accounting treatment, which the undisputed evidence discussed above demonstrates was followed by Colonial Bank, was entirely consistent with the Tax Allocation Policy.  Hicks Tr. 194:9-18.

Third, as required under the Interagency Policy Statement, no provision of the internal Tax Allocation Policy purports "to characterize refunds attributable to a subsidiary depository institution that the parent receives from a taxing authority as the property of the parent."  *See id.* 63 Fed. Reg. at 64759.  Nor did BancGroup ever conduct itself as if there were such a provision. To the contrary, every federal refund during the years at issue was either paid by wire transfer from the IRS directly into Colonial Bank accounts or paid by IRS checks that were deposited directly into Colonial Bank accounts even though payable to BancGroup as the "taxpayer."  *See supra* at 29-32.  These actions demonstrate BancGroup's understanding that it was not the owner of the refunds but instead was acting as Colonial Bank's agent in receiving them, just as the Interagency Policy Statement requires.  *See* Interagency Policy Statement, 63 Fed. Reg. at 64759.

Fourth, the Tax Allocation Policy itself incorporates by reference the Interagency Policy Statement and its requirements, albeit indirectly.  The Tax Allocation Policy expressly refers to three statements of policy issued by federal banking regulators, two of which expressly incorporate or reiterate the requirements of the Interagency Policy Statement.  *See* Federal Reserve Board Holding Company Manual, § 2070.0.1.4 ("Regardless of the treatment of an institution's tax loss for regulatory reporting and supervisory purposes, a parent company that receives a tax refund from a taxing authority obtains these funds as agent for the consolidated group on behalf of the group members.  Accordingly, an organization's tax-allocation agreement or other corporate policies should not purport to characterize refunds attributable to a subsidiary depository institution that the parent receives from a taxing authority as the property of the parent."); OTS Holding Company Regulatory Handbook, § 400 & Appendix 400C (incorporating Interagency Policy Statement).  The third pronouncement that is referred to in the Tax Allocation Policy, the FDIC's 1978 Statement of Policy, was updated by the 1998

Interagency Policy Statement, which in turn recited that it "does not materially change any of the guidance" provided in that earlier FDIC policy statement.  *See* Interagency Policy Statement, 63 Fed. Reg. at 64758.

Fifth, the fact that the Tax Allocation Policy provides for payments to be "remitted" to or from BancGroup with respect to the "tax liability/refund" of members of the consolidated group does not alter the ownership rights of any member in its tax refunds.  Remitting tax payments and refunds through the "sole agent" for the group is required by the IRS consolidated return regulations and has nothing to do with a transfer of ownership.  *See* Treas. Reg. 1.1502-77(a). Since BancGroup never earned any income, its only contribution to this calculation was a regular loss, and Colonial Bank paid BancGroup for the use of that loss contemporaneously.[15]  *See supra* at 27-28.  When refunds were issued by the IRS in BancGroup's name, they were paid directly to Colonial Bank without ever passing through a BancGroup account.

Sixth, BancGroup's argument that the Tax Allocation Policy somehow creates a debtor-creditor relationship between BancGroup and Colonial Bank cannot be squared with federal banking laws.  Even if (solely for the sake of argument) one were to view the policy as a "contract," Alabama law recognizes that "an interpretation of a contract which gives a reasonable, lawful and effective meaning to all of the terms is preferred to an interpretation which leaves a part unreasonable, unlawful or with no effect."  *Fid. & Dep. Co. of Md. v. Jefferson Cty. Comm'n*, 756 F. Supp. 2d 1329, 1337 (N.D. Ala. 2010) (citing *Bd. of Water & Sewer Comm'rs of City of Mobile v. Bill Harbert Constr. Co.*, 870 So. 2d 699, 710 (Ala. 2003)).

---

[15] Colonial Bank's tax manager, David Reimer, testified in his deposition that this quarterly payment to BancGroup for the use of its losses was the primary function served by the Tax Allocation Policy.  *See* Reimer Tr. 94:17-21, 96:17-97:1.

If the Tax Allocation Policy resulted in the extension of credit from Colonial Bank to BancGroup, as BancGroup argues, it would violate fundamental federal banking laws. There are no provisions in the Tax Allocation Policy providing for the payment of a market-rate of interest for any "loan" of refunds by the Bank to BancGroup, or for the posting of collateral to secure such a "loan," as would be required under sections 23A and 23B of the Federal Reserve Act and their implementing regulations. *See supra* at 20-25. Indeed, the Tax Allocation Policy does not even include the general language that was found in the *BSD Bancorp* tax sharing agreement requiring that any "loan" of refunds from the Bank to the holding company would "be in accordance with applicable federal regulations regarding affiliate transactions." *BSD Bancorp.*, slip op. at 5.

In sum, BancGroup was nothing more than a conduit for payments of tax liabilities and tax refunds between Colonial Bank and the IRS, and nothing in the language of the Tax Allocation Policy states, or even implies, that by serving as such an intermediary BancGroup somehow obtained an ownership interest in those payments. Nor is there any language in the Tax Allocation Policy or principle of law or equity that would permit such an inference.

Here, just as in *Lubin* and *BSD Bancorp*, there is no language in the Tax Allocation Policy that alters the ownership rights of Colonial Bank in its income tax refunds. To the contrary, the internal policy clearly reflects an agency relationship between BancGroup and the members of the consolidated group, including Colonial Bank, that is entirely consistent with its role as "sole agent" under the consolidated return regulations and the *Bob Richards* rule. The Tax Allocation Policy does not constitute a "differing agreement" within the meaning of *Bob Richards.* The general rule that Colonial Bank is the owner of the tax refunds at issue applies.

**5.     12 U.S.C. § 1823(e) Prohibits BancGroup's Argument Based on the Unsigned Tax Allocation Policy**

Even if the Tax Allocation Policy could be construed in the manner advocated by BancGroup (which it cannot be for the reasons already discussed), no such unsigned, undated document is valid to assert claims that tend to diminish the interests of the FDIC as receiver in assets of a failed bank, such as income tax refunds.  *See* 12 U.S.C. §§ 1821(d)(9), 1823(e)(1); *Indep. BankGroup*, 217 B.R. at 447-48 (tax refund is type of asset subject to written agreement requirement, rejecting holding company claim to refunds based on unsigned tax allocation policy).

In order to enforce an agreement entered into by a failed bank against the FDIC as its receiver, a party must establish that the agreement: (1) was in writing; (2) was executed by the failed bank and by the claimant contemporaneously with the bank's acquisition of the asset to which the agreement relates; (3) was approved by the failed bank's board of directors, or its loan committee, as reflected in the minutes; and (4) has been continuously an official record of the bank from the time of its execution.[16]  12 U.S.C. § 1823(e)(1); *see also* 12 U.S.C. § 1821(d)(9)

---

[16] Section 1823(e)(1) provides:

(e)     **Agreements against interests of Corporation**

(1)     **In general**

No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or under section 1821 of this title, either as security for or by purchase as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement –

(A)     is in writing;

(B)     was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution;

(C)     was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee; and

("any agreement which does not meet the requirements set forth in section 1823(e) of this title shall not form the basis of, or substantially comprise, a claim against the receiver or the Corporation").

The Eleventh Circuit has strictly construed the statutory requirement that an agreement must be "executed" to be enforceable against the FDIC as receiver for a failed bank, holding that "[i]n the context of section 1832(e), 'executed' *must mean* that the depository institution has 'signed' the agreement." *Twin Constr., Inc. v. Boca Raton Inc.*, 925 F.2d 378, 384 (11th Cir. 1991) (emphasis added). In this regard, reference to parol evidence to establish the existence and terms of an alleged agreement is "flatly prohibit[ed]." *First Union Nat'l Bank of Fla. v. Hall*, 123 F.3d 1374, 1380 (11th Cir. 1997) (citing *Twin Constr.*, 925 F.2d at 384).

The *Twin Construction* court also rejected a narrow interpretation of the types of agreement that are covered by section 1823(e), finding the variety of "assets" covered by the statute were "far broader than the narrow reading appellant offers." *See Twin Constr.*, 925 F.2d at 382. The one court to have directly considered the issue, the Vermont bankruptcy court in *Independent BankGroup*, concluded that tax refunds were "assets" within the meaning of section 1823(e) and that a signed writing therefore was required in a suit against the FDIC by a bankrupt holding company concerning ownership of refunds. *See Indep. BankGroup*, 217 B.R. at 447.

There is no dispute that the internal Tax Allocation Policy here was never executed by Colonial Bank. Indeed, on its face it is apparent that the document is unsigned and undated. *See* Clarke Decl., Exh. 19. Moreover, while witnesses testified to a general familiarity with there being an internal tax allocation policy, they identified numerous different documents as the

---

        (D)    has been continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C. § 1823(e)(1).

embodiment of that policy, some in different form and others rife with typographical errors. *See* Clarke Decl., Exhs. 20-22; Byrne Tr. 84:4-10, 101:5-22, 221:13-222:8; Reimer Tr. 94:17-21; Moore Tr. 182:11-23, 195:2-10. It is precisely such confusion and uncertainty that section 1823(e) is intended to guard against.

Consequently, even if the Tax Allocation Policy could be contorted to have the meaning that BancGroup ascribes to it, the policy would not be enforceable against the FDIC-Receiver to alter the "presumptive principal-agent relationship" that was recognized in *Bob Richards*. *See Lubin*, 2011 WL 825751, at *5.

### 6. BancGroup's Contract Argument Is Not Available as a Matter of Applicable Bankruptcy Law

BancGroup's debtor-creditor argument also contradicts two principles of applicable bankruptcy law. First, to the extent that BancGroup believes that the Tax Allocation Policy is a "contract," it was required to obtain an order of the bankruptcy court either assuming or rejecting that contract during the pendency of its chapter 11 case. *See* 11 U.S.C. § 365(a). BancGroup never assumed the Tax Allocation Policy, and therefore, as the result of its confirmed plan of liquidation, the policy (to the extent BancGroup argues it is a contract) was deemed to be rejected when the plan became effective on June 2, 2011. *See* The Colonial BancGroup, Inc. Plan of Liquidation, § 7.1 ("[a]ll executory contracts (including Employee-Related Agreements) and unexpired leases that have not been assumed and assigned, or rejected, pursuant to an order entered by the Bankruptcy Court on or before the Effective Date, shall be deemed to be rejected by the Debtor on the Effective Date").

The rejection of an executory contract under section 365 of the Bankruptcy Code is deemed a breach of that agreement by the debtor as of the date of its bankruptcy petition, *see* 11 U.S.C. § 365(g), and a debtor cannot seek to enforce its alleged rights under a contract that has

been rejected.  *See, e.g., Hall v. Perry (In re Cochise College Park, Inc.)*, 703 F.2d 1339, 1356 (9th Cir. 1983); *In re Newlin*, 370 B.R. 870, 876 (M.D. Ga. 2007) (chapter 7 trustee cannot enforce a mandatory purchase right that "arises solely from a Partnership Agreement that has been deemed rejected"); *In re Auto Dealer Servs., Inc.*, 96 B.R. 360, 364 (Bankr. M.D. Fla. 1989).

Second, section 365(c)(2) of the Bankruptcy Code prohibits a debtor from assuming any pre-petition contract to make a loan to the debtor, since the effect of such an assumption would be to require a prepetition creditor to provide post-petition financing to a bankrupt entity.  *See* 11 U.S.C. § 365(c)(2); *In re Sun Runner Marine, Inc.*, 945 F.2d 1089, 1092 (9th Cir. 1991).  The Tax Allocation Policy is not such a contract, but if the Policy were the contract that BancGroup claims it to be then BancGroup would not be permitted to enforce it.

### B. BancGroup's Other Tax-Related Claims Are Not Supported by the Evidence

The second category of tax-related claim asserted in the amended complaint is an unliquidated claim "on account of (i) federal interest, penalties and taxes paid [by BancGroup] on behalf of Colonial Bank and/or its subsidiaries, (ii) benefits due to BancGroup for tax losses and credits generated by BancGroup and (iii) any and all unpaid interest, penalties and taxes attributable to Colonial Bank and its subsidiaries for which BancGroup is liable . . . ."  Compl., ¶ 32.

BancGroup has not provided detail with regard to this generalized claim.  However, the undisputed evidence discussed in the preceding sections establishes that:  (1) Colonial Bank already paid for all federal tax liability for the years preceding its failure; (2) the IRS owes Colonial Bank refunds of over $253 million for tax liability, and it is therefore effectively impossible for either BancGroup or Colonial Bank to owe the IRS any amounts for other tax

years; (3) BancGroup already was paid by Colonial Bank for the "tax losses and credits generated by BancGroup"; and (4) Colonial Bank overpaid BancGroup at least $20 million for those "tax credits and losses" in 2008 and 2009 when the losses were not needed to reduce Colonial Bank's federal tax liability.

