# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| THE COLONIAL BANCGROUP, INC.,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Colonial Bank,<br><br>Defendant. | Case No. 2:10-cv-0198 (MHT) |
| In re<br><br>THE COLONIAL BANCGROUP, INC.,<br><br>Debtor. | Case No. 2:10-cv-0409 (MHT) |

## CONSOLIDATED MEMORANDUM OF LAW OF THE FDIC-RECEIVER IN OPPOSITION TO MOTIONS FOR PARTIAL SUMMARY JUDGMENT

Michael A. Fritz, Sr.
michael@fritzandhughes.com
Fritz, Hughes & Hill LLC
1784 Taliaferro Trail, Suite A
Montgomery, Alabama 36117
(334) 215-4422

John J. Clarke, Jr.
Thomas R. Califano
Michael D. Hynes
Spencer Stiefel
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
(212) 335-4500

Attorneys for the
  Federal Deposit Insurance Corporation,
  as Receiver for Colonial Bank

Dated: September 22, 2011

## <u>Table of Contents</u>

Page

PRELIMINARY STATEMENT ............................................................... 1

BACKGROUND ..................................................................................... 6

STATEMENT OF UNDISPUTED FACTS ............................................ 6

SUMMARY JUDGMENT STANDARD ................................................. 6

ARGUMENT -- BOTH OF BANCGROUP'S MOTIONS FOR PARTIAL SUMMARY
JUDGMENT SHOULD BE DENIED IN THEIR ENTIRETY ....................... 7

I.      BANCGROUP HAS NO PROPERTY INTEREST IN THE
        FEDERAL INCOME TAX REFUNDS AT ISSUE ........................ 7

        A.      BancGroup's Role as "Sole Agent" for the Affiliated Group Does Not
                Create  Any Property Interest in Colonial Bank's Federal Income Tax
                Refunds ............................................................................... 8

        B.      The Undisputed Evidence Demonstrates BancGroup's Understanding
                That It Was Acting as Agent for Colonial Bank ................... 14

                1.      Colonial Bank Paid All the Tax Liability ............... 15

                2.      BancGroup Was Paid for Its Losses and Did Not Pay
                        Any Tax Liability ................................................... 16

                3.      Colonial Bank Suffered the Losses .......................... 17

                4.      BancGroup Handled Colonial Bank Refunds in the
                        Manner That an Agent Would ................................. 17

                5.      Anticipated 2009 Carryback Refunds Also Were
                        Recorded as Assets of Colonial Bank ...................... 18

        C.      The Internal Tax Allocation Policy Is Not a "Differing Agreement"
                That Would Alter the Bob Richards Rule ............................. 19

                1.      12 U.S.C. § 1823(e) Prohibits BancGroup's Argument
                        Based on the Unsigned Tax Allocation Policy ......... 20

                2.      The Tax Allocation Policy Is Not a "Clear and Explicit"
                        Agreement That Alters the *Bob Richards* Presumption ............ 23

Page

3.    The Tax Allocation Policy Incorporated, and Was Intended to Comply with, the Interagency Policy Statement ..................................... 26

4.    No Express Language of Trust Is Required ............................................. 30

5.    BancGroup's Interpretation of the Tax Allocation Policy Would Violate Federal Banking Law ....................................... 34

D.    BancGroup's Contract Argument Is Not Available as a Matter of Applicable Bankruptcy Law ............................................... 37

II.    BANCGROUP HAS NO PROPERTY INTEREST IN THE REIT PREFERRED SECURITIES ..................................................... 38

A.    BancGroup Delivered the REIT Preferred Securities to Colonial Bank on August 11, 2009 ..................................................... 38

1.    The Undisputed Evidence Establishes BancGroup's Delivery of Ownership to Colonial Bank. ................................................. 38

2.    Delivery Was Effected Pursuant to the Uniform Commercial Code ..................................................................... 48

a.    BancGroup's Written Acknowledgements Completed "Delivery" to Colonial Bank Under the Statute .......................... 48

b.    BancGroup's Instruction to Record Colonial Bank as Owner of the Securities Can Be Completed By CBG Florida REIT. ....................................................................... 49

3.    BancGroup Waived Its Claim to Ownership of the REIT Preferred Securities ......................................................... 51

B.    BancGroup's Argument Would Result in a Breach of a Capital Maintenance Commitment Under the Bankruptcy Code .................................... 52

III.    BANCGROUP IS NOT ENTITLED TO ANY RELIEF UNDER SECTION 502(d) OF THE BANKRUPTCY CODE ..................................................... 55

CONCLUSION ................................................................................................. 57

## Table of Authorities

Page

Cases

*3V Capital Master Fund Ltd. v. Official Committee of Unsecured Creditors*
(*In re TOUSA, Inc.*), 444 B.R.613 (S.D. Fla. 2011) .............................................51

*Air Prods. & Chems., Inc. v. La. Land & Exploration Co.*,
867 F.2d 1376 (11th Cir. 1989) .........................................................................51

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).........................................................................................6, 7

*Andrews v. Troy Bank & Tr. Co.*,
529 So. 2d 987 (Ala. 1988).................................................................................41

*Arbogast v. Bryan*,
393 So. 2d 606 (Fla. Dist. Ct. App. 1981) .........................................................52

*Asher Candy Co. v. MAFCO Holdings, Inc. (In re Marvel Entertainment Group, Inc.)*,
273 B.R. 58 (D. Del. 2002)...........................................................................12, 13

*Auto Dealer Servs., Inc. v. Prestige Motor Car Imports, Inc. (In re Auto Dealer Servs., Inc.)*,
96 B.R. 360 (Bankr. M.D. Fla. 1989) ..................................................................37

*Bd. of Water & Sewer Comm'rs of City of Mobile v. Bill Harbert Constr. Co.*,
870 So. 2d 699 (Ala. 2003).................................................................................35

*Begier v. Internal Rev. Svc.*,
496 U.S. 53 (1990)........................................................................................11, 32

*Bell v. Killian*,
266 Ala. 12, 93 So. 2d 769 (Ala. 1957 (collecting cases)................................16, 34

*Black Horse Capital LP v. JPMorgan Chase Bank, N.A.*
(*In re Washington Mutual, Inc.*), 442 B.R. 297 (Bankr. D. Del. 2011)...................39

*Brandt v. Fleet Capital Corp. (In re TMCI Elecs.)*,
279 B.R. 552 (Bankr. N.D. Cal. 1999) .............................................................9, 14

*Brown v. Brown*,
604 So. 2d 365 (Ala. 1992).................................................................................32

*BSD Bancorp, Inc. v. F.D.I.C. (In re BSD Bancorp, Inc.)*,
No. 94-1341-IEG, slip op. (S.D. Cal. Feb. 28, 1995) ..................................... *passim*

*Butler v. Maxistorage, Inc.*.
33 So. 3d 1221 (Ala. Civ. App. 2009) ..................................................................47

Page

*Capital Bancshares, Inc. v. F.D.I.C.*,
  957 F.2d 203 (5th Cir. 1992) ....................................................................... *passim*

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ........................................................................................7

*Clay v. Cummins*,
  77 So. 328 (Ala. 1917) .....................................................................................9

*Cohen v. Un-Ltd. Holdings, Inc. (In re Nelco, Ltd.)*,
  264 B.R. 790 (Bankr. E.D. Va. 1999) .......................................................... *passim*

*Corporacion Venezolana de Fomento v. Vintero Sales Corp.*,
  452 F. Supp. 1108 (S.D.N.Y. 1978) ...............................................................42

*Davis v. Dorsey*,
  495 F. Supp. 2d 1162 (M.D. Ala. 2007) ........................................................23

*E.I. duPont de Nemours & Co. v. F.D.I.C.*,
  32 F.3d 592 (D.C. Cir. 1994) ..........................................................................22

*Ennis v. Phillips*,
  890 So. 2d 313 (Fla. Dist. Ct. App. 2005) .....................................................42

*F.D.I.C. v. Brandt (In re Florida Park Banks, Inc.)*,
  110 B.R. 986 (Bankr. M.D. Fla. 1990) ......................................................... *passim*

*Fid. & Dep. Co. of Md. v. Jefferson Cty. Comm'n*,
  756 F. Supp. 2d 1329 (N.D. Ala. 2010) ...................................................34, 35

*First Nat'l Bank of Arizona v. Cities Svc. Co.*,
  391 U.S. 253 (1968) ..........................................................................................7

*First Union Nat'l Bank of Fla. v. Hall*,
  123 F.3d 1374 (11th Cir. 1997) ................................................................22, 23

*Florida Polk County v. Prison Health Services, Inc.*,
  170 F.3d 1081 (11th Cir. 1999) ......................................................................30

*Fraley v. Cincinnati Ins. Co.*
  No. 05-0006, 2006 WL 2583572 (M.D. Ala. Sept. 7, 2006) ..........................13

*Franklin Sav. Corp. v. Franklin Sav. Ass'n (In re Fraklin Sav. Corp.)*,
  159 B.R. 9 (Bankr. D. Kan. 1993), *aff'd sub nom. R.T.C. v. Franklin Sav.*
  *Corp. (In re Franklin Sav. Corp.)*, 182 B.R. 859 (D. Kan. 1995) ....................26, 29

Page

*Frierdrich v. Mottaz,*
 294 F. 3d 864 (7th Cir. 2002) ...............................................................46

*Gutharz v. Park Centre West Corp.,*
 409 F. App'x 248 (11th Cir. 2010) ..................................................42, 46

*Hall v. Perry (In re Cochise College Park, Inc.),*
 703 F.2d 1339 (9th Cir. 1983) ...............................................................37

*Holloway v. Internal Rev. Svc. (In re Odom Antennas, Inc.),*
 340 F.3d 705 (8th Cir. 2003) ...........................................................55, 56

*In the Matter of Discon Corp.,*
 346 F. Supp. 839 (S.D. Fla. 1971) .........................................................36

*In re Baker,*
 No. 08-42247-JJR-13, 2009 WL 3854103 (Bankr. N.D. Ala. Nov. 17, 2009).......................31

*In re Lids Corp.,*
 260 B.R. 680 (Bankr. D. Del. 2001) ......................................................56

*In re Newlin,*
 370 B.R. 870 (M.D. Ga. 2007) ...............................................................37

*In re Poffenbarger,*
 281 B.R. 379 (Bankr. S.D. Ala. 2002) ....................................................32

*In re Wash. Mut., Inc.,*
 No. 08-12229, 2011 WL 57111 (Bankr. D Del. Jan. 7, 2011).................................54

*Indep. BankGroup, Inc. v. F.D.I.C. (In re Indep. BankGroup, Inc.),*
 217 B.R. 442 (Bankr. D. Vt. 1998)..................................................10, 13, 20, 22

*Island Pl. Apts. LLC v. First Home View Corp. (In re Miami Neighbrhoods, Inc.),* Adv.
 No. 08-01186–AJC, 2008 WL 2444530 (Bankr. S.D. Fla. June 16, 2008), *reconsid.*
 *denied,* 2008 WL 4397425 (Bankr.S.D.Fla. Sep 26, 2008)....................................51

*Johnson v. Bd. of Regents of Univ. of Ga.,*
 263 F.3d 1234 (11th Cir. 2001) .................................................................6

*Jones v. Cole,*
 No. 08-1011-JTM, 2009 WL 2163185 (D. Kan. July 17, 2009) ......................................41, 42

*Jump v. Manchester Life & Cas. Mgmt. Corp.,* 438 F. Supp. 185 (E.D. Mo. 1977),
 *aff'd in relevant part,* 579 F.2d 449 (8th Cir. 1978)....................................9, 10, 31

Page

*Jump v. Manchester Life & Cas. Mgmt. Corp.*,
    579 F.2d 449 (8th Cir. 1978) ................................................................9

*Kahn v. Lynch Comms. Sys., Inc.*,
    638 A.2d 1110 (Del. 1994) ...............................................................23

*Kallop v. McAllister*,
    678 A.2d 526 (Del. 1996) ............................................................39, 42

*Logan v. Credit Gen, Ins. Co. (In re PRS Ins. Group, Inc.)*,
    331 B.R. 580 (Bankr. D. Del. 2005), *reconsid. denied*,
    335 B.R. 77 (Bankr. D. Del. 2005) ...............................................55, 56

*Lubin v. F.D.I.C.*,
    No. 1:10-cv-00874-RWS, 2011 WL 825751 (N.D. Ga. Mar. 2, 2011) .......................... *passim*

*Malone v. Parker*, 953 F. Supp. 1512, 1515 (M.D. Ala. 1996), *aff'd*,
    130 F.3d 444 (11th Cir. 1997) ............................................................7

*McCafferty v. McCafferty (In re McCafferty)*,
    96 F.3d 192 (6th Cir. 1996) ..............................................................32

*McCamy v. Kerr (In re Real Estate Exch. Svcs. Inc.)*,
    No. 08–85871–PWB, 2009 WL 6499249, at *19 (Bankr. N.D. Ga. Oct. 9, 2009) ...............16

*Mize v. Jefferson City Board of Educ.*,
    93 F.3d 739 (11th Cir. 1996) ..............................................................7

*Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*,
    813 F.2d 1177 (11th Cir. 1987) .....................................................32, 51

*O.T.S. v. Overland Park Fin. Corp. (In re Overland Park Fin. Corp.)*,
    232 B.R. 215 (D. Kan. 1999), *aff'd, O.T.S. v. Overland Park Fin. Corp. (In re*
    *Overland Park Fin. Corp.)*, 236 F.3d 1246 (10th Cir. 2001) ................................54

*O.T.S. v. Overland Park Fin. Corp. (In re Overland Park Fin. Corp.)*,
    236 F.3d 1246 (10th Cir. 2001) ..........................................................53

*OPS Shopping Ctr., Inc. v. F.D.I.C.*,
    992 F.2d 306 (11th Cir. 1993) ...........................................................22

*Phillips v. Zimring*,
    284 So. 2d 233 (Fla. Dist. Ct. App. 1973) .........................................41, 42

*Putnam v. Putnam*,
    274 Ala. 472, 150 So. 2d 209 (Ala. 1963) .................................................32

Page

*Rodgers v. Cnty. of Monroe (In re Rodgers)*,
  333 F.3d 64 (2d Cir. 2003)............................................................................51

*R.T.C. v. FirstCorp, Inc. (In re FirstCorp., Inc.)*,
  973 F.2d 243 (4th Cir. 1992) ...................................................................53, 54

*R.T.C. v. Franklin Sav. Corp. (In re Franklin Sav. Corp.)*,
  182 B.R. 859 (D. Kan. 1995) ..........................................................13, 26, 29

*Sackett v. Shahid*,
  772 So. 2d 273 (Fla. Dist. Ct. App. 1998) .......................................39, 41, 42, 46

*Schacter v. Lefrak (In re Lefrak)*,
  227 B.R. 222 (S.D.N.Y. 1998)........................................................................46

*Smallwood v. Moretti*,
  128 So. 2d 628 (Fla. Dist. Ct. App. 1961) ......................................................42

*Springel v. Prosser (In re Prosser)*,
  Adv. Proc. No. 08-03002, 2009 WL 3270765 (Bankr. D.V.I. Oct. 9, 2009)..........56

*Springfield Assocs., L.L.C. v. Enron Corp. (In re Enron Corp.)*,
  379 B.R. 425 (S.D.N.Y. 2007)........................................................................56

*Super. of Ins. for N.Y. v. Ochs (In re First Central Fin. Corp.)*,
  269 B.R. 481 (Bankr. E.D.N.Y. 2001), *aff'd*, 377 F.3d 209 (2d Cir. 2004) .........13, 26, 28, 33

*T&B Scottsdale Contractors, Inc. v. United States*,
  866 F.2d 1372 (11th Cir. 1989) ......................................................................32

*Tanner v. Robinson*,
  411 So. 2d 240 (Fla. Dist. Ct. App. 1982) ...............................................39, 41, 42

*Team Fin. Corp. v. F.D.I.C. (In re Team Fin., Inc.)*,
  Adv. No. 09-5084, 2010 WL 1730681 (Bankr. D. Kan. Apr. 27, 2010)..........13, 29

*Transamerica Comm. Fin. Corp. v. Citibank, N.A. (In re Sun Runner Marine, Inc.)*,
  945 F.2d 1089 (9th Cir. 1991) .......................................................................38

*Twin Constr., Inc. v. Boca Raton Inc.*,
  925 F.2d 378 (11th Cir. 1991) ..................................................................21, 22

*United Dominion Indus., Inc. v. United States*,
  532 U.S. 822 (2001)................................................................................11, 12, 13

Page

*United States v. MCorp Fin., Inc. (In re MCorp Fin., Inc.)*,
   170 B.R. 899 (S.D. Tex. 1994) ...................................................................13, 29