The substantial overpayment by Colonial Bank for BancGroup's unneeded losses in 2008 and 2009 far exceeds any amount by which BancGroup might be held liable by any taxing authority other than the IRS for "unpaid interest, penalties and taxes attributable to Colonial Bank." Moreover, since BancGroup has never provided supporting detail with respect to this allegation, it is not entitled to any favorable inference in this regard. *See Celotex*, 477 U.S. at 323 (summary judgment appropriate where non-moving party has "failed to make a sufficient showing on an essential element of her case").

## II.   THE FDIC-RECEIVER IS THE OWNER OF INSURANCE PROCEEDS FOR FIDELITY BOND CLAIMS

BancGroup's claim to own the proceeds of up to $50.5 million that are expected to be paid with respect to a claim for loss made under several policies of fidelity insurance is similar to its claim to own tax refunds that are the property of Colonial Bank. There is no dispute that the fidelity insurance policies were purchased to insure against loss suffered by Colonial Bank as the result of forgery, embezzlement, fraud or similar misconduct. There is no dispute that Colonial Bank is an insured party under the policies or that Colonial Bank was the entity that paid premiums for that insurance. There is no dispute that Colonial Bank suffered an insured loss in an amount far greater than the coverage limits, as set forth in a proof of loss that was prepared by the FDIC-Receiver describing losses arising from criminal misconduct of Colonial Bank

employees.  There is no dispute that BancGroup did not suffer any such loss, as it admitted in a filing early in its bankruptcy case.[17]

Notwithstanding the weight of evidence establishing Colonial Bank as the proper owner of the anticipated insurance proceeds however, BancGroup contends that it, not Colonial Bank, is the owner of the proceeds based solely on a provision in the insurance policies that designates BancGroup, as the "first named assured," as the party with whom the insurers will interact.  As with BancGroup's *ex post facto* claim to ownership of income tax refunds, this claim is not supported as a matter of law or undisputed fact.

### A.    Colonial Bank Purchased the Fidelity Insurance and Was the Insured Entity That Suffered "Loss"

The fidelity bonds and crime policy at issue (the "Bonds") are:  (a) Federal Insurance Company Financial Institution Bond Form A (81158390 DFI), which had an effective period of March 1, 2009 to March 1, 2010 and a $25 million single loss limit of liability with a $1 million deductible ("Bond Form A"), *see* Declaration of Beppy Hassey ("Hassey Decl."), Exh. B); (b) Federal Insurance Company Financial Institution Electronic and Computer Crime Policy (81260198 DFI), which had a policy period of March 1, 2009 to March 1, 2010 and a $25 million single loss limit of liability with a $1 million deductible (the "Crime Policy"), *see* Hassey Decl., Exh. D; and (c) Federal Insurance Company Financial Institution Bond Form B

---

[17] The amended complaint also purports to assert a claim against the FDIC-Receiver for any proceeds that the FDIC-Receiver receives under policies of director and officer liability insurance.  *See* Compl., ¶ 85.  If the FDIC-Receiver receives any such proceeds, however, it will be in satisfaction of claims that the FDIC-Receiver has asserted for harm caused to the Bank by directors, officers or employees of the Bank who are insured under those policies.  There is no question that BancGroup has no interest whatsoever in such claims, or the funds that the FDIC-Receiver might recover from insurance (or any other source) with respect to them.  *See Lubin v. Skow (In re Integrity Bancshares, Inc.)*, 382 F. App'x 866, 870–71 (11th Cir.) (FDIC as receiver, not holding company, owned claims for harm caused by officers and directors to failed bank), *rehearing denied*, 408 F. App'x 345 (11th Cir. 2010)

(81910594 DFI), which had an effective period of July 16, 2009 to July 16, 2010 and a $500,000 single loss limit of liability with a $30,000 deductible ("Bond Form B"), *see* Hassey Decl., Exh. C.

There is no dispute that as a "Subsidiary" of BancGroup, Colonial Bank was one of the "Assureds" under each of the Bonds.  In fact, Colonial Bank accounted for roughly 99.3% of BancGroup's assets as of December 31, 2008 and was the source of substantially all of BancGroup's income.  *See* Stmt. Facts, ¶ 2.  BancGroup's primary function was to provide management, supervision, and capital to its subsidiaries.  Moore Tr. 17:15-17:22.  While BancGroup had only two or three employees, Colonial Bank had more than 4,000.  Moore Tr. 232:2-8.  While BancGroup conducted its business in a single office that it rented from Colonial Bank, Moore Tr. 232:9-17, Colonial Bank conducted business in over 350 branches and several headquarter facilities, *id.*  As of December 31, 2008, the Bank had over 370 ATMs, $18.6 billion in deposits, and $14.5 billion in loans.  *See* Hassey Decl., Exh. E at 1, Exh. F at 1.  In contrast, BancGroup was not a bank, did not originate loans and did not accepts deposits.  Moore Tr. 17:6-14; Byrne Tr. 43:1-13.  In sum, BancGroup was not a financial institution that needed financial institution bonds for itself.

The "Loss" insured against under the Bonds (*i.e.* employee dishonesty, trade or loan dishonesty, forgery, counterfeit money, defective signatures) is the type of loss that would be suffered by Colonial Bank, not by BancGroup.  *See* Moore Tr. 231:14-232:1, 233:14-21.  Unsurprisingly given these facts, the bond applications show that in underwriting the coverage, the insurer primarily considered the risk associated with Colonial Bank.  *See* Hassey Decl., Exhs. E, F (applications).

Colonial Insurance Agency, Inc., which despite its similar name was not affiliated with BancGroup or Colonial Bank, was the insurance agent that helped procure the Bonds. Its files show that invoices were addressed to and sent to Colonial Bank, *see* Hassey Decl., Exh. G, and that Colonial Bank thereafter issued checks to pay for the premiums, Hassey Decl., Exh. H. BancGroup has not come forward with any evidence that BancGroup paid for any of the premiums, and the FDIC-Receiver is aware of none.

On August 10, 2010, Colonial Insurance Agency provided notice to the insurer that Colonial Bank reported circumstances that could give rise to a claim under the Bonds. On behalf of Colonial Bank, Colonial Insurance Agency completed and submitted online claim notification forms identifying Colonial Bank as the insured for that claim. *See* Hassey Decl., Exh. I at 4-5. The notices attached a letter from David Byrne, the general counsel of Colonial Bank and of BancGroup, in which Mr. Byrne reported that Colonial Bank and BancGroup had been informed that they were targets of a federal criminal investigation related to Colonial Bank's mortgage warehouse lending division. *See* Hassey Decl., Exh. I at 2-3. Colonial Insurance Agency prepared and submitted three online claim notifications to the insurer identifying "Colonial Bank" as the insured in each form. Hassey Decl., Exh. I at 4, 8, 13.

On February 1, 2010, the FDIC-Receiver submitted a proof of loss under the Bonds relating to the criminal misconduct of two Colonial Bank employees in its mortgage warehouse lending division, Cathy Kissick and Teresa Kelly. *See* Declaration of Thomas O'Brien dated August 11, 2011 ("O'Brien Decl."), Exh. 1. Pursuant to a fraudulent and dishonest scheme, Kissick and Kelly caused Colonial Bank to fund fictitious, sub-par, worthless, and undocumented residential loans and pools of loans to the Bank's customer, Taylor Bean & Whitaker Mortgage Corp. *See* O'Brien Decl., Exh. 1 at 1-2. Kissick and Kelly later pled guilty

to, and were convicted of, bank fraud.  *See* Judgment, *United States v. Kissick*, No. 1:11-cv-0088 (E.D. Va. Jun. 17, 2011); Judgment, *United States v. Kelly*, No. 1:11-cv-0119 (E.D. Va. Jun. 17, 2011).  In the proof of loss, the FDIC-Receiver claimed a loss, as successor to Colonial Bank, for the full amount of the available insurance under the Bonds.  O'Brien Decl., Exh. 1 at 2, 15.  The losses sustained by Colonial Bank as the result of the criminal misconduct unquestionably are far greater than the combined coverage limits of the policies.  *See id.*  No payment has been made yet by the insurer with respect to the FDIC-Receiver's proof of loss.

Tellingly, BancGroup previously informed the bankruptcy court that it was not aware of any claim that could be asserted under Bond Form A, and therefore it requested the court's permission to cancel the policy and seek the return of premiums paid for it.  *See* Motion to Exercise Ownership Rights Over Certain Insurance Policies, dated Oct. 30, 2009, at 4-5 [Bankr. Doc. No. 242].  After the FDIC-Receiver informed BancGroup's counsel that the FDIC-Receiver had claims under Bond Form A and that it would object to the requested relief, BancGroup modified the form of order submitted to the bankruptcy court to require prior approval of the FDIC-Receiver before that policy could be cancelled.  Stmt Facts, ¶ 49.

### B.     BancGroup's Role as Agent Does Not Give Rise to Property Rights in the Fidelity Insurance Proceeds

The foregoing facts are not subject to any reasonable dispute.  The amended complaint is silent as to the basis for BancGroup's claim to ownership of the proceeds recovered under the Bonds.  BancGroup has suggested that the "joint assured" provision of the Bonds somehow provides it with an ownership interest in insurance proceeds due to Colonial Bank.  BancGroup's position is unsupportable.

### 1.    BancGroup's Role as "Sole Agent" Under the Policies

The first sentence of the joint-assured clause permits the insurer to treat BancGroup as an agent bound to act on behalf of the other assureds, including Colonial Bank:

> Only the first named ASSURED shall be deemed to be *the sole agent of the others for all purposes under this Bond*, including but not limited to the giving or receiving of any notice or proof required to be given and for the purpose of effecting or accepting any amendments to or termination of the Bond.

Hassey Decl., Exh. B at 7 (emphasis added).  The second sentence of the joint-assured clause states that the other assureds will have no beneficiary interest in the Bonds:

> Each and every other ASSURED shall be conclusively deemed to have consented and agreed that *none of them shall have any direct beneficiary interest in or any right of action under this Bond* and neither this Bond nor any right of action shall be assignable.

*Id.* (emphasis added).

Alabama law requires that an insurance contract be interpreted as a whole and, whenever possible, interpreted in a manner that harmonizes and gives effect to all of its provisions. *Westport Ins. Corp. v. Tuskegee Newspapers, Inc.*, 402 F.3d 1161, 1164 (11th Cir. 2005); *Twin City Fire Ins. Co. v. Alfa Mut. Ins. Co.*, 817 So.2d 687, 691-92 (Ala. 2001); *Scottsdale Ins. Co., v. Nat'l Sec. Fire & Cas. Ins. Co.*, 741 So.2d 424, 426 (Ala. Civ. App. 1999); Ala. Code § 27-14-17.  Applying this fundamental principle, these two sentences of the joint assured provision must be read together, with the result that the second sentence means that assureds other than the first-named assured have no beneficial interest *only insofar as* the first-named assured has been given and actually performs an exclusive agency duty to act on behalf of the other assureds.  However, when circumstances disrupt the first-named assured's right or ability to exercise its agency duties – whether by operation of law, by BancGroup's inaction, or due to BancGroup's breach of its

duty to Colonial Bank by claiming an ownership interest directly adverse to its principal – the second sentence must be disregarded.

As previously discussed, "[a]n agent is a fiduciary with respect to matters within the scope of his agency," Restatement (Third) of Agency, § 8.01, and "[l]oyalty to [the principal's] trust is the first duty which the agent owes to his principal," *Clay*, 77 So. at 329.[18]   Courts presume that "when an agent acts within the scope of the agency relationship, *there is identity of interests* between principal and agent." *CIT Group/Equip. Fin., Inc. v. Roberts*, 885 So.2d 185 (Ala. Civ. App. 2003) (discussing theory of imputed knowledge from agent to principal) (citation omitted) (emphasis added).  Accordingly, an agent is not allowed to receive a benefit as a result of violating its duty to the principal.  *Id.*   Moreover, the "agent must not, except where the principal has full knowledge and gives consent, assume any duties or enter into any transaction concerning the subject matter of the agency in which he has an individual interest or represents interests adverse to that of his principal." *Naviera Despina, Inc. v. Cooper Shipping Co., Inc.*, 676 F. Supp. 1134, 1141 (S.D. Ala. 1987).