*United States v. Revco D.S., Inc. (In re Revco D.S., Inc.)*,
   11 B.R. 631 (Bankr. N.D. Ohio 1990) .............................................................10

*United States v. Seattle First Nat'l Bank*,
   321 U.S. 583 (1944).......................................................................................43

*United States v. Whiting Pools, Inc.*,
   462 U.S. 198 (1983)..................................................................................11, 32

*W. Dealer Mgmt., Inc. v. England (In re Bob Richards Chrysler-Plymouth
   Corp.)*, 473 F.2d 262 (9th Cir.), *cert. denied*, 412 U.S. 919 (1973) ............................... *passim*

*Wolkowitz v. F.D.I.C. (In re Imperial Credit Indus., Inc.)*,
   527 F.3d 959 (9th Cir. 2008) ...........................................................................53

*Woods v. Christensen Shipyards, Ltd.*,
   No. 04-61432-CIV, 2005 WL 5654643 (S.D. Fla. Sept. 23, 2005)........................52

*XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.)*,
   16 F.3d 1443 (6th Cir. 1994) ...........................................................................32

*Zucker v. F.D.I.C. (In re NetBank, Inc.)*,
   Adv. Proc. No. 3:08-ap-00346-JAF (Bankr. M.D. Fla. Sept. 30, 2010).....................29, 30, 33

Statutes, Rules and Regulations

11 U.S.C. § 350(b) ..................................................................................................55

11 U.S.C. § 365(a) ..................................................................................................37

11 U.S.C. § 365(c)(2)............................................................................................4, 38

11 U.S.C. § 365(g) ...............................................................................................3, 37

11 U.S.C. § 365(o) .......................................................................................52, 53, 54

11 U.S.C. § 502(d) .........................................................................................5, 55, 56

11 U.S.C. § 507(a)(9)..................................................................................52, 53, 54, 55

11 U.S.C. § 541(b)(1) ..............................................................................................10

11 U.S.C. § 541(d) .......................................................................................11, 32, 51

Page

12 U.S.C. § 371c ...................................................................................................3, 35

12 U.S.C. § 371c-1 ................................................................................................3, 35

12 U.S.C. § 375b(9)(D) ..............................................................................................36

12 U.S.C. § 1821(d)(9) ...........................................................................................20, 21

12 U.S.C. § 1823(e) ..........................................................................3, 20, 21, 22, 23

12 U.S.C. § 1828(j) .....................................................................................................36

26 U.S.C. § 172 .............................................................................................................18

26 U.S.C. § 172(a) ........................................................................................................18

26 U.S.C. 1501 ................................................................................................................8

Fla. Stat. Ann. § 671.103 ............................................................................................41

Fla. Stat. Ann. § 678.313 (repealed in 1998) .......................................................41

Fla. Stat. Ann. § 678.3011 ............................................................................38, 41, 48

Fla. Stat. Ann. §§ 678.3011(1)(b), (2)(b) ..............................................................48, 49

Fla. Stat. Ann. § 678.3021 ......................................................................................41, 42

Fla. Stat. Ann. § 678.3051(1) ..................................................................................49, 50

Worker, Homeownership and Business Assistance Act of 2009,
     Pub. L. No. 111-92, 123 Stat. 2984 ...................................................................18

12 C.F.R. § 223.14 ........................................................................................................35

12 C.F.R. § 223.51 ........................................................................................................36

12 C.F.R. § 223.52 ........................................................................................................36

Treas. Reg. § 1.1502-13 ................................................................................................8

Treas. Reg. § 1.1502-6(a) .......................................................................................8, 15

Treas. Reg. § 1.1502-77(a) ......................................................................................2, 26

Treas. Reg. § 1.1502-77(a)(3) ....................................................................................15

Treas. Reg. § 1.1502-77(a)(2)(v) .................................................................................8

Page

Treas. Reg. § 1.1502-11(a) ...........................................................................8

Treas. Reg. § 301.6402-7(g)(iii) .............................................................12, 14

Fed. R. Bankr. P. 5010........................................................................55

Fed. R. Civ. P. 56............................................................................1, 6, 7

Board of Governors of the Federal Reserve System, "Transactions Between Member
   Banks and Their Affiliates," 67 Fed. Reg. 76560 (Dec. 12, 2002)..........................35

Interagency Policy Statement on Income Tax Allocation in a Holding Company
   Structure," which was promulgated jointly in November 1998 by the Federal Reserve
   Board, the FDIC, the Office of the Comptroller of the Currency and the Office of
   Thrift Supervision. *See* 63 Fed. Reg. 64757 (Nov. 23, 1998).............................26. 27, 28, 30

### Other Authorities

Federal Reserve Board Holding Company Manual, § 2070.0.1.4 ...............................27

OTS Holding Company Regulatory Handbook, § 400 & Appendix 400C .................................27

H.R. Rep. No. 681(I), 101st Cong., 2d Sess. 179 (1990).................................................53

Restatement (Third) of Agency, § 8.01 ........................................................9

Restatement (Third) of Agency, § 8.02 ........................................................9

Restatement (Third) of Agency, § 8.05(1)....................................................3, 10, 31

Restatement (Third) of Agency § 8.12 ........................................................3

Restatement (Third) of Trusts, § 7...........................................................31

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the Federal Deposit Insurance Corporation, as receiver for Colonial Bank (the "FDIC-Receiver"), respectfully submits this consolidated memorandum of law in opposition to the motions for partial summary judgment filed by debtor and plaintiff The Colonial BancGroup, Inc. ("BancGroup") with respect to two disputed issues: the ownership of roughly $253 million in pending federal income tax refunds and the ownership of $300 million in REIT preferred securities that BancGroup transferred to Colonial Bank in August 2009 in accordance with its commitment to regulators and other documents governing the securities.

## PRELIMINARY STATEMENT

Until August 14, 2009, BancGroup was the holding company for Colonial Bank, which accounted for more than 99% of BancGroup's assets and all of its net income. BancGroup presided over the decline and collapse of its bank subsidiary resulting in the costliest bank failure of 2009 and the sixth largest in United States history. The FDIC has estimated that the failure of Colonial Bank will cost its deposit insurance fund approximately $4.8 billion.

In these two related proceedings, BancGroup and its bondholder constituents seek to add to this woeful record by laying claim to ownership of certain Colonial Bank assets that are the property of the FDIC-Receiver. The arguments advanced in support of BancGroup's two motions for summary judgment not only contradict the undisputed evidence – including the testimony of BancGroup's own senior officers – but also lack support under applicable law. The Bankruptcy Code is not a license to take property that belongs to another. Nor do losses by BancGroup's bondholders justify such an absurd and inequitable result, as BancGroup argues.

Tax refunds. The first of BancGroup's two motions asserts that BancGroup, rather than the FDIC-Receiver (as successor to Colonial Bank), is the owner of approximately $253 million

in pending federal income tax refunds.  There is no dispute that all of the federal taxes at issue were paid by Colonial Bank.  None of those taxes were funded by BancGroup.  To the contrary, in addition to paying the consolidated tax liability for the entire group, Colonial Bank made quarterly payments to BancGroup for the use of BancGroup's losses.  Nor is there any dispute that Colonial Bank by itself had sufficient operating losses to recover all of the available federal tax refunds on its own.

This should be the end of the ownership issue.  The pending refunds are the property of Colonial Bank, just as Colonial Bank had recorded them in its general ledger accounts, just as the Bank had reported to its regulators before its failure, and just as BancGroup's chief accounting officer testified during his deposition in these proceedings.  No witness has testified that BancGroup was the owner of the federal tax refunds, nor can BancGroup point to a single document suggesting that federal refunds ever were accounted for in that way.  There are none.

In BancGroup's view, however, ownership should not be resolved based on these undisputed facts or on what all the witnesses agree actually happened.  Instead, it argues, the issue turns on BancGroup's lawyers' argument that a one page internal tax allocation policy that BancGroup calls a "Tax Allocation Agreement" superseded BancGroup's role as agent for Colonial Bank and created an interest-free, unsecured extension of credit.  According to BancGroup, the unsigned policy established a debtor-creditor relationship between BancGroup and Colonial Bank under which the FDIC-Receiver is merely a general unsecured creditor of BancGroup and not the direct owner of the tax refunds at issue.

This argument is flawed in many respects.  BancGroup is designated by Internal Revenue Service regulation as the "sole agent" for Colonial Bank and the other members of the affiliated group for all federal tax matters including refunds, *see* Treas. Reg. § 1.1502-77(a), an

indisputable fact that BancGroup fails to mention.  Nothing in the internal tax allocation policy that BancGroup relies upon altered that agency relationship.  To the contrary, the plain language of the document reiterates it.  As agent/trustee, BancGroup had a duty to segregate its principals' funds and to turn them over promptly.  *See* Restatement (Third) of Agency, §§ 8.05, 8.12. Before Colonial Bank failed, that is exactly what BancGroup did by arranging for Colonial Bank to be paid federal tax refunds from the IRS directly or by depositing IRS refund checks directly into Colonial Bank accounts.  Moreover, BancGroup's argument is contradicted by all of the testimony, including testimony from BancGroup's own senior officers.

In addition, the construction of the internal tax allocation policy that is urged by BancGroup is impermissible because it would violate federal banking law, which expressly prohibits unsecured extensions of credit from a bank to its parent holding company.  *See* 12 U.S.C. §§ 371c, 371c-1.  Banking regulators similarly prohibit a bank holding company from adopting policies or agreements under which the holding company claims ownership of its bank subsidiary's tax refunds.  In direct conflict with BancGroup's unfounded debtor-creditor argument, BancGroup's general counsel David B. Byrne, Jr. testified that BancGroup was aware of this regulatory prohibition and that the internal tax allocation policy complied with it.  Byrne Tr. 95:7-99:2.

Finally, even if it could be read in the manner BancGroup advocates (which it cannot be), the unsigned, undated internal tax allocation policy would not be enforceable here under either federal banking law or the Bankruptcy Code.  *See* 12 U.S.C. § 1823(e) (unsigned document not valid "to diminish or defeat the interest of the [FDIC] in any asset acquired by it" as receiver for a failed bank); 11 U.S.C. § 365(g) (rejected executory contract deemed breached as of petition

date and is unenforceable); 11 U.S.C. § 365(c)(2) (prohibiting assumption of prepetition contract requiring extension of credit to debtor).

REIT Preferred Securities.  As with its tax refund claim, BancGroup's claim to own $300 million in REIT preferred securities that BancGroup transferred to Colonial Bank in August 2009 requires the Court to disregard substantial undisputed evidence, including the deposition testimony of BancGroup's most senior officers, in favor of an aggressive (and ultimately unsustainable) legal argument.

There is no dispute that the terms of the REIT preferred securities required their conversion into BancGroup preferred stock if Colonial Bank faced certain types of financial difficulty.  In those circumstances, BancGroup committed to immediately contribute the securities to the Bank.  There can be no dispute that the purpose of this provision was to provide capital to Colonial Bank in the applicable circumstances, when the Bank would need it.  Indeed, bank regulators only authorized valuable Tier 1 capital treatment for the securities because BancGroup "covenanted," in writing, to contribute the securities to Colonial Bank if such an "exchange event" ever were declared by regulators.

Had BancGroup not made that commitment to regulators, the REIT preferred securities never would have been issued and BancGroup never would have raised $300 million to fund a 2007 corporate acquisition.  It is preposterous for BancGroup to now claim ownership of the securities, as it does, based on an assertion that it always retained the option to disregard its commitment to regulators.  Unsurprisingly, no witness has provided testimony to that effect, which would amount to an admission that BancGroup committed a fraud upon federal regulators.

BancGroup does not discuss the substantial efforts undertaken by its own senior officers to ensure that the REIT preferred securities were contributed to Colonial Bank after the FDIC

declared an exchange event on August 10, 2009.  As a result of those efforts, by August 11, 2009 ownership of the securities had been transferred from BancGroup to Colonial Bank.

In BancGroup's view, however, the only fact that matters is that the issuer of the securities, CBG Florida REIT Corp., never entered Colonial Bank's name in its transfer records as the owner of the securities.  BancGroup's name was never entered in the REIT's transfer records either, even though that was also required under the Exchange Agreement upon which BancGroup bases its arguments.

Whether or not the names were changed, however, CBG Florida REIT Corp. was duly instructed to reflect the ownership changes in its transfer records, and the REIT, BancGroup and Colonial Bank all understood that ownership had been transferred to Colonial Bank as of August 11, 2009.  Even the cases relied upon by BancGroup make clear that Colonial Bank, not BancGroup, is the owner of the securities under such circumstances.  Moreover, even if there were any merit to this argument (which there is not) BancGroup waived it when its general counsel and its chief accounting officer certified in writing to the FDIC that the capital contribution had been made.

Bankruptcy Code § 502(d).  As an afterthought, BancGroup asserts that section 502(d) of the Bankruptcy Code precludes any recovery by the FDIC-Receiver with respect to both of these matters because BancGroup has asserted various avoidance claims against it.  This argument is not only inequitable; it is also wrong.  Section 502(d) does not apply until a creditor has been adjudged liable to repay an avoidable transfer and has failed to comply with that judgment.  No such judgment has been entered against the FDIC-Receiver, nor should one ever be entered given the factual and legal inadequacies of BancGroup's avoidance claims here.

Summary judgment cannot be granted for BancGroup on either of its motions.  Both motions should be denied.

## BACKGROUND

The factual and procedural background to BancGroup's current motions for partial summary judgment are set forth in the memorandum of law in support of the FDIC-Receiver's motion for summary judgment on all claims, which the FDIC-Receiver filed on August 15, 2011 in *Colonial BancGroup, Inc. v. F.D.I.C.*, No. 2:10-cv-0198 (MHT) [Doc. No. 110].  The FDIC-Receiver refers to and incorporates that discussion by reference.

## STATEMENT OF UNDISPUTED FACTS

In accordance with Rule 56(c) of the Federal Rules of Civil Procedure and section 2 of the Court's Uniform Scheduling Order, as amended, the FDIC-Receiver has set forth the undisputed facts discussed in this memorandum in opposition, with appropriate citations to the record, in its Statement of Undisputed Facts in Support of FDIC-Receiver's Motion for Summary Judgment filed on August 15, 2011 in *Colonial BancGroup, Inc. v. F.D.I.C.*, No. 2:10-cv-0198 (MHT) [Doc. No. 110] ("Stmt Facts").  The FDIC-Receiver incorporates that separate filing, as well as the affidavits, declarations, deposition transcripts and other evidence cited therein, by reference rather than restating its contents here.

## SUMMARY JUDGMENT STANDARD

Summary judgment is granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1242 (11th Cir. 2001).  The moving party bears the initial burden of identifying "particular parts of materials in the record" showing that there is no genuine

dispute as to any material fact, Fed. R. Civ. P. 56(c)(1)(A), or that the non-moving party has "failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see* Fed. R. Civ. P. 56(c)(1)(B).  The burden then shifts to the non-moving party to "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Malone v. Parker*, 953 F. Supp. 1512, 1515 (M.D. Ala. 1996) (quoting *Celotex*, 477 U.S. at 324), *aff'd*, 130 F.3d 444 (11th Cir. 1997).

In deciding a summary judgment motion, the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "[T]he non-movant's evidence is to be accepted for purposes of summary judgment.  Likewise, all inferences drawn from the evidence must be viewed in the light most favorable to the non-moving party." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) (citations omitted).  "[S]ummary judgment will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  For a motion to be denied, "'all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Id.* (quoting *First Nat'l Bank of Ariz. v. Cities Svc. Co.*, 391 U.S. 253, 288-89 (1968)).

## ARGUMENT

### BOTH OF BANCGROUP'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT SHOULD BE DENIED IN THEIR ENTIRETY

**I.      BANCGROUP HAS NO PROPERTY INTEREST IN THE FEDERAL INCOME TAX REFUNDS AT ISSUE.**

BancGroup's argument that it owns roughly $253 million in pending federal tax refunds fails to acknowledge its role as "sole agent" for the affiliated group, ignores that *BancGroup has*

the burden to establish an agreement that overrides the *Bob Richards* presumption, disregards applicable banking law and misreads the alleged tax allocation policy at issue in an effort to transform the FDIC-Receiver from the owner of the refunds (as the successor to Colonial Bank) to a mere general unsecured creditor of BancGroup's bankruptcy estate.

### A.   BancGroup's Role as "Sole Agent" for the Affiliated Group Does Not Create Any Property Interest in Colonial Bank's Federal Income Tax Refunds.