"An agent has a duty, subject to any agreement with the principal, (1) not to deal with the principal's property so that it appears to be the agent's property; (2) not to mingle the principal's property with anyone else's; and (3) to keep and render accounts to the principal of money or other property received or paid out on the principal's account." Restatement (Third) Agency § 8.12.  As "sole agent," BancGroup has a duty to act only as a pass-through; that is, to accept the Bond proceeds for the benefit and on behalf of the FDIC-Receiver only and to pass them to

---

[18] Alabama courts have looked to the Restatement of Agency in deciding agency issues. *See, e.g. Mfrs. Cas. Ins. Co. v. Martin-Lebreton Ins. Agency*, 242 F.2d 951, 953 (5th Cir. 1957); *Benchmark Med. Holdings, Inc. v. Rehab Solutions, LLC*, 307 F. Supp. 2d 1249, 1266-67 (M.D. Ala. 2004).

the FDIC-Receiver.  As the United States Supreme Court said on this point long ago, at the time of the bankrupt agent's insolvency,

> when its right to continue in business ceased, it had not fully performed its duties as agent and collector.  It had not received the moneys collected by its subagent.  They were traceable as separate and specific funds, and therefore the plaintiff [principal] was entitled to have them paid out of the assets in the hands of the [bankruptcy] receiver, for, when he collected them from these subagents, he was, in fact, collecting them as the agent to the principal.

*Commercial Nat'l Bank v. Armstrong*, 148 U.S. 50, 57-58 (1893).

### 2.    The Joint Assured Provision Does Not Create Property Rights in the Fidelity Bond Proceeds for the BancGroup Bankruptcy Estate

In determining whether insurance proceeds belong to a bankruptcy estate, courts have been careful to distinguish between a debtor's ownership of *policies* and its ownership of policy *proceeds*.  *See Louisiana World Expo., Inc. v. Contractors Creditors Comm. (In re Louisiana World Expo., Inc.)*, 832 F.2d 1391, 1400 (5th Cir. 1987) (liability proceeds payable to officers and directors were not part of bankruptcy estate).  The fact that a corporation owns a *policy* does not necessarily mean that it also owns the policy *proceeds.*  The policy *proceeds* belong to the named insured(s) who suffer the loss or liability.  *Id.*

Numerous courts have followed this analysis to find that a debtor did not have a property interest in proceeds of insurance policies in which it was a named insured.  *See In re CHS Electronics, Inc.*, 261 B.R. 538, 541-42 (Bankr. S.D. Fla. 2001) ("[T]he fact that [the debtor] obtained and owns the Policies here is not determinative.  Instead, the Court must focus on who has the rights against the Proceeds."); *see also In re Adelphia Comm'ns Corp.,* 298 B.R. 49, 53 (S.D.N.Y. 2003) (policy proceeds not property of the estate because debtor had no pending covered claims); *In re Medex Reg'l Labs., LLC*, 314 B.R. 716, 722-23 (Bankr. E.D. Tenn. 2004) (same); *In re Allied Digital Techs. Corp.*, 306 B.R. 505, 512 (Bankr. D. Del. 2004) ("[W]hen the

liability policy provides the debtor with indemnification coverage but indemnification either has not occurred, is hypothetical, or speculative, the proceeds are not property of the bankruptcy estate").

Reported decisions in Alabama and elsewhere have uniformly held that an insured who suffers a loss under an insurance policy is a real party in interest pursuant to Federal Rule of Civil Procedure 17(a) or analogous state rules and, therefore, has standing to bring a claim under the policy despite a joint-assured clause that assigns claim rights to another assured.  In *New Amsterdam Cas. Co. v. W.D. Felder & Co.*, 214 F.2d 825, 826 (5th Cir. 1954), for example, an assured other than the first named assured brought suit on a fidelity bond for losses caused by its employees' fraud or dishonesty.[19]  The insurer denied coverage arguing that the assured did not have the right to maintain the suit because it was not the first named assured under the provisions of the bond to that effect.  The district court rejected the argument.  On appeal, the Fifth Circuit affirmed, holding that the joint assured clause did not prevent the assured from maintaining the action.

In *Lumbermen's Mut. Cas. Co. v. Norris Grain Co.*, 343 F.2d 670, 689 (8th Cir. 1965), the Eighth Circuit also rejected a defendant insurer's argument, based on language in a "joint assured" clause.  Similarly, in *Lubin v. Cincinnati Ins. Co.*, 1:09-CV-2985-RWS, 2010 WL 5313754 (N.D. Ga. Dec. 17, 2010), the district court rejected a bankrupt holding company's attempt to claim ownership of fidelity bond proceeds, finding that the FDIC as receiver for the failed bank was the real party in interest with a right to recover the proceeds even though the failed bank was not expressly named as an insured under the policy.  In Alabama, the real party in interest is one who possesses an "interest in the insurance payments or the substantive right to

---

[19] Cases decided by the Fifth Circuit prior to 1981 are binding precedent in the Eleventh Circuit.  *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*).

the relief sought." *Lowe v. Am. Med. Int'l*, 494 So. 2d 413, 414 (Ala. 1986) (health insurance); *see White v. Brookley Fed. Credit Union*, 283 Ala. 597, 219 So.2d 849 (1968) (employee could collect proceeds under disability policy where named-insured refused to collect despite policy provision providing that only named-insured could collect under policy); *Protective Life Ins. Co. v. Moore*, 228 Ala. 476, 153 So. 751, 753 (1934) (employees covered under company life insurance were real parties in interest, even though policy listed employer as insured; the purpose of the insurance was to insure the employees for their benefit, the employer was only a nominal beneficiary and he acted merely as a trustee of the employees, or an agent for distribution).

In this case, BancGroup has admitted that it is not aware of any claims it may have under Bond Form A.  Its only claim to the fidelity insurance proceeds is based entirely on a proof of loss detailing harm that was suffered by Colonial Bank as a result of criminal actions of Colonial Bank employees.  Colonial Bank paid premiums for the Bonds, and the insurance provided under those policies is obviously intended to protect against the type of loss that might be suffered by a bank, not by its holding company.  BancGroup's assertion that its agency relationship somehow converts insurance proceeds that are due to the FDIC-Receiver into property of the holding company's estate should be rejected.

### 3. The Subrogation Clauses in the Bonds Would Be Meaningless if Payment Were Not Made to the FDIC-Receiver, as Colonial Bank's Successor

Each of the Bonds contains a subrogation clause.  *See* Hassey Decl., Exh. B at 21. ("Recoveries, whether effected by the [insurer] or by the ASSURED, shall be applied net of the expenses of such recovery in the following order: first, to the satisfaction of the ASSURED'S covered loss which would otherwise have been paid but for the fact that it is in excess of either the [single limit of liability] or the [aggregate limit of liability], second, to the [insurer] in satisfaction of amounts paid in settlement of the ASSURED'S claim . . . .").  Pursuant to those

provisions, the insurer has asserted in the Taylor Bean & Whitaker chapter 11 case that it is subrogated to the rights of Colonial Bank and the FDIC-Receiver with respect to the insured losses.  That proof of claim states, in pertinent part, as follows:

> [I]n the event that Federal Insurance Company makes any payment in connection with the claim of the FDIC, as Receiver of Colonial Bank, for losses resulting from the dishonest or otherwise improper conduct and/or unlawful conduct of Taylor, Bean & Whitaker Mortgage Corp., or its officers and/or employees, then in such event Federal Insurance Company would be subrogated to all of the rights of Colonial Bank and the FDIC, as Receiver of Colonial Bank, to the extent of Federal Insurance Company's payment . . . .

*See* Stmt. Facts, ¶ 51.  The insurer's bankruptcy proof of claim makes no mention of any contemplated payment to or subrogation to the rights of BancGroup, nor would such a claim make senses because the Bonds contemplate subrogation to the rights of the insured that sustained the insurable loss.

Similarly, it would make no sense for the insurer to pay the Bond proceeds to BancGroup because BancGroup indisputably did not sustain the insured losses and BancGroup has no rights to the underlying assets to which the insurer could be subrogated.  BancGroup has no subrogation rights to transfer; only Colonial Bank has those rights.  If the subrogation clauses in the Bonds are to have any meaning or effect, payment must be made by the insurer to the FDIC-Receiver, the only entity that suffered the losses and the only entity that owns the underlying assets to which a subrogation claim conceivably might be asserted.

## III.   BANCGROUP'S CLAIMS TO THE REIT PREFERRED SECURITIES ARE WITHOUT BASIS IN FACT OR LAW

In the amended complaint, BancGroup asserts two different claims with respect to a series of securities with a $300 million face amount (the "REIT Preferred Securities") that was issued in May 2007 by an indirect subsidiary of Colonial Bank called CBG Florida REIT Corp.  First, BancGroup claims that those securities were never contributed to Colonial Bank when

regulators directed that such a contribution occur in August 2009 as provided for under the terms of the governing agreements.  *See* Compl., ¶ 49.  Second, BancGroup claims that if that capital contribution did occur it should be avoided as a preference or a fraudulent transfer.  Compl., ¶ 51.  Trial is not appropriate on either of these claims.

### A.    The Undisputed Evidence Establishes that the REIT Preferred Securities Were Contributed to Colonial Bank on August 11, 2009

The evidence demonstrates that the REIT Preferred Securities were contributed by BancGroup to Colonial Bank effective as of August 11, 2009 in accordance with BancGroup's commitments to bank regulators when it obtained their approval for the securities offering several years earlier.  This uncontroverted evidence includes:  (i) the plain language of the governing documents, (ii) accounting records reflecting the completed capital contribution, (iii) a certification provided to the FDIC by BancGroup's general counsel David Byrne that the contribution had been completed, and (iv) the unchallenged testimony of Mr. Byrne and other senior BancGroup officers who were directly involved in the transaction.

### 1.    BancGroup Irrevocably Committed to Contribute the Securities to Colonial Bank if an Exchange Event Occurred

CBG Florida REIT Corp. ("CBG Florida REIT" or the "REIT") was established as a wholly-owned, indirect subsidiary of Colonial Bank that qualified as a real estate investment trust for purposes of federal tax laws.  The assets of the REIT consisted primarily of participation interests in mortgage loans that had been originated by Colonial Bank.  *See* Compl., ¶¶ 44, 45.

In early 2007, BancGroup and Colonial Bank requested permission from regulators to raise $300 million through a proposed offering of REIT preferred securities by the REIT.  The REIT Preferred Securities would be offered to qualified investors and would provide a stream of dividends funded by the loans held by the REIT as well as a $300 million liquidation preference in the event that the REIT ever were to be wound up.  Stmt. Facts, ¶ 53.

BancGroup and Colonial Bank wanted regulators to agree that the securities, once issued, would qualify as Tier 1 capital, Moore Tr. 107:2-13, which would enable BancGroup to spend the proceeds raised in the offering but still include the outstanding securities in calculating the most critical regulatory capital ratios for both the Bank and its holding company, Moore Tr. 72:4-6; 102:17-104:17.

At the time of the offering, the primary banking regulator for Colonial Bank was the Office of the Comptroller of the Currency (the "OCC") and the primary banking regulator for BancGroup was the Federal Reserve Bank of Atlanta.  Both agencies approved Tier 1 capital treatment for the proposed securities subject to the requirement that, if Colonial Bank fell into financial hardship, investors holding the REIT Preferred Securities would be deemed, instead, to hold shares of BancGroup preferred stock and Colonial Bank would become the owner of the REIT Preferred Securities (and therefore the beneficiary of the stream of dividends and the $300 million liquidation preference associated with the securities).  *See* Clarke Decl., Exhs. 35-38; Moore Tr. 127:4-130:4.  These requirements were consistent with the regulatory guidance about obtaining Tier 1 capital treatment for this kind of securities at that time.  *See generally* Board of Governors of the Federal Reserve System, Final Rule, "Risk-Based Capital Standards: Trust Preferred Securities and the Definition of Capital," 70 Fed. Reg. 11827, 11828 (Mar. 10, 2005).