Under the Internal Revenue Code, affiliated groups of corporations may elect to file a consolidated federal income tax return.  26 U.S.C. § 1501.  Making such an election provides certain advantages to the group, including that losses suffered by one member can be used to offset income earned by another member resulting in a reduction of the group's consolidated tax liability.[1]  *See* Treas. Reg. §§ 1.1502-11(a), 1.1502-13.

If a group elects to file a consolidated return, only one return may be filed on behalf of all of the affiliated corporations.  The regulations designate the common parent corporation to act as "sole agent" for the members of the group with respect to "all matters" relating to the tax liability for that consolidated return year, which includes the receipt of refunds owed to any member of the group.  *See* Treas. Reg. § 1.1502-77(a)(2)(v).  This does not mean the parent corporation has a property interest in any tax refunds that may be paid to it for the members of the group.  To the contrary:

> The only reason the tax refunds are not being paid directly to the subsidiary is because income tax regulations require that the parent act as the sole agent, when duly authorized by the subsidiary, to handle all matters relating to the tax return . . . But these regulations are basically procedural in purpose and were adopted solely for the convenience and protection of the federal government.

---

[1] Each member of the affiliated group remains severally liable for the full amount of the consolidated tax liability.  Treas. Reg. § 1.1502-6(a).

*W. Dealer Mgmt., Inc. v. England (In re Bob Richards Chrysler-Plymouth Corp.)*, 473 F.2d 262, 265 (9th Cir.), *cert. denied*, 412 U.S. 919 (1973); *see also Capital Bancshares, Inc. v. F.D.I.C.*, 957 F.2d 203, 208 (5th Cir. 1992); *Jump v. Manchester Life & Cas. Mgmt. Corp.*, 579 F.2d 449, 452 (8th Cir. 1978).

"An agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship," Restatement (Third) of Agency, § 8.01 (2006), and "not to acquire a material benefit from a third party in connection with transactions conducted or other actions taken on behalf of the principal," *id.*, § 8.02.; *see Clay v. Cummins*, 77 So. 328, 329 (Ala. 1917) ("Loyalty to [the principal's] trust is the first duty which the agent owes to his principal."). Consistent with these fundamental principles, courts have recognized that allowing a parent corporation "to keep any refunds arising solely from a subsidiary's losses simply because the parent and subsidiary chose a procedural device to facilitate their income tax reporting unjustly enriches the parent." *Bob Richards*, 473 F.2d at 265; *see also Capital Bancshares*, 957 F.2d at 208 (same).

The general rule therefore is that "a tax refund resulting solely from offsetting the losses of one member of a consolidated filing group against the income of that same member in a prior or subsequent year should inure to the benefit of that member." *Bob Richards*, 473 F.2d at 265; *see Capital Bancshares*, 957 F.2d at 208 (refund was property of FDIC as receiver for failed bank, not bankrupt holding company, where "Bank could have generated the refund on its own had it filed income taxes separately from the group").[2]

---

[2] *See also BSD Bancorp, Inc. v. F.D.I.C. (In re BSD Bancorp, Inc.)*, No. 94-1341-IEG, slip op. at 4 (S.D. Cal. Feb. 28, 1995); *Jump v. Manchester Life & Cas. Mgmt. Corp.*, 438 F. Supp. 185, 189 (E.D. Mo. 1977), *aff'd in relevant part*, 579 F.2d 449, 452 (8th Cir. 1978); *Brandt v. Fleet Capital Corp. (In re TMCI Elecs.)*, 279 B.R. 552, 558 (Bankr. N.D. Cal. 1999); *Cohen v. Un-Ltd. Holdings, Inc. (In re Nelco, Ltd.)*, 264 B.R. 790, 810 (Bankr. E.D. Va. 1999)

This general rule only can be altered by a "clear and explicit agreement" to the contrary. *Cohen v. Un-Ltd. Holdings, Inc. (In re Nelco, Ltd.)*, 264 B.R. 790, 809 (Bankr. E.D. Va. 1999); *see Capital Bancshares*, 957 F.2d at 207-08; *Bob Richards*, 473 F.2d at 265 (general rule applies "[a]bsent any differing agreement").  As will be discussed at greater length below, *see infra* at 24-37, BancGroup is mistaken in contending that an unsigned intercorporate tax allocation policy constitutes such a "differing agreement" here.

Because it is acting as an agent, a common parent that receives a tax refund attributable to the earnings history of a subsidiary member of the affiliated group holds the refund "as trustee of a specific trust," and the parent is under a duty to turn over the refund to the member that owns it.  *Bob Richards*, 473 F.2d at 265; *see Capital Bancshares*, 957 F.2d at 208 (endorsing holding that specific trust is created); *Jump*, 438 F. Supp. at 189 (subsidiary's refund held by parent "is not a debt owed . . . but rather, a fund which Management Corp. holds in a specific trust" for the subsidiary).

The common law and the Bankruptcy Code are entirely consistent.  *See* Restatement (Third) of Agency, § 8.05(1) (2006) (agent has duty "not to use property of the principal for the agent's own purposes or those of a third party"); *id.*, § 8.12 (agent has duty "not to deal with the principal's property so that it appears to be the agent's property"); 11 U.S.C. § 541(b)(1) ("Property of the estate does not include any power that the debtor may exercise solely for the

---

("To allow a member of a consolidated group to receive a tax refund when the member did not contribute to the tax payment would result in the unjust enrichment of that member."); *Indep. BankGroup, Inc. v. F.D.I.C. (In re Indep. BankGroup, Inc.)*, 217 B.R. 442, 448 (Bankr. D. Vt. 1998) (refund owned by FDIC as receiver for failed bank rather than bankrupt holding company); *United States v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 111 B.R. 631, 639 (Bankr. N.D. Ohio 1990) (refund was owned by subsidiary that had earned income and was charged for tax liability by common parent); *F.D.I.C. v. Brandt (In re Fla. Park Banks, Inc.)*, 110 B.R. 986, 989 (Bankr. M.D. Fla. 1990) (FDIC as receiver, not bankrupt holding company, was entitled to entire refund attributable to taxes paid and losses sustained by failed bank).

benefit of an entity other than the debtor."); 11 U.S.C. § 541(d) (excluding from property of the estate property in which debtor holds only legal title and not an equitable interest); *Begier v. Internal Rev. Svc.*, 496 U.S. 53, 59 (1990) ("Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'"); *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n.10 (1983) ("Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition" from property of the bankruptcy estate).

BancGroup argues in error that the *Bob Richards* rule somehow was abrogated by the ten-year old decision of the United States Supreme Court in *United Dominion Indus., Inc. v. United States*, 532 U.S. 822 (2001), an opinion that never mentioned *Bob Richards* and did not purport to address the issue of ownership of tax refunds. The *United Dominion* decision instead considered whether "product liability losses" (a concept that has no application to banks) should be calculated by reference to the "separate" net operating loss sustained by the members of an affiliated group, as the IRS asserted, or instead by reference to the "consolidated net operating loss" of the entire group, as the taxpayer argued. *See id.* at 824, 830-31. Observing that the IRS had not provided for a definition of "separate" net operating loss in the applicable regulations, the Court agreed with the taxpayer that under the regulations "the essential relationship" between "product liability loss" and "net operating loss" was the same for a consolidated group as it would be for a "conventional corporate taxpayer." *Id.* at 830, 838.

The *United Dominion* opinion is silent as to which member of the group owned the refund that might result from the Court's holding. Indeed, nothing about the opinion suggests that ownership of the refund that the taxpayer won in the *United Dominion* decision ultimately was determined within the group by anything other than the *Bob Richards* rule. IRS regulations

11

take no position on the question of ownership of tax refunds among group members.  *See Bob Richards*, 473 F.2d at 264 ("The Internal Revenue Service is not concerned with the subsequent disposition of tax refunds and none of its regulations can be construed to govern this issue.").  The *Bob Richards* rule fills that gap.  The fact that IRS regulations do not, in another context, define the term "separate net operating loss" has no effect on that common law rule regarding ownership of tax refunds.

Equally inapposite is the opinion in *Asher Candy Co. v. MAFCO Holdings, Inc. (In re Marvel Entm't Group, Inc.)*, 273 B.R. 58 (D. Del. 2002), which also did not concern the ownership of tax refunds but instead addressed the effect of deconsolidation on the separate net operating losses of a former member of an affiliated group.  *See id.* at 83-85.  Whether or not a subsidiary's hypothetical stand-alone net operating losses are a "legal fiction," as the court in *Marvel* reasoned, under *Bob Richards* an income tax refund is owned by the subsidiary whose earnings and loss *history* are the source of the refund unless there is a clear and explicit "differing agreement" to the contrary.

BancGroup's contention that *United Dominion* and *Marvel* somehow stand for the proposition that the filing of a consolidated return "substantively transfers tax benefits from member-subsidiaries to filing parent entities," BancGroup Mem. at 30, finds no support in either one of those opinions and represents an egregious misrepresentation of federal tax law.  Indeed, directly contradicting this assertion, IRS regulations expressly provide that losses of a failed bank are to be used *before* losses of another group member in claiming refunds for a consolidated group that includes such an institution.  *See* Treas. Reg. § 301.6402-7(g)(iii) ("Notwithstanding any contrary rule or principle of the Code or regulations, if an institution and another member of the carryback year group have net operating losses that arise in taxable years

ending on the same date and are carried to the same consolidated carryback year, the carryback year group's consolidated taxable income for that year is treated as offset first by the loss attributable to the institution to the extent thereof.").[3]

BancGroup's claim that it is exempt from *Bob Richards* because a bankrupt debtor cannot be "unjustly" enriched is also unfounded.  Even the cases cited by BancGroup establish that unjust enrichment exists where a party "holds money which, in equity and good conscience, belongs to the plaintiff."  *Fraley v. Cincinnati Ins. Co.*, No. 1:05cv0006-VPM, 2006 WL 2583572, at *5 (M.D. Ala. Sept. 7, 2006) (cited by BancGroup).  Nothing about bankruptcy excuses a debtor from this principle.  To the contrary, nearly every decision applying *Bob Richards* has applied it against a bankrupt entity, including numerous bankrupt bank holding companies.  *See, e.g., Capital Bancshares*, 957 F.2d at 208 (refund was property of FDIC as receiver for failed bank, not bankrupt holding company); *Lubin v. F.D.I.C.*, No. 1:10-cv-00874-RWS, 2011 WL 825751, at *6 (N.D. Ga. Mar. 2, 2011) (same); *BSD Bancorp, Inc. v. F.D.I.C. (In re BSD Bancorp, Inc.)*, No. 94-1341-IEG, slip op. at 4 (S.D. Cal. Feb. 28, 1995) (same); *Indep. BankGroup, Inc. v. F.D.I.C. (In re Indep. BankGroup, Inc.)*, 217 B.R. 442, 448 (Bankr. D. Vt. 1998) (same); *Fla. Park Banks*, 110 B.R. at 988-89 (same).  Indeed, "[t]o permit a bankruptcy parent company to appropriate its bankrupt subsidiary's assets absent an express or implied agreement to do so unjustly enriches the parent (and the parent's creditors) to the

---

[3] BancGroup cites no authority for its expansive interpretation of *Marvel* and *United Dominion*, and many of the decisions it relies on expressly acknowledge that *Bob Richards* states the presumptive rule.  *See R.T.C. v. Franklin Sav. Corp. (In re Franklin Sav. Corp.)*, 182 B.R. 859, 862-63 (D. Kan. 1995) ("As a general rule, a parent corporation holds tax refunds in trust for its subsidiaries."); *Team Fin. Corp. v. F.D.I.C. (In re Team Fin., Inc.)*, Adv. No. 09-5084, 2010 WL 1730681, at *6 (Bankr. D. Kan. Apr. 27, 2010); *Super. of Ins. for N.Y.  v. Ochs (In re First Central Fin. Corp.)*, 269 B.R. 481, 489-90 (Bankr. E.D.N.Y. 2001), *aff'd*, 377 F.3d 209 (2d Cir. 2004); *United States v. MCorp Fin., Inc. (In re MCorp Fin., Inc.)*, 170 B.R. 899, 902 (S.D. Tex. 1994).

jeopardy of the subsidiaries' creditors." *Brandt v. Fleet Capital Corp. (In re TMCI Elecs.)*, 279 B.R. 552, 558 (Bankr. N.D. Cal. 1999).

Further, in this case equity is on the side of the FDIC-Receiver. Like BancGroup, the FDIC-Receiver is administering an estate for creditors – those of Colonial Bank – and the FDIC in its corporate capacity, as subrogee to Colonial Bank's depositors, holds a significant priority claim against its recoveries based on the $4.8 billion it has expended to protect those depositors. Stmt. Facts, ¶ 5. In contrast, BancGroup's creditors are primarily bondholders, many of which likely purchased their bonds at a substantial discount.

### B. The Undisputed Evidence Demonstrates BancGroup's Understanding That It Was Acting as Agent for Colonial Bank.

Approximately $253 million in federal income tax refunds were claimed in filings by the parties in September 2010 that have not yet been paid by the IRS.[4] *See* Stmt. Facts, ¶¶ 10-12. As the FDIC-Receiver has discussed in detail in its motion for summary judgment, Colonial Bank paid all of the taxes for the relevant years and by itself sustained sufficient operating losses to claim refunds of all of those taxes. *See* Treas. Reg. § 301.6402-7(g)(iii) (losses of failed bank to be used first in offsetting taxable income of group in carryback years). The evidence shows that BancGroup's role in all of these transactions was consistent with, and limited to, that of agent. No witness agreed with BancGroup's current argument that the relationship with its bank subsidiary was one of debtor and creditor.[5]

---

[4] Those substantial pending refunds result from a special, five-year carryback of net operating losses from 2009, the year that Colonial Bank was closed by its regulators, and their payment will result in the recovery of federal taxes paid for the 2004, 2005, 2006 and 2007 tax years. *See* Stmt. Facts, ¶ 11. (The affiliated group sustained a net operating loss in 2008. *See* Stmt. Facts, ¶ 21, Figure 1.)

[5] In order to avoid unnecessary duplication, the FDIC-Receiver refers to and incorporates by reference here its discussion of these issues in the memorandum of law in support of its

### 1.   Colonial Bank Paid All the Tax Liability.

With respect to tax payments, BancGroup's payments to the IRS uniformly occurred one or two days after receiving payment of the same amount (or more) from Colonial Bank.  *See* Stmt. Facts, ¶¶ 23-24, Figure 2.  Under the consolidated return regulations, Colonial Bank was required to pay its tax liabilities through BancGroup as its agent.  *See* Treas. Reg. 1.1502-77(a)(3) ("no subsidiary has authority to act for or to represent itself in any matter related to the tax liability for the consolidated return year").

The payment of tax liability from Colonial Bank to BancGroup and from BancGroup to the IRS was mandated by IRS regulations, under which BancGroup is expressly designated as "sole agent" for all members of the group.  The fact that payments flowed in this way only illustrates BancGroup's role as agent.  *Nelco*, 264 B.R. at 810 ("the court concludes that the fact that [parent] actually paid the IRS is immaterial for calculating a member's participation in a tax refund" since parent did not itself fund any tax payments); *see Capital Bancshares*, 957 F.2d at 207; *Bob Richards*, 473 F.2d at 265.

There was no instance when BancGroup failed to promptly remit to the IRS the amounts paid to it for that purpose by Colonial Bank, contradicting BancGroup's assertion that the Tax Allocation Policy established an "account" between BancGroup and Colonial Bank.[6]  *See* BancGroup Mem. at 17-18.  Further, the short delay between BancGroup's receipt of Colonial Bank's tax payments and BancGroup's payment of those amounts to the IRS belies BancGroup's contention that the funds were somehow converted into BancGroup's property.   Merely

---

motion for summary judgment and in the supporting statement of undisputed facts, together with the citations to the record evidence that are set forth therein.  [Doc. Nos. 110, 111]

[6] Given that BancGroup and all of the other members of the group would be severally liable for the full tax liability owed, failing to pay tax liability that was owed because of Colonial Bank's net income would have been against BancGroup's economic self-interest.  *See* Treas. Reg. § 1.1502-6(a).

depositing a trust beneficiary's funds into an account with other funds does not render the trust funds "unidentifiable" due to commingling.   A trust beneficiary can recover the funds from his trustee if they can be traced, which is presumed if the balance of the account never falls below the amount of the funds held in trust.   *See, e.g., Bell v. Killian*, 266 Ala. 12, 22, 93 So. 2d 769, 779 (Ala. 1957) (collecting cases); *McCamy v. Kerr (In re Real Estate Exch. Svcs. Inc.)*, No. 08–85871–PWB, 2009 WL 6499249, at *19 (Bankr. N.D. Ga. Oct. 9, 2009).