In accordance with these regulatory requirements, BancGroup, Colonial Bank and CBG Florida REIT entered into an Exchange Agreement dated as of May 21, 2007 (the "Exchange Agreement") in connection with the closing of the REIT Preferred Securities offering.  *See* Clarke Decl., Exh. 40; Moore Tr. 120:9-121:20.  In the Exchange Agreement, the three affiliated corporations agreed that if Colonial Bank's federal banking regulator declared that an "Exchange

Event" had occurred with respect to the Bank, then a "Conditional Exchange" of the REIT Preferred Securities would occur "as of 8:00 A.M., New York time, on the date for such exchange set forth in such [regulatory] directive . . . ."  In that event, "[e]ffective on the date and time of the Conditional Exchange," the following actions would occur or be required:

> "(a)  each holder of [REIT preferred securities] shall be unconditionally obligated to surrender to [BancGroup] any certificate representing [those securities] as set forth in the Articles of Incorporation;

> (b)  [CBG Florida REIT] shall record, or cause to be recorded, in its share registry [BancGroup] as owner of all of the [REIT preferred securities], as transferee from the Persons who are holders of the [those securities] immediately prior to such date and time;

> (c)  [BancGroup] shall issue a number of shares of [BancGroup preferred stock] equal to the number of shares of [REIT preferred securities] to the holders of record of the [REIT preferred securities] upon surrender of the certificates representing [the REIT preferred securities];

> (d)  all of the [REIT Preferred Securities] then outstanding will be deemed to be owned by [BancGroup], without any action by [CBG Florida REIT] or any other action being necessary or required by any other Person, and Persons who are holders of [REIT Preferred Securities] shall have no rights under the securities, other than the right to receive [BancGroup preferred stock] in exchange therefore, as provided herein; and

> (e)  *[BancGroup] shall contribute all of the [REIT Preferred Securities] to [Colonial Bank] as a capital contribution and [CBG Florida REIT] shall record, or cause to be recorded, in its share registry the Bank as owner of all of the [REIT Preferred Securities].*"

*See* Clarke Decl., Exh. 40 (Exchange Agreement) at § 2 (emphasis added).[20]

An "Exchange Event" that could prompt a regulatory notification causing or requiring these actions would occur when:

---

[20] The Exchange Agreement assumed that Colonial Bank's federal regulator would be the OCC, but it also defined that term to include "any successor United States Federal bank regulatory agency that is the primary supervisory agency for the Bank."  *See* Clarke Decl., Exh. 40 (Exchange Agreement) at 2.  The amended and restated articles of incorporation of CBG Florida REIT included a substantially similar provision *See* Clarke Decl., Exh. 38 at 8 (definition of "Primary Regulator").

"(a)     [Colonial Bank] becomes 'undercapitalized' under the OCC's prompt corrective action' regulations (and including any successor regulations);

(b)     [Colonial Bank] is placed into conservatorship or receivership; or

(c)     the OCC, in its sole discretion, anticipates [Colonial Bank] becoming 'undercapitalized' in the near term or takes a supervisory action that limits the payment of dividends by the Bank and in connection therewith, directs and exchange."

*Id.*[21]   All of the agreements and other documents governing the terms of the REIT Preferred Securities were duly authorized through actions of the boards of BancGroup, Colonial Bank and the REIT at the time of the offering.  *See* Byrne Tr. 35:18-22, 50:14-54:19.

BancGroup received substantial benefits from the structure of the offering.  As a result of the Tier 1 capital treatment accorded to the REIT Preferred Securities, BancGroup raised roughly $300 million that it used to acquire another bank holding company while continuing to include the same value in its Tier 1 capital calculations for both BancGroup and Colonial Bank.   Moore Tr. 130:13-132:2.   From the closing of the offering in May 2007 through its last filing in July 2009, Colonial Bank listed the REIT Preferred Securities as Tier 1 capital in its quarterly Call Reports.  *See* Stmt. Facts, ¶ 60.

### 2.     BancGroup Contributed the Securities to Colonial Bank When an Exchange Event Was Declared

On August 10, 2009, the FDIC sent a letter to BancGroup, Colonial Bank and CBG Florida REIT reporting that an Exchange Event had occurred and directing a Conditional

---

[21]    In connection with the offering of the REIT preferred securities, the articles of incorporation of CBG Florida REIT were amended and restated to include substantially identical provisions.  *See* Clarke Decl., Exh. 39 at 5.

Exchange to occur "effective at 8:00 A.M. New York time on August 11, 2009."[22]   Clarke

Decl., Exh. 41; Moore Tr. 154:15-155:22.

Upon receipt of the letter from the FDIC, senior officers of BancGroup conferred with

one another and with outside counsel to ensure that BancGroup took the steps that were called

for under the governing documents.   Byrne Tr. 60:20-63:22; Hicks Tr. 119:16-21.   After

reviewing the Exchange Agreement, the officers directed the relevant accounting employees to

record transactions in the general ledger reflecting the exchange of the REIT Preferred Securities

as the result of the Conditional Exchange and BancGroup's simultaneous contribution of those

securities to Colonial Bank as a capital contribution.   *See* Moore Tr. 158:2-9, 159:2-160:5,

170:14-173:4; Hicks Tr. 120:1-17, 126:19-127:8; Byrne Tr. 61:21-62:11; Moore Exh. 37.

Mr. Byrne and Mr. Hicks testified in their depositions that they understood these

transactions had been recorded effective as of 8 A.M. on August 11, 2009, as required under the

Exchange Agreement.   Byrne Tr. 69:7-70:21; Hicks Tr. 126:19-127:18.   On that date, Mr. Hicks

sent an email to the FDIC's acting regional director reporting that the transactions had been

completed.   *See* Clarke Decl., Exh. 43; Byrne Tr. 64:2-65:1.   The FDIC requested "something

more formal" to confirm that the transactions had been completed, Hicks Tr. 125:21-126:15, and

in response on August 13, 2009, Mr. Byrne signed a certification, which was delivered to the

FDIC, attesting that the transactions had been recorded.   *See* Clarke Decl., Exh. 44; Byrne Tr.

69:7-70:21; Hicks Tr. 125:17-126:15.   The certification included an attachment that reflected the

---

[22] In June 2008, Colonial Bank changed its charter from a national bank regulated by the OCC to an Alabama state-chartered bank regulated by the Alabama State Banking Department and the FDIC.  As a result, the FDIC became its primary federal regulator.  As previously noted, the Exchange Agreement and the amended articles of incorporation of CBG Florida REIT both provided that an Exchange Event could be declared by the primary federal regulator for Colonial Bank, whether it was the OCC or another successor agency.  At the time of the events at issue, the FDIC was the relevant federal regulator.

accounting entries that had been made in the books and records of Colonial Bank and BancGroup on August 11, 2009 to reflect the contribution of capital of Colonial Bank of the REIT Preferred Securities. *See* Clarke Decl., Exh. 44; Hicks Tr. 126:16-127:18.

### B. BancGroup's Avoidance Claims Regarding Its Contribution of REIT Preferred Securities to Colonial Bank Are Not Actionable

In its pending motion for partial judgment on the pleadings, the FDIC-Receiver has identified two separate reasons why BancGroup's attempt to avoid the contribution of the REIT Preferred Securities to Colonial Bank must fail as a matter of law. The FDIC-Receiver incorporates those arguments by reference, and in the interest of brevity will only briefly summarize them here. *See* Memorandum of Law in Support of Motion of Defendant FDIC-Receiver for Partial Judgment on the Pleadings, dated Feb. 24, 2011 [Doc. No. 45]; Reply Memorandum in Further Support of FDIC-Receiver's Motion for Partial Judgment on the Pleadings, dated Apr. 18, 2011 [Doc. No. 61].

First, BancGroup's avoidance claims are barred by 12 U.S.C. § 1828(u). That statute prohibits any claim or action against the FDIC-Receiver for the return of assets of a "controlling shareholder" of an insured bank that were transferred to that bank by the controlling shareholder, or a claim "for monetary damages or other" relief based on such a transfer, if at the time of the transfer the bank was "subject to any direction issued in writing by a Federal banking agency to increase its capital . . . ." 12 U.S.C. § 1828(u).

There is no dispute that Colonial Bank was subject to the required "direction in writing . . . to increase its capital," which was reflected in a consent cease and desist order issued by the FDIC in June 2009 in addition to an earlier memorandum of understanding. *See* Stmt. Facts, ¶ 66. In its brief responding to the FDIC-Receiver's earlier motion, "BancGroup conced[ed]" that the June 2009 cease and desist order constituted the type of regulatory direction in writing

that triggers application of section 1828(u).[23]  *See* Plaintiff's Brief in Opposition to Motion of Defendant FDIC-Receiver for Judgment on the Pleadings, dated Apr. 8, 2011, at 21 [Doc. No. 59].

BancGroup's other challenges to the application of section 1828(u) to bar these claims are wrong for the reasons set forth in the FDIC-Receiver's reply in support of its earlier motion, which are incorporated by reference here.  Specifically, BancGroup's assertion that it can assert an avoidance claim with respect to the transfer "defensively," as a way to prevent the FDIC-Receiver from recovering on other claims under section 502(d) of the Bankruptcy Code, is simply wrong.  Section 1828(u) prohibits not only claims for the return of an avoidable transfer or damages based on such a transfer but also for "*other* legal or equitable relief" based on such a theory.  *See* 12 U.S.C. § 1828(u) (emphasis added).  The "setoff" argument that BancGroup would like to pursue falls squarely within this prohibition.  Nor can this claim seeking affirmative relief from the FDIC-Receiver be recast in retrospect as an "affirmative defense," as BancGroup has argued, since BancGroup is asserting affirmative relief in that claim.  In any event, such an affirmative "defense" also would be "other legal or equitable relief" that would be subject to the prohibition in section 1828(u).

Second, and in the alternative, no avoidance claim can be asserted with respect to the contribution to Colonial Bank of the REIT Preferred Securities because the securities were never "property of the estate."  Under the "control test" that has been recognized by the Eleventh Circuit and other courts, property transferred by a debtor pre-petition is excluded from "property of the estate" for avoidance claims if the debtor lacked "(1) the power to designate which party

---

[23] In fact, the prohibition of section 1828(u) arose earlier, when Colonial Bank agreed to a December 15, 2008 memorandum of understanding with the FDIC that also required the Bank to increase its capital.  *See* Stmt. Facts, ¶ 65.

will receive the funds, and (2) the power to actually disburse the funds at issue to that party." *3V Capital Master Fund Ltd. v. Official Committee of Unsecured Creditors (In re TOUSA, Inc.)*, 444 B.R. 613, 647 (S.D. Fla. 2011). The control test requires a court to review "the actual documents governing the transactions." *Id.* The rationale for this rule is that "without the requisite control, the subject property could not have been used by the debtor to pay another creditor, and the transfer thus did not decrease the value of the debtor's estate." *Id.* (discussing *Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*, 813 F.2d 1177, 1181-82 (11th Cir. 1987)).

In this case, the provisions of the Exchange Agreement unconditionally obligated BancGroup to "contribute all of the [REIT Preferred Securities] then outstanding to the Bank as a capital contribution." Clarke Decl., Exh. 40 (Exchange Agreement) at § 2(e). This unconditional obligation was required to occur "[e]ffective on the date and time of the Conditional Exchange," *id.*, § 2, in other words, simultaneously with the occurrence of the very same event that would result in BancGroup having any constructive possession of the REIT Preferred Securities in the first place.

Under the Exchange Agreement, BancGroup had no discretion to use the securities to pay its other creditors or to satisfy any other obligations. Indeed, the undisputed evidence establishes that BancGroup did precisely what it was bound by contract to do – immediately contribute the REIT preferred securities to Colonial Bank on August 11, 2009 when the Exchange Event was declared. *See* Byrne Tr. 61:21-62:11; Hicks Tr. 120:14-17, 126:19-127:8; Moore Tr. 158:2-9. 159:20-160:5. Application of the "control" test could not be clearer than it is under these facts.

## IV.   JUDGMENT SHOULD BE ENTERED FOR THE FDIC-RECEIVER ON BANCGROUP'S OTHER AVOIDANCE CLAIMS

In addition to its challenges to its own contribution of the REIT Preferred Securities to its Bank subsidiary, BancGroup's amended complaint purports to assert avoidance claims with

respect to a variety of other capital contributions or other transactions involving Colonial Bank during the two years prior to its bankruptcy petition. *See* Compl., ¶¶ 39-43 (capital contributions and "certain other transfers", ¶¶ 52-56 (preference claims), & Exh. B (table of alleged transfers). The FDIC-Receiver previously has identified the inadequacy of pleading with respect to most of these claims in its pending motion for partial judgment on the pleadings.

BancGroup's response to that earlier motion to dismiss speaks volumes. There it informed the Court that:

> BancGroup's purpose in seeking the relief prayed for in the Complaint is to utilize the avoidance recoveries as defenses to and offsets against claims asserted by the FDIC-Receiver in its proof of claim filed in BancGroup's Chapter 11 bankruptcy case.

*See* Plaintiff's Brief in Opposition to Motion of Defendant FDIC-Receiver for Judgment on the Pleadings, dated Apr. 8, 2011, at 2 [Doc. No. 59].

BancGroup's meritless avoidance claims, in other words, are merely one prong in its two-pronged strategy to misappropriate tax refunds and insurance proceeds that are the property of the FDIC-Receiver, first by arguing that the FDIC-Receiver is really just a creditor in BancGroup's chapter 11 case, then by arguing that because the FDIC-Receiver has been sued for over $1 billion in meritless avoidance claims it should not be permitted to recover anything from the BancGroup bankruptcy estate, leaving the FDIC-Receiver's valuable property exclusively to BancGroup's bondholders instead. Such gamesmanship has no place in the federal courts. In any event, summary judgment should be granted in the FDIC-Receiver's favor as to all of the avoidance claims on several different grounds

## A. Section 1828(u) Bars Avoidance Claims for Any Transfers Made on or after December 15, 2008

As previously mentioned, and as set forth in the FDIC-Receiver's motion for partial judgment on the pleadings, section 1828(u) of title 12 bars any avoidance claim against the

FDIC-Receiver for transfers by a holding company to or on behalf of its bank subsidiary at a time when the bank was subject to a direction in writing to increase its capital.  *See* 12 U.S.C. § 1828(u).  That section prohibits all of BancGroup's avoidance claims challenging transfers made on or after December 15, 2008, when Colonial Bank entered into a memorandum of understanding with the FDIC that, among other things, required the Bank to increase its capital. *See* Stmt. Facts, ¶ 66.