### 2.   BancGroup Was Paid for Its Losses and Did Not Pay Any Tax Liability.

While Colonial Bank was regularly paying the entire tax liability for the affiliated group, BancGroup was making no such payments.   To the contrary, it is undisputed that Colonial Bank made a separate quarterly payment to BancGroup for the use of BancGroup's regular operating losses based on the amount of taxes that Colonial Bank and its subsidiaries saved by offsetting the loss of BancGroup (and in many instances, also its non-bank subsidiary Colonial Brokerage, Inc.) against the net income of Colonial Bank and its subsidiaries.   *See* Stmt. Facts, ¶ 26, Figure 3; Reimer Tr. 39:20-25.

BancGroup's receipt of contemporaneous payments for the value of its operating losses further demonstrates the unjust windfall that BancGroup is seeking by claiming to own the refunds here, for which it already was paid its share years ago.   *See Capital Bancshares*, 957 F.2d at 208 ("We further note that Bancshares showed only losses during the relevant period, and could not have generated any tax refund on its own.   To allow Bancshares to keep the refund generated by the Bank would unjustly enrich the parent."); *Fla. Park Banks*, 110 B.R. at 989 ("to allow the Debtor a share of the refund would 'unjustly enrich' the Debtor since it paid none of the refunded taxes").

### 3. Colonial Bank Suffered the Losses.

During 2008 and continuing into 2009, Colonial Bank experienced significant operating losses. Through the second quarter of 2009, Colonial Bank reported a net loss of $727 million. *See* Stmt. Facts, ¶ 25. The loss for 2009 later increased greatly. Even according to the competing 2009 federal income tax return filed by BancGroup, Colonial Bank experienced an operating loss of $2.783 billion for the year. *See id.*

This one-year operating loss for Colonial Bank was more than twice as great as the aggregate net income reported by the entire consolidated group for the tax years 2004 through 2007. *See* Stmt. Facts, ¶¶ 20-21 & Figure 1. As a result, there can be no dispute that if it were filing its own return, Colonial Bank would have reported sufficient net operating losses by itself to claim refunds from the IRS of the full amount of the federal tax liability that it had paid for the relevant years.

### 4. BancGroup Handled Colonial Bank Refunds in the Manner That an Agent Would.

Long before the present controversy, the affiliated group applied for federal income tax refunds on three separate occasions. *All* of these refunds – roughly $190 million in total – were deposited directly into accounts of Colonial Bank when payments were made by the IRS, even though all of the refunds were paid to BancGroup as agent for the group under the consolidated return regulations. *See* Stmt. Facts, ¶¶ 29-34.

As BancGroup's chief accounting officer Brent Hicks testified during his deposition, refunds were deposited directly into Colonial Bank accounts because the refunds were assets of Colonial Bank, not of BancGroup. *See* Hicks Tr. 63:3-64:16. That is exactly how the refunds were accounted for both before they were paid by the IRS and after payment was received, and it is how Colonial Bank reported the refunds in its periodic Call Reports to bank regulators. *See*

Stmt. Facts, ¶¶ 35-37.   During his deposition testimony, Mr. Hicks confirmed that no similar asset was recorded in BancGroup's financial statements.  Hicks Tr. 60:5-21, 61:16-62:2.  He also confirmed that to the extent the Colonial Bank asset was a receivable, it reflected a receivable that was due from the IRS, not from BancGroup.  Hicks Tr. 56:15-17.

No witness has testified that BancGroup had any ownership interest in any federal tax refunds.  No accounting entries or other documentary evidence have ever been identified by BancGroup that suggest that refunds ever were treated as BancGroup assets, and the FDIC-Receiver is not aware of any such documents.  As William A. Rogers, the recently retired head of Deloitte LLP's U.S. financial institutions tax practice, has noted in his expert report in these proceedings, the accounting evidence points ineluctably to the conclusion that income tax refunds were treated as assets of Colonial Bank, not BancGroup.  *See* Declaration of John J. Clarke, Jr., dated September 22, 2011 ("9/22 Clarke Decl."), Exh. 1 (Expert Report of William A. Rogers).

### 5. Anticipated 2009 Carryback Refunds Also Were Recorded as Assets of Colonial Bank.

Colonial Bank was closed by its regulators on August 14, 2009.  By that date, the Internal Revenue Code had not yet been amended to permit the special, one-time election to take a five-year carryback of NOLs for either the 2008 or 2009 tax years that was enacted in November 2009.[7]  Through June 30, 2009, Colonial Bank had experienced significant operating losses and anticipated that it would be able to claim refunds of unrecovered taxes paid for the 2007 tax year

---

[7] Historically, the Internal Revenue Code has permitted a taxpayer to carry back net operating losses to recover taxes paid in the two preceding tax years only.  *See* 26 U.S.C. § 172(a).  Three months after Colonial Bank was closed, however, in November 2009, the tax code was amended to permit a special, one-time election under which taxpayers could carry back net operating losses sustained during either the 2008 or 2009 tax years to recover taxes paid in the preceding five years.  *See* Worker, Homeownership, and Business Assistance Act of 2009, § 13, Pub. L. No. 111-92, 123 Stat. 2984, 2992-95 (amending 26 U.S.C. § 172).

based on the two-year carryback that was permitted as of that time.  As a result, as of June 30, 2009 Colonial Bank had recorded an asset of $65,429,000 in its general ledger account for "Federal Income Tax Refunds Receivable."  *See* Hicks Tr. 115:15-116:22.  Colonial Bank also reported that amount as an asset in its Call Report filed with bank regulators for the quarter ending June 30, 2009.  *Id.*

On November 6, 2009, the Internal Revenue Code was amended to permit a five-year carryback for 2008 or 2009.  As a result, taxes paid in 2004, 2005 and 2006 would now be available for refund in addition to taxes paid in 2007.  Based on the 2009 consolidated return and related filings that were filed by the FDIC-Receiver, the total amount of refunds available from those years is $253 million, including the $65,429,000 that Colonial Bank already had recorded as an asset as of the date of its failure.  *See* Stmt. Facts, ¶ 38.

There is no basis to conclude that any different accounting treatment would have been appropriate for the additional anticipated refunds that arose as the result of a subsequent change in law.  To the contrary, if a debtor-creditor relationship were intended, BancGroup would have recorded the income tax receivable on its own books and also recorded a corresponding income tax refund payable due to Colonial Bank.  There were no such entries, as BancGroup does not, and cannot, dispute.

### C.   The Internal Tax Allocation Policy Is Not a "Differing Agreement" That Would Alter the *Bob Richards* Rule.

*Bob Richards* and cases that have applied it recognize that the members of an affiliated group can "override" the presumptive rule that the group member that paid the taxes and generated the losses owns the resulting tax refund by entering into a "differing agreement" that is fair and not overreaching.  *Bob Richards*, 473 F.2d at 265; *Lubin*, 2011 WL 825751, at *6 (tax sharing agreement did not alter *Bob Richards* presumption); *BSD Bancorp,* slip op. at 4 (same);

*Fla. Park Banks*, 110 B.R. at 988-89 (internal tax allocation policy statements in board minutes of bank and holding company did not constitute an agreement that altered the *Bob Richards* rule).

Cases applying *Bob Richards* have recognized that any "differing agreement" must be "clear and explicit" in order for it to modify the presumptive rule that the corporation that paid the taxes and generated the losses owns the tax refunds. *Nelco*, 264 B.R. at 809 (collecting cases). As a result, the burden falls squarely on BancGroup to prove that an undated and unsigned intercorporate tax allocation policy (the "Tax Allocation Policy") was a "differing agreement" that altered the *Bob Richards* presumption and resulted in the transfer of ownership of Colonial Bank's tax refunds to BancGroup. *See* Declaration of John J. Clarke, Jr. dated August 15, 2011 ("8/15 Clarke Decl."), Exh. 19 (copy of Tax Allocation Policy). BancGroup has not met, and cannot meet, that burden. Even if it were enforceable, which it is not, the Tax Allocation Policy does not alter the *Bob Richards* presumption that Colonial Bank is the owner of the federal tax refunds at issue.

### 1.     12 U.S.C. § 1823(e) Prohibits BancGroup's Argument Based on the Unsigned Tax Allocation Policy.

The Tax Allocation Policy is an unsigned, undated document that cannot be applied to diminish the interests of the FDIC as receiver in "assets" of a failed bank, such as income tax refunds, even if it had the meaning that BancGroup mistakenly advocates. *See* 12 U.S.C. §§ 1821(d)(9), 1823(e)(1); *Indep. BankGroup*, 217 B.R. at 447-48 (tax refund is type of asset subject to written agreement requirement, rejecting holding company claim to refunds based on implied tax allocation policy).

In order to enforce an agreement entered into by a failed bank against the FDIC as its receiver, a party must establish that the agreement: (1) was in writing; (2) was executed by the

failed bank and by the claimant contemporaneously with the bank's acquisition of the asset to which the agreement relates; (3) was approved by the failed bank's board of directors, or its loan committee, as reflected in the minutes; and (4) has been continuously an official record of the bank from the time of its execution.[8]  12 U.S.C. § 1823(e)(1); *see also* 12 U.S.C. § 1821(d)(9) ("any agreement which does not meet the requirements set forth in section 1823(e) of this title shall not form the basis of, or substantially comprise, a claim against the receiver or the Corporation").

The Eleventh Circuit has strictly construed the statutory requirement that an agreement must be "executed" to be enforceable against the FDIC as receiver for a failed bank, holding that "[i]n the context of section 1823(e), 'executed' *must mean* that the depository institution has 'signed' the agreement."  *Twin Constr., Inc. v. Boca Raton, Inc.*, 925 F.2d 378, 384 (11th Cir. 1991) (emphasis added).  In this regard, reference to parol evidence to establish the existence and

---

[8] Section 1823(e)(1) provides:

(e)    **Agreements against interests of Corporation**

(1)    **In general**

No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement –

(A)    is in writing;

(B)    was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution;

(C)    was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee; and

(D)    has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C. § 1823(e)(1).

terms of an alleged agreement is "flatly prohibit[ed]."  *First Union Nat'l Bank of Fla. v. Hall*, 123 F.3d 1374, 1380 (11th Cir. 1997) (citing *Twin Constr.*, 925 F.2d at 384).

The *Twin Construction* court also rejected a narrow interpretation of the types of agreement that are covered by section 1823(e), finding the variety of "assets" covered by the statute were "far broader than the narrow reading appellant offers."  *See Twin Constr.*, 925 F.2d at 382.  The one court to have directly considered the issue, the Vermont bankruptcy court in *Independent BankGroup*, concluded that tax refunds were "assets" within the meaning of section 1823(e) and that a signed writing therefore was required in a suit against the FDIC by a bankrupt holding company concerning ownership of refunds.  *See Indep. BankGroup*, 217 B.R. at 447.[9] The undisputed testimony and documentary evidence here establishes that federal tax refunds were "assets" of Colonial Bank, and there is no question that BancGroup's argument would "tend[] to diminish" the FDIC-Receiver's rights in those assets.

There is no dispute that the internal Tax Allocation Policy was never executed by Colonial Bank.  Indeed, on its face it is apparent that the document is unsigned and undated.  *See* 8/15 Clarke Decl., Exh. 19.  BancGroup does not cite any authority to support its argument that board minutes alone satisfy the execution requirement under section 1823(e), and that argument impermissibly relies on extrinsic evidence in violation of section 1823(e).  *See First Union*, 123

---

[9] Neither *E.I. duPont de Nemours & Co. v. F.D.I.C.*, 32 F.3d 592, 597 (D.C. Cir. 1994), nor *OPS Shopping Ctr., Inc. v. F.D.I.C.*, 992 F.2d 306 (11th Cir. 1993), supports BancGroup's contention that the Tax Allocation Policy is not subject to section 1823(e).  The holding in *duPont* turned on the court's conclusion that the plaintiff was not attempting to "rely upon the escrow agreement in order to diminish the FDIC's interest in 'any asset'" of a failed bank because the bank never had an "interest" in the funds in the escrow account.  *duPont*, 32 F.3d at 597.  Here, in contrast, there is no question that BancGroup is attempting to "diminish" the FDIC-Receiver's interest in valuable "assets" – the $253 million in federal tax refunds.  In *OPS Shopping Ctr.*, the Eleventh Circuit expressly rejected a litigant's attempt to limit the scope of the common law *D'Oench* doctrine, not the contrary as BancGroup suggests, and the court never addressed section 1823(e).  992 F.2d at 311.

F.3d at 1380.  The argument that policies in board minutes can amount to such a binding agreement has been rejected in a similar case.  *See Fla. Park Banks*, 110 B.R. at 988.[10]

Moreover, while witnesses testified to a general familiarity with there being an internal tax allocation policy, they identified numerous different documents as the embodiment of that policy, some in different form and others rife with typographical errors.  *See*  8/15 Clarke Decl., Exhs. 20-22; Byrne Tr. 84:4-10, 101:5-22, 221:13-222:8; Reimer Tr. 94:17-21; Moore Tr. 182:11-23, 195:2-10.  It is precisely such confusion and uncertainty that section 1823(e) is intended to guard against.  Even if the Tax Allocation Policy could be contorted to have the meaning that BancGroup ascribes to it, therefore, the policy would not be enforceable against the FDIC-Receiver to alter the "presumptive principal-agent relationship" that was recognized in *Bob Richards.  See Lubin*, 2011 WL 825751, at *5.

> **2.     The Tax Allocation Policy Is Not A "Clear and Explicit" Agreement That Alters the *Bob Richards* Presumption.**

Beyond questions of its enforceability, the language of the Tax Allocation Policy itself does not "override" the *Bob Richards* presumption that Colonial Bank owns the refunds at issue.  To the contrary, the Tax Allocation Policy confirms the principal-agent relationship between Colonial Bank and BancGroup.

---

[10] BancGroup's attempt to show that Colonial Bank received adequate "consideration" from BancGroup is also critically flawed.  *See* BancGroup Mem. at 14.  The court in *Bob Richards* expressly rejected the argument that is advanced by BancGroup that Colonial Bank's consent to filing a consolidated return constitutes adequate consideration for a transfer of ownership of refunds.  *See Bob Richards*, 473 F.2d at 264.  An agreement to transfer ownership rights to a holding company with respect to refunds worth more than $250 million would require substantial consideration, *see id.*, especially given BancGroup's duty not to abuse its dominant ownership position.  *See Davis v. Dorsey*, 495 F. Supp. 2d 1162, 1175 (M.D. Ala. 2007) ("A controlling or dominating shareholder standing on both sides of a transaction, as in a parent-subsidiary context, bears the burden of proving its entire fairness.") (quoting *Kahn v. Lynch Comms. Sys., Inc.*, 638 A.2d 1110, 1115 (Del. 1994)).  The illusory benefits that BancGroup claims Colonial Bank supposedly gained from the Tax Allocation Policy hardly satisfy this "entire fairness" standard.

The decision in *BSD Bancorp* illustrates the narrowness of the exception to the *Bob Richards* presumption.  In that case, a holding company and its bank subsidiary had entered into a tax sharing agreement under which the bank would be "reimbursed in cash" for a tax benefit to the group that might result from its annual loss and under which "[r]efunds due subsidiaries from the Company which cannot be fully funded when due . . . will be carried on the subsidiary's books as a 'loan to parent.'"  *BSD Bancorp*, slip op. at 5.  After the bank failed and the holding company filed for bankruptcy, a federal income tax refund was paid to the holding company.  The holding company argued, as does BancGroup here, that the tax sharing agreement established a debtor-creditor relationship.  The court examined the "economic reality" of the parties' relationship, and the agreement as a whole, and concluded that the tax sharing agreement did not alter the principal-agent relationship between the holding company and the bank that was presumed under *Bob Richards* even though the agreement expressly contemplated a "loan" of such refunds in certain circumstances.  *Id.*, slip op. at 10-12.

In *Florida Park Banks*, the trustee for a bankrupt holding company advanced arguments that are strikingly similar to BancGroup's arguments here.  The trustee contended that unsigned internal "policy statements" adopted by the boards of directors of the holding company and its bank subsidiary constituted a "binding agreement" concerning the ownership of tax refunds.  110 B.R. at 987-88.  As in the current case, the policy statements provided for the bank to "periodically remit payments to the holding company" based on the bank's calculation of what it would have paid if it filed a separate return.  *Id.* at 988.  They also provided that if the bank incurred a taxable loss, "the holding company will reimburse the subsidiary to the extent that there is a tax benefit arising from the loss in the consolidated tax return."  *Id.*  The bankruptcy court was not persuaded that the "policy statements" could be viewed as a binding agreement

regarding tax refunds, but in any event rejected the trustee's claim that the holding company was entitled to any share of the refunds given the fact that the failed bank had paid all of the taxes at issue. *Id.* at 988-89.