In this regard, the FDIC-Receiver refers to and incorporates by reference its arguments for dismissal of these claims that were set forth in support of the FDIC-Receiver's pending motion for partial judgment on the pleadings.  *See* Memorandum of Law in Support of Motion of Defendant FDIC-Receiver for Partial Judgment on the Pleadings, dated Feb. 24, 2011 [Doc. No. 45]; Reply Memorandum in Further Support of FDIC-Receiver's Motion for Partial Judgment on the Pleadings, dated Apr. 18, 2011 [Doc. No. 61].

In addition to BancGroup's REIT Preferred Securities claim, the claims that are subject to this statutory prohibition include:  the purchase by BancGroup's subsidiary CBG Real Estate LLC of various loans from Colonial Bank, which the undisputed evidence establishes occurred on or effective as of December 31, 2008, *see* Stmt. Facts, ¶¶ 68-69; the March 31, 2009 contribution by BancGroup to Colonial Bank of a 65% participation interest in the same CBG Real Estate loans, *see* Compl., ¶ 42; and alleged contributions to Colonial Bank of cash and securities valued at $71 million during 2009, *see* Compl., Exh. B.

Section 1828(u) would also absolutely bar BancGroup's avoidance claim with respect to an alleged transfer to Colonial Bank in June 2009 of $166 million in federal income tax refunds. *See* Compl., ¶ 42.  As already discussed, however, those tax refunds were paid by the IRS directly to Colonial Bank and never touched the books of BancGroup.  *See supra* at 30-32.  As a

result, there was no "transfer" that could be avoided as either a preference or a constructive fraudulent transfer.  Moreover, the reason that the refunds were paid directly to Colonial Bank was because they were Colonial Bank assets, as its accounting records already reflected.  *See* Hicks Tr. 57:20-64:16.  Consequently, the refunds were never "property of the estate" as to which either a claim of preference or fraudulent transfer could be asserted as a matter of law. *See* 11 U.S.C. § 544(b)(1) (state law fraudulent transfer claims) (trustee may avoid "any transfer of an interest of the debtor in property . . ." that meets the statutory criteria); 11 U.S.C. § 547(b) (preferences) (setting forth requirements for avoidance as a preference of "any transfer of an interest of the debtor in property"); 11 U.S.C. § 548(a) (fraudulent transfers) ("trustee may avoid any transfer . . . of an interest of the debtor in property . . .").

### B.   The Undisputed Facts Demonstrate that Colonial Bank Was Solvent at All Times Prior to December 15, 2008

Summary judgment also is appropriate as to BancGroup's constructive fraudulent transfer challenge to $375 million in capital contributions to Colonial Bank during 2008 (all of which occurred before December 15th of that year, when Colonial Bank entered into a memorandum of understanding with its regulator).  *See* Compl., Exh. B.   The evidence establishes that Colonial Bank was solvent at the time of each of those alleged transfers, precluding these claims because BancGroup received reasonably equivalent value in return.[24]  *See* 11 U.S.C. § 548(a)(1) (debtor can avoid transfer for which it received less than a reasonably equivalent value and that

---

[24] BancGroup includes generic allegations regarding preferences in this section of its amended complaint, but there is no reasonable reading of that pleading under which the 2008 capital contributions could be construed to be "preferences," which are by definition transfers made by a debtor to a creditor "for or on account of an antecedent debt."  *See* 11 U.S.C. § 547(b).  No capital contribution can be construed to be a transfer on account of an "antecedent debt," nor has BancGroup made any creditable allegation that any of the 2008 capital contributions was made on that basis.

was made while the debtor was insolvent or the debtor was rendered insolvent as the result of the transfer).

Neither the Bankruptcy Code nor state law permits a claim for constructive fraudulent transfer where the debtor receives a corresponding benefit from the transaction, whether directly or indirectly. *Gen. Elec. Cred. Corp. v. Murphy (In re Duque Rodriguez)*, 895 F.2d 725, 727 (11th Cir. 1990); *TOUSA*, 444 B.R. at 657; *CareerCom Corp. v. United States Dep't of Educ. (In re CareerCom Corp.)*, 215 B.R. 674, 677 (Bankr. M.D. Pa. 1997); *In re Augie/Restivo Baking Co.*, 87 B.R. 242, 247 (Bankr. E.D.N.Y. 1988); *see also Pennington v. Bigham*, 512 So. 2d 1344, 1346 (Ala. 1987) (elements of constructive fraud under Alabama law include that grantor "conveys property without receiving valuable consideration"). In such a situation, "the debtor's net worth has been preserved and the interests of its creditors have not been injured by the transfer." *Duque Rodriguez*, 895 F.2d at 727 (quoting *Rubin v. Mfrs. Hanover Tr. Co.*, 661 F.2d 979, 991 (2nd Cir. 1981)).

For this reason, "transfers to a solvent subsidiary are considered to be for reasonably equivalent value because, since the parent is the sole stockholder of the subsidiary corporation, any benefit received by the subsidiary is also a benefit to the parent." *Branch v. F.D.I.C.*, 825 F. Supp. 384, 399-400 (D. Mass. 1993); *see Lawrence Paperboard Corp. v. Arlington Tr. Co. (In re Lawrence Paperboard Corp)*, 76 B.R. 866, 872 (Bankr. D. Mass. 1987); *Garrett v. Falkner (In re Royal Crown Bottlers of N. Alabama, Inc.)*, 23 B.R. 28, 30 (Bankr. N.D. Ala. 1982) ("the passing to a subsidiary of the consideration for a transfer by a debtor-parent may be presumed to be substantial"). Indeed, a parent corporation that makes a capital contribution to its wholly owned subsidiary receives an identical benefit in return in the form of an increase in the value of its equity investment in that subsidiary.

As the Third Circuit has observed:

> when the debtor is a going concern and its realizable going concern value
> after the transaction is equal to or exceeds its going concern value before
> the transaction, reasonably equivalent value has been received.

*Mellon Bank, N.A. v. Metro Comm'ns, Inc.*, 945 F.2d 635, 647 (3d Cir. 1991), *cert. denied*, 503 U.S. 937 (1992). The district court in *Branch* observed that it was "aware of no case in which transfers to a solvent subsidiary have been determined to be for less than equivalent value," and the *Branch* court therefore found such transfers to be subject to a rebuttable presumption that reasonably equivalent value was received. *Branch*, 825 F. Supp. at 400.

These principles are fully applicable to bar BancGroup's avoidance claims with respect to the 2008 capital contributions in this case. The undisputed evidence establishes that Colonial Bank was solvent at the time of every one of the challenged capital contributions to Colonial Bank in 2008.

According to BancGroup's discovery responses, the first capital contribution in 2008 was of $65 million and occurred during the first quarter. There is no doubt that Colonial Bank was solvent then. In its Call Report for the period ending March 31, 2008, Colonial Bank reported net income for the quarter of over $27 million and total equity capital of nearly $2.3 *billion*. *See* Clarke Decl., Exh 24. Sarah Moore, the chief financial officer of BancGroup and Colonial Bank at the time, testified that she believed the figures reported in that Call Report were accurate. Moore Tr. 66:4-7.

The second capital contribution in 2008 occurred on or around April 25, 2008, and was in the amount of $290 million. On that date, BancGroup issued 43.7 million shares of its common stock to public investors in an offering that raised approximately $333 million after underwriting fees and expenses. BancGroup made the $290 million capital contribution to Colonial Bank

from the proceeds of that stock offering, leaving $43 million in new cash at the holding company even after the capital contribution had been made.  Moore Tr. 50:21-53:20.

Ms. Moore testified in her deposition that at the time of this capital contribution, Colonial Bank was able to pay its debts as they came due, had adequate capital, was considered "well capitalized" within the meaning of that term in federal banking law, and the value of its assets exceeded the value of its liabilities.  Moore Tr. 54:9-23.  Reflecting all of the foregoing, on May 19, 2008 and July 28, 2008, Colonial Bank paid dividends to BancGroup of $38 million and $20 million, respectively, after determining on each occasion that the Bank had sufficient capital surplus and earnings from its operations to pay such dividends under applicable state and federal laws that would otherwise limit the payment of dividends by a bank or an Alabama corporation. Moore Tr. 58:20-59:12, 56:19-57:12.[25]

According to BancGroup's discovery responses, the final capital contribution in 2008, of $20 million, occurred sometime during the third quarter of that year.  While the Call Report filed by Colonial Bank for that quarter reported a modest operating loss for the year of $38 million, it also reported that Colonial Bank retained total equity capital of $2.47 billion at the end of the quarter, an increase of nearly $200 million from the amount of equity capital that the Bank had reported at the prior quarter's end.  *See* Clarke Decl. Exh. 25.  Ms. Moore testified that she believed those figures to be accurate when the Call Report was filed.  Moore Tr. 66:4-7.

---

[25] *See* 12 U.S.C. § 60 ("national bank may not declare and pay dividends in any year in excess of an amount equal to the sum of the total of the net income of the bank for that year and the retained net income of the bank for the preceding two years" minus certain other transfers); 12 C.F.R. § 5.64(c); Ala. Code § 5-5A-21 ("it shall be unlawful for [a] bank to declare or pay a dividend in excess of 90 percent of the net earnings of such bank until the surplus of such bank shall be equal to at least 20 percent of capital"); Ala. Code § 10-2B-6.40 (prohibiting dividends by Alabama corporation if, after giving effect to dividend, "[t]he corporation would not be able to pay its debts as they become due in the usual course of business" or "[t]he corporation's total assets would be less than the sum of its total liabilities . . .").

Even by the end of 2008, by which time Colonial Bank had been required to enter into a memorandum of understanding with its bank regulators, the Bank was still considered "well capitalized" within the meaning of applicable federal banking laws. *See* Clarke Decl. Exh. 27 at 7. As of that date, several months after the last of the 2008 capital contributions, Colonial Bank reported in its Call Report total equity capital of $1.44 billion. *See* Clarke Decl. Exh. 26. Further, while the Bank reported a loss of $849 million for the year, a significant portion of that loss ($575 million) was attributable to goodwill impairment, a non-cash charge. *See id.*; Moore Tr. 78:15-80:9.

In brief, there is no evidence that Colonial Bank was insolvent at the time of any of the 2008 capital contributions, and BancGroup therefore necessarily received "reasonably equivalent value" for each of those transfers. Since Colonial Bank was solvent, it follows that its parent corporation, BancGroup, also was solvent at the time of each of the transfers, providing yet another reason why any constructive fraudulent transfer challenge to those contributions must fail. *See* 11 U.S.C. § 548(B)(ii)(I) (debtor must have been insolvent or become insolvent as the result of challenged transfer); *see also* 11 U.S.C. § 544(b); *see* Ala. Code §§ 8-9A.4(c), 8-9A.5(a).[26]

### C.   BancGroup's Claim With Respect to the 2007 Citrus & Chemical Transaction Fails for Additional Reasons

The amended complaint includes in the table of challenged transfers a 2007 merger transaction that the complaint labels "Citrus & Chemical Acquisition." *See* Compl., Exh. B. No further elaboration is provided there or elsewhere in the amended complaint as to the nature of

---

[26] Section 544(b) provides in pertinent part that "[t]he trustee may avoid any transfer of . . . property . . . that is voidable under applicable law . . . ." 11 U.S.C. § 544(b)(2011). Under the Alabama Fraudulent Transfer Act, claims for constructive fraudulent transfer have substantially similar elements to those set forth in section 548(a)(1) of the Bankruptcy Code. *See* Ala. Code §§ 8-9A.4(c), 8-9A.5(a).

BancGroup's challenge to this transaction.  The undisputed facts establish that no avoidance claim can be sustained against the FDIC-Receiver with respect to the transaction for several reasons.

First, there can be no genuine dispute that Colonial Bank and BancGroup were solvent at the time of that 2007 transaction, which was in fact an acquisition by *BancGroup* (not Colonial Bank) of a bank holding company called Citrus & Chemical Bancorporation.  *See* Clarke Decl. Exh. 50.  The transaction was announced by BancGroup on July 18, 2007 and closed on December 3rd of that year.  *See* Stmt. Facts, ¶ 71.  Clarke Decl. Exh. 51  at 79.  According to its Call Report for year-end 2007, Colonial Bank had earned net income of $192 million for the year and closed the year with equity capital of $2.29 billion.  *See* Clarke Decl. Exh. 23.