More recently, in *Lubin*, the district court considered a tax sharing agreement between a bankrupt holding company and a failed bank under which the holding company agreed to pay the bank any tax refund "in an amount no less than the amount the Bank would have been entitled to receive as a separate entity." *See Lubin*, 2011 WL 825751, at *5. Just as BancGroup argues here, the bankruptcy trustee in *Lubin* argued that the language of the agreement established a debtor-creditor relationship. As in *BSD Bancorp*, however, the *Lubin* court concluded that such language did not override the presumption of an agency relationship, and agency was consistent with "[t]he economic reality of the arrangement between [the holding company] and the Bank . . ." *Id.* at *6. Accordingly, the court dismissed the holding company's claim to ownership of tax refunds that were attributable to the earnings and loss history of the failed bank. *Id.*

Here, as in these earlier decisions, there is no language in the Tax Allocation Policy that indicates a clear intent by Colonial Bank to loan its tax refunds to BancGroup and thereby create a debtor-creditor relationship. To the contrary, the internal policy clearly reflects an agency relationship. This is confirmed by the expert report of William Lesse Castleberry, an experienced tax practitioner and adjunct professor of tax at New York University, who concludes that the Tax Allocation Policy in this case did not alter BancGroup's role as "sole agent" under the consolidated return regulations. *See* 9/22 Clarke Decl., Exh. 2 (Expert Report of William Lesse Castleberry).

The fact that the Tax Allocation Policy provides for payments to be "remitted" to or from BancGroup with respect to the "tax liability/refund" of members of the consolidated group does

not alter the ownership rights of any member in its tax refunds. Remitting tax payments and refunds through the "sole agent" for the group is required by the IRS consolidated return regulations and has nothing to do with a transfer of ownership. *See* Treas. Reg. 1.1502-77(a). *BSD Bancorp* definitively rejects BancGroup's assertion that a debtor-creditor relationship can be implied simply by use of words like "reimbursement" or "credits." *BSD Bancorp*, slip op. at 10-11. As *Nelco*, *Lubin* and *BSD Bancorp* demonstrate, the use of words like "payment" and "remit" in the Tax Allocation Policy do not indicate an intent to establish a "differing agreement" within the meaning of *Bob Richards*. The general rule that Colonial Bank is the owner of the tax refunds at issue applies.[11]

### 3. The Tax Allocation Policy Incorporated, and Was Intended to Comply with, the Interagency Policy Statement.

The Tax Allocation Policy states that it was adopted under the Federal Reserve Board's "Bank Holding Company Rules and Regulations, OTS Holding Company Regulatory Handbook (Section 500), and FDIC 1978 Statement of Policy." *See* 8/15 Clarke Decl., Exh. 19. Two of these three regulatory statements of policy expressly incorporate, or reiterate, the requirements of the "Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure," which was promulgated jointly in November 1998 by the Federal Reserve Board, the FDIC, the Office of the Comptroller of the Currency and the Office of Thrift Supervision. *See* 63 Fed. Reg.

---

[11] The tax sharing agreements in the decisions relied upon by BancGroup were notably different. None of those cases involved an unsigned tax allocation policy such as the one at issue here. In addition, in *Franklin Sav. Corp. v. Franklin Sav. Ass'n (In re Fraklin Sav. Corp.)*, 159 B.R. 9 (Bankr. D. Kan. 1993), *aff'd sub nom. R.T.C. v. Franklin Sav. Corp. (In re Franklin Sav. Corp.)*, 182 B.R. 859 (D. Kan. 1995), a bank and its holding company entered into two separate agreements that were intended to use tax liability forgiveness transactions by the holding company as a means to increase the capital of its bank subsidiary. In *Super. of Ins. for N.Y. v. Ochs (In re First Central Fin. Corp.)*, 269 B.R. 481 (Bankr. E.D.N.Y. 2001), *aff'd*, 377 F.3d 209 (2d Cir. 2004), an insurance company and its subsidiary had entered into a complex agreement that, among other things, provided for an escrow account of tax overpayments that would be released to the parent under certain circumstances. Other differences are discussed below.

64757, at 64758 (Nov. 23, 1998) (the "Interagency Policy Statement").[12]  During his deposition in these actions, BancGroup's general counsel David Byrne testified that he was aware of the requirements of the Interagency Policy Statement and that the Tax Allocation Policy complied with those requirements.  *See* Byrne Tr. 95:7-99:22; *see also* Hicks Tr. 20:10-22:9, 106:10-108:9.

In the Interagency Policy Statement, federal regulators reaffirmed "that intercorporate tax settlements between an [insured depository] institution and the consolidated group should result in *no less favorable treatment* to the institution than if it had filed its income tax return as a separate entity."  *See* Interagency Policy Statement, 63 Fed. Reg. at 64757 (emphasis added). This meant that a bank in a holding company structure could not be required to pay a greater tax liability, or recover a smaller tax refund, than it would have paid or received had it filed its own return.  *Id.* at 64758.  In order to ensure that this occurred, "[e]ach depository institution's applicable income taxes, reflecting either an expense or benefit, should be recorded as if the institution had filed on a separate entity basis."  *Id.* at 64758.  In addition, the regulators made clear that:

> a parent company that receives a tax refund from a taxing authority obtains these funds *as agent for the consolidated group on behalf of the group members*.  Accordingly, an organization's tax

_____

[12] *See* Federal Reserve Bank Board Holding Company Supervision Manual, § 2070.0.1.4 ("Regardless of the treatment of an institution's tax loss for regulatory reporting and supervisory purposes, a parent company that receives a tax refund from a taxing authority obtains these funds as agent for the consolidated group on behalf of the group members.  Accordingly, an organization's tax-allocation agreement or other corporate policies should not purport to characterize refunds attributable to a subsidiary depository institution that the parent receives from a taxing authority as the property of the parent."); OTS Holding Company Handbook, § 400 & Appendix 400C (incorporating Interagency Policy Statement).  The third pronouncement that is referred to in the Tax Allocation Policy, the FDIC's 1978 Statement of Policy, was updated by the 1998 Interagency Policy Statement, which in turn recited that it "does not materially change any of the guidance" provided in that earlier FDIC policy statement.  *See* Interagency Policy Statement, 63 Fed. Reg. at 64758.

>allocation agreement or other corporate policies should not purport to characterize refunds attributable to a subsidiary depository institution that the parent receives from a taxing authority as the property of the parent.

*Id.* at 64759 (emphasis added).

Mr. Byrne's testimony that the Tax Allocation Policy complied with these requirements is confirmed by the language of the Tax Allocation Policy itself, which provides that the "end result" of its allocation guidelines should be "that each member of the group having a tax liability is allocated their respective tax liability on a separate return basis, *as though each subsidiary were dealing directly with State or Federal taxing authorities*."   8/15 Clarke Decl., Exh. 19 (emphasis added).  Consistent with this provision, the undisputed evidence shows that Colonial Bank's "applicable income taxes, reflecting either an expense or benefit, [were] recorded as if the institution had filed on a separate entity basis," just as the Interagency Policy Statement requires.  *See* 63 Fed. Reg. at 64758.  BancGroup's chief accounting officer, T. Brent Hicks, testified that he understood that this accounting treatment was entirely consistent with the Tax Allocation Policy.  Hicks Tr. 194:9-18.

As the Interagency Policy Statement required, no provision of the internal Tax Allocation Policy purports "to characterize refunds attributable to a subsidiary depository institution that the parent receives from a taxing authority as the property of the parent."  *See* 63 Fed. Reg. at 64759. Nor did BancGroup ever conduct itself as if there were such a provision, demonstrating its understanding that BancGroup was not the owner of the refunds but instead was acting as Colonial Bank's agent/trustee in receiving them.  *See id.*

All but one of the cases relied upon by BancGroup in support of its debtor-creditor argument are distinguishable on this ground alone.  One case involved insurance companies, not a bank, and the Interagency Policy Statement therefore was not applicable.  *See Super. of Ins. for*

*N.Y. v. Ochs (In re First Cent. Fin. Corp.)*, 269 B.R. 481 (Bankr. E.D.N.Y. 2001), *aff'd*, 377 F.3d 209 (2d Cir. 2004).  Two of the decisions, while involving bank holding companies, predated the Interagency Policy Statement by several years.  *See United States v. MCorp Fin., Inc. (In re MCorp Fin., Inc.)*, 170 B.R. 899, 901-02 (S.D. Tex. 1994); *Franklin Sav. Corp. v. Franklin Sav. Ass'n (In re Fraklin Sav. Corp.)*, 159 B.R. 9 (Bankr. D. Kan. 1993), *aff'd sub nom. R.T.C. v. Franklin Sav. Corp. (In re Franklin Sav. Corp.)*, 182 B.R. 859 (D. Kan. 1995).[13]  And one of the decisions involved a tax sharing agreement between a bank and its holding company that (unlike the Tax Allocation Policy here) did not make reference to, or incorporate the Interagency Policy Statement.  *See Team Fin. Inc. v. F.D.I.C. (In re Team Fin., Inc.)*, Adv. No. 09-5084, 2010 WL 1730681, at *2-3 (Bankr. D. Kan. Apr. 27, 2010).[14]

In one decision, however, a bankruptcy court concluded that a tax allocation agreement created a debtor-creditor relationship between a holding company and its bank subsidiary even though the agreement provided that it was "intended to allocate the tax liability in accordance with" the Interagency Policy Statement.  *See Zucker v. F.D.I.C. (In re NetBank, Inc.)*, Adv. Proc. No. 3:08-ap-00346-JAF, slip op. at 30 (Bankr. M.D. Fla. Sept. 30, 2010).  The bankruptcy court in *NetBank* based its conclusion on the rationale that as a mere "statement of policy," the Interagency Policy Statement did not have the force of law.  *See id.*, slip op. at 29.

---

[13] Neither the *MCorp* nor the *Franklin Savings* courts addressed the substantially similar individual agency guidance that preceded the Interagency Policy Statement and that were in effect at the time.  *See* 63 Fed. Reg. at 64758 (stating that "[t]his interagency policy statement does not materially change any of the guidance previously issued by any of the Agencies").

[14] The bankruptcy court in *Team Financial* subsequently entered an order stating that its opinion is not final and that the "Court's conclusions of law in the Memorandum Opinion could change based on additional evidence that may be admitted later in this proceeding."  Order entered on June 11, 2010, *Team Fin. Inc.. v. F.D.I.C. (In re Team Fin., Inc.)*, Adv. No. 09-5084 (Bankr. D. Kan.).

That reasoning misses the point.  Whether or not the Interagency Policy Statement has the force of a statute or regulation, the incorporation of the Interagency Policy Statement by reference into a tax allocation agreement (or policy) demonstrates the parties' *intent* to maintain the agent-principal relationship that the Interagency Policy Statement mandates.  In failing to take into account the expressed intention of the parties, the court in *NetBank* appears to have committed a fundamental error of law.  *See Fla. Polk Cnty. v. Prison Health Servs., Inc.*, 170 F.3d 1081, 1084 (11th Cir. 1999) ("It is a venerable principle of contract law that the provisions of a contract should be construed so as to give every provision meaning.").  An appeal of the decision is pending.  At a minimum, it is not persuasive authority here.[15]

BancGroup similarly attempts to evade the effect of the Interagency Policy Statement on this basis, but whatever legal force might be attributable to the Interagency Policy Statement, the fact that BancGroup indisputably intended to comply with its requirements (as BancGroup's general counsel confirmed in his testimony) precludes BancGroup's argument that the Tax Allocation Policy established a debtor-creditor relationship.  The Interagency Policy Statement reiterates that a parent holding company merely acts as agent in receiving tax refunds for the members of the group and instructs that a "tax allocation agreement or other corporate policies should not purport to characterize refunds attributable to a subsidiary depository institution that the parent receives from a taxing authority as the property of the parent."  63 Fed. Reg. at 64759.

### 4.    No Express Language of Trust Is Required.

BancGroup's assertion that the Tax Allocation Policy establishes a debtor-creditor relationship because it does not provide for an express trust misunderstands the *Bob Richards*

---

[15] Further, in contrast with the substantial and undisputed evidence here that establishes Colonial Bank's ownership of tax refunds, the courts in *NetBank* and *Team Financial* were not presented with any evidence other than the pertinent tax sharing agreements themselves.

presumption.  As agent, BancGroup received Colonial Bank's tax refunds "as trustee of a specific trust," that is, of a trust implied by law.  *Bob Richards*, 473 F.2d at 265; *see Capital Bancshares*, 957 F.2d at 207-08; *Jump*, 438 F. Supp. at 189.  Consequently, there was no need for the Tax Allocation Policy to provide for an express trust because BancGroup already had a common law duty, as fiduciary, to handle Colonial Bank's refunds as a fiduciary and trustee.  *See* Restatement (Third) of Agency, § 8.05(1) (agent has duty "not to use property of the principal for the agent's own purposes or those of a third party"); *id.*, § 8.12(1) (agent has duty "not to deal with the principal's property so that it appears to be the agent's property").

BancGroup's argument that escrow and use restrictions are necessary for the FDIC-Receiver to show ownership contradicts the entire line of *Bob Richards* cases.  *Bob Richards*, *BSD Bancorp*, *Lubin*, *Nelco* and *Florida Parks* place the burden on the holding company to prove the existence of an agreement containing a clear expression of an intent to supersede the presumptive agency relationship.  None of these cases required the bank to show the existence of escrow and use instructions, and no such requirement should be inferred here.

Consistent with the *Bob Richards* rule, Alabama law recognizes the concept of a "resulting trust," which is one "implied by law in property that is held by a transferee, in whole or in part, as trustee for the transferor."  Restatement (Third) of Trusts (2003), § 7; *see, e.g., In re Baker*, No. 08-42247-JJR-13, 2009 WL 3854103, at *7 (Bankr. N.D. Ala. Nov. 17, 2009) (bank certificate of deposit excluded from property of estate as "resulting trust").  The *Bob Richards* specific trust also meets the definition of a constructive trust, which under Alabama law can arise "when the legal title to property is obtained by one in violation, express or implied, of some duty owed to one who is equitably entitled thereto, and when the property thus obtained is held in

hostility to his beneficiary's rights of ownership . . . ." *Putnam v. Putnam*, 274 Ala. 472, 475, 150 So. 2d 209, 213 (Ala. 1963).[16]

Under either rubric, when the parent taxpayer is a debtor in bankruptcy, the Bankruptcy Code expressly excludes such refunds from the property of its estate. *See* 11 U.S.C. § 541(d); *Whiting Pools, Inc.*, 462 U.S. at 205 n.10; *T&B Scottsdale Contractors, Inc. v. United States*, 866 F.2d 1372, 1376 (11th Cir. 1989) ("funds in the debtor's possession held for a third-party do not become part of the estate in bankruptcy"); *see also Begier*, 496 U.S. at 61-65 (in accordance with statutory trust imposed by Internal Revenue Code, Bankruptcy Code § 541(d) excluded funds from property of the estate that were withheld from employees' salaries to pay FICA taxes even though funds were never maintained in a separate account); *Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*, 813 F.2d 1177, 1182 (11th Cir. 1987) (for purpose of avoidance claim, funds deposited into debtor's bank account were not property of its estate because debtor did not control the disposition of the funds).

The decisions relied upon by BancGroup in this regard are distinguishable on various grounds. In *First Central*, the Second Circuit held that the existence of a written tax sharing agreement that did not include express language of trust precluded a finding of "unjust

---

[16] BancGroup's attempt to escape *Bob Richards* on the ground that it has not engaged in "wrongdoing" misstates Alabama law, which recognizes that "it is unnecessary that there be the presence of fraud, wrongdoing, abuse of a confidential relationship, or other unconscionable conduct in order for a constructive trust to arise." *In re Poffenbarger*, 281 B.R. 379, 388 (Bankr. S.D. Ala. 2002) (citing *Brown v. Brown*, 604 So. 2d 365, 369-70 (Ala. 1992)). Further, BancGroup places mistaken reliance on several decisions suggesting that constructive trusts are disfavored in bankruptcy, including *XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.)*, 16 F.3d 1443 (6th Cir. 1994). The Sixth Circuit later limited its holding in the *Omegas* case, noting that the policy of ratable distribution to creditors that was the basis for that decision "would not be relevant where the property at issue was not subject to distribution to creditors." *See McCafferty v. McCafferty (In re McCafferty)*, 96 F.3d 192, 196 (6th Cir. 1996) (citing *Begier*, 496 U.S. at 58). That is precisely the circumstance here. In any event, *Omegas* is not followed in the Eleventh Circuit. *See Poffenbarger*, 281 B.R. at 389 n.7.

enrichment" as a matter of New York law.  *See First Cent. Fin. Corp.*, 377 F.3d at 213-14.  The appellate court made no attempt to reconcile its holding with *Bob Richards* or the cases that have followed it, although those decisions had been discussed in the bankruptcy court decision that it was reviewing.   In any event, the decision was expressly limited to an interpretation of New York law that is inapplicable here.