In connection with the closing of the transaction, on November 26, 2007 the Colonial Bank board of directors declared a special dividend of $125 million to BancGroup, which BancGroup used to fund the cash portion of the merger consideration to Citrus & Chemical's stockholders.  *See* Moore Tr. 28:3-28:21.  In connection with the declaration of that dividend, Ms. Moore determined that Colonial Bank had sufficient resources to pay the dividend in accordance with applicable federal law.  *See* Moore Tr. 29:12-21.  She also testified that at the time of merger, Colonial Bank was able to pay its debts as they became due and had adequate capital.  Moore Tr. 39:8-39:20.  As a result, to the extent Colonial Bank could be deemed to be a "transferee" with respect to the transaction (which it cannot be), BancGroup necessarily received reasonably equivalent value in exchange for any such "transfer."

Second, the fact that Colonial Bank funded a substantial portion of the acquisition costs belies any claim for constructive fraudulent transfer against the FDIC-Receiver with respect to that transaction.  *See* 11 U.S.C. § 550(a) (avoidance cause of action only available against "initial

transferee," "entity for whose benefit the transfer was made" or "immediate or mediate transferee" of initial transferee). Colonial Bank was a transferor, not the transferee, in the Citrus & Chemical transaction. Nor can Colonial Bank be characterized as the person "for whose benefit" any transfer was made in that transaction. Rather, BancGroup was the principal beneficiary of the transaction, which was considered immediately accretive to the holding company's earnings and increased BancGroup's market share in Florida. *See* Moore Tr. 35:13-36:9. No claim against the FDIC-Receiver is available based on that transfer under section 550 of the Bankruptcy Code.

Finally, BancGroup also was solvent at the time of the transaction, and the transaction did not render BancGroup insolvent. *See* Moore Tr. 39:12-39:15. Indeed, in the same meeting in which it approved the Citrus & Chemical acquisition, the BancGroup board of directors also declared dividends to BancGroup's common stockholders and authorized sizeable securities repurchases by BancGroup. *See* Moore Tr. 41:2-46:17. Ms. Moore testified that at the time, she had performed the necessary financial analysis and was comfortable that BancGroup had sufficient resources to engage in these transactions. Moore Tr. 46:2-46:13.

## V.     NONE OF BANCGROUP'S OTHER MISCELLANEOUS CLAIMS PRESENTS AN ISSUE FOR TRIAL

The amended complaint includes an assortment of other miscellaneous claims that appear to have been included primarily to reserve rights rather than to actually seek recovery. In discovery, BancGroup has conceded that it has no basis for many of these claims. Others are not supported by the evidence or are simply inactionable.

### A.     BancGroup Cannot Establish Its Claim for an Intercompany Receivable Allegedly Owing from Colonial Bank

In its amended complaint, BancGroup asserts that Colonial Bank owed it $514,420.78 based on transactions between the two corporations prior to the Bank's failure. *See* Compl.,

¶¶ 24-26.  BancGroup's support for this alleged claim is what its own counsel has called a "stack of documents," and a potentially unrelated schedule, that its principal witness Sarah Moore could not identify or authenticate.  *See* Moore Tr. 252:10-253:9.   Summary judgment cannot be defeated by alleged evidence that would not be admissible at trial.  *See Anderson v. Liberty Lobby*, 477 U.S. at 249 ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party") (citations omitted).

Even setting aside this fundamental evidentiary problem, however, the balance alleged by BancGroup fails to take into account the more than $20 million in unwarranted payments that were made by Colonial Bank to BancGroup for the use of BancGroup's tax losses in the second half of 2008 and in 2009, when BancGroup knew that Colonial Bank and its subsidiaries had no taxable income.  *See supra* at 28;  Hicks Tr. 100:18-103:10; Reimer Tr. 43:12-50:17, 146:9-19. The amount of any intercompany balance that might be owed to either party by the other one therefore tips decidedly in favor of the FDIC-Receiver, not BancGroup.

### B.      Deposit Claims

BancGroup asserts several claims concerning the balances held in several demand deposit accounts at Colonial Bank at the time of the Bank's failure and for various alleged costs and damages arising from a hold on those accounts that has been placed on those accounts by the FDIC-Receiver while its setoff rights are determined.  Compl., ¶¶ 64-74, 90-91.  As this Court is aware, those issues have been the subject of substantial motion practice in the bankruptcy court and are the subject of a pending appeal before this Court.  *See F.D.I.C. v. The Colonial BancGroup, Inc. (In re The Colonial BancGroup, Inc.)*, No. 2:11-cv-0133 (MHT) (M.D. Ala.).

Section 553(a) of the Bankruptcy Code provides that a debtor's bankruptcy filing "does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that

arose before the commencement of the case under this title against the claim of such creditor that arose before the commencement of the case." 11 U.S.C. § 553(a). The FDIC-Receiver, as the successor to Colonial Bank, has setoff rights with respect to the deposit balances and timely moved for relief from the automatic stay to protect and assert those setoff rights in accordance with Supreme Court guidance. *See Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 21 (1995) (deposit "consists of nothing more or less than a promise to pay, from the bank to the depositor . . ." and bank's administrative hold pending stay relief motion did not violate section 362 of the Bankruptcy Code) (citing *Bank of Marin v. England*, 385 U.S. 99, 101 (1966) ("The relationship of bank and depositor is that of debtor and creditor, founded upon contract.")); *see also King v. Porter*, 230 Ala. 112, 160 So. 101, 105 (1935) (Alabama law).

The bankruptcy court denied the FDIC-Receiver's motion for relief from the automatic stay, but with BancGroup's consent the hold on the account balances has remained in place by court order while the FDIC-Receiver's appeal is pending (although BancGroup has been permitted to spend substantial amounts of funds reflected in one of those account balances to pay for its ongoing administrative expenses). *See* Stmt. Facts, ¶ 84. Even before that order was entered, however, a prior order of the bankruptcy court provided that the FDIC-Receiver would not be deemed to be in violation of the automatic stay while its setoff rights were being adjudicated. *See* Stmt. Facts, ¶ 85. There is, therefore, no basis for BancGroup to claim any consequential damages as the result of the FDIC-Receiver's entirely legal efforts to protect its rights.

To the extent that BancGroup's claim purports to seek recovery of the deposit balances that it has not already spent, that claim ultimately will be determined in the separate litigation

that is currently pending as the FDIC-Receiver's appeal in this Court.  No trial therefore is necessary in this action as to that claim.

### C. Placeholder Claims

The amended complaint asserts a litany of unsubstantiated claims that BancGroup's discovery responses establish have no basis in fact.  These include:  claims for (i) unspecified "preferences," Compl., ¶¶ 52-56, (ii) amounts allegedly paid by BancGroup under unspecified vendor contracts, Compl., ¶¶ 57-59; (iii) allegedly "improper asset possession and sales" by the FDIC-Receiver, Compl., ¶¶ 60-63 (also separately asserted as a claim for "conversion" without identifying any BancGroup property that allegedly was "converted," *see* Compl., ¶¶ 117-18); (iv) alleged "costs and expenses that inured to the sole or primary benefit of Colonial Bank subsequent to the Receivership Date," Compl., ¶¶ 75-76; (v) "employee related costs," Compl., ¶¶ 77-81; (vi) reimbursement for amounts paid by BancGroup in indemnification to former Colonial Bank officers or directors, Compl., ¶¶ 86-88; and (vii) other unspecified contingent, unliquidated claims, Compl., ¶ 89.[27]

BancGroup has not even attempted to develop these claims in discovery, and it failed to provide supporting details for these claims in its discovery responses.  For example, BancGroup could not specify "vendor contracts" under which it has paid any amounts that should have been paid by the FDIC-Receiver.  Instead, it merely referred generally to a schedule and proofs of claim that have been filed in its bankruptcy case.  *See* Clarke Decl., Exh. 53 at Response to Interrogatory No. 14.  Similarly, the only "administrative cost" that BancGroup could identify was an $11,000 claim that had been asserted against BancGroup by a third-party vendor, with no

---

[27] The FDIC-Receiver has moved to dismiss BancGroup's preference claims, Compl., ¶¶ 52-56, for failure to satisfy the applicable pleading standards.  That motion remains pending and the FDIC-Receiver does not waive its arguments by including those claims in this motion for summary judgment.

explanation as to why the FDIC-Receiver should be responsible for paying it. *See* Clarke Decl., Exh. 53 at Response to Interrogatory No. 19.

In response to an interrogatory asking BancGroup to identify "assets" that the FDIC-Receiver allegedly possessed or sold "improperly," BancGroup pointed to a bankruptcy schedule that identified miscellaneous items. *See* Clarke Decl., Exh. 53 at Response to Interrogatory No. 16.    However, BancGroup cannot dispute that when the FDIC-Receiver sold the headquarters building that had been owned by Colonial Bank (where BancGroup rented space), the FDIC-Receiver arranged for BancGroup to negotiate with the buyer of that building to sell BancGroup's furniture, fixtures and equipment that were located on those premises.  BancGroup sold that personal property for $110,000. *See* Notice of Proposed Sale of FF&E Assets Pursuant to FF&E Sales Procedures, dated November 9, 2010 [Bankr. Doc. No. 990].   Similarly, the schedule that BancGroup identified listed various vehicles that BancGroup claimed the FDIC-Receiver had improperly withheld from it but that BancGroup sold, with the FDIC-Receiver's consent, in November 2009.  *See* Order Pursuant to Sections 105 and 363 of the Bankruptcy Code Granting Motion of the Debtor for Authority to Sell Certain Motor Vehicles Free and Clear of Liens Pursuant to Procedures Approved by the Court, entered on November 19, 2009 [Bankr. Doc. No. 304].

In response to the FDIC-Receiver's request that BancGroup identify "employee related costs," BancGroup could not identify any apart from costs relating to employee benefit plans for which BancGroup, not Colonial Bank, was the sponsor. *See* Clarke Decl., Exh. 53 at Response to Interrogatory No. 21.  One of these plans was a "top hat" plan that BancGroup terminated during its bankruptcy case, allowing BancGroup to collect $1.9 million without objection from the FDIC-Receiver.  *See* Memorandum Opinion entered June 25, 2010 [Bankr. Doc. No. 776].

Finally, in response to the FDIC-Receiver's request that BancGroup identify any claim for indemnification or contribution that it had paid on behalf of Colonial Bank, BancGroup identified none.  *See* Clarke Decl., Exh. 53 at Response to Interrogatory No. 26.  Instead, it referred to bankruptcy proofs of claim that had been filed, but not paid by BancGroup, by unspecified claimants.  *Id.*

BancGroup should simply withdraw these claims, since it is obvious that it has no basis to continue to assert them despite conducting discovery for the past fourteen months.  *See* Stmt. Facts, ¶¶ 87-88.  In the event it refuses to do so, however, summary judgment should be entered in favor of the FDIC-Receiver on all of these claims.

### D.    Interest

BancGroup is not entitled to prejudgment interest as a matter of fact or law.  *See* Compl., ¶ 96.  First, for the reasons set forth above, BancGroup has no allowable claim against the Colonial Bank receivership and therefore has not been denied the use of the amount of that claim prior to judgment.  Second, even were that not the case, payment of prejudgment interest to any receivership claimant would violate the Federal Deposit Insurance Act, which provides for a pro rata distribution of receivership assets to allowed claimants subject to a strict scheme of priorities and does not provide for payment of interest.  *See* 12 U.S.C. §§ 1821(d)(10), (d)(11); *Golden Pac. Bancorp v. F.D.I.C.*, 375 F.3d 196, 204 n.9 (2d Cir. 2004) ("interest cannot be paid to any depositor or creditor, including secured creditors, unless the receivership first satisfies its principal obligations to all creditors") (collecting cases).

In this case, as BancGroup has recognized in its prior briefs in this action, it is a virtual certainty that claimants holding allowed general claims will not receive any distribution with respect to their allowed claims.  Indeed, as of March 31, 2011 the Colonial Bank receivership

was reporting a deficit of $4.8 billion as the result of claims against the receivership holding a higher priority.  *See* Stmt Facts, ¶ 5.

      **E.**      **Payment on Equity Interest in Colonial Bank**

      For the same reason, no trial is required for BancGroup's claim for the right to any surplus in the Colonial Bank receivership as the owner of 100% of the common stock of Colonial Bank.  Compl., ¶ 97.  If there were such a surplus, any such distribution would occur by operation of the schedule of priorities set forth in 12 U.S.C. § 1821(d)(11).

## CONCLUSION

      For all of the foregoing reasons, the FDIC-Receiver respectfully requests that the Court enter judgment in its favor with respect to all claims asserted in the amended complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure and grant the FDIC-Receiver such other and further relief as it may deem just and proper.