The bankruptcy court in *First Central*, in turn, based its holding on the language of the tax allocation agreement at issue, which contained far more detailed provisions indicating a debtor-creditor relationship, including escrow provisions, than the Tax Allocation Policy here.  *See First Cent. Fin. Corp.*, 269 B.R. at 494-95 (noting that escrow provision permitted tax overpayments to be released to the parent after expiration of NOL carryback period).  The courts in *Team Financial* and *NetBank* followed similar reasoning and made no effort to address the *Bob Richards* holding that as agent the parent receives refunds "as trustee of a specific trust."  *See NetBank*, slip op. at 17-21; *Team Fin.*, 2010 WL 1730681, at *4-5.  Both of those opinions failed to recognize that a party seeking to establish the existence of a "differing agreement" bears the burden to overcome the *Bob Richards* presumption of an agent-principal relationship.[17]

Finally, two opinions cited by BancGroup relied on the failure of a tax allocation agreement to require segregation of funds as an indication of a debtor-creditor relationship rather than one between an agent and principal.  *See NetBank*, slip op. at 18-21; *First Cent. Fin. Corp.*, 269 B.R. at 495-96.  The undisputed evidence here, however, demonstrates that there was such segregation – Colonial Bank's refunds were always deposited directly into accounts of Colonial Bank because BancGroup recognized that the refunds were owned by Colonial Bank.  *See supra*

---

[17] Both the *NetBank* and *Team Financial* decisions also failed to reconcile their holdings with applicable federal banking law, which prohibits an unsecured, non-interest bearing extension of credit from a bank to its holding company.  *See infra* at 35-37.

at 17-18.  Even if this were not an indisputable fact, however, Alabama law recognizes that a fiduciary's commingling of trust funds does not deprive the beneficiary of a remedy of implied trust, as previously discussed.  *See Bell v. Killian*, 266 Ala. 12, 22, 93 So. 2d 769, 779 (Ala. 1957) (collecting cases).

BancGroup's own actions therefore undercut its newfound assertion that it had license to use Colonial Bank's refunds as its own property merely because the Tax Allocation Policy allowed it a 30-day grace period to turn over refunds to their rightful owner.[18]  *See* BancGroup Mem. at 19.  BancGroup never used that grace period, and even if there had been an instance when it momentarily held refunds before paying them over to Colonial Bank (which there was not), any such delay would not have defeated the Bank's property rights in those funds.[19]

### 5.    BancGroup's Interpretation of the Tax Allocation Policy Would Violate Federal Banking Law.

Even if (solely for the sake of argument) one were to view the Tax Allocation Policy as a "contract," Alabama law recognizes that "an interpretation of a contract which gives a reasonable, lawful and effective meaning to all of the terms is preferred to an interpretation which leaves a part unreasonable, unlawful or with no effect."  *Fid. & Dep. Co. of Md. v.*

---

[18] In this regard, the Tax Allocation Policy is particularly unclear.  It provides:  "The tax liability/refund of each member of the consolidated group will be estimated on a quarterly basis and funds remitted to/from the parent, also on a quarterly basis, within 30 days of the time that the estimated tax payments/refunds are due to/from federal and state taxing authority . . . ."  *See* 8/15 Clarke Decl. Exh. 19.  It is unclear what time BancGroup believes is meant as the date when a refund would be "due from" the IRS, since a taxpayer does not know when its refund will be paid by the IRS, or in what amount, until it is actually paid.  In practice, the evidence shows, Colonial Bank was paid refunds directly from the IRS whenever they were paid.

[19] While the parties have agreed that the fact that any post-petition tax refunds must be deposited into an escrow account that has been established by order of the bankruptcy court "shall have no bearing on the determination of ownership," *see* Stipulation and Order Regarding Establishment of Segregated Account for Tax-Related Payments entered on March 10, 2010 [Bankr. Doc. No. 621], it is a fact that no post-petition tax refunds will ever be commingled with other BancGroup funds because of that tax refund escrow account.  *See* Stmt. Facts, ¶ 8.

*Jefferson Cty. Comm'n*, 756 F. Supp. 2d 1329, 1337 (N.D. Ala. 2010) (citing *Bd. of Water & Sewer Comm'rs of City of Mobile v. Bill Harbert Constr. Co.*, 870 So. 2d 699, 710 (Ala. 2003)). In this case, BancGroup's debtor-creditor argument would result in a construction of the Tax Allocation Policy that violates fundamental prohibitions of federal banking law.

Sections 23A and 23B of the Federal Reserve Act are among the most fundamental federal restrictions on the activities of banks and their "affiliates," including holding companies. *See* 12 U.S.C. §§ 371c, 371c-1. These statutes are "designed to protect against a depository institution suffering losses in transactions with affiliates. They also limit the ability of a depository institution to transfer to its affiliates the subsidy arising from the institution's access to the Federal safety net." Board of Governors of the Federal Reserve System, "Transactions Between Member Banks and Their Affiliates," 67 Fed. Reg. 76560 (Dec. 12, 2002) (adopting Federal Reserve Board's Regulation W).

Section 23A limits the aggregate amount of "covered transactions" that an insured bank or its subsidiaries may enter into with their non-bank affiliates and requires that such transactions be on "terms and conditions that are consistent with safe and sound banking practices." 12 U.S.C. § 371c(a). Under this section, any extension of credit, in whatever form, that is made from a bank to its holding company must be secured by collateral from the holding company equal to at least 100%, and as much as 130%, of the amount of the extension of credit. *See* 12 C.F.R. § 223.14. Under section 23B, any transaction between an insured bank and its "affiliates" must be "on terms and under circumstances, including credit standards, that are substantially the same, or at least as favorable to [the bank] as those prevailing at the time for comparable transactions with or involving other nonaffiliated companies." 12 U.S.C. § 371c-1(a). Thus, for

example, a market rate of interest is required for any extension of credit from an insured bank to its holding company.  *See* 12 C.F.R. §§ 223.51, 223.52.[20]

If the Tax Allocation Policy resulted in the extension of credit from Colonial Bank to BancGroup, as BancGroup argues, it would violate these laws.  There are no provisions in the Tax Allocation Policy providing for the payment of a market-rate of interest for any "loan" of refunds by the Bank to BancGroup, or for the posting of collateral to secure such a "loan."  Indeed, the Tax Allocation Policy does not even include the general language that was found in the *BSD Bancorp* tax sharing agreement requiring that any "loan" of refunds from the bank to the holding company would "be in accordance with applicable federal regulations regarding affiliate transactions."  *BSD Bancorp.*, slip op. at 5.[21]

BancGroup senior officers were well aware of sections 23A and 23B and took great efforts to comply with their requirements.  *See* Byrne Tr. 74:16-75:3; Hicks Tr. 108:23-110:1.  BancGroup's argument that the same officers adopted a Tax Allocation Policy that violated those provisions defies common sense.

---

[20] Sections 23A and 23B apply by their literal terms to "member banks" and their subsidiaries, *i.e.* banks that are members of the Federal Reserve system.  Under 12 U.S.C. § 1828(j), however, the restrictions of those statutes were extended to "every nonmember insured bank in the same manner and to the same extent as if the nonmember insured bank were a member bank."

[21] It cannot be argued that no "extension of credit" would result from BancGroup's interpretation.  By definition, an "extension of credit" is any transaction in which a person "becomes obligated (directly or indirectly, or by any means whatsoever) to pay money or its equivalent to the bank."  12 U.S.C. § 375b(9)(D); *see also In the Matter of Discon Corp.,* 346 F. Supp. 839, 844 (S.D. Fla. 1971) (to "borrow" means "to receive temporarily from another, implying or expressing the intention either of returning the thing received or giving its equivalent to the lender").

**D.      BancGroup's Contract Argument Is Not Available as a
        Matter of Applicable Bankruptcy Law.**

BancGroup's debtor-creditor argument also contradicts two principles of applicable bankruptcy law.  First, to the extent that BancGroup believes that the Tax Allocation Policy is a "contract," it was required to obtain an order of the bankruptcy court either assuming or rejecting that contract during the pendency of its chapter 11 case.  *See* 11 U.S.C. § 365(a).  BancGroup never assumed the Tax Allocation Policy, and therefore as the result of its confirmed plan of liquidation the policy (to the extent BancGroup argues it is a contract) was deemed to be rejected when the plan became effective on June 2, 2011.  *See* The Colonial BancGroup, Inc. Plan of Liquidation, § 7.1 ("[a]ll executory contracts (including Employee-Related Agreements) and unexpired leases that have not been assumed and assigned, or rejected, pursuant to an order entered by the Bankruptcy Court on or before the Effective Date, shall be deemed to be rejected by the Debtor on the Effective Date").

The rejection of an executory contract under section 365 of the Bankruptcy Code is deemed a breach of that agreement by the debtor as of the date of its bankruptcy petition, *see* 11 U.S.C. § 365(g), and a debtor cannot seek to enforce its alleged rights under a contract that has been rejected.  *See, e.g., Hall v. Perry (In re Cochise College Park, Inc.)*, 703 F.2d 1339, 1356 (9th Cir. 1983); *In re Newlin*, 370 B.R. 870, 876 (M.D. Ga. 2007) (chapter 7 trustee cannot enforce a mandatory purchase right that "arises solely from a Partnership Agreement that has been deemed rejected"); *Auto Dealer Servs., Inc. v. Prestige Motor Car Imports, Inc. (In re Auto Dealer Servs., Inc.)*, 96 B.R. 360, 364 (Bankr. M.D. Fla. 1989).

Second, section 365(c)(2) of the Bankruptcy Code prohibits a debtor from assuming any pre-petition contract to make a loan to the debtor, since the effect of such an assumption would be to require a prepetition creditor to provide post-petition financing to a bankrupt entity.  *See* 11

37

U.S.C. § 365(c)(2); *Transamerica Comm. Fin. Corp. v. Citibank, N.A. (In re Sun Runner Marine, Inc.)*, 945 F.2d 1089, 1092 (9th Cir. 1991).  The Tax Allocation Policy is not such a contract, but if the Policy were the contract that BancGroup claims it to be then BancGroup would not be permitted to enforce it under the plain language of the Bankruptcy Code.

## II.   BANCGROUP HAS NO PROPERTY INTEREST IN THE REIT PREFERRED SECURITIES.

In its second summary judgment motion, BancGroup asserts that it owns $300 million in REIT preferred securities issued by CBG Florida REIT Corp., a wholly owned indirect subsidiary of Colonial Bank, despite undisputed evidence that BancGroup made a capital contribution of the securities to Colonial Bank on August 11, 2009.  BancGroup does not dispute that it twice certified in writing to the FDIC that the contribution had been completed.  BancGroup asserts in error, however, that the apparent failure of CBG Florida REIT to cause its transfer agent to record Colonial Bank as the owner of the securities in the issuer's transfer records makes BancGroup their owner.  Neither the facts nor the law support this argument.[22]

### A.   BancGroup Delivered the REIT Preferred Securities to Colonial Bank on August 11, 2009.

#### 1.   The Undisputed Evidence Establishes BancGroup's Delivery of Ownership to Colonial Bank.

BancGroup argues in error that Fla. Stat. Ann. § 678.3011, Florida's version of section 8-301 of the Uniform Commercial Code, sets forth the exclusive methods for delivering ownership of a security.  To the contrary, that statute's provisions do "not purport to be an exclusive list of the only methods of effectuating a valid transfer of securities," as both

---

[22] The factual background concerning the REIT preferred securities is set forth in detail in the FDIC-Receiver's statement of undisputed facts and memorandum of law in support of its pending motion for summary judgment, and that discussion is incorporated by reference.  [Doc. Nos. 110, 111]

BancGroup's argument and the decisions it relies upon recognize.  *Kallop v. McAllister*, 678 A.2d 526, 531 (Del. 1996); *see, e.g., Sackett v. Shahid*, 722 So. 2d 273, 276 (Fla. Dist. Ct. App. 1998) (cited by BancGroup) ("the provisions of the Uniform Commercial Code 'are not exclusive and do not undercut the validity of a gift of securities which is otherwise effective under common law standards'") (quoting *Tanner v. Robinson*, 411 So. 2d 240, 242 (Fla. Dist. Ct. App. 1982))*; see also Black Horse Capital LP v. JPMorgan Chase Bank, N.A. (In re Washington Mutual, Inc.)*, 442 B.R. 297, 305 (Bankr. D. Del. 2011) (cited by BancGroup) ("Article 8 does not provide the exclusive means by which ownership of securities can arise").

As discussed in the FDIC-Receiver's prior submissions, in May 2007 CBG Florida REIT issued a series of $300 million in preferred securities to qualified investors.  To satisfy a requirement imposed by bank regulators as a condition to approving Tier 1 capital treatment, the securities were subject to automatic conversion into shares of BancGroup preferred stock.  In such circumstances, BancGroup "covenanted" to bank regulators that it would immediately contribute the securities to Colonial Bank.  *See* Stmt Facts, ¶¶ 53-58; 8/15 Clarke Decl., Exhs. 35-36.  In addition to this "covenant," an Exchange Agreement dated as of May 21, 2007 among BancGroup, Colonial Bank and CBG Florida REIT (the "Exchange Agreement") set forth a series of actions that all would occur among those three entities, "[e]ffective on the date and time of" such a "Conditional Exchange," resulting in Colonial Bank being the owner of the securities. *See* 8/15 Clarke Decl., Exh. 40, § 2.

On August 10, 2009, the FDIC issued written notice to BancGroup, Colonial Bank and CBG Florida REIT declaring that an "Exchange Event" had occurred.  The letter triggered the automatic conversion of the securities (in the hands of investors) into shares of BancGroup

preferred stock "effective at 8:00 A.M. New York time on August 11, 2009."[23]   8/15 Clarke

Decl., Exh. 41; Moore Tr. 154:15-155:22; *see* BancGroup Mem. at 10.   The letter also directed

BancGroup to contribute the REIT preferred securities to Colonial Bank and directed CBG

Florida REIT to record Colonial Bank as the owner of the REIT preferred securities, both as

required under the terms of the Exchange Agreement.   *See* 8/15 Clarke Decl., Exh. 41;

BancGroup Mem. at 10.[24]

There is no dispute that BancGroup made a contribution of capital of the securities to

Colonial Bank on August 11, 2009 in response to the FDIC letter, as reflected in general ledger

accounts for both BancGroup and Colonial Bank.   *See* Stmt. Facts, ¶¶ 62-64.   BancGroup's only

claim to ownership is based on the fact that CBG Florida REIT's transfer records have not been

updated to reflect Colonial Bank as the record owner of the securities as CBG Florida REIT

agreed to do in the Exchange Agreement.   While it is accurate that CBG Florida REIT's transfer

agent, Bank of New York Mellon ("<u>BNY Mellon</u>"), has not made that change in the transfer

records, however, it is also true that the records also were never changed to show *BancGroup* as

the owner of the securities.   *See* 9/22 Clarke Decl., Exh. 3.

BancGroup's argument that it is the owner of the REIT preferred securities therefore

requires the Court to acknowledge that the Uniform Commercial Code does not exclude other

---

[23]   The automatic conversion was governed by CBG Florida REIT's certificate of incorporation, *see* 8/15 Clarke Decl. Exh. 39, § 4.4.7, and not by the Exchange Agreement.   The public investors in the REIT preferred securities were not parties to the Exchange Agreement, but there can be no dispute that they were subject to the applicable charter provisions.

[24]   The FDIC letter actually directed "Colonial Bank" to record the ownership change rather than CBG Florida REIT.   *See id.*   Colonial Bank was the indirect owner of all of CBG Florida REIT's common stock and therefore had the power to make that change.   However, CBG Florida REIT (through its Treasurer, T. Brent Hicks) also was an addressee and a recipient of the letter and also therefore received this instruction directly.

methods of transferring ownership.  However, under the same principle BancGroup's entire claim to ownership must be rejected.