Dated:  Montgomery, Alabama
       August 15, 2011

                                          /s/ Michael A. Fritz, Sr.
                                    Michael A. Fritz, Sr.
                                    Fritz Hughes & Hill, LLC
Of Counsel:                       1784 Talieferro Trail, Suite A
                                    Montgomery, AL 36117
Charles B. Lee                   T: (334) 215-4422
Miller & Martin PLLC
Suite 1000 Volunteer Bldg.
832 Georgia Avenue                - and –
Chattanooga, Tennessee 37402
(423) 756-6600                 John J. Clarke, Jr.
                                    Thomas R. Califano
                                    Michael D. Hynes
                                    Spencer Stiefel
                                    DLA Piper LLP (US)
                                    1251 Avenue of the Americas
                                    New York, New York  10020-1104
                                    (212) 335-4500

                                    Attorneys for the
                                     Federal Deposit Insurance Corporation
                                     as receiver for Colonial Bank

## CERTIFICATE OF SERVICE

The undersigned hereby certifies he is one of the attorneys for defendant FDIC-Receiver and that on August 15, 2011, a true and correct copy of the foregoing document was filed with this Court's ECF system in this action, which will cause the electronic service of this document upon all persons registered in this action to receive CM/ECF notifications as of its filing to include the following:

Brent W. Herrin
Cohen Pollock Merlin & Small, P.C.
3350 Riverwood Parkway, Suite 1600
Atlanta, GA  30339

Peter E. Calamari
Kevin Reed
David L. Elsberg
Benjamin I. Finestone
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue
New York, NY 10010

Andrew P. Campbell
Caroline Smith Gidiere
Stephen D. Wadsworth
Leitman, Siegal, Payne & Campbell PC
420 N. 20th Street, Suite 2000
Birmingham, AL 35203

   /s/ Michael A. Fritz, Sr.   
Michael A. Fritz, Sr.

# EXHIBIT A

MAR-10-2009 08:27 AM                                                      P.01

```
1
2
3
4
5
6
7           UNITED STATES DISTRICT COURT
8
9           SOUTHERN DISTRICT OF CALIFORNIA
10
11
12   In re                          )   Case Number 93-12207-A11
                                     )
13   BSD BANCORP, INC.,             )   DIST. CT. CASE NO.
                                     )   94-1341-IEG
14          Debtor.                  )
                                     )   ORDER DENYING PLAINTIFF'S
15   ────────────────────────────   )   MOTION FOR SUMMARY JUDGMENT
                                     )   AND ORDERING FURTHER
16   BSD BANCORP, INC.,             )   BRIEFING ON DEFENDANT'S
                                     )   MOTION FOR PARTIAL SUMMARY
17          Plaintiff,              )   JUDGMENT
                                     )   [DOC. # 2]
18   v.                             )
                                     )
19   FEDERAL DEPOSIT INSURANCE      )
     CORPORATION, as Receiver for   )
20   the Bank of San Diego,         )
                                     )
21          Defendant.              )
                                     )
22   ────────────────────────────   )
     FEDERAL DEPOSIT INSURANCE      )
23   CORPORATION, as Receiver for   )
     the Bank of San Diego,         )
24                                   )
            Counterclaimant,        )
25                                   )
     v.                             )
26                                   )
     BSD BANCORP, INC.,             )
27                                   )
            Counterdefendant.       )
28
```

1

# BACKGROUND

BSD Bancorp Inc. ("Bancorp") was the corporate parent of the Bank of San Diego ("Bank"). On October 29, 1993, the Federal Deposit Insurance Corporation ("FDIC") was appointed receiver for the Bank. On November 3, 1993, Bancorp filed a petition under Chapter 11 of the Bankruptcy Code.

Bancorp and the corporations which it controlled, including the Bank, filed their tax returns as a consolidated group. When a group of affiliated corporations elects to file their tax returns as a consolidated group, the entire group is subject to one annual tax liability. Losses in one company can be offset against profits in another for purposes of computing this tax liability, and many intercompany transfers have no direct effect on tax liability. The group's parent corporation files the return, pays the tax, receives any refunds, and deals with the IRS generally. The corporations in the group are each severally liable for the entire amount of the tax. See generally Boris I. Bittker & James S. Eustice, Federal Taxation of Corporations and Shareholders ¶ 13.43 (6th ed. 1994).

Shortly after its bankruptcy filing, Bancorp received federal and state tax refunds totalling about $2 million. Those refunds are said to be Bancorp's primary asset. The refunds were concededly based on prior tax payments attributable to the Bank's earnings, and have been kept in a segregated account. The FDIC

///
///
///
///

2

1 filed a contingent claim against Bancorp in the bankruptcy

2 court,[1] contending that Bancorp held the tax refunds in trust for

3 the Bank and that they were thus not property of the bankruptcy

4 estate.

5     On March 24, 1994, Bancorp initiated an adversary proceeding

6 in the bankruptcy court against the FDIC as receiver of the Bank,

7 seeking a declaration that the tax refunds are property of the

8 estate and the avoidance of a number of prepetition payments

9 which Bancorp made to the Bank.  This Court withdrew the

10 reference on August 8, 1994.  Bancorp has now filed a motion for

11 summary judgment on its first declaratory judgment claim.  The

12 FDIC has filed a cross-motion for partial summary judgment.

13                       **DISCUSSION**

14 **A.   Debt or Trust?**

15     There is no dispute that Bancorp owes all or most of the

16 refund money to the Bank.  The primary issue here is whether this

17 is an ordinary debt or a sum of money which Bancorp holds in

18 trust for the Bank.  If the debt is an ordinary debt, the FDIC

19 has to share the refund money with Bancorp's other creditors in

20 bankruptcy.  If the money is held in trust, on the other hand,

21 ///

22

23 --------------------

24 [1] The FDIC also tried to get the IRS to pay the federal
refunds directly to it by following the procedure set out in

25 Treas. Reg. § 301.6402-7.  That rule establishes a special
procedure by which the FDIC and other receivers for insolvent

26 financial institutions can arrange to receive the institutions'
share of refunds owed to consolidated groups directly.  Bancorp

27 contends that by invoking this procedure, the FDIC violated the
automatic stay.  At any rate, the FDIC was unsuccessful; the IRS

28 paid the refunds to Bancorp.

3

1   under 11 U.S.C. § 541(d) it is not part of the bankruptcy

2   estate,[2] and Bancorp has to hand it over to the FDIC.

3      In re Bob Richards Chrysler-Plymouth Corp., 473 F.2d 262,

4   265 (9th Cir. 1973), held that the parent of a consolidated group

5   acts as an agent for the rest of the group in collecting taxes

6   and refunds.  The court based this holding on Treas. Reg. §

7   1.1502-77, which provides that the parent corporation is an agent

8   of the remaining corporations for a number of purposes set out in

9   detail in the regulation.  This holding is thus apparently

10  federal common law.

11     Furthermore, because of the agency relationship, the parent

12  corporation holds the money owing to the subsidiaries in trust

13  for them.  473 F.2d at 265.  This accords with the general

14  principle that when an agent "is vested with the title to

15  property that he holds for his principal, he is also a trustee."

16  1 Austin W. Scott & William F. Fratcher, The Law of Trusts § 8,

17  at 95 (4th ed. 1987).[3]

18     The rules of Bob Richards would seem to resolve the issue

19  and lead to the conclusion that Bancorp holds the refunds in

20  trust.  Bancorp argues, however, that because it entered into a

21

22  [2]Ninth Circuit cases applying 11 U.S.C. § 541(d) have said
    that assets held in trust might nonetheless be property of the
23  bankruptcy estate if the state law creating the trust was
    contrary to federal bankruptcy policy.  See, e.g., In re Unicom,
24  13 F.3d 321, 325 & n.6 (9th Cir. 1994).  No case has yet
    considered whether this "policy override" would apply to a trust
    arising under federal law.

25

26  [3]The Third Circuit recently declared a similar federal
    common law trust over certain refunds that a bankrupt gas
27  pipeline held for its customers pursuant to an order of the
    Federal Energy Regulatory Commission.  In re Columbia Gas Sys.
    Inc., 997 F.2d 1039, 1055-61 (3d Cir. 1993).

28

4

1  tax sharing agreement with the Bank, their relationship was

2  transformed in such a way that it holds the money as a debtor and

3  not in trust.  The FDIC attacks this tax allocation agreement on

4  a number of grounds.

5  B.   The Tax Allocation Agreement

6       Bancorp, the Bank, and other affiliated corporations entered

7  into a tax sharing agreement in 1991.  (Pl.'s Ex. 17.)  Their

8  boards of directors ratified it.  There are also some similar

9  agreements pertaining to earlier time periods.  The agreement

10 provides, in relevant part:

11      Any subsidiary incurring an annual loss on a tax basis that
        results in a tax benefit on the consolidated return shall be
12      reimbursed in cash in an amount determined in a manner
        consistent with the allocation of taxes to profitable
13      subsidiaries.  Refunds due subsidiaries from the Company
        which cannot be fully funded when due then will be carried
14      on the subsidiary's books as a "loan to parent" and will
        accrue interest at not less than the Federal Funds Rate.
15      The occurrence of this event is unusual and its likelihood
        of happening is considered remote.  All loans between parent
16      and subsidiary will be in accordance with applicable federal
        regulations regarding affiliate transactions.

17

18      The parties have proffered no extrinsic evidence bearing on

19 the interpretation of this contract.  The Court consequently

20 interprets it as a matter of law.  Cf. Southland Corp. v. Emerald

21 Oil Co., 789 F.2d 1441, 1443 (9th Cir. 1986).

22      Before interpreting the tax sharing agreement, however, it

23 is necessary to consider the FDIC's contentions that portions or

24 all of it are invalid.  It is convenient for these purposes to

25 consider two relevant aspects of the agreement separately.

26 First, the agreement appears to establish some guidelines for how

27 tax liabilities and refunds are allocated.  These will be

28 referred to as the "allocation guidelines."  Second, the

                                5

1  agreement appears to allow Bancorp to defer payment of refunds
2  by, in effect, "borrowing" the refund from the subsidiary.  This
3  will be referred to as the "line of credit."  Separate
4  consideration of these two portions of the agreement is useful
5  because "[t]he California cases take a very loose view of
6  severability, enforcing valid parts of an apparently indivisible
7  contract where the interests of justice or the policy of the law
8  . . . would be furthered."  1 B.E. Witkin, Summary of California
9  Law: Contracts § 432 (9th ed. 1987).

10  C.   Validity of the Tax Allocation Agreement

11       The FDIC argues that the agreement is invalid or not binding
12  on the FDIC for a number of reasons:[4]

13       1)   12 U.S.C. § 1823(e).  That subsection provides that

14       No agreement which tends to diminish or defeat the interest
         of the [FDIC] in any asset acquired by it . . . . as receiver
15       of any insured depository institution, shall be valid
         against the [FDIC] unless such agreement--
16       . . .
17       (B) was executed by the depository institution and any
         person claiming an adverse interest thereunder, including
         the obligor, contemporaneously with the acquisition of the
18       asset by the depository institution . . . .

19  The FDIC argues that the agreement violates 12 U.S.C. § 1823(e)
20  because it is not "contemporaneous[] with the acquisition of the
21  asset by the depository institution."

22       If one views the "asset" as the refunds, this view seems
23  literally correct, since the refunds were paid long after the
24  agreement took effect.  However, this reasoning would ban all tax

25       _____

26       [4]Even if the agreement is binding, the FDIC as receiver
     appears to have the power to repudiate it under 12 U.S.C. §
27  1821(e).  The FDIC does not argue this issue, however, so it need
     not be considered further.

28

                                    6

1  allocation agreements because such agreements necessarily have to

2  be prospective. "[S]atisfaction of the contemporaneousness

3  requirement should be considered in light of commercial reality."

4  RTC v. Midwest Fed. Sav. Bank, 4 F.3d 1490, 1501 (9th Cir. 1993).

5  In this case, it is consistent with commercial reality, and with

6  the FDIC's own recommendations, for consolidated groups of

7  corporations to enter into prospective tax allocation agreements.

8  It is likewise consistent with commercial reality for banks to

9  approve lines of credit in advance of the actual borrowing.

10  Consequently, the Court finds that § 1823(e) does not prevent the

11  tax allocation agreement from binding the FDIC.[5]

12      2)   The Common Law D'Oench Duhme Doctrine.  The common-law

13  D'Oench Duhme doctrine largely overlaps with 12 U.S.C. § 1823(e).

14  However, "[f]or D'Oench Duhme to apply, there at least must be a

15  showing that the [borrower] lent himself to a scheme or

16  arrangement whereby the banking authority . . . was or was likely

17  to be misled." Murphy v. FDIC, 38 F.3d 1490, 1498 (9th Cir.