Florida law expressly provides that Article 8 of the UCC "is not a comprehensive codification of the law governing the creation or transfer of interests in securities . . . Article 8 does not determine whether a property interest in a certificated or uncertificated security is acquired under any other law, such as the law of gifts, trusts, or equitable remedies."  Official Comment 2, Fla. Stat. Ann. § 678.3021.[25]

The doctrine of "constructive delivery" has been recognized by the courts to have survived Florida's enactment of the Uniform Commercial Code.  *See Sackett*, 722 So. 2d at 276; *Tanner*, 411 So. 2d at 242; *Phillips v. Zimring*, 284 So. 2d 233, 235 (Fla. Dist. Ct. App. 1973) (UCC section "involves the legal title only and does not embrace the broad field of equitable rights and interests and the methods of their transfer") (collecting cases).  The same is true under Alabama law.  *See Andrews v. Troy Bank & Tr. Co.*, 529 So. 2d 987, 992 (Ala. 1988) ("the adoption of UCC Article 8 . . . did not abrogate the equitable principles established in prior decisions of this Court that, as between the parties, there may be a transfer of ownership of stock in a corporation where the owner presently intends to make such a transfer even though there is some technical defect in the mode of transfer.").

"Constructive delivery exists where," as here, "even in the absence of any actual delivery, the parties act in a manner which is inconsistent with any conclusion other than that they

---

[25]  The Uniform Commercial Code generally provides that "[u]nless displaced by the particular provisions of this code, the principles of law and equity . . . shall supplement its provisions."  Fla. Stat. Ann. § 671.103.  When Florida amended the UCC in 1998, the word "only" was omitted from the "delivery" provision of Article 8 even though its predecessor statute had included the word.  *Compare* Fla. Stat. Ann. § 678.3011 *with* Fla. Stat. Ann. § 678.313 (repealed in 1998).  This change in statutory language has significance.  *See Jones v. Cole*, No. 08-1011-JTM, 2009 WL 2163185, at *9 (D. Kan. July 17, 2009).

intended a change in ownership."  *Jones v. Cole*, No. 08-1011-JTM, 2010 WL 5015307, at *2

(D. Kan. Dec. 3, 2010).[26]  It "requires an unmistakable intention to transfer title without

transferring possession."  *Kallop*, 678 A.2d at 531 (citing *Corporacion Venezolana de Fomento

v. Vintero Sales Corp.*, 452 F. Supp. 1108, 1117 (S.D.N.Y. 1978)); *see Phillips*, 284 So. 2d at

235 (doctrine requires "intention that the stock should then and there be vested in the

transferee").

While BancGroup struggles to suggest that its ownership rights arise in some way other

than constructive delivery, in fact its argument that BancGroup was "deemed" to be the owner of

the REIT preferred securities upon the occurrence of the Conditional Exchange is based on the

constructive delivery doctrine.  BancGroup cannot dispute that CBG Florida REIT never

recorded BancGroup as the owner of the REIT preferred securities, nor can it avoid the fact that

the Exchange Agreement expressly required CBG Florida REIT to take that step, just as the

---

[26] The decision in *Sackett* mistakenly suggested that the common law requirements for ownership transfers under Florida law were essentially identical to those set forth in the UCC. *See Sackett*, 722 So. 2d at 276.  This suggestion directly conflicts with Florida's enactment of the UCC.  *See* Official Comment 2, Fla. Stat. Ann. § 678.3021.  The *Sackett* court cited *Tanner* for this proposition, *see id.*, but *Tanner* held exactly the opposite.  *See Tanner*, 411 So. 2d at 242 ("we hold that an *inter vivos* transfer by gift of any interest in securities is accomplished by either actual *or constructive delivery* of the same, where donative intent is also present, and where acceptance by the donee may be presumed or is proven directly . . .") (emphasis added). Under *Sackett*, the established doctrine of constructive delivery would be meaningless, since there would be no situations where the common law doctrine would lead to a different result from the UCC.  Neither *Tanner* nor earlier Florida decisions applying the constructive delivery doctrine can be reconciled with that view of the law.  *See Tanner*, 411 So. 2d at 242 (shares were transferred by "missing" letter stating intent to give them to plaintiff); *Phillips*, 284 So. 2d at 235-36 (ownership was transferred even though "there was no physical delivery of the stock certificates" where "there was an intention that the stock should then and there be vested in the transferee"); *Smallwood v. Moretti*, 128 So. 2d 628, 629 (Fla. Dist. Ct. App. 1961) ("The fact that the shares were never issued is immaterial, because it is possible under some circumstances for one to own stock in a corporation though no certificate has been issued to him.").  The decisions in *Guthartz v. Park Ctr. W. Corp.*, 409 F. App'x 248 (11th Cir. 2010), and *Ennis v. Phillips*, 890 So. 2d 313, 314-15 (Fla. Dist. Ct. App. 2005), merely repeated the error articulated in *Sackett* without analysis, and those opinions therefore are equally unpersuasive.

agreement also required CBG Florida REIT to record Colonial Bank as the owner immediately thereafter.  *Compare* 8/15 Clarke Decl., Exh. 40 (Exchange Agreement), § 2(b) (CBG Florida REIT "shall record, or cause to be recorded, in its share registry [BancGroup] as owner of all of the [REIT preferred securities], as transferee from the Persons who are holders of [those securities] immediately prior to such date and time") *with id.*, § 2(e) (CBG Florida REIT "shall record, or cause to be recorded, in its share registry the Bank as owner of all of the [REIT preferred securities]").  By contract, both the recording of BancGroup and the subsequent recording of Colonial Bank as the owner of the securities were to occur "[e]ffective on the date and time of the Conditional Exchange."  *See id.*, § 2.[27]

Further, there can be no genuine factual dispute that it was BancGroup's intention to transfer ownership of the REIT preferred securities to Colonial Bank on and as of August 11, 2009, in accordance with the Exchange Agreement and BancGroup's earlier commitment to regulators.  BancGroup falsely asserts that "nobody took any steps whatsoever to effectuate the Downstream Contribution" in response to the FDIC's August 10th letter.  BancGroup Mem. at 3 (emphasis omitted).  The record shows otherwise.

On August 10, 2009, after they received the FDIC letter, BancGroup's senior officers, including Mr. Byrne (the general counsel), Mr. Hicks (the chief accounting officer) and Sarah H.

---

[27] To the extent BancGroup suggests that its ownership arose "by operation of law," it is mistaken.  BancGroup cites no authority for this assertion.  In fact, its ownership was the result of a contract, and not the product of a statute, merger, bankruptcy or similar legal imperative.  *See United States v. Seattle First Nat'l Bank*, 321 U.S. 583, 587-88 (1944) ("few if any transfers ever take place 'wholly by operation of law' for every transfer must necessarily be a part of a chain of human events, rarely if ever other than voluntary in character.  Thus to give any real substance to the exemption, we must take a more narrow view and examine the transfer apart from its general background.  We must look only to the immediate mechanism by which the transfer is made effective.  If that mechanism is *entirely statutory*, effecting an automatic transfer without any voluntary action by the parties, then the transfer may truly be said to be 'wholly by operation of law.'") (emphasis added).

Moore (the chief financial officer), conferred with one another and with outside counsel about what needed to be done to "effectuate the Downstream Transfer" (to use BancGroup's terms). *See* Moore Tr. 157:1-161:5; Hicks Tr. 119:1-121:12; Byrne Tr. 60:20-63:21; 9/22 Clarke Decl., Exh. 4. They reviewed the Exchange Agreement and the offering circular for the REIT preferred securities to refamiliarize themselves with the mechanics of the exchange. *See* 9/22 Clarke Dec, Exhs. 4-5. The officers concluded that the conversion of the securities into BancGroup preferred stock would occur automatically the next morning but that BancGroup would need to reflect a capital contribution of the REIT preferred securities from BancGroup to Colonial Bank in their financial statements. Hicks Tr. 120:1-120:10; Moore Tr. 161:22-162:23; 9/22 Clarke Dec, Exh. 4.[28]

Accounting personnel were assigned to make the required journal entries in the general ledger accounts of BancGroup and Colonial Bank. On August 12th, an accounting manager named David Rogers sent an email to Mr. Hicks and five other colleagues reporting: "We did it. It appears that we accomplished what we set out to do yesterday." The email attached a spreadsheet setting forth the journal entries that had been made to reflect the ownership transfer and a concomitant increase in BancGroup's equity investment in its subsidiary. *See* 8/15 Clarke Dec, Exh. 42.

On the evening of August 11th, Mr. Hicks, who was the Treasurer of CBG Florida REIT in addition to his role as chief accounting officer for both BancGroup and Colonial Bank, sent an email to the FDIC's regional director reporting that "[t]he exchange took effect under the terms

---

[28] In its motion, BancGroup invents a new and wholly unnecessary requirement, asserting that the parties never entered into a new "assignment agreement" to accomplish the capital contribution. *See* BancGroup Mem. at 12. No such agreement was needed because BancGroup already had committed in the Exchange Agreement (and in correspondence with regulators) to contribute the REIT preferred securities to Colonial Bank "[e]ffective on the date and time of the Conditional Exchange." *See* 8/15 Clarke Decl., Exh. 41 § 2.

of the Exchange Agreement.  We are reflecting the impact of the exchange *in our books and records* today . . . ."  9/22 Clarke Dec, Exh. 6 (emphasis added).

After that email was sent, the FDIC requested more formal confirmation that BancGroup's obligation to contribute the REIT preferred securities to Colonial Bank had been satisfied.  Hicks Tr. 125:21-126:15.  In response, on August 13, 2009, BancGroup's general counsel David Byrne signed a certification, prepared in consultation with Mr. Hicks, in which he reported that "Colonial reflected the impact of the exchange in *its books and records* on August 11, 2009."  8/15 Clarke Decl., Exh. 44 (emphasis added).  An attachment to the certification detailed the journal entries that had been made.  *See id.*  That more formal certification thereafter was delivered to the FDIC.  Hicks Tr. 125:17-127:8.

Nothing about either communication stated or implied that Mr. Hicks's reference to "our books and records" and Mr. Byrne's reference to "Colonial's" "books and records" was limited to changes to the accounting records or excluded changes to the *transfer* records of CBG Florida REIT, which was part of the "Colonial" enterprise.  Further, the testimony establishes that Lisa Free, BancGroup's head of investor relations, was assigned the task of contacting BNY Mellon, the transfer agent, to cause the necessary ownership changes to be recorded in the transfer records of CBG Florida REIT Corp.  Hicks Tr. 170:12-171:4.  On August 11th, Ms. Free called BNY Mellon for that purpose, but the conversation was sidetracked by BNY Mellon's request for a new transfer agency agreement and the payment of additional fees.  9/22 Clarke Dec, Exh. 7.  Colonial Bank failed on August 14, 2009.  The name change never was recorded in CBG Florida REIT's transfer records.

In their depositions, Mr. Byrne, Mr. Hicks and Ms. Moore all testified that it was their intention to make sure that BancGroup did what was required to deliver ownership of the REIT

preferred securities to Colonial Bank, just as BancGroup had committed that it would do in regulatory correspondence and in the Exchange Agreement.  *See* Moore Tr. 159:20-160:2. Mr. Hicks and Mr. Byrne, who were charged with implementing the capital contribution, testified that they believed everything that needed to be done had been done.  Hicks Tr. 120:18-23 ("Q.  And by August 13, 2009, did you believe that Colonial BancGroup and Colonial Bank had done everything that they were required to do to comply with their obligations under the exchange agreement?  A.  Yes. . . ."); *see also* Moore Tr. 160:23-161:4 ("Q.  And was it your understanding that David Byrne and Brent Hicks and the other people that were working with them were working towards trying to make sure that that happened?  A.  That was my understanding.").

None of the cases that BancGroup relies on involved similar intercorporate transactions, nor were any of those courts presented with such overwhelming and undisputed evidence of intent.  *See Gutharz*, 409 F. App'x at 249 (mother's mailing of stock powers to son was ineffective because mother and father owned corporations as tenants by the entirety); *Frierdich v. Mottaz*, 294 F.3d 864, 869 (7th Cir. 2002) (promise of part ownership of company in prenuptial agreement not a transfer where pledgor continued to act as owner of stock); *Schachter v. Lefrak (In re Lefrak)*, 227 B.R. 222, 226 (S.D.N.Y. 1998) (shares in cooperative apartment not transferred from husband to wife where husband did not sign writing "evidencing a clear and *present* intent" to transfer ownership and wife's name was never added to mortgage loan) (emphasis in original); *Ennis*, 890 So. 2d at 314 (purchasers of yacht business were not aware of pre-sale letter from seller to manager pledging ownership interest in company and letter was not effective transfer as against purchasers); *Sackett,* 722 So. 2d at 276 (refusing to exempt corporate stock from judgment collection action based on failure of creditor husband who controlled close

46

corporation to update stock records to reflect ownership of stock with his wife as tenants by the entirety); *Butler v. MaxiStorage, Inc.*. 33 So. 3d 1221, 1228 (Ala. Civ. App. 2009) (bill of sale insufficient evidence of transfer of ownership where alleged transferees presented evidence that transaction was intended to be a sham).

BancGroup's suggestion that further board action was necessary to approve the capital contribution is not correct.  The BancGroup board of directors expressly authorized the capital contribution in 2007, when it authorized the documents that would govern the REIT preferred securities.  *See* Byrne Tr. 37:16-38:20; 9/22 Clarke Dec, Exh. 8.  Indeed, a resolution adopted by the BancGroup board at a meeting on May 9, 2007 empowered a special committee to enter into the transaction, including "an exchange agreement pursuant to which BancGroup is obligated to issue the BancGroup Preferred Stock in exchange for the REIT Preferred under certain circumstances *and to immediately thereafter contribute such REIT Preferred to Colonial Bank, N.A. . . .*"  9/22 Clarke Dec, Exh. 8 at 3 (emphasis added).  Moreover, in August 2009, the chairman of BancGroup's board of directors, Simuel Sippial, Jr., was informed of BancGroup's efforts to contribute the REIT preferred securities to Colonial Bank in August 2009 and approved them.  *See* Moore Tr. 165:17-166:4;

Nor did BancGroup retain an "option" to disregard its commitment to contribute the securities to Colonial Bank, as it asserts in a footnote.  *See* BancGroup Mem. at 17 n.46.  No witness has suggested that BancGroup even considered disregarding its "covenant" to make the capital contribution, and that is not surprising.  *See* Moore Tr. 166:5-11 ("Q.  Did Mr. Sippial ever tell you not to record the transfers that needed to be recorded?  A.  No.  Q.  Did anybody that you can recall ever tell you not to record the transfers that needed to be recorded?  A.  No.").  BancGroup's "covenant" was expressly required by federal regulators as a condition to

47

authorizing the securities, and BancGroup's argument therefore would amount to an admission that BancGroup defrauded federal regulators in obtaining that regulatory approval. *See* Moore Tr. 127:4-131:8; 8/15 Clarke Decl., Exhs. 35-38.

### 2. Delivery Was Effected Pursuant to the Uniform Commercial Code.

#### a. BancGroup's Written Acknowledgements Completed "Delivery" to Colonial Bank Under the Statute.

Constructive delivery is not the only way that ownership of the REIT preferred securities was transferred. Even without a change in the transfer records, "delivery" to Colonial Bank occurred within the terms of Fla. Stat. Ann. § 678.3011 because in August 2009 BancGroup "acknowledge[d] that it [held the securities] for" Colonial Bank, as contemplated for "delivery" of a security within that statute. *See* Fla. Stat. Ann. §§ 678.3011(1)(b), (2)(b).[29]

BancGroup's first acknowledgment of "delivery" of the securities to Colonial Bank within the meaning of section 678.3011 was Mr. Hicks's August 11, 2009 email to the FDIC confirming that "[w]e are reflecting the impact of the exchange in our books and records today

---

[29] Fla. Stat. Ann. § 678.3011 provides, in pertinent part:

(1)    Delivery of a certificated security to a purchaser occurs when:

(a)    The purchaser acquires possession of the security certificate;

(b)    Another person, other than a securities intermediary, either acquires possession of the security certificate on behalf of the purchaser or, having previously acquired possession of the certificate, acknowledges that it holds for the purchaser; or

(c)    [OMITTED]

(2)    Delivery of an uncertificated security to a purchaser occurs when:

(a)    The issuer registers the purchaser as the registered owner, upon original issue or registration of transfer; or

(b)    Another person, other than a securities intermediary, either becomes the registered owner of the uncertificated security on behalf of the purchaser or, having previously become the registered owner, acknowledges that it holds for the purchaser.

. . . ." 9/22 Clarke Dec, Exh. 6.   A second "acknowledgement" was made when Mr. Byrne provided his more formal written certification to the FDIC on August 13, 2009 that "Colonial reflected the impact of the exchange in its books and records on August 11, 2009." *See* 8/15 Clarke Decl., Exh. 44.