18  1994) (en banc) (internal quotation marks omitted).  Here, the

19  agreement was sufficiently explicit that the FDIC could not have

20  been misled as to Bancorp's potential right to "borrow" the

21  refunds.  The FDIC in fact knew in early 1993 that the

22

23      [5]The FDIC also argues that the ratification by the board of
directors is ineffective because the tax portion of the agreement
was an addendum to the agreement as adopted by the board.  The

24  addendum was incorporated by reference, however, and it appears
that an explicit incorporation by reference suffices for §

25  1823(e).  See FDIC v. Kasal, 913 F.2d 486, 491 (8th Cir. 1991);
see also RTC v. Midwest Fed. Sav. Bank, 4 F.3d 1490, 1501 (9th

26  Cir. 1993) (§ 1823(e) "does not require that such agreements be
confined to the face of any one particular lending/borrowing

27  document") (quoting RTC v. Oak Apts. Joint Venture, 966 F.2d 995,
999 (5th Cir. 1992)).

28

1  arrangements for passing tax refunds through Bancorp were a

2  source of potential problems.  (Pl.'s Ex. 19.)

3      3)   Indefiniteness.  The FDIC also contends that the tax

4  allocation agreement is too indefinite to be binding.  It cites

5  In re Florida Park Banks Inc., 110 B.R. 986 (Bankr. M.D. Fla.

6  1989), where the consolidated group had a "policy" regarding tax

7  allocation.  The court there found that the policy did not rise

8  to the level of an agreement that could override the rule of Bob

9  Richards, so the FDIC got the tax refund.

10     The tax allocation guidelines at issue here are extremely

11 vague.  They state that loss-making subsidiaries will receive tax

12 benefits "in an amount determined in a manner consistent with the

13 allocation of taxes to profitable subsidiaries" (emphasis added).

14 The agreement also provides that tax payments by profitable

15 subsidiaries "will be calculated based on the individual

16 subsidiary's stand-alone estimated payment liability" (emphasis

17 added).

18     The line of credit provision in the agreement is not as

19 vague.  However, nothing is said about how long Bancorp may

20 continue to hold on to the borrowed funds.  The interest rate

21 must be "not less than the Federal Funds Rate," but the actual

22 rate is not specified.

23     California courts are tolerant of indefinite terms in

24 contracts.  Thus, for example, courts may fill in an omitted

25 duration term.  1 Witkin, supra, § 152.  The interest rate could

26 be implied from that which comparable borrowers pay.  The

27 allocation guidelines may be seen as setting very broad outer

28 limits to how the tax burdens and benefits are spread, excluding,

8

1  for example, payments utterly unrelated to an individual
2  subsidiary's stand-alone payment liability.  Consequently, the
3  tax allocation guidelines and line of credit provisions of the
4  tax allocation agreement are not so indefinite as to be
5  unenforceable.
6      4)   Lack of Consideration.  The FDIC also contends that the
7  agreement lacked consideration to the Bank.  Consideration may be
8  any benefit however small or contingent.  Consolidated group tax
9  reporting offered the Bank at least the possibility of lower tax
10  burdens as a consequence of the benefits of consolidation
11  discussed extensively in the FDIC's own papers.  This is
12  sufficient consideration for the tax allocation agreement.
13      5)   Illegality.  The FDIC appears to argue that the tax
14  refund line of credit from the Bank to Bancorp is contrary to
15  applicable law and regulations.  However, the tax allocation
16  agreement itself provides that credit will be extended only in a
17  way consistent with applicable regulations, which would seem to
18  cure any possible illegality.
19  D.  Effect of the Agreement on the Agency and Trust Relationship
20      Having concluded that the tax allocation agreement is
21  binding on the FDIC, it is now necessary to consider whether the
22  agreement destroys the principal-agent relationship recognized in
23  Bob Richards, supra.
24      Bancorp first contends that the very existence of a tax
25  allocation agreement destroys the principal-agent relationship.
26  It bases this contention on the fact that there was no such
27  agreement in Bob Richards.  However, this is an excessively
28  ///

9

1  narrow interpretation of that case.  This Court interprets Bob
2  Richards as holding that unless the corporations in a
3  consolidated group agree otherwise, the parent acts as their
4  agent for payment of tax and refunds.  This rule is like many
5  other gap-filling rules in contract law which provide a default
6  in the absence of applicable agreement by the parties, e.g.
7  U.C.C. § 2-205 (offer by merchant in signed writing irrevocable
8  "during the time stated or if no time is stated for a reasonable
9  time").  Parties to a contract do not override a gap-filling rule
10  simply by reaching explicit agreement on some other matter.
11  Rather, the terms of their agreement must expressly or impliedly
12  override the gap-filling rule itself.  It is thus necessary to
13  consider whether the terms of the tax allocation agreement
14  expressly or impliedly override the Bob Richards principal-agent
15  relationship.

16      Bancorp points to the language "[a]ny subsidiary incurring
17  an annual loss on a tax basis that results in a tax benefit on
18  the consolidated return shall be reimbursed in cash" in the tax
19  allocation agreement.  It contends that the use of the word
20  "reimbursed" indicates that a debtor-creditor relationship was
21  intended.  It also argues that the refunds owing the Bank were
22  recorded as a "receivable" on its books.  It cites In re Franklin
23  Sav. Corp., 159 B.R. 9, 29 (Bankr. D. Kan. 1993), where the court
24  relied on the words "reimbursement" and "credits" to conclude
25  that a tax allocation agreement established a debtor-creditor
26  relationship.

27      In deciding whether a transaction intended to create a
28  debtor-creditor relationship, however, a court must examine the

10

1  economic reality of the transaction rather than the words used.

2  See In re Woodson Co., 813 F.2d 266, 272 (9th Cir. 1987).  The

3  economic reality here is that, except in the "unusual"

4  circumstances in which the agreement allowed Bancorp to borrow

5  the refund, the agreement required Bancorp to give the Bank its

6  share of the refund in cash and immediately.  This strongly

7  suggests an intent to maintain a principal-agent relationship

8  unless Bancorp borrowed the refund pursuant to the terms of the

9  agreement.

10     Furthermore, the agreement itself recognizes that any loan

11  from the Bank to Bancorp would be subject to regulations

12  governing loans to affiliates.  Although the parties do not

13  discuss these regulations in their papers,[6] it appears that 12

14  U.S.C. § 371c(c)(1) applies here.  That subsection forbids

15  unsecured loans from a Federal Reserve member bank to its holding

16  company, while § 371c(e) allows the Federal Reserve Board to

17  authorize such loans by regulation or order.  12 U.S.C.

18  § 1828(j)(1) extends the restrictions of § 371c to all federally

19  insured banks.  For a debtor-creditor relationship to arise

20

21     [6]Bancorp does attach as an exhibit to its complaint some
excerpts from an FDIC examination manual containing an extensive

22  discussion of § 371c.  (Pl.'s Ex. 4, at 8-11.)  The FDIC cites
Lincoln Savings & Loan Association v. Wall, 743 F. Supp. 901

23  (D.D.C. 1990), where the court upheld the Federal Home Loan Bank
Board's decision to put Charles Keating's thrift into

24  receivership.  In doing so, the court found that an agreement
requiring the thrift to make large payments to its parent,

25  ostensibly for the purpose of paying the consolidated group's tax
liability, fell afoul of the then-existing regulatory

26  restrictions on a thrift's lending to its parent.  Lincoln
Savings, 743 F. Supp. at 908-11.  Those restrictions (then

27  codified at 12 C.F.R. § 583.4 (1986), and since repealed) were
similar to those in 12 U.S.C. § 371c.

28

1  between Bancorp and Bank, then, there would presumably have to be
2  some further agreement through which Bancorp supplied collateral
3  meeting the requirements of § 371c(c)(1).

4      The Court consequently holds that the tax allocation
5  agreement intended to abrogate the principal-agent relationship
6  between Bank and Bancorp only when Bancorp borrowed the refunds
7  from Bank under the terms of the agreement.  Bancorp holds Bank's
8  share of the refunds in trust, as the Bank's agent, unless and
9  until Bancorp borrows them under the terms of the agreement.

10     There remains the question whether Bancorp could properly
11  borrow the refunds at issue here under the terms of the
12  agreement.  The language of the agreement itself provides the
13  answer.  Bancorp is allowed to borrow "[r]efunds . . . which
14  cannot be fully funded when due."  Bancorp received the refunds
15  at issue here in cash and placed them in a segregated account.
16  Therefore, it had the wherewithal to pay the refunds immediately
17  to the Bank.  The requirement that the refunds "cannot be fully
18  funded" was thus not met here.  Bancorp had no right to borrow
19  the refunds under the tax allocation agreement, and it therefore
20  continued to hold them in trust.[7]  Bancorp's motion for summary
21  judgment is thus DENIED.

22  E.  Funds in the Segregated Tax Refund Account

23     The FDIC's cross-motion for summary judgment seeks an order
24  directing that the whole of Bancorp's segregated tax refund
25  account be turned over to it.  To decide this motion, it is

26  _____

27  [7]It is also possible that Bancorp had no right to borrow the
    refunds from the Bank because its doing so would be inconsistent
28  with applicable regulations.

12

1  necessary to determine what portion of that money represents
2  refunds owed to the Bank.

3       The Court does not believe that the parties have adequately
4  briefed the issue of what share of the refunds belongs to the
5  Bank.  The resolution of that issue depends on how refunds
6  received by Bancorp are supposed to be allocated to other members
7  of the consolidated group.  The tax allocation agreement may shed
8  some light on this question.  Background rules of law, such as
9  those stated in Bob Richards, may also shed light on this
10 question.  The Court consequently directs the parties to provide
11 further briefing on what share of the refunds belongs to the
12 Bank.  The FDIC is to file an additional brief, no longer than 25
13 pages, by March 13, 1995.  Bancorp may file an opposition by
14 March 27, 1995.  The FDIC may file a 10-page reply by April 3,
15 1995.  At that point, the Court may decide the FDIC's motion for
16 partial summary judgment on the papers, or it may schedule an
17 additional hearing.

18 F.   Objections to Evidence

19      Bancorp objects extensively to the declaration of Carol
20 Turner filed by FDIC.  The primary objection is that Ms. Turner
21 is rendering inadmissible lay opinion.  Ms. Turner states that
22 she has worked for over fourteen years as a tax accountant for
23 the FDIC.  This would normally justify her testifying as an
24 expert on tax accounting.  The objections on the ground of
25 inadmissible lay opinion are thus overruled.

26      Ms. Turner's declaration appears to rely on tax records of
27 the Bank of San Diego.  Such documents are admissible hearsay
28 under Fed. R. Evid. 803(6).  Expert witnesses are also permitted

13

1  to rely on inadmissible evidence if "of a type reasonably relied

2  on by experts in the particular field." Fed. R. Evid. 703.

3  Hearsay objections to Ms. Turner's declaration are thus

4  overruled.

5       Ms. Turner's declaration contains expert opinion on pure

6  questions of law.  The declaration of Diane L. Gilabert filed by

7  Bancorp also contains expert opinion on questions of law.  Expert

8  opinion on questions of law is inappropriate.  United States v.

9  Brodie, 858 F.2d 492, 496 (9th Cir. 1988).  The Court has reached

10 an independent conclusion on all questions of law and has not

11 taken expert opinion as authoritative on such issues.

12      Bancorp has also filed evidentiary objections to the FDIC's

13 memorandum of points and authorities.  A memorandum of points and

14 authorities is not evidence and evidentiary objections to it are

15 inappropriate.

16 G.   Conclusion

17      Bancorp's motion for summary judgment on its first claim is

18 DENIED.  The FDIC's motion for partial summary judgment is

19 continued pending further briefing as directed by this order.

20      IT IS SO ORDERED.

21

22 Dated:  Feb. 28, 1995          Irma E. Gonzales
                                   IRMA E. GONZALES
23                                 United States District Judge

24

25

26

27

28

                              14

1   Copies distributed/mailed to:

2   JEFFREY ISAACS ESQ
    GERALD P KENNEDY ESQ
3   MARTINA MENDE ESQ
    PROCOPIO CORY HARGREAVES AND SAVITCH
4   530 B ST STE 2100
    SAN DIEGO CA 92101

5
    SCOTT HUGHES ESQ
6   FEDERAL DEPOSIT INSURANCE CORPORATION
    LEGAL DIVISION
7   4 PARK PLAZA
    IRVINE CA 92715

8
    ANTHONY J DAIN ESQ
9   DAIN & LI
    555 WEST BEECH ST STE 222
10  SAN DIEGO CA 92101

11  MICHAEL F DUHL ESQ
    JOHN L ROGERS ESQ
12  HOPKINS & SUTTER
    THREE FIRST NATIONAL PLAZA STE 4100
13  CHICAGO IL 60602

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SEGdoc
94-1341.ORD
02/24/95                                        15