Both Mr. Hicks and Mr. Byrne believed then, and still believe today, that BancGroup did everything it needed to do in order to transfer ownership of the securities to Colonial Bank. Byrne Tr. 61:21-62:11; Hicks Tr. 120:18-120:23.  There also can be no dispute that CBG Florida REIT, the issuer of the securities, was aware of these two written "acknowledgements." Mr. Hicks was the Treasurer of CBG Florida REIT, and he was directly involved in providing them both.  *See* Hicks Tr. 121:13-122:20.

BancGroup's lengthy effort to distinguish its "deemed" ownership of the securities under the Exchange Agreement from the transfer of ownership to Colonial Bank by capital contribution therefore is beside the point.  Even if BancGroup may have been "deemed" to be the owner of the REIT preferred securities as a result of the Conditional Exchange, its subsequent acknowledgement that it had contributed the securities to Colonial Bank itself constituted "delivery" under the UCC.  *See* Fla. Stat. Ann. §§ 678.3011(1)(b), (2)(b).

### b.   BancGroup's Instruction to Record Colonial Bank as Owner of the Securities Can Be Completed By CBG Florida REIT.

In addition, if BancGroup is correct that the REIT preferred securities became "uncertificated" upon the occurrence of the Conditional Exchange (an issue that is not free from question), then CBG Florida REIT is entitled to rely on BancGroup's clear and unequivocal statement that it had transferred ownership of the securities to Colonial Bank as an "instruction" to change the name of the owner of the securities to Colonial Bank within the meaning of the UCC.  Fla. Stat. Ann. § 678.3051(1) ("If an instruction has been originated by an appropriate

person but is incomplete in any other respect, any person may complete it as authorized and the issuer may rely on it as completed, even though it has been completed incorrectly.").

In addition to the two acknowledgements by Mr. Hicks and Mr. Byrne, CBG Florida REIT also received such an "instruction" in the Exchange Agreement.  In section 2(e) of that agreement, CBG Florida REIT agreed that it would "record, or cause to be recorded, in its share registry the Bank as owner of all of the" REIT preferred securities "[e]ffective on the date and time of the Conditional Exchange."  8/15 Clarke Decl., Exh. 40 (Exchange Agreement), § 2(e).  BancGroup provided that "instruction" to CBG Florida REIT through the Exchange Agreement, and the FDIC's August 10, 2009 letter triggered the provisions that effectuated it.  *See* Official Comment 1, Fla. Stat. Ann. § 678.3051 (instruction may take any form agreed by the issuer and the registered owner).

BancGroup is mistaken to assert that instead of ownership of the securities, the FDIC-Receiver is left only with a "chose in action" against BancGroup for breach of the Exchange Agreement.  BancGroup completed its responsibilities under section 2(e) of the Exchange Agreement when it "contribute[d] all of the [REIT preferred securities] to the Bank," Exchange Agreement, § 2(e).  If any entity has not fulfilled its duties under that contract it is CBG Florida REIT, which agreed in section 2(e) that it would "record, or cause to be recorded, in its share registry the Bank as owner of all of the [REIT preferred securities]."  *Id.*

Having received the "instruction" from BancGroup to make that name change, however, CBG Florida REIT and its transfer agent were empowered to "complete it as authorized," and they still are today.  Fla. Stat. Ann. § 678.3051(1).  Contrary to BancGroup's contention, the issuer's ministerial act to record the name change in its transfer records does not involve any property of BancGroup's estate, and the automatic stay of bankruptcy does not apply.  *See, e.g.,*

*Rodgers v. Cnty. of Monroe (In re Rodgers)*, 333 F.3d 64, 69 (2d Cir. 2003) (automatic stay did not bar non-debtor's delivery of deed to third party even though debtor retained record title following foreclosure sale because debtor's bare legal title was insufficient to establish the property as "property of the estate"); *Island Pl. Apts. LLC v. First Home View Corp. (In re Miami Neighborhoods, Inc.)*, Adv. No. 08–01186–AJC, 2008 WL 2444530, *7 (Bankr. S.D. Fla. June 16, 2008) (postpetition recording of certificate of title did not violate automatic stay where certificate of sale had been issued prior to petition date), *reconsid. denied*, 2008 WL 4397425 (Bankr. S.D. Fla. Sept. 26, 2008); *see also* 11 U.S.C. § 541(d) (property of the estate does not include property over which debtor has legal title but not equitable interest).[30]

### 3. BancGroup Waived Its Claim to Ownership of the REIT Preferred Securities.

BancGroup knowingly waived its argument to ownership of the REIT preferred securities in its actions and its written acknowledgments to the FDIC at the time of the Conditional Exchange.  Waiver is "an intentional or voluntary relinquishment of a known right, or conduct giving rise to an inference the relinquishment of a known right."  *Air Prods. & Chems., Inc. v. La. Land & Exploration Co.*, 867 F.2d 1376, 1379 (11th Cir. 1989) (applying Florida law)

---

[30] As the FDIC-Receiver has discussed in its pending motion for judgment on the pleadings, under the "control test" that has been recognized by the Eleventh Circuit and other courts, property transferred by a debtor pre-petition is excluded from "property of the estate" for avoidance claims if the debtor lacked "(1) the power to designate which party will receive the funds, and (2) the power to actually disburse the funds at issue to that party."  *3V Capital Master Fund Ltd. v. Official Committee of Unsecured Creditors (In re TOUSA, Inc.)*, 444 B.R. 613, 646-47 (S.D. Fla. 2011).  The control test requires a court to review "the actual documents governing the transactions."  *Id.* at 647.  The rationale for this rule is that "without the requisite control, the subject property could not have been used by the debtor to pay another creditor, and the transfer thus did not decrease the value of the debtor's estate."  *Id.* (discussing *Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*, 813 F.2d 1177, 1181-82 (11th Cir. 1987)).  This doctrine underscores the invalidity of BancGroup's claim to ownership of the securities here because it never had control over the securities given its unequivocal commitment to contribute the securities to Colonial Bank if there were a Conditional Exchange.

(citations omitted).  "Waiver may be explicit if a party makes a specific statement of his intent to waive a right, or it may be implied through conduct and such conduct 'must make out a clear case.'"  *Woods v. Christensen Shipyards, Ltd.*, No. 04-61432-CIV, 2005 WL 5654643, at *2 (S.D. Fla. Sept. 23, 2005) (quoting *Air Prods.*, 867 F.2d at 1379); *see Arbogast v. Bryan*, 393 So. 2d 606, 607-08  (Fla. Dist. Ct. App. 1981) (distinguishing doctrines of waiver and estoppel).

For the reasons already discussed, any right that BancGroup might have held to claim ownership of the REIT preferred securities based on CBG Florida REIT's failure to record Colonial Bank as their owner was waived when BancGroup made journal entries in its general ledger accounts and those of Colonial Bank to reflect the capital contribution, took steps to change the name of the record owner of the securities to Colonial Bank in CBG Florida REIT's transfer records and informed regulators that its "books and records" had been revised to "reflect[] the impact of the exchange."  *See supra* at 40-47.  The undisputed evidence demonstrates unequivocally that BancGroup waived the argument that it now advances.

### B.   BancGroup's Argument Would Result in a Breach of a Capital Maintenance Commitment Under the Bankruptcy Code.

Even assuming *arguendo* that BancGroup were found to own the REIT preferred securities, the eventual result of such a holding would only be a separate order directing BancGroup to redeliver the securities to the FDIC-Receiver to fulfill BancGroup's capital maintenance commitment to contribute the securities to Colonial Bank.  *See* 11 U.S.C. §§ 365(o), 507(a)(9).  That capital maintenance commitment was set forth in letters from BancGroup's chief financial officer, Sarah Moore, to bank regulators in April 2007 in which

BancGroup "covenanted" to contribute the REIT preferred securities in the event of a Conditional Exchange.[31]

Section 365(o) of the Bankruptcy Code provides that "[i]n a case under chapter 11 of this title, the trustee shall be deemed to have assumed . . . and shall immediately cure any deficit under any commitment by the debtor to a Federal depository institutions regulatory agency . . . to maintain the capital of an insured depository institution."  11 U.S.C. § 365(o).  Section 507(a)(9), in turn, provides the FDIC-Receiver with a priority claim for any uncured deficit under a holding company's prepetition capital maintenance commitment that is entitled to recovery ahead of all general unsecured claims.  11 U.S.C. § 507(a)(9).

These provisions were enacted "to prevent institution affiliated parties from using bankruptcy to evade commitments to maintain capital reserve requirements of a federally insured depository institution."  H.R. Rep. No. 681(I), 101st Cong., 2d Sess. 179 (1990).  As the Fourth Circuit has observed, section 365(o) "places the financial interest of the federal deposit insurance system ahead of that of the holding company and its creditors."  *R.T.C. v. FirstCorp, Inc. (In re FirstCorp., Inc.)*, 973 F.2d 243, 248 (4th Cir. 1992); *see also Wolkowitz v. F.D.I.C. (In re Imperial Credit Indus., Inc.)*, 527 F.3d 959, 973 (9th Cir. 2008) ("assumption and cure" mechanism of section 365(o) "has been interpreted to require a trustee to immediately pay any deficit to a federal depository institution as a condition of remaining in Chapter 11"); *O.T.S. v. Overland Park Fin. Corp. (In re Overland Park Fin. Corp.)*, 236 F.3d 1246, 1253 (10th Cir. 2001) (same).

---

[31] The various regulatory agreements that are the subject of the FDIC-Receiver's pending appeal from a bankruptcy court decision denying its motion pursuant to section 365(o) of the Bankruptcy Code are not being cited as a basis for the argument here.  *See F.D.I.C. v. The Colonial BancGroup, Inc.*, No. 2:10-cv-0877-MHT (M.D. Ala.).

With respect to the REIT preferred securities, BancGroup made a capital maintenance commitment in April 2007 letters to the Office of the Comptroller of the Currency (Colonial Bank's primary federal regulator at the time) and the Federal Reserve Bank of Atlanta (BancGroup's primary regulator) in which Ms. Moore wrote that:  "BancGroup *covenants* to contribute the perpetual preferred stock to Colonial Bank, N.A. in the event of [a Conditional Exchange]."  8/15 Clarke Decl., Exhs. 35-36 (emphasis added).  It was only based on this "covenant" that the regulators approved Tier 1 capital treatment for the securities, without which BancGroup never would have issued the securities.  Moore Tr. 110:22-111:13.  The two regulators approved the application for Tier 1 capital treatment in letters dated April 24, 2007 and April 27, 2007.  *See* 8/15 Clarke Decl., Exh. 24; 9/22 Clarke Decl., Exh. 9.

The BancGroup written "covenant" in its letters to regulators constitutes a "commitment to maintain the capital" of an insured depository institution within the meaning of sections 365(o) and 507(a)(9) of the Bankruptcy Code.  *See Overland Park*, 232 B.R. 215, 228 (informal stipulation by bank holding company constituted capital maintenance commitment within the meaning of section 365(o)); *In re Wash. Mut., Inc.*, No. 08-12229, 2011 WL 57111, at *12 (Bankr. D Del. Jan. 7, 2011) (noting possibility of § 365(o) claim against bankrupt holding company in similar circumstances).

As a result, in the unlikely event that BancGroup is held to be the owner of the REIT preferred securities, then it is obligated to "immediately cure" its deficit under the prepetition capital maintenance commitment as a condition to proceeding in chapter 11.  *See* 11 U.S.C. § 365(o); *FirstCorp.*, 973 F.2d at 247.  BancGroup does not have sufficient assets other than the

securities themselves to pay the cure amount, and therefore it would be required to redeliver the

REIT preferred securities to the FDIC-Receiver to cure the deficit under that commitment. [32]

## III.     BANCGROUP IS NOT ENTITLED TO ANY RELIEF UNDER SECTION 502(d) OF THE BANKRUPTCY CODE

In both of its summary judgment motions, BancGroup asserts that if BancGroup prevails

in its misguided ownership arguments, the FDIC-Receiver would be barred from recovery on

allegedly "resulting claims" by section 502(d) of the Bankruptcy Code.  Besides demonstrating

the inequity of BancGroup's contentions, it is not entitled to the relief it argues for under that

section as a matter of fact or law.

Section 502(d) of the Bankruptcy Code provides:

> Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, *for which such entity or transferee is liable* under section 522(i), 542, 543, 550, or 553 of this title.

11 U.S.C. § 502(d) (emphasis added).  "[T]he purpose of section 502(d) is to ensure compliance

with judicial orders by totally disallowing any claim filed by a creditor that is *liable* for a

preferential or fraudulent transfer -- unless the creditor first pays the amount due to the estate."

*Logan v. Credit Gen. Ins. Co. (In re PRS Ins. Group, Inc.)*, 331 B.R. 580, 587 (Bankr. D. Del.

2005), *reconsid. denied*, 335 B.R. 77 (Bankr. D. Del. 2005) (emphasis added); *see Holloway v.*

---

[32] Confirmation of BancGroup's plan of liquidation would be no impediment to such relief.  No distributions have been made pursuant to that plan, and it cannot be argued that the plan has been "substantially consummated" given that the fundamental contingency to consummation is the resolution of this litigation.  *See* 11 U.S.C. § 350(b) (chapter 11 case may be reopened for "cause"); Fed. R. Bankr. P. 5010 (case may be reopened on motion of debtor or any other party in interest).  Even if the case were not reopened, the FDIC-Receiver would be entitled to a priority recovery pursuant to BancGroup's plan of liquidation in accordance with 11 U.S.C. § 507(a)(9), which would have the same result.

*Internal Rev. Svc. (In re Odom Antennas, Inc.)*, 340 F.3d 705, 708 (8th Cir. 2003) (§ 502(d) does not provide affirmative relief but is merely "intended to have the coercive effect of insuring compliance with judicial orders").

"In order to sustain a section 502(d) defense to a claim, the debtor must first establish that the creditor *is liable* for an avoidable transfer." *PRS Ins.*, 331 B.R. at 587 (emphasis added) (citing *Holloway*, 340 F.3d at 708). Therefore, "a debtor wishing to avail itself of the benefits of section 502(d) must first obtain a judicial determination on the preference complaint." *In re Lids Corp.*, 260 B.R. 680, 684 (Bankr. D. Del. 2001); *see Springfield Assocs., L.L.C. v. Enron Corp. (In re Enron Corp.)*, 379 B.R. 425, 438 (S.D.N.Y. 2007); *Springel v. Prosser (In re Prosser)*, Adv. Proc. No. 08-03002, 2009 WL 3270765, at *14 (Bankr. D.V.I. Oct. 9, 2009) ("[I]t is premature to disallow Trustee Carroll's claim. There has been no failure to comply with a judgment to warrant application of § 502(d) at this point.").

BancGroup has not established that the FDIC-Receiver is liable to it for any allegedly avoidable transfer made to Colonial Bank. Moreover, for the reasons set forth in the FDIC-Receiver's pending motions for judgment on the pleadings and for summary judgment (which the FDIC-Receiver incorporates by reference), BancGroup has no substantial likelihood of ever obtaining such a judgment.

## CONCLUSION

For all of the foregoing reasons, the FDIC-Receiver respectfully requests that the Court deny both of BancGroup's motions for summary judgment in their entirety and grant the FDIC-Receiver such other and further relief as it may deem just and proper.

Dated:  Montgomery, Alabama
       September 22, 2011

                                               /s/ Michael A. Fritz, Sr.
                                      Michael A. Fritz, Sr.
                                      Fritz Hughes & Hill, LLC
                                      1784 Talieferro Trail, Suite A
                                      Montgomery, AL 36117
                                      T: (334) 215-4422

                                              - and –

                                      John J. Clarke, Jr.
                                      Thomas R. Califano
                                      Michael D. Hynes
                                      Spencer Stiefel
                                      DLA Piper LLP (US)
                                      1251 Avenue of the Americas
                                      New York, New York  10020-1104
                                      (212) 335-4500

                                      Attorneys for the
                                       Federal Deposit Insurance Corporation
                                       as receiver for Colonial Bank

## CERTIFICATE OF SERVICE

The undersigned hereby certifies he is one of the attorneys for defendant FDIC-Receiver and that on September 22, 2011, a true and correct copy of the foregoing document was filed with this Court's ECF system in this action, which will cause the electronic service of this document upon all persons registered in this action to receive CM/ECF notifications as of its filing to include the following:

Brent W. Herrin
Cohen Pollock Merlin & Small, P.C.
3350 Riverwood Parkway, Suite 1600
Atlanta, GA  30339

Peter E. Calamari
Kevin Reed
David L. Elsberg
Benjamin I. Finestone
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue
New York, NY 10010

Andrew P. Campbell
Caroline Smith Gidiere
Stephen D. Wadsworth
Leitman, Siegal, Payne & Campbell PC
420 N. 20th Street, Suite 2000
Birmingham, AL 35203

     /s/ Michael A. Fritz, Sr.
       Michael A. Fritz, Sr.