# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

```
----------------------------------------------------------x
                                            :
                                            :
THE COLONIAL BANCGROUP, INC.,               :
                                            :
        Plaintiff,                          :
                                            :
v.                                          :          Case No.  2:10-cv-00198
                                            :
FEDERAL DEPOSIT INSURANCE                   :
CORPORATION, AS RECEIVER FOR                :
COLONIAL BANK,                              :
                                            :
        Defendant.                          :
                                            :
----------------------------------------------------------x
```

## THE COLONIAL BANCGROUP, INC.'S BRIEF IN OPPOSITION TO THE MOTION OF THE FDIC-RECEIVER FOR SUMMARY JUDGMENT

<u>**TABLE OF CONTENTS**</u>

<u>**Page**</u>

I.    PRELIMINARY STATEMENT ...........................................................................1

II.   FACTUAL BACKGROUND ...........................................................................4

    A.    BancGroup's Receivership Proof Of Claim .........................................4

    B.    FDIC-Receiver's Bankruptcy Proof Of Claim ....................................5

    C.    Summary Judgment Motions In These Actions....................................5

III.  THE FDIC-RECEIVER'S MOTION SHOULD BE DENIED WITH RESPECT
     TO TAX-RELATED CLAIMS ...........................................................................6

    A.    The FDIC-Receiver Improperly Asks The Court To Go Beyond The TAA
        Which Is Dispositive Of BancGroup's Ownership Of Tax Refunds......................6

    B.    The FDIC-Receiver's Attempts To Ignore Or Alter The Terms Of The
        TAA Should Be Rejected.......................................................................12

        1.    The FDIC-Receiver's Lead Cases Only Support BancGroup's Tax
            Refund Motion ...............................................................................12

        2.    The FDIC-Receiver's Attempts To Insert New Terms Into The
            TAA Should Be Rejected................................................................15

    C.    The FDIC-Receiver's Attempts To Evade The TAA Fail .....................22

        1.    12 U.S.C. § 1823(e) Does Not Preclude The Court's Consideration
            Of The Debtor-Creditor Relationship Established By The TAA...............22

            (a)    Section 1823 Is Inapplicable.........................................23

            (b)    Assuming *Arguendo* Section 1823 Is Applicable To The
                TAA, The Statutory Requirements Have Been Met ....................29

        2.    Nothing In The Bankruptcy Code Undermines BancGroup's
            Position .........................................................................................32

    D.    The Extrinsic Evidence Supports BancGroup's Position And At Most
         Establishes The Existence Of Genuine Issues Of Material Fact..........................35

        1.    The Undisputed Extrinsic Evidence Supports BancGroup's
            Ownership Of Tax Refunds ...........................................................35

2.     There Are Genuine Issues of Fact Concerning Certain Extrinsic Evidence ........................................................................37

E.    The FDIC-Receiver's Reliance On The "Bob Richards Rule" Is Misplaced ........40

F.    BancGroup's Other Tax-Related Claims ................................................44

IV.    SUMMARY JUDGMENT SHOULD BE DENIED WITH RESPECT TO INSURANCE PROCEEDS CLAIMS ........................................................44

A.    The Plain And Unambiguous Language Of The Policies Entitles BancGroup To The Insurance Proceeds ........................................44

B.    The FDIC-Receiver's Arguments In Support Of Summary Judgment Are Misplaced ................................................................48

1.     The Facts Cited by the FDIC-Receiver Are Unremarkable ...............49

2.     The "Sole Agent" Language In The Policies Cannot Alter or Override BancGroup's Exclusive Right To Receive And Distribute Proceeds ........................................................50

3.     The FDIC-Receiver's Cases Regarding Other Joint Assured Provisions Are Easily Distinguishable ................................52

4.     Paying The Proceeds To BancGroup Would Not Subvert The Subrogation Clauses In The Bonds ........................................53

C.    Even If The Court Finds The Terms Of The Contract "Ambiguous," The Issue Of The True Meaning Of The Contract Is An Issue For The Jury ..............55

V.    THE FDIC-RECEIVER'S MOTION SHOULD BE DENIED WITH RESPECT TO CLAIMS RELATED TO REIT PREFERRED SECURITIES ...................................56

A.    The RPS Comprise Property Of BancGroup's Estate ...........................................56

1.     The FDIC-Receiver's Motion Should Be Denied And BancGroup's RPS Motion Should Be Granted Because No Downstream Contribution Occurred As A Matter of Law ........................56

2.     Assuming Arguendo The Parties' Intent Were Relevant To Whether A Downstream Contribution Occurred, Disputed Issues Of Fact Preclude Granting The FDIC-Receiver's Motion ........................59

B.    Assuming *Arguendo* The RPS Were Contributed To Bank, They Were BancGroup's Property Prior Thereto ........................................62

VI.    SUMMARY JUDGMENT SHOULD BE DENIED WITH RESPECT TO BANCGROUP'S AVOIDANCE CLAIMS ................................................65

|   |   |   |   |
|---|---|---|---|
| | A. | At A Minimum, Section 1828(u) Has No Application To BancGroup's Avoidance Actions Concerning Transfers Which Occurred Prior To June 15, 2009 ........................................................................................65 |
| | B. | BancGroup May Assert Avoidance Actions For Transfers Subsequent To June 15, 2009 Defensively Notwithstanding Section 1828(u) ............67 |
| | C. | Genuine Issues Of Fact Exist Concerning BancGroup And Bank's Insolvency ..............................................................................................69 |
| | D. | The FDIC-Receiver's Argument Concerning The 2007 Citrus & Chemical Transaction Focuses On The Wrong Transfer ......................................77 |
| VII. | | SUMMARY JUDGMENT SHOULD BE DENIED WITH RESPECT TO BANCGROUP'S OTHER CLAIMS ...........................................................78 |
| | A. | BancGroup's Intercompany Receivable .............................................78 |
| | B. | Deposit Claims ..................................................................................79 |
| | C. | Other Claims .....................................................................................81 |
| | | 1. | Preferential Transfers ...............................................................81 |
| | | 2. | Vendor Claims And Administrative Claims .................................82 |
| | | 3. | Improper Asset Possession And Sales .......................................82 |
| | | 4. | Employee Related Costs ...........................................................84 |
| | | 5. | Indemnification Claims .............................................................84 |
| | D. | Interest ..............................................................................................85 |
| | E. | Equity Claims ....................................................................................86 |
| VIII. | | CONCLUSION ..........................................................................................87 |

# TABLE OF AUTHORITIES

**Page**

## Cases

*Alexandria Assocs. v. Mitchell Co.*,
  2 F.3d 598 (5th Cir. 1993) ...................................................................................25

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)...............................................................................................6

*Armstrong v. First Nat'l Bank (In re Clothes, Inc.)*,
  40 B.R. 997 (D. N.D. 1984)..................................................................................20

*Atherton v. F.D.I.C.*,
  519 U.S. 213 (1997)..............................................................................................43

*Bad Ass Coffee Co. of Hawaii v. Naughty Donkey Enters., LLC*,
  No. 2090893, 2010 Ala. Civ. App. LEXIS 365 (Ala. Civ. App. Dec. 03, 2010) ....................7

*Bank of Am., N.A. v. Mukamai (In re Egidi)*,
  571 F.3d 1156 (11th Cir. 2009) ................................................................... *passim*

*Bank One Tex. Nat'l Ass'n v. Morrison*,
  26 F.3d 544 (5th Cir. 1994) ..................................................................................30

*In re Bates*,
  58 B.R. 915 (Bankr. W.D. Tenn. 1986)..................................................................20

*Baumann v. Savers Federal Sav. & Loan Assoc.*,
  934 F.2d 1506 (11th Cir. 1991) ............................................................................28

*BSD Bancorp, Inc.*,
  No. 09-05084, at 10 ..............................................................................................29

*Branch v. FDIC*,
  825 F. Supp. 384 (D. Mass. 1993) ........................................................................70

*Bufman Organization v. Federal Deposit Insurance Corp.*,
  82 F.3d 1020 (11th Cir. 1996) ...............................................................25, 26, 28

*Butler v. MaxiStorage, Inc.*,
  33 So. 3d 1221, 1228 (Ala. Civ. App. 2009) ........................................................58

*Capital Bancshares, Inc. v. FDIC*,
  957 F.2d 203 (5th Cir. 1992) .........................................................................15, 29

*Coated Sales Inc. v. First Eastern Bank (In re Coated Sales Inc.)*,
  144 B.R. 663 (Bankr. S.D.N.Y. 1992)...................................................................75

*Cohen v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*,
  138 B.R. 687 (Bankr. S.D.N.Y. 1992)...................................................................34

*Cohen v. Un-Ltd. Holdings, Inc. (In re Nelco, Ltd.)*,
    264 B.R. 790 (Bankr. E.D. Va. 1999) .................................................................15

*D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.*,
    315 U.S. 447 (1942).............................................................................................23

*DuVoisin v. Anderson (In re Southern Indus. Banking Corp.)*,
    71 B.R. 351 (Bankr. E.D. Tenn. 1987) ...............................................................76

*In re Duque Rodriguez*,
    77 B.R. 937 (Bankr. S.D. Fla. 1987), *aff'd*, 895 F.2d 725 (11th Cir. 1990) ..........70

*E.I. du Pont de Nemours & Co. v. FDIC*,
    32 F.3d 592 (D.C. Cir. 1994) .................................................................... *passim*

*Ennis v. Phillips*,
    890 So. 2d 313 (Fla. Dist. Ct. App. 2004) ....................................................58, 59

*Ervin v. Stackhouse*,
    64 So. 3d 666, 671 (Ala. Civ. App. 2010) ..........................................................46

*Fid. & Dep. Co. of Md. v. Jefferson Cty. Comm'n*,
    756 F. Supp. 2d 1329 (N.D. Ala. 2010) ..................................................20, 21, 35

*In re First City Bancorporation*,
    No. 392-39474-HCA-11, 1995 Bankr. LEXIS 1683 (Bankr. N.D. Tex. May 15, 1995) ........70

*In re Florida Park Banks, Inc.*,
    110 B.R. 986 (Bankr. M.D. Fla. 1990) ................................................................15

*In re Flying J, Inc.*,
    No. 08-13384, 2009 WL 5215000 (Bankr. D. Del. Dec. 28, 2009)........................34

*Franklin Sav. Corp. v. Franklin Sav. Ass'n (In re Franklin Sav. Corp.)*,
    159 B.R. 9 (Bankr. D. Kan. 1993) ................................................................10, 29

*Franklin Sav. Corp. v. Franklin Sav. Ass'n (In re Franklin Sav. Corp.)*,
    182 B.R. 859 (D. Kan. 1995) .........................................................................8, 9, 22

*Frierdich v. Mottaz (In re Frierdich)*,
    294 F.3d 864 (7th Cir. 2002) ...............................................................................58

*In re Geri Zahn*,
    25 F.3d 1539 (11th Cir. 1994) ........................................................................25, 27

*Golden Pac. Bancorp. v. F.D.I.C.*,
    375 F.3d 196 (2d Cir. 2004).................................................................................85

*Guthartz v. Park Ctr. W. Corp.*,
    409 Fed. Appx. 248, 250 (11th Cir. 2010)......................................................58, 59

*Gwaltney v. Russell*,
    984 So. 2d 1125 (Ala. 2007) ...............................................................................47

*Hall v. Gulledge*,
  173 So. 2d 571 (Ala. 1965) ...................................................................................51

*Indep. Bankgroup v. FDIC (In re Indep. Bankgroup)*,
  217 B.R. 442 (Bankr. D. Vt. 1998) .......................................................................26

*In re Installation Servs., Inc.*,
  101 B.R. 282 (Bankr. N.D. Ala. 1989) ..................................................................81

*John v. RTC*,
  39 F.3d 773 (7th Cir. 1994) ...................................................................................23

*Kessler v. National Enters.*,
  165 F.3d 596 (8th Cir. 1999) .................................................................................23

*Klein v. Tabatchnick*,
  610 F.2d 1043 (2d Cir. 1979) ................................................................................76

*Krazalic v. Republic Title Co.*,
  314 F.3d 875 (7th Cir. 2002) .................................................................................16

*Liggans R.V. Ctr. v. John Deere Ins. Co.*,
  575 So. 2d 567 (Ala. 1991) ....................................................................................47

*Lubin v. F.D.I.C.*,
  No. 10-00874, 2011 U.S. Dist. LEXIS 21391 (N.D. Ga. Mar. 2, 2011) ...................13, 14, 15

*Lubin v. Cincinnati Ins. Co.*, 2010 WL 5313754 (N.D. Ga. Dec. 17, 2010) ...........................53, 54

*Lumbermen's Mut. Cas. Co. v. Norris Grain Co.*,
  343 F.2d 670 (8th Cir. 1965) .................................................................................52, 53

*In re Marvel Entm't Grp., Inc.*,
  273 B.R. 58 (D. Del. 2002) ....................................................................................27, 41

*McLemore v. Hyundai Motor Mfg. Ala., LLC*,
  7 So. 3d 318, 333 (Ala. 2008) ...............................................................................17

*McMath v. FDIC*,
  2011 U.S. Dist. LEXIS 34650 (M.D. Ala. Mar. 31, 2011) ....................................25

*Meyer v. Meyer*,
  952 So. 2d 384 (Ala. Civ. App. 2006) ...................................................................7

*Miles College, Inc. v. Oliver*,
  382 So. 2d 510 (Ala. 1980) ....................................................................................55

*In re Model Imperial*,
  250 B.R. 776 (Bankr. S.D. Fla. 2000).....................................................................65

*Morrow v. Green Tree Servicing, L.L.C.*,
   360 F. Supp. 2d 1246 (M.D. Ala. 2005) (internal quotation omitted) .................................... 43

*Naviera Despina, Inc. v. Cooper Shipping Co.*,
   676 F. Supp. 1134 (S.D. Ala. 1987) .................................................................................... 52

*New Amsterdam Cas. Co. v. W.D. Felder & Co.*,
   214 F.2d 825 (5th Cir. 1954) .............................................................................................. 52

*Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*,
   813 F.2d 1177 (11th Cir. 1987) .............................................................................. *passim*

*In re Norquist*,
   43 B.R. 224 (Bankr. D. Wash. 1984) ................................................................................. 33

*OPS Shopping Ctr., Inc. v. FDIC*,
   992 F.2d 306 (11th Cir. 1993) ................................................................................. *passim*

*In re Patterson*,
   967 F.2d 505 (11th Cir. 1992) ............................................................................................ 79

*In re Peralta Food Corp.*,
   No. 07-16508, 2008 WL 190503 (S.D. Fla. Jan. 18, 2008) ................................................. 33

*Resolution Trust Corp. v. Midwest Fed. Sav. Bank*,
   4 F.3d 1490 (9th Cir. 1993) ............................................................................................... 30

*Riverside Park Realty Co. v. FDIC*,
   465 F. Supp. 305 (M.D. Tenn. 1978) .................................................................................. 30

*Sackett v. Shahid*,
   722 So. 2d 273 (Fla. Dist. Ct. App. 1998) .......................................................................... 59

*Segal v. Rochelle*,
   382 U.S. 375 (1966) ........................................................................................................... 34

*Seidman v. Office of Thrift Supervision (In re Seidman)*,
   37 F.3d 911 (3d Cir. 1994) .................................................................................................. 16

*Smith v. Citicorp Pers.-to-Pers. Fin. Ctrs., Inc.*,
   477 So. 2d 308 (Ala. 1985) .................................................................................................. 7

*Superintendent of Ins. v. First Cent. Fin. Corp. (In re First Cent. Fin. Corp.)*,
   269 B.R. 481 (Bankr. E.D.N.Y. 2001) .................................................................... *passim*

*Superintendent of Ins. v. Ochs,* 377 F.3d 209 (2d Cir. 2004) .................................................. 9, 27

*In re TOUSA, Inc.*,
   444 B.R. 613 (S.D. Fla. 2011) ............................................................................................ 64

*In re Team Fin. Inc.*,
   No. 09-5084, 2010 Bankr. LEXIS 1493 (Bankr. D. Kan. 2010) .................................... *passim*

*Ex parte Textron, Inc.*,
    No. 1100032, 2011 WL 118255 ...........................................................................47

*Thompkins v. Lil Joe Records, Inc.*,
    476 F.3d 1294 (11th Cir. 2007) .....................................................................33, 34

*Twin Constr., Inc. v. Boca Raton, Inc.*,
    925 F.2d 378 (11th Cir. 1991) ..................................................................26, 28, 31

*United Dominion Indus. v. United States*,
    532 U.S. 822 (2001) ..........................................................................................41

*United Land Corp. v. Drummond Co., Inc.*,
    990 So. 2d 858 (Ala. 2008) ...............................................................................47

*United States Lines, Inc. v. U.S. (In re McLean Inds., Inc.)*,
    196 B.R. 670 (S.D.N.Y. 1996) ..........................................................................68

*United States v. MCorp Fin. Inc. (In re MCorp Fin. Inc.)*,
    170 B.R. 899 (S.D. Tex. 1994) .......................................................................8, 11

*United States v. White*,
    466 F.3d 1241 (11th Cir. 2006) ..........................................................................42

*VFB LLC v. Campbell Soup Co.*,
    482 F.3d 624 (3d Cir. 2007)...............................................................................74

*W. Dealer Mgmt., Inc. v. England (In re Bob Richards Chrysler-Plymouth Corp.)*,
    473 F.2d 262 (9th Cir. 1973), *cert. denied*, 412 U.S. 919 (1973)................... *passim*

*Woodman of the World Life Ins. Soc'y v. Harris*,
    740 So. 2d 362 (Ala. 1999) ...............................................................................47

*Zucker v. FDIC (In re Netbank, Inc.)*,
    Adv. No. 08-00346 (Bankr. M.D. Fla. Sept. 30, 2010) ....................................1, 8

## **Statutes**

12 C.F.R. § 325.103 ...................................................................................................76

12 C.F.R. § 325.6(a) ..................................................................................................66

12 C.F.R. § 571.7(b) ..................................................................................................16

26 C.F.R. § 1.1502-77(a)(2)(v) ..................................................................................42

11 U.S.C. § 362(a) ....................................................................................................80

11 U.S.C. § 362(a)(3) .....................................................................................42, 79, 83

11 U.S.C. § 502(d) ...............................................................................................67, 68

11 U.S.C. § 546(e) .....................................................................................................68

11 U.S.C. § 546(f) ...................................................................................................68

11 U.S.C. § 546(g) ...................................................................................................68

11 U.S.C. § 546(i) ....................................................................................................68

11 U.S.C. § 546(j) ....................................................................................................68

12 U.S.C. § 91 ..........................................................................................................19

12 U.S.C. § 371c .......................................................................................................15

12 U.S.C. § 371c-1 ...................................................................................................20

12 U.S.C. § 504 ........................................................................................................20

12 U.S.C. § 1441a(y)(3) ..........................................................................................19

12 U.S.C. § 1468(c) .................................................................................................19

12 U.S.C. § 1818(b) .................................................................................................66

12 U.S.C. § 1823(e) .......................................................................................22, 23, 24

12 U.S.C. § 1823(e)(3) .............................................................................................23

12 U.S.C. § 1828(u) ........................................................................................... *passim*

12 U.S.C. § 1828(u)(1) ............................................................................................68

63 Fed. Reg. 64578 ............................................................................................18, 28

63 Fed. Reg. 64757 ..................................................................................................39

63 Fed. Reg. 64758 ..........................................................................................................

Fla. Stat. § 678.3011 ...............................................................................................57

The Colonial BancGroup, Inc. ("BancGroup") hereby submits this opposition brief to the Motion of the Federal Deposit Insurance Corporation (the "FDIC"), in its capacity as receiver (the "FDIC-Receiver") for Colonial Bank ("Bank"), for Summary Judgment on All Claims (the "Motion," supported by the FDIC-Receiver's Memorandum of Law in Support of the Motion, the "FDIC-Receiver's Brief" or "Brf.") and respectfully requests a ruling denying the Motion.

## I.       PRELIMINARY STATEMENT

The FDIC-Receiver seeks to characterize this action as BancGroup's attempt to grab assets "rightfully" belonging to the FDIC-Receiver.  However, the true essence of this dispute is the FDIC-Receiver's attempt to position itself at the front of the line ahead of BancGroup's other creditors, including taxing agencies, bondholders, trade vendors, and employees.  With respect to the two largest assets in dispute – $253 million in Tax Refunds and $300 million in REIT Preferred Securities or "RPS" – BancGroup does not contest that the FDIC-Receiver has a claim in BancGroup's bankruptcy (subject to certain defenses).  Instead of sharing pari passu with BancGroup's other creditors, however, the FDIC-Receiver effectively argues that it should be exempt from BancGroup's bankruptcy and that the assets which relate to its claims should be carved out from BancGroup's estate to the exclusion and detriment of BancGroup's other creditors.  Neither Congress nor the caselaw provides any grounds to do so.  Rather, Congress has provided that creditors should be treated equally in bankruptcy and the caselaw teaches that attempts to take assets directly from the estate are anathema to the Bankruptcy Code.

First, with respect to the Tax Refunds, the FDIC-Receiver is correct that summary judgment is appropriate, but judgment should be entered in BancGroup's favor.  As set forth in the BancGroup Tax Refund Brief in support of BancGroup's motion for summary judgment, the parties entered into a governing tax allocation agreement (the "TAA") approved annually by Bank and BancGroup's respective Boards.  The TAA provides that BancGroup, acting as

consolidated group tax-filer, is to pay all tax liabilities to the IRS and receive all tax refunds from the IRS.  In connection with this arrangement, Bank agreed to pay to BancGroup an amount equivalent to what Bank would theoretically owe to the IRS, and BancGroup agreed to pay to Bank an amount equivalent to what Bank would theoretically be owed from the IRS, each as if Bank were a separately-filing entity.  To be clear, BancGroup does not seek to escape that liability in its bankruptcy.  Rather, BancGroup seeks to respect the debtor-creditor relationship established by the TAA pursuant to which the Tax Refunds are the property of the parent/tax-filer (i.e., BancGroup), and Bank is treated on a par with BancGroup's numerous other creditors.

Finding the result dictated by Congress unacceptable, the FDIC-Receiver attempts to alter the four corners of the TAA by pointing to "course of dealing."  The parties' conduct is irrelevant under Alabama law.  However, it only confirms that for years Bank paid its tax liabilities to BancGroup (and not the IRS) and the IRS paid tax refunds to BancGroup (and not Bank) which, in turn, forwarded such amounts to Bank.  Unsurprisingly, all of this conduct was in accord with the dual Board-approved TAA.  Now that BancGroup's obligation to pay Bank its "separate return" tax refund is subject to BancGroup's bankruptcy, however, the FDIC-Receiver is fighting to create a new distribution scheme for itself.  This attempt should be rejected.

With respect to the RPS, the parties agree that under certain circumstances BancGroup would come to own the RPS.  The parties further agree that those circumstances occurred.  Thereafter, BancGroup was obligated to transfer those securities to Bank.  The FDIC-Receiver tacitly concedes with BancGroup that this contribution did not occur automatically.  Thus, the only issue for the Court to determine is whether the facts submitted by the FDIC-Receiver accomplish this contribution as a matter of law.  They do not.  Like the dispute over the Tax Refunds, BancGroup does not contest that the FDIC-Receiver has a corresponding claim (subject

to certain defenses) for the value of the RPS as of BancGroup's Petition Date, but that claim will be administered in BancGroup's bankruptcy as Congress has provided.  For this reason, the RPS are property of BancGroup's estate, the FDIC-Receiver's motion should be denied, and judgment should be granted in favor of BancGroup.

With respect to the proceeds of certain fidelity bonds, the FDIC-Receiver advances an argument that it believes entitles it, and it alone, to the entirety of the proceeds.  However, the Policies unambiguously foreclose the FDIC-Receiver's position, providing that BancGroup has the <u>exclusive</u> entitlement to any such proceeds and that Bank "<u>consented and agreed</u>" to hold no direct beneficiary interest in such proceeds.  Just as it attempts to do with respect to the Tax Refunds, the FDIC-Receiver attempts to cloud the issue with irrelevant facts.  But, none of those facts change the outcome – the proceeds are property of BancGroup's estate.

With respect to BancGroup's avoidance actions, at least one significant disputed issue of fact bars the FDIC-Receiver's Motion – Bank's insolvency.  The FDIC-Receiver ignores – and asks this Court to ignore – the effect that one of the largest bank frauds in the history of the United States had on Bank's assets, notwithstanding that in Lee Farkas' federal criminal proceedings the FDIC-Receiver has described this effect as nothing less than "enormous."  Those criminal proceedings and Taylor, Bean & Whitaker Mortgage Corp.'s ("<u>TBW</u>") own bankruptcy proceedings have unearthed the fact that there was a "hole" in Bank's balance sheet of staggering proportions.  This staggering fraud rendered Bank and BancGroup insolvent such that the contributions made from BancGroup to Bank were without fair consideration in exchange. Those are constructive fraudulent transfers which are avoidable by BancGroup.  The FDIC-Receiver's only "evidence" of Bank's purported financial health are financial statements and the opinion of BancGroup's CFO neither of which take into account the TBW fraud.  Summary

judgment is therefore inappropriate.  A trier of fact must determine Bank's financial position as of the dates of the undisputed contributions, assisted with the benefit of expert testimony.

The FDIC-Receiver overreaches in moving for summary judgment on "all claims," attesting that there are no disputed issues of fact to consider in connection with the largest bank failure of 2009 caused by a $2.9 billion fraud scheme orchestrated by one of the nation's largest privately-held mortgage lending companies.  The FDIC-Receiver's submission – 34 pages of "undisputed facts" and 76 pages of briefing – is testimony to the contrary.  For all of these reasons, the Motion should be denied.

## II.      FACTUAL BACKGROUND

On August 14, 2009 (the "Receivership Date"), Bank was closed by the Alabama State Banking Department, and the FDIC was appointed as its receiver.  The FDIC-Receiver sold and assigned substantially all of the former assets of Bank to Branch Banking and Trust Company ("BB&T") pursuant to a Purchase and Assumption Agreement dated as of August 14, 2009, among the FDIC-Receiver, the FDIC (in its corporate capacity), and BB&T.

On August 25, 2009 (the "Petition Date"), BancGroup filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Middle District of Alabama (the "Bankruptcy Court").  Prior to the Petition Date, BancGroup was headquartered and conducted business in Montgomery, Alabama.  BancGroup was the holding company for Bank prior to the order closing Bank.  On June 2, 2011, the Bankruptcy Court entered an order confirming BancGroup's second amended chapter 11 plan of liquidation, which went effective on June 3, 2011 (the "Plan").

### A.     BancGroup's Receivership Proof Of Claim

On November 19, 2009, BancGroup filed a proof of claim in Bank's receivership proceeding (the "Receivership Proof of Claim").  On January 6, 2010, the FDIC-Receiver

summarily disallowed BancGroup's Receivership Proof of Claim in its entirety.  On March 5, 2010, BancGroup filed a complaint (the "FIRREA Complaint") commencing an action contesting the FDIC-Receiver's disallowance of the Receivership Proof of Claim (the "FIRREA Action"), as it was obligated to do pursuant to the Financial Institutions Reform, Recovery and Enforcement Act of 1989 within 60 days after the date on which the FDIC-Receiver disallowed BancGroup's Receivership Proof of Claim in order to preserve its rights.  [No. 10-00198, D.I. 1].

### B.    FDIC-Receiver's Bankruptcy Proof Of Claim

On November 30, 2009, the FDIC-Receiver filed a proof of claim in BancGroup's chapter 11 bankruptcy case (Claim No. 139), and on February 19, 2010, the FDIC-Receiver filed an amendment to that proof of claim (together, the "Bankruptcy Proof of Claim").

On March 4, 2010, BancGroup filed an objection in the Bankruptcy Court to the FDIC-Receiver's Bankruptcy Proof of Claim (the "Claim Objection").  [No. 09-32303, D.I. 598].  The Claim Objection commenced a contested matter which is now before this Court after the Court granted the FDIC-Receiver's motion for withdrawal of the reference.[1]

### C.    Summary Judgment Motions In These Actions

On August 15, 2011, BancGroup filed two identical summary judgment motions in this FIRREA Action and the Claim Objection:  (i) BancGroup's Motion for Summary Judgment Concerning Ownership of Tax Refunds (the "BancGroup Tax Refund Motion," as supported by the "BancGroup Tax Refund Brief"); and (ii) BancGroup's Motion for Summary Judgment Concerning Ownership of REIT Preferred Securities (the "BancGroup RPS Motion," as

---

[1]    The scheduling orders (Uniform Scheduling Order, No. 10-00409, D.I. 36 (as amended) and Uniform Scheduling Order, No. 10-00198, D.I.  28) in the FIRREA Action and the Claim Objection also allow the parties to use discovery in one matter in the other matter.

supported by the "BancGroup RPS Brief").  To avoid duplication, BancGroup incorporates its

statement of facts and argument from the BancGroup summary judgment briefs herein.[2]

That same day, the FDIC-Receiver filed its Motion and its Brief in support thereof in the

FIRREA Action.

## III.   THE FDIC-RECEIVER'S MOTION SHOULD BE DENIED WITH RESPECT TO TAX-RELATED CLAIMS[3]

### A.   The FDIC-Receiver Improperly Asks The Court To Go Beyond The TAA Which Is Dispositive Of BancGroup's Ownership Of Tax Refunds

The FDIC-Receiver's argument that Bank owns the Tax Refunds is premised on the

holding of *W. Dealer Mgmt., Inc. v. England (In re Bob Richards Chrysler-Plymouth Corp.)*, 473

F.2d 262 (9th Cir. 1973), *cert. denied*, 412 U.S. 919 (1973).  However, *Bob Richards* and cases

that have followed its holding expressly defer to the terms of an express or implicit tax sharing

agreement when one exists.  *Id.* at 264 ("Normally, where there is an explicit agreement, or

where an agreement can fairly be implied, as a matter of state corporation law the parties are free

to adjust among themselves the ultimate tax liability.").   Thus, there is no dispute that

BancGroup and Bank were free to allocate tax refunds and liabilities under a tax sharing

agreement[4] and that the terms of such an agreement control the issue of ownership of the Tax

Refunds.  The parties have done so here.  Nevertheless, the FDIC-Receiver's Brief ignores the

actual terms of the TAA, The Colonial BancGroup, Inc., and its Subsidiaries Intercorporate Tax

---

[2]   Capitalized terms not immediately defined shall have the meanings ascribed to them in the BancGroup Tax Refund Brief or the BancGroup RPS Brief.

[3]   Summary judgment cannot be granted where there are "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986).  In deciding a motion for summary judgment, the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986).

[4]   *See* Brf. at 33; *see also* BancGroup Tax Refund Brief at 12-13.

Allocation Policy,[5] until page 35 of its Brief, flooding the Court with assertions concerning the purported conduct of the parties, all of which is extrinsic to the TAA.  When the FDIC-Receiver finally addresses the TAA, it limits its discussion of the agreement's actual language to no more than two paragraphs.[6]  But, the parties' conduct is irrelevant (and, as discussed *infra*, is either supportive of BancGroup's position or a disputed issue of fact).  Rather, the parties' intent with respect to the allocation of tax attributes is evident from the four corners of the TAA and that agreement reflects that BancGroup and Bank agreed to establish a debtor-creditor relationship.  The TAA is dispositive over Tax Refund ownership and for this reason the FDIC-Receiver's Motion should be denied in favor of the BancGroup Tax Refund Motion.

As set forth in the BancGroup Tax Refund Brief, under Alabama law, the express terms of the TAA control and are to be interpreted exclusively to determine the parties' intent.  *See* BancGroup Tax Refund Brief at 21 (*citing Smith v. Citicorp Pers.-to-Pers. Fin. Ctrs., Inc*., 477 So. 2d 308, 310 (Ala. 1985); *Meyer v. Meyer*, 952 So. 2d 384, 391 (Ala. Civ. App. 2006); *Bad Ass Coffee Co. of Hawaii v. Naughty Donkey Enters., LLC*, No. 2090893, 2010 Ala. Civ. App. LEXIS 365, at *6-7 (Ala. Civ. App. Dec. 03, 2010)).  Here, the terms of the TAA establish a debtor-creditor relationship as between BancGroup and Bank which affords ownership of the Tax Refunds to BancGroup.[7]

In order to determine ownership of tax refunds as between parent corporations and their subsidiaries, courts have examined the agreements between the parties to assess whether they give rise to a debtor-creditor relationship on one hand, or a trust or agency relationship on the

---

[5]   Declaration of Andrew P. Campbell ("Campbell Dec.), Ex. A (April 21, 2008 Meeting Minutes of the Board of Directors of Colonial Bank, N.A. and the attached TAA at BB&T 008881, BB&T 008887, BB&T 008879, and BB&T 008880).

[6]   Brf. at 35, 37.

[7]   Rather than duplicate its position entirely, BancGroup includes a shorter version of its position and incorporates the BancGroup Tax Refund Brief herein.

other.  If the former, the tax refund is owned by the parent, subject to a contractual claim the subsidiary may assert for any entitlement under a tax sharing agreement.  Because the plain language of the TAA establishes a debtor-creditor relationship as between BancGroup and Bank – and not a trustee-beneficiary relationship – the Tax Refunds at issue here are owned by BancGroup.

Courts that have reviewed tax sharing agreements and concluded that they establish a debtor-creditor relationship have consistently premised their rulings on the following elements: (1) language evincing an intent to create a debtor-creditor relationship; and (2) the absence of provisions requiring that the parent company hold funds in escrow or segregation or otherwise restricting the use of funds received by the parent.  *See, e.g., Franklin Sav. Corp. v. Franklin Sav. Ass'n (In re Franklin Sav. Corp.)*, 182 B.R. 859, 863 (D. Kan. 1995) (finding use of "reimbursement" and "credit" language established debtor-creditor protocol and noting absence of trust language); *United States v. MCorp Fin. Inc. (In re MCorp Fin. Inc.)*, 170 B.R. 899, 902 (S.D. Tex. 1994) (finding tax allocation agreement language regarding "[c]ash settlement between [parent] and the Subsidiary" establishes "an account between MCorp as the taxpayer and its subsidiaries as its constituents"); *In re Team Fin. Inc.,* No. 09-5084, 2010 Bankr. LEXIS 1493, *36-37 (Bankr. D. Kan. 2010) (considering "payment" language establishing "ordinary contractual obligations," absence of trust or agency provision, and lack of segregation or use restrictions), *Zucker v. FDIC (In re Netbank, Inc.)*, Adv. No. 08-00346 (Bankr. M.D. Fla. Sept. 30, 2010) slip op. at 17-18 (noting absence of trust, escrow, or use restriction provision or provision requiring parent to act at bank's direction and control);[8] *Superintendent of Ins. v. First Cent. Fin. Corp. (In re First Cent. Fin. Corp.)*, 269 B.R. 481, 496-98 (Bankr. E.D.N.Y. 2001)

---

[8]   Campbell Dec. Ex. B (The slip opinion of *Zucker v. FDIC (In re Netbank, Inc.)*, Adv. No. 08-00346 (Bankr. M.D. Fla. Sept. 30, 2010)).

*aff'd sub nom. Superintendent of Ins. v. Ochs,* 377 F.3d 209 (2d Cir. 2004) (considering "payment" terms and the absence of segregation requirement, trust language, or use restriction as factors in determining the creation of a debtor-creditor relationship).   The FDIC-Receiver ignores this well-settled body of caselaw.

The terms of the TAA are remarkably similar to the agreements courts have uniformly determined to establish debtor-creditor relationships.   There are at least three operative components that make the debtor-creditor relationship clear:  (i) tax liabilities/payments; (ii) tax reimbursement payments; and (iii) tax refunds.  First, with respect to tax liabilities/payments, the TAA provides:

- The tax liability [] of each member of the consolidated group will be estimated on a quarterly basis and funds remitted to [ ] [BancGroup], also on a quarterly basis, within 30 days of the time that the estimated tax payments [] are due to [] the federal and state taxing authority . . . .[9]

Under the TAA, Bank's quarterly tax liability was to be estimated and paid to BancGroup (not the IRS) within 30 days of the date that BancGroup's consolidated tax liability was due to the IRS.   Thus, a debtor-creditor relationship was established as between Bank (debtor) and BancGroup (creditor).  *See In re Franklin Sav. Corp.*, 182 B.R. at 863; *see also In re Team Fin. Inc.,* 2010 Bankr. LEXIS 1493, at *36-37.

Second, with respect to tax reimbursement payments, the TAA provides:

- A member of the consolidated group may incur a tax loss that it cannot carry back on a separate entity basis, but which could be utilized as a carry forward for the group member.  If this tax loss is used currently to reduce the consolidated tax liability, the group member will receive payment from [BancGroup] for its use of the tax loss.[10]

---

[9]   Campbell Dec. Ex. A (TAA at BB&T 008880, ¶ 4 (emphases added)).

[10]   Campbell Dec. Ex. A (TAA at BB&T 008880, ¶ 3 (emphasis added)).

- Also, if a member's prior year tax loss is used as a carry forward to offset the current year consolidated tax liability, the group member <u>will receive payment from [BancGroup]</u> for its use of the carry forward tax loss.[11]

The TAA addresses the scenario in which one Member's theoretical tax benefits are applied against another Member's theoretical separate tax liability, providing that BancGroup is to <u>pay</u> Members for the use of their theoretical separate return tax benefits that Members would otherwise have been able to realize themselves if they were filing a separate tax return.  In doing so, the parties' use of the term "payment" is indicative of a debtor-creditor relationship as between BancGroup (debtor) and Bank (creditor).  *See In re Netbank, Inc.*, slip op. at 16-17; *In re First Cent. Fin. Corp.*, 269 B.R. at 497.  Courts have explicitly recognized that reimbursement for "use" of a Member's tax benefit reflects a debtor-creditor relationship.  *See In re Team Fin. Inc.,* 2010 Bankr. LEXIS 1493, at *35-36; *Franklin Sav. Corp. v. Franklin Sav. Ass'n (In re Franklin Sav. Corp.)*, 159 B.R. 9, 29 (Bankr. D. Kan. 1993).

<u>Third</u>, with respect to tax refunds, the TAA provides:

- The tax [] refund of each member of the consolidated group will be estimated on a quarterly basis and funds <u>remitted [] from [BancGroup]</u>, also on a quarterly basis, <u>within 30 days of the time that the estimated tax [] refunds are due [] from the federal and state taxing authority</u> . . . .[12]

Thus under the TAA, BancGroup was required to estimate and pay Bank a tax refund within 30 days of the date that tax refunds were due from the IRS.  Courts have found similar terms provide for a debtor-creditor relationship.  *See In re Netbank, Inc.*, slip op. at 17-18; *In re First Cent. Fin. Corp.*, 269 B.R. at 491, 498.  Moreover, the TAA provides that the "tax [] refund of each member . . . is computed on a <u>separate return basis</u>."[13]  This indicates that the intercompany payable the TAA establishes from BancGroup (as debtor) to Bank (as creditor) is

---

[11]  Campbell Dec. Ex. A (TAA at BB&T 008880, ¶ 3 (emphasis added)).

[12]  Campbell Dec. Ex. A (TAA at BB&T 008880, ¶ 3 (emphasis added)).

[13]  Campbell Dec. Ex. A (TAA at BB&T 008880, ¶ 2 (emphasis added)).

distinct from the tax refund due BancGroup from the IRS.  For example, even if BancGroup were to receive a refund in an amount smaller than what Bank would be owed on a theoretical "separate return basis," BancGroup would owe Bank the larger, independently-calculated amount.  Courts have found that such provisions evince a debtor-creditor relationship.  *See, e.g.*, *In re First Cent. Fin. Corp.*, 269 B.R. at 498.

The express and unambiguous terms of the TAA are substantially similar to the terms of tax sharing agreements considered in *Franklin Savings*, *First Central*, *Team Financial*, and *Netbank* – cases which the FDIC-Receiver simply elects not to cite.  In each instance, a debtor-creditor relationship was found.  Just as those agreements did, the TAA imposes "ordinary contractual obligations" on BancGroup and Bank with respect to tax liability and tax refunds. *See In re Team Fin. Inc.,* 2010 Bankr. LEXIS 1493, at *37.  If Bank as a theoretical stand alone tax payer would have owed taxes to the IRS, it owed, as debtor, a like payment under the TAA <u>to</u> BancGroup, as creditor.  Conversely, if Bank as a theoretical stand alone tax payer would have been entitled to a tax refund, it was owed, as creditor, a payment under the TAA <u>from</u> BancGroup, as debtor.  Bank was indebted to BancGroup with respect to tax liabilities, and BancGroup was indebted to Bank with respect to tax refunds and reimbursement payments pursuant to the TAA.  That is a debtor-creditor relationship (*i.e*., the "quintessential business of bankruptcy").  *In re MCorp Fin. Inc.*, 170 B.R. at 902.

Additionally, as discussed on pages 21-25 of the BancGroup Tax Refund Brief, the TAA includes <u>no language</u> requiring BancGroup to segregate, escrow, or otherwise restrict the use of Tax Refunds received from the IRS.  Nor does it contain any terms which the FDIC-Receiver is able to point to which establishes an agency or trust relationship.  This point was confirmed by Mr. Reimer, Bank's former tax director, and Mr. Byrne, Bank and BancGroup's former general

counsel.[14]  Just like these witnesses, there is simply nothing in the TAA the FDIC-Receiver can point to as indicating the relationship between Bank and BancGroup is one of trust or agency.

The chart on pages 26-27 of the BancGroup Tax Refund Brief graphically depicts the striking similarity between the TAA's terms and the terms of the tax sharing agreements examined by the courts that issued decisions finding a debtor-creditor relationship and parent/tax-filer ownership of tax refunds.  In sum, the TAA is substantially similar to the tax sharing agreements that have been deemed by other courts to establish debtor-creditor relationships and includes no language calling for a different result.  In view of the fact that the parties elected to allocate ownership over the Tax Refunds under the TAA, the FDIC-Receiver's motion should be denied.

B.    **The FDIC-Receiver's Attempts To Ignore Or Alter The Terms Of The TAA Should Be Rejected**

Despite the fact that the TAA conforms with the tax sharing agreements other courts have uniformly held establish debtor-creditor relationships, the FDIC-Receiver argues obliquely that the TAA is not a "differing agreement" as contemplated under *Bob Richards*.[15]  In support of this assertion, however, the FDIC-Receiver (i) cites caselaw that only supports BancGroup's position when applied to the actual terms of the TAA, and (ii) attempts to alter the terms of the TAA by referring the Court to irrelevant, extrinsic evidence or by seeking to incorporate language from an interagency policy statement which is entitled to no deference whatsoever.

1.    *The FDIC-Receiver's Lead Cases Only Support BancGroup's Tax Refund Motion*

---

[14]    Declaration of John Clarke ("Clarke Dec.") Ex. 4 (July 28, 2011 Deposition Transcript of David Reimer ("Reimer Tr.") at 145:5-146:8); Clarke Dec. Ex. 2 (July 14, 2011 Deposition Transcript of David B. Byrne  ("Byrne Tr.") at 243:20-244:19).

[15]    Brf. at 33.

The FDIC-Receiver asserts that *In re BSD Bancorp, Inc.,* No. 09-05084 (S.D. Cal. Feb. 28, 1995)[16] and *Lubin v. F.D.I.C.,* No. 10-00874, 2011 U.S. Dist. LEXIS 21391 (N.D. Ga. Mar. 2, 2011) "illustrate[] the narrowness of th[e] exception" to *Bob Richards*.[17]   However, its discussion of those cases ignores the actual terms of the TAA.   In view of the TAA's actual terms, those cases do not support the FDIC-Receiver's position.   Rather, they only serve to reinforce the merits of the BancGroup Tax Refund Motion.

The FDIC-Receiver mischaracterizes the holding of *BSD Bancorp.*   There, the court analyzed the language of a tax sharing agreement and found it to reflect an agency relationship. *BSD Bancorp* at 11.   The tax sharing agreement included an express provision to be exercised in "remote" and "unusual" circumstances under which the parent could borrow tax refunds from the subsidiary. *Id.* at 5, 11.   Therefore, by negative inference, the court determined that the inclusion of this express exception reflected that "<u>except</u>" in the circumstances where the loan option was elected, the parties otherwise intended that the parent act solely as agent to the subsidiary. *Id.* (emphasis added).   The *BSD Bancorp* tax sharing agreement provided that when this loan option was not exercised (and it was not), "the agreement required [the parent/tax-filer] to give the [subsidiary-bank] its share of the refund in cash and <u>immediately</u>." *BSD Bancorp* at 11 (emphasis added).

The TAA includes none of the foregoing provisions upon which the *BSD Bancorp* decision is premised.   First, no special and "unusual" loan option provision is found in the TAA from which the Court might infer an intent to act as agent or trustee "except" where such option

---

[16]   A copy of *BSD Bancorp* is attached as Exhibit A to the Brf.

[17]   Brf. at 33-34.

is elected.  Second, under the TAA, BancGroup is expressly required to pay Bank its separate

return tax refund within 30 days, not "immediately."[18]

In *Lubin* – another case in which the court examined the plain language of the tax sharing

agreement – the court was faced with a tax sharing agreement containing express language

(omitted entirely from the FDIC-Receiver's Brief) establishing an agency relationship:

> "If the Holding Company receives a tax refund from a taxing
> authority, these refunds <u>are obtained as agent</u> of the consolidated
> group <u>on behalf of the individual group members</u>.  This allocation
> agreement as well as other corporate policies should not be
> intended to consider refunds attributable to the subsidiary banks,
> which are received by the Holding Company from the taxing
> authority, as the property of the Holding Company."

*Lubin, 2011 U.S. Dist. LEXIS 21931* at *15-16 (emphasis added).   Thus, the tax sharing

agreement in *Lubin* included express language establishing an agency relationship and

disclaiming any parent ownership of tax refunds.  The TAA includes nothing of the sort.

In an effort to somehow parallel the *Lubin* tax sharing agreement to the TAA, the FDIC-

Receiver asserts that the former provided that the parent/tax-filer was to pay its subsidiary tax

refunds "in an amount no less that the amount the Bank would have been entitled to receive as a

separate entity."[19]  But this was not the language on which the court's decision was premised.

As discussed above, the court based its finding on express language establishing an agency

relationship.  The language the FDIC-Receiver actually cites in its Brief supports a debtor-

creditor, not agency, relationship.  *See In re First Cent. Fin. Corp.*, 269 B.R. at 498 (finding that

"the only rational interpretation" of provision providing for right to refund payment in an amount

that bank "would have received if it had filed on a stand-alone basis" was payment of an

independent debt not "the automatic payment to [bank] of any tax refund received by [parent]");

---

[18]   Campbell Dec. Ex. A (TAA at BB&T 008880, ¶ 4).

[19]   Brf. at 34.

*see also NetBank,* at 24 (finding that tax sharing agreement "in no way changes the fact that a debtor-creditor relationship was established between the Debtor and the Bank under the agreement regarding amounts equal to the amounts to which the Bank [and its subsidiaries] would have been entitled if it had filed separately").

Thus, even under the FDIC-Receiver's lead cases, *BSD Bancorp* and *Lubin*, the result is the same – the TAA establishes a debtor-creditor relationship affording Tax Refund ownership to BancGroup.[20]

> 2.    *The FDIC-Receiver's Attempts To Insert New Terms Into The TAA Should Be Rejected*

Next, the FDIC-Receiver continues to shift focus away from the actual terms of the TAA, instead choosing to discuss (i) the Interagency Policy Statement on Income Tax Allocation in Holding Company Structure, November 1998 (the "<u>IPS</u>"), (ii) irrelevant and inadmissible evidence, and (iii) sections 23A and 23B of the Federal Reserve Act (*see* 12 U.S.C. § 371c, 371c-1, "<u>Section 371c</u>")).

---

[20]   The FDIC-Receiver cites but does not discuss *Cohen v. Un-Ltd. Holdings, Inc. (In re Nelco, Ltd.)*, 264 B.R. 790 (Bankr. E.D. Va. 1999) and *In re Florida Park Banks, Inc.*, 110 B.R. 986 (Bankr. M.D. Fla. 1990). In an attempt to narrow the *Bob Richards* holding that a tax sharing agreement controls, the FDIC-Receiver cites language from the *Nelco* decision stating that a tax sharing agreement must be "clear and explicit." Brf. at 33. It is impossible to explain entirely the *Nelco* court's meaning, because it cites *Bob Richards* and *Capital Bancshares, Inc. v. FDIC*, 957 F.2d 203, 207-08 (5th Cir. 1992) as authority for this statement. Both of those decisions, however, expressly state that a tax sharing agreement may be <u>implicit</u>. *See Capital Bancshares*, 957 F.2d at 207; *Bob Richards,* 473 F. 2d at 264. In any event, *Nelco* is easily distinguished. The tax refund was awarded to the subsidiary because the court found the tax sharing agreement did "not address the allocation of tax refunds among the consolidated group." *In re Nelco, Ltd.*, 264 B.R. at 809.

In *Florida Park Banks*, the court found there was no agreement between the parties "as to the allocation of tax refunds." 110 B.R. at 989. The court did not consider policy statements to comprise binding agreements due to "questions regarding the effective date of the agreement" and because it perceived that the term "tax benefit" was too vague. *Id.* at 988. Here, as set forth in the BancGroup Tax Refund Motion, there is no question about the TAA's effective date – it was approved annually and repeatedly for the impending 12-month period. BancGroup Tax Refund Brf. at 6 (noting annual approval, ratification, and affirmation of the TAA by the Boards of Directors of Bank and BancGroup). And the TAA does not use vague language. Rather, it expressly provides for the payment of "tax refunds", "tax liabilities", and reimbursement of "tax losses" as between BancGroup and Bank.

As an initial matter, taken independently, the IPS is entitled to no deference whatsoever. The IPS is a statement of desired policy positions formulated by several banking regulators. Courts have repeatedly rejected the FDIC-Receiver's attempts to champion the IPS. *See In re Netbank, Inc.*, slip op. at 29 (rejecting FDIC's reliance on the IPS in tax refund ownership dispute because it "does not constitute a rule or regulation or have the force of law"); *see also In re Team Fin. Inc.*, 2010 Bankr. LEXIS 1493, at *25-28 ("Not even the FDIC asserts that this policy statement has the force of law.").  In a similar context, the Third Circuit rejected the Office of Thrift Supervision's ("OTS") argument that certain directors and officers ran afoul of an OTS "Statement of Policy" set forth at 12 C.F.R. § 571.7(b).  *Seidman v. Office of Thrift Supervision (In re Seidman)*, 37 F.3d 911, 931-32 (3d Cir. 1994).   In *Seidman*, the court concluded that the policy statement was "just that – a policy statement, not a regulation," and that it did not have the "force of law."  *Id.*   Here, the IPS has not even been published in the Code of Federal Regulations or subjected to public process as was the policy statement in *Seidman*.  *See, e.g., Krazalic v. Republic Title Co.*, 314 F.3d 875, 881 (7th Cir. 2002) ("A simple announcement is too far removed from the process by which courts interpret statutes to earn deference.  A simple announcement is all we have here.  One fine day the policy statement simply appeared in the Federal Register.  No public process preceded it . . . .").

Notwithstanding the foregoing, the FDIC-Receiver's Brief establishes a false dichotomy in order to create the misimpression that the TAA does not establish a debtor-creditor relationship.  In one of the rare instances in which it actually quotes from the TAA, the FDIC-Receiver makes much of the fact that the TAA provides, "that each member of the group having a tax liability is allocated their respective tax liability on a separate return basis . . . ."[21]  The

---

[21]   Brf. at 35.

FDIC-Receiver next compares this language to similar guidance in the IPS.[22]   However, as discussed *supra*, the fact that the intercompany liabilities agreed to by Bank and BancGroup were to be calculated based upon Bank's "separate return" calculations only supports a debtor-creditor relationship.  The TAA's language provides the basis on which Bank's liabilities will be calculated.  The fact that certain parallels can be drawn to the IPS does not create an agency or trust relationship.

Perhaps appreciating the foregoing, the FDIC-Receiver next seeks to effectively "cut and paste" other language from the IPS into the TAA by offering the testimony of David Byrne.[23]   As an initial matter, Mr. Byrne had nothing to do with the drafting of the TAA.  The TAA pre-dated his employment at Bank and BancGroup.[24]   In any event, his vague statement that the FDIC-Receiver interprets as conveying Mr. Byrne's belief that the TAA was "consistent" with the IPS is irrelevant and inadmissible under Alabama law.  *See McLemore v. Hyundai Motor Mfg. Ala., LLC*, 7 So. 3d 318, 333 (Ala. 2008) ("It is elementary that it is the terms of the written contract, not the mental operations of one of the parties, that control its interpretation.  Stated another way, the law of contracts is premised upon an objective rather than a subjective manifestation of intent approach.  A court should give the terms of the agreement their clear and plain meaning and should presume that the parties intended what the terms of the agreement clearly state.") (internal quotation and citation omitted).  The same is true with Bank and BancGroup's former Chief Accounting Officer, Mr. Hicks', subjective and after-the-fact opinions.  Moreover, when asked

---

[22]   Brf. at 35.

[23]   Brf. at 34-35.

[24]    Brf at 35; Clarke Dec. Ex. 2 (Byrne Tr. at 83:16-84:1 (Q.  How did you become familiar with that document?  A.  My recollection is [sic.] [the TAA] predated my coming to the Bank, and it was a method by which in the filing of the consolidated tax return the entities could take advantage of the gains and losses by the financial subs and the op subs of the Bank and holding company.")).

the more specific inquiry of whether they could point to any language in the TAA that actually supports this theory, both Mr. Byrne and Mr. Hicks responded that they could find none.[25]

The FDIC-Receiver goes on to argue weakly that the IPS was somehow "incorporated by reference . . . albeit indirectly" in the TAA.[26]  However, as a threshold matter, the TAA does not "incorporate" anything.  Rather, it simply provides that the TAA was elected "under" various handbooks and policies.[27]  That language is unremarkable.  Indeed, the IPS expressly encourages institutions to enter into tax allocation agreements.  *See* 63 Fed. Reg. 64578 ("A holding company and its subsidiary institutions are encouraged to enter into a written, comprehensive tax allocation agreement tailored to their specific circumstances . . . . Although each agreement will be different, tax allocation agreements usually address certain issues common to consolidated groups. Therefore, such an agreement should: . . .- Discuss the amount and timing of the institution's payments for current tax expense, including estimated tax payments;- Discuss reimbursements to an institution when it has a loss for tax purposes; . . ."); *see also In re Team Fin., Inc*., 2010 Bankr. LEXIS 1493, at *27 ("In fact, [the IPS] encourages these agreements").  Additionally, as discussed above, there are several provisions of the TAA which are supportive of a debtor-creditor relationship that are consistent with certain elements of the IPS – such as the fact that the intercompany liabilities agreed to by Bank and BancGroup were to be calculated based upon Bank's "separate return" calculations.

---

[25]   Clarke Dec. Ex. 2 (Byrne Tr. at 244:1-20 ("Q.  Is there any language in this tax allocation policy that provides that any amounts paid by members to CBG will be held in trust for the benefit of the member? MR. CLARKE:  Objection to form.  A.  I'm quickly scanning the document.  I don't see the word trust. There is a reference to an exercise of truing up, but I don't see the word trust.  But I -- If I've overlooked it, please point it out to me.  Q.  Is there any language in this document that you understand to mean that funds paid to CBG by the members are to be held in a segregated account or an escrow account?  MR. CLARKE:  Objection to form.  A.   I do not see that language in this document.")).

[26]   Brf. at 36.

[27]   Campbell Dec. Ex. A (TAA at BB&T 008880, ¶ 1).

Moreover, the IPS itself is not referenced at all (which is not surprising in view of the fact that the TAA was originally drafted before the IPS existed). Rather, the IPS's predecessor, the "FDIC 1978 Statement of Policy," is referenced.[28] The FDIC-Receiver concedes this fact, but asks the Court to overlook it because the IPS "does not materially change any of the guidance" provided in the earlier policy statement.[29] This request is belied by the fact that the language the FDIC-Receiver wishes to "incorporate" into the TAA, concerning "characterization" of refunds as property of the parent, is found exclusively in the IPS and not its referenced predecessor.[30]

Continuing to avoid discussion of the TAA's express terms, the FDIC-Receiver asserts that the TAA must not form a debtor-creditor relationship because it "cannot be squared with federal banking laws."[31] The FDIC-Receiver asserts that because the TAA does not expressly provide for payment of interest from BancGroup to Bank, any debtor-creditor relationship would purportedly violate Section 371c, and therefore the TAA's plain language should be ignored (or interpreted differently that the Court otherwise would).

To the extent the FDIC-Receiver is arguing that a violation of Section 371c would void the TAA, it offers no explanation of how and cites no precedent in which a tax sharing agreement was invalidated under Section 371c. In fact, nothing in Section 371c provides that any "loan" or "extension of credit" made in violation of the statute is void *ab initio* or gives rise to anything other than an enforceable debtor-creditor relationship. Rather, the statute plainly contemplates civil penalties (*see* 12 U.S.C. §§ 504 & 1818(i)(2)) or regulatory action, such as "cease and desist" orders (*see* 12 U.S.C. §§ 1468(c) & 1818), as the sole remedies for violations

---

[28]   Campbell Dec. Ex. A (TAA at BB&T 008880, ¶ 1).

[29]   Brf. at 37.

[30]   Brf. at 36.

[31]   Brf. at 37.

of Section 371c.  This stands in clear contrast to other provisions whereby Congress made its intent clear to render certain transactions void or invalid.  *See, e.g.*, 12 U.S.C. §§ 91, 1441a(y)(3) & 1467a(f).  Courts have confirmed this point.  *See Armstrong v. First Nat'l Bank (In re Clothes, Inc.)*, 40 B.R. 997, 1000 (D.N.D. 1984) (rejecting bankruptcy trustee's argument that "failure to comply with the statute makes the loan instruments unenforceable" because "while the extension of credit . . . was not proper procedure, the loan is not voidable . . . " under title 12); *In re Bates*, 58 B.R. 915, 916-17 (Bankr. W.D. Tenn. 1986) (rejecting argument that notes purportedly issued in violation of title 12's "Regulation O" were "voidable" and noting that "the exclusive sanctions provided for violation of this regulation" are the imposition of civil penalties under 12 U.S.C. § 504).  Thus, even if performance under the TAA could potentially give rise to a violation of Section 371c (which the FDIC-Receiver does not establish),[32] this does not change the fact that a debtor-creditor relationship was established or the outcome with respect to ownership of the Tax Refunds.

Moreover, to the extent the FDIC-Receiver is arguing that the Court should read terms establishing an agency relationship into the TAA to harmonize its terms with Section 371c, that argument too should be rejected even assuming *arguendo* that a debtor-creditor relationship under the TAA would violate Section 371c.  The FDIC-Receiver cites *Fid. & Dep. Co. of Md. v.*

---

[32]   It is completely unclear that a BancGroup-Bank debt provided for under the TAA would in fact be a "covered transaction" under Section 371c or that any such debt would not be "on terms and under circumstances . . .  that are substantially the same, or at least as favorable to [Bank] as those prevailing at the time for comparable transactions with or involving other nonaffiliated companies."  12 U.S.C. § 371c-1.  BancGroup and Bank's officers were not certain one way or the other.  *See* Clarke Dec. Ex. 2 (Byrne Tr. 163:6-17 (Q.  And what discussions did you have with the chief financial officer on the topic of whether or not transfers of funds under the tax allocation policy were transactions that should be reflected on one of these questionnaires [concerning Section 371c and extension of credit among Bank and its affiliates]?  A.  Certain allocations of funds under the policy <u>may or may not</u> have triggered consideration requiring one of the questionnaires.  But I can't tell you today whether or not it was done each and every time.") (emphasis added)).  Unsurprisingly, the FDIC-Receiver cites no precedent in which Section 371c was found to be applicable to intercompany debts established under a tax sharing agreement.

*Jefferson Cty. Comm'n*, 756 F. Supp. 2d 1329, 1337 (N.D. Ala. 2010) for the proposition that "an interpretation of a contract which gives a reasonable, lawful and effective meaning to all of the terms is preferred to an interpretation which leaves a part unreasonable, unlawful or with no effect." Brf. at 37. The District Court in *Jefferson County* was interpreting two agreements between the parties and was therefore simply stating a general theory of contract interpretation when dealing with <u>conflicting</u>, <u>express</u> provisions *Jefferson Cty.*, 756 F. Supp. 2d at 1334-35, 1337 (interpreting and reconciling language in the "Performance Bond" and "Construction Contract" between plaintiff and defendant, the latter having been incorporated by reference in the former). *Jefferson County* is inapposite. First, the TAA does not incorporate by reference Section 371c. Second, the TAA contains <u>no</u> language suggesting a trust or agency relationship which the Court must reconcile with the balance of the TAA's terms. *Jefferson County* certainly does not stand for the proposition that the plain terms of a contract should be forsaken to avoid even the suggestion of a violation of a regulation that is not incorporated into the contract and which finds no support within the four corners of the document. In fact, *Jefferson County* states clearly the rule that "[w]here there is a written contract, the court looks no further than the four corners of the document to determine the intent of the parties." *Id.* at 1335.

When the FDIC-Receiver finally gets around to discussing the operative language of the TAA, it limits its discussion to <u>one</u> paragraph, offering nothing more than the conclusory statement, without citation, that "the fact that the [TAA] provides for payments to be 'remitted' to or from BancGroup with respect to the 'tax liability/refund' of members of the consolidated group does not alter the ownership rights of any member in its tax refunds."[33] But, as summarized above, and discussed in more detail in BancGroup's Tax Refund Brief, the caselaw

---

[33]   Brf. at 37.

uniformly holds otherwise.  Where a tax sharing agreement "addresses the circumstances under which the subsidiary is entitled to reimbursement of tax refunds from the holding company," it allocates ownership of tax refunds.  *In re Franklin Sav. Corp.*, 182 B.R. at 863.  And where tax sharing agreements provide for a parent obligation to "pay" refunds to the subsidiary, as does the TAA, debtor-creditor relationships exist and nothing more.  *In re Team Fin., Inc.*, 2010 Bankr. LEXIS 1493, at *34-35, 37.  That is exactly what the parties provided for in the TAA and why the FDIC-Receiver's motion must be denied.

C.     **The FDIC-Receiver's Attempts To Evade The TAA Fail**

On the heels of its efforts to ignore or alter the plain language of the TAA, the FDIC-Receiver continues its efforts to avoid the effect of the TAA's provisions by seeking to find a statutory basis on which the TAA may be disregarded.  For the reasons discussed below, these arguments should be rejected.

1.     *12 U.S.C. § 1823(e) Does Not Preclude The Court's Consideration Of The Debtor-Creditor Relationship Established By The TAA*

The FDIC-Receiver argues that 12 U.S.C. § 1823(e) ("Section 1823") precludes this Court from determining that the TAA establishes a debtor-creditor relationship between BancGroup and Bank because the TAA supposedly "was never executed by Colonial Bank."[34] However, the plain language and purpose of Section 1823 indicate it is inapplicable to disputes other than those governing "conventional loan transactions."  *E.I. du Pont de Nemours & Co. v. FDIC*, 32 F.3d 592, 597 (D.C. Cir. 1994).  The Eleventh Circuit has not considered Section 1823 in the context of a tax sharing agreement.  However, BancGroup submits it would likely refuse to apply the statute given its well-settled exception to claims which are unrelated to "regular banking transactions," particularly when application of Section 1823 would not further the

---

[34]   Brf. at 40.

underlying policies of the *D'Oench* doctrine.  *See OPS Shopping Ctr., Inc. v. FDIC*, 992 F.2d 306, 308-11 (11th Cir. 1993).  The *D'Oench* doctrine – codified by Section 1823 – permits federal banking regulators to rely on a bank's records of regular banking transactions and to ensure mature consideration of unusual loan transactions by senior bank officials.[35]  In any event, even if Section 1823 is applicable, the TAA satisfies its requirements.

(a)   Section 1823 Is Inapplicable

"[T]he requirements of § 1823(e) effectively limit that provision to <u>conventional loan transactions</u>."  *E.I. du Pont,* 32 F.3d at 597 (emphasis added).  Cases from other Circuits are in accord.  *See, e.g., Kessler v. Nat'l Enters*., 165 F.3d 596, 599 (8th Cir. 1999) ("it is not realistic to apply the bar of § 1823(e) to <u>non-banking transactions</u>"); *John v. RTC*, 39 F.3d 773, 776 (7th Cir. 1994) ("By its language § 1823(e) applies only to <u>conventional loan activities</u> . . . the only sensible reading of § 1821(d)(9)(A) must limit its scope to the loan-related transactions covered by § 1823(e).");  12 U.S.C. § 1823(e)(3) (referring to a depository institution's "<u>loan committee</u>") (all emphases added).[36]

---

[35]  *D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp*., 315 U.S. 447 (1942).  In *D'Oench, Duhme*, the Supreme Court held that the FDIC is not bound by agreements between borrowers and financial institutions that are not expressed in the written agreements between the parties.

[36]  Section 1823 provides:  No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the [FDIC] unless such agreement —

(1) is in writing,

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(4) has been continuously, from the time of its execution, an official record of the depository institution. 12 U.S.C. § 1823(e).

Significantly, notwithstanding the position it takes in its brief, the FDIC has acknowledged how Section 1823 should not be applied in instances such as these.  Declaring that "overly aggressive application of the specific requirement of [*D'Oench* and Section 1823] could lead to inequitable and inconsistent results in particular cases," the FDIC has issued a policy and developed guidelines to "ameliorate this possibility."  FDIC Law, Regulations, Related Acts, 5000 - Statement of Policy Regarding Federal Common Law and Statutory Provisions Protecting FDIC, as Receiver or Corporate Liquidator, Against Unrecorded Agreements or Arrangements of a Depository Institution Prior to Receivership, by Order of the FDIC Board of Directors, February 4, 1997 (the "<u>FDIC Policy and Guidelines</u>").[37]  The FDIC Policy & Guidelines state that "[t]he use of *D'Oench* or [Section 1823] should be limited in most circumstances to <u>loan transactions</u> and other <u>similar ordinary banking transactions</u>."  *Id.* (emphasis added).  More specifically, the FDIC Policy & Guidelines state that "the FDIC, as a matter of policy, will not seek to bar claims which by their very nature do not lend themselves to <u>the enumerated requirements of section 1823(e)</u> [and t]o that end, the FDIC will continue to assert the protections of the *D'Oench* doctrine and FIRREA (sections 1821(d)(9)(A), 1823(e)) only in accordance with the Guidelines."  *Id.* (emphasis added).

In accord with the FDIC Policy & Guidelines, the court in *E.I. du Point* found that Section 1823 was inapplicable to a claim against a depository institution arising from an escrow arrangement established by the institution because this claim did not relate to the bank's "conventional loan transactions."  *E.I. du Pont,* 32 F.3d at 597   The court's decision was premised in part on one of the enumerated requirements of Section 1823, subsection (3)'s

---

[37]   Campbell Dec. Ex. C (FDIC Law, Regulations, Related Acts, 5000 - Statement of Policy Regarding Federal Common Law and Statutory Provisions Protecting FDIC, as Receiver or Corporate Liquidator, Against Unrecorded Agreements or Arrangements of a Depository Institution Prior to Receivership, by Order of the FDIC Board of Directors, February 4, 1997).

reference to "the loan committee." *Id.* Other courts have agreed, reasoning that inclusion of "non-banking transactions within the coverage of § 1823(e) and § 1821 could lead to absurd results." *See, e.g.*, *Alexandria Assocs. v. Mitchell Co*., 2 F.3d 598, 602 (5th Cir. 1993) ("For example, each ordinary trade creditor of a bank would find it necessary to have its purchase order or other contract documents approved by the bank's directors and recorded in the Board's minutes if such creditor was to avoid potential uncollectibility under *D'Oench*.").

Neither the Eleventh Circuit nor any other Circuit court has considered whether Section 1823 is applicable to tax sharing agreements (which are inherently unrelated to a bank's regular banking transactions). However, in considering tort claims, the Eleventh Circuit has developed a well-settled "relatedness" exception to Section 1823 which turns on whether the claims at issue are sufficiently related to the failed bank's regular banking transactions such that application of Section 1823 furthers the underlying policies of *D'Oench*. *See Bufman Org. v. FDIC*, 82 F.3d 1020, 1025-29 (11th Cir. 1996) (conducting claim by claim analysis to determine whether each related to <u>regular banking transactions</u> and noting that a "regular banking transaction usually results in the acquisition of an asset, such as a note"); *In re Geri Zahn*, 25 F.3d 1539, 1543 (11th Cir. 1994) (noting the requirement that a claim "be sufficiently intertwined with <u>regular banking transactions</u>, such that exclusion of the alleged 'secret agreement' accords with the underlying policies of *D'Oench*"); *OPS Shopping,* 992 F.2d at 311 (explaining that *D'Oench* is only applicable to "claims arising out of <u>regular banking transactions</u>, a record of which one would expect to be reflected in the records of the bank's <u>regular banking transactions</u>"); *McMath v. FDIC*, 2011 U.S. Dist. LEXIS 34650, *29-31 (M.D. Ala. Mar. 31, 2011) (rejecting the FDIC-Receiver for Colonial Bank's "broad-brush analysis" of Section 1823 in favor of test which requires that claims arise from "<u>a regular banking transaction</u>") (all emphases added). Notably,

the D.C. Circuit stated that its *E.I. du Point* analysis "is in accord with the Eleventh Circuit's test." 32 F.3d at 600. In *OPS Shopping*, the Court of Appeals distinguished claims concerning matters that would be found in "records of regular banking transactions" from claims concerning matters found in other records such as those found in departments handling bank personnel or the sale or transfer of the bank's stock. 992 F.2d at 310. The court reasoned that such claims fall outside the scope of the protections of Section 1823 and *D'Oench*.

The FDIC-Receiver cites *Twin Constr., Inc. v. Boca Raton, Inc.*, 925 F.2d 378 (11th Cir. 1991) – a case that pre-dates each of *Bufman Organization*, *Geri Zahn*, and *OPS Shopping* – for the proposition that Section 1823 is applicable to tax sharing agreements. However, the agreement at issue in *Twin Construction* concerned a mortgage loan owned by the failed bank (*i.e.*, one of the bank's conventional loan transactions) and the priority of such vis-à-vis competing debts. *Twin Constr., Inc.*, 925 F.2d at 380. Evincing this, the document was found to be "included in [the failed bank's] records as one of the loan documents." *Id.* at 383. Thus, the document at issue in *Twin Construction* related to regular banking transactions.

Here the TAA concerns the allocation of tax liabilities and tax refunds between BancGroup and its affiliates. The Tax Refunds are simply not related to the Bank's ordinary, conventional, or regular banking operations such as accepting deposits and pooling those funds to provide credit to third parties either directly by lending, or indirectly by investing through the capital markets. *See Bufman Org.*, 82 F.3d at 1025 (providing examples of "regular banking transactions" as acquisition of a note or extension of letter of credit).[38] The TAA is not a

---

[38] In *Indep. Bankgroup v. FDIC (In re Indep. Bankgroup)*, 217 B.R. 442 (Bankr. D. Vt. 1998), the court held that a tax refund was sufficiently connected to banking activities for application of Section 1823. *In re Independent Bankgroup*, 217 B.R. at 447. The decision contained no reasoning underlying this conclusion. Notably, however, in that case, a written tax sharing agreement could not be located or produced by either party. *Id.* Thus, stretching the scope of Section 1823 arguably served the policies of *D'Oench* which guard against "secret agreements" as the Eleventh Circuit discussed in *Geri Zahn*. Here,

document that would have been presented to the Bank's loan committee as Section 1823(e)(c) expressly contemplates. Rather, it is a document relating to intercompany matters that would have been found in the tax department, not the Bank's loan origination or credit department.[39] Companies that have nothing to do with the banking industry – and therefore do not engage in regular banking transactions – utilize tax sharing agreements. *See, e.g., Superintendent of Ins. v. Ochs,* 377 F.3d at 211 (tax sharing agreement between parent and New York insurance company); *In re Marvel Entm't Grp., Inc.,* 273 B.R. 58 (D. Del. 2002) (tax sharing agreement between parent and comic book operating subsidiary). The fact that the transactions underlying the TAA have nothing to do with conventional banking transactions such as loan origination or collection dictates that Section 1823 is therefore inapplicable. This is particularly true where the Tax Refunds – at least primarily – are generated not through losses arising from Bank's loan portfolio, but as a result of the extraordinary and massive fraud enacted upon Bank by TBW.[40]

Moreover, application of Section 1823 to the TAA would not further the underlying policies of *D'Oench* as the Eleventh Circuit found pertinent in *Geri Zahn.* *See In re Geri Zahn*, 25 F.3d at 1543. The Eleventh Circuit has articulated such purposes as: (i) to allow federal banking regulators such as the FDIC to rely on a bank's records of <u>regular banking transactions</u> when evaluating the institution's financial soundness; and (ii) "to ensure mature consideration of <u>unusual loan transactions</u> by senior bank officials", and to prevent fraudulent insertion of new

---

where the Board-approved TAA cannot be said to be any sort of "secret agreement," it is impossible to conclude that the TAA is "sufficiently intertwined with regular banking transactions, such that exclusion of the alleged 'secret agreement' accords with the underlying policies of *D'Oench*." *In re Geri Zahn*, 25 F.3d at 1543.

[39] *See* Clarke Dec. Ex. 3 (July 26, 2011 Deposition Transcript of T. Brent Hicks ("Hicks Tr.") at 107:5-21 ("The policy was primarily owned by [corporate tax director] Mr. Reimer.").

[40] *See* Clarke Dec. Ex. 2 (Byrne Tr. at 245:20-246:3 ("Q. In your view was the Bank's total 2009 losses in large part directly attributable to Taylor-Bean's fraudulent activity? MR. HUGHEY: Object to the form. A. Not entirely. Q. In large part was the question. A. In large part, yes.")).

terms, with the collusion of bank employees, when a bank appears headed for failure. *OPS Shopping*, 992 F.2d at 308-09, 311.[41] It is not surprising therefore that courts have determined the *D'Oench* doctrine does not bar judicial enforcement of tax sharing agreements. *See BSD Bancorp* at 7 (finding "agreement was sufficiently explicit that the FDIC could not have been misled as to Bancorp's potential right to 'borrow' the refunds" such that *D'Oench* did not preclude assertion of tax sharing agreement).

In this case, one cannot fathom more "mature consideration" by more "senior bank officials" than that which occurred with respect to the TAA (*i.e.*, repeated annual Board review, adoption, affirmation, ratification, and approval). Moreover, the FDIC functioned as Bank's primary regulator for more than a year prior to the Receivership Date. And as discussed above, the IPS – a document the FDIC-Receiver touts throughout its Brief – expressly encourages institutions to enter into tax allocation agreements. *See* 63 Fed. Reg. 64758. Thus, the FDIC-Receiver cannot credibly argue it was unaware of the TAA when deciding what course of action to take with respect to Bank upon receivership. There is no credible argument that the FDIC-Receiver could have been misled as to "the true obligations of the parties" or that BancGroup lent itself to a "scheme or arrangement whereby the banking authority . . . was or was likely to be misled." *See Baumann v. Savers Fed. Sav. & Loan Assoc.*, 934 F.2d 1506, 1517 (11th Cir. 1991).[42]

---

[41]   The Eleventh Circuit has determined that the purposes of *D'Oench* and Section 1823 are the same. *Bufman Org. v. FDIC*, 82 F.3d 1020, 1025 (11th Cir. 1996); *see also Baumann v. Savers Fed. Sav. & Loan Assoc.*, 934 F.2d 1506, 1515 (11th Cir. 1991).

[42]   This alone has been contemplated as grounds on which to find Section 1823 inapplicable. *See Twin Constr., Inc. v. Boca Raton, Inc.*, 925 F.2d 378, 382-83 (11th Cir. 1991) ("Appellant has declined to argue that it has not lent itself to an arrangement that might mislead banking authorities, so we need not discuss what non-fraudulent activity would escape the reach of *D'Oench* and section 1823(e).").

Section 1823 does not apply to the TAA because the TAA is not at all related to the Bank's regular banking or conventional loan transactions. Moreover, none of the policies underlying D'Oench and Section 1823 are furthered in view of the fact that the TAA received mature consideration by senior bank officials and BancGroup did not lend itself to a scheme whereby the FDIC could be misled. In short, application of Section 1823 here would not likely be countenanced by the Eleventh Circuit and serves none of the principles underlying the statute.

Finally, applying Section 1823 to tax sharing agreements would render an entire body of caselaw meaningless. Many of the decisions concerning ownership of tax refunds have opined that an implicit agreement would be sufficient to provide that a parent is the owner of tax refunds as opposed to a failed bank in FDIC or RTC receivership. *See Capital Bancshares, Inc. v. FDIC*, 957 F.2d 203, 207 (5th Cir. 1992) (court will not question allocation of tax refund which results from express or <u>implied agreement</u> between the affiliated companies); *see also Bob Richards,* 473 F. 2d at 264 (same); *see also BSD Bancorp, Inc.,* No. 09-05084, at *10 (considering the question of whether the parties "expressly or impliedly" override *Bob Richards*"); *see also Franklin Sav. Corp.*, 159 B.R. at 29 ("where an agreement can fairly be <u>implied</u> . . . the parties are free to adjust among themselves the ultimate tax liability") (internal citation omitted) (all emphases added). Implicit agreements, by definition, could never be signed and would therefore never satisfy Section 1823's requirements.

<blockquote>(b)   Assuming *Arguendo* Section 1823 Is Applicable To The TAA, The Statutory Requirements Have Been Met</blockquote>

There is no dispute that the TAA is in writing, was approved annually by Bank's Board, and was an official Bank record. And there is no dispute that the Board resolutions approving

the TAA were themselves executed and that the TAA was attached thereto.[43]  Still, advancing a hyper-technical reading of the statute, the FDIC-Receiver argues that the TAA is not "executed" by the depository institution as contemplated by Section 1823.[44]

    In order to avoid anomalous and inequitable results where parties are not attempting to advance "secret" side agreements against bank regulators, courts have found that documents may satisfy Section 1823's requirements where they are incorporated by reference in another document.  *See, e.g., Riverside Park Realty Co. v. FDIC*, 465 F.Supp. 305, 313 (M.D. Tenn. 1978) (rejecting the FDIC's assertion of Section 1823 against plaintiff's enforcement of loan agreement unexecuted by failed bank where agreement was incorporated by reference in separate deed of trust such that FDIC was clearly on notice); *BSD Bancorp* at 7 (rejecting FDIC's argument that Section 1823 precluded consideration of the tax sharing agreement attached to board materials given that tax portion was "incorporated by reference . . . and it appears that an explicit incorporation by reference suffices for § 1823(e)").  Other courts have recognized that "neither *D'Oench, Duhme* nor § 1823(e) requires that the agreement between the parties be confined to one document; rather, a collection of official bank documents can reflect the agreement reached."  *Bank One Tex. Nat'l Ass'n v. Morrison*, 26 F.3d 544, 550 (5th Cir. 1994); *see also Resolution Trust Corp. v. Midwest Fed. Sav. Bank*, 4 F.3d 1490, 1501 (9th Cir. 1993), *amended on other grounds, reh'g denied, Resolution Trust Corp. v. Midwest Fed. Sav. Bank*, 36 F.3d 785 (9th Cir. 1993) ("the fact that an agreement between the failed lender and the borrower

---

[43]   Campbell Dec Ex. A (April 21, 2008 Meeting Minutes of the Board of Directors of Colonial Bank, N.A. and the attached TAA at BB&T 008881, BB&T 008887, BB&T 008879, and BB&T 008880); Campbell Dec. Ex. D (April 10, 2008 email sent by David Rogers to Pam Chestnutt, copying Brent Hicks and Tamara Stidham, excerpting the attachments by attaching the TAA and related Board Resolution); Campbell Dec. Ex. E (April 16, 2008 Resolutions of the Board of Directors of The Colonial BancGroup, Inc attaching a copy of the TAA).

[44]   Brf. at 40.

is manifested in more than one document does not automatically imply a deceptive secret agreement") (*citing RTC v. Oak Apartments. Joint Venture*, 966 F.2d 995, 999 (5th Cir. 1992)).

The fact that courts have been flexible in applying Section 1828 should come as no surprise to the FDIC-Receiver.  In the FDIC Policy & Guidelines – designed to "inform persons doing business with an institution of the circumstances" in which Section 1823 may be asserted by the FDIC – the FDIC pronounces that "it may be appropriate to consider all of the failed institution's books and records in determining the agreement, <u>not just an individual document</u>." FDIC Policy & Guidelines (emphasis added).

Notwithstanding its own pronouncement, the FDIC-Receiver cites *Twin Constr., Inc. v. Boca Raton, Inc*., 925 F.2d 378 (11th Cir. 1991) in support of its request that this Court take a narrow view of the TAA.  However, in *Twin Construction*, the document at issue was simply unsigned and was not attached to <u>executed</u> and dated board minutes as is the TAA.  *Twin Construction* goes on to discuss the policy reasons for the execution requirement, including that bank examiners not be misled and to assure that the document at issue received prudent consideration.  *Id.* at 384.  Those concerns are simply not relevant here.

Here, the Board-approved TAA was attached to signed Board resolutions which expressly approve and ratify the TAA. [45]   David Reimer, the corporate tax director who

---

[45]   *See* Clarke Dec. Ex. 2 (Byrne Tr. at 220:16-227:18, quoted language at 222:3-223:13 ("Q.  And, in fact, the Exhibit A is what I've marked as Exhibit 31 here, and that's the intercorporate tax allocation policy that was approved as reflected in the minutes; correct?  A.  To my knowledge, yes, sir.  Q.  And it was, in fact, unanimously approved; correct?  A.   Yes, sir.")); *see also* Campbell Dec Ex. A (April 21, 2008 Meeting Minutes of the Board of Directors of Colonial Bank, N.A. and the attached TAA); *see also* Campbell Dec. Ex. D (April 10, 2008 email sent by David Rogers to Pam Chestnutt, copying Brent Hicks and Tamara Stidham, excerpting the attachments by attaching the TAA and related Board Resolution); *see also* Campbell Dec. Ex. E (April 16, 2008 Resolutions of the Board of Directors of The Colonial BancGroup, Inc attaching a copy of the TAA).

"owned"[46] the TAA, stated that "there wasn't a signed copy because <u>the board approval was the -</u> <u>- was the execution.</u>"[47]  Mr. Reimer stated that the only reason the TAA was not signed again (on top of the Board's execution) was because "the board wasn't going to go through and sign everything there was in the board minutes.  <u>It was all included.</u>"[48]

The TAA, "all included" with the Board minutes, satisfies all of Section 1823's requirements.  Particularly in view of the fact that none of the policy considerations underlying *D'Oench* or Section 1823 is present, assuming *arguendo* that the Court finds that Section 1823 is applicable to the TAA, the statute is nonetheless satisfied.  The Court can and should enforce the TAA in accordance with its terms.

Finally, the FDIC-Receiver attempts to cast a cloud of uncertainty over the TAA, arguing that witnesses only testified to "a general familiarity" with the TAA.[49]  However, each of the pertinent witnesses had no trouble at all identifying the TAA.[50]  The fact that the FDIC-Receiver presented a separate and entirely irrelevant form of tax sharing agreement that, unlike the TAA, was never approved by Bank or BancGroup's Boards does not render the TAA a "secret" or "deceptive" agreement.  Judgment should be rendered in BancGroup's favor.

2.    *Nothing In The Bankruptcy Code Undermines BancGroup's Position*

As a last-ditch effort, and notwithstanding that its position seeking to take from BancGroup's estate and its competing creditors is anathema to the equities of bankruptcy, the

---

[46]    Clarke Dec. Ex. 3 (Hicks Tr. at 107:5-107:21 ("The policy was primarily owned by [corporate tax director] Mr. Reimer.")).

[47]    Clarke Dec. Ex. 4 (Reimer Tr. 129:18-129:20 (emphasis added)).

[48]    Clarke Dec. Ex. 4 (Reimer Tr. 129:5-129:12 (emphasis added)).

[49]    Brf. at 40.

[50]    Clarke Dec. Ex. 2 (Byrne Tr. at 84:4-10 and 222:3-8); Clarke Dec. Ex. 4 (Reimer Tr. at 94:14-94:21); Clarke Dec. Ex. 1 (May 3, 2011 Deposition Transcript of Sarah H. Moore ("<u>Moore Tr.</u>") at 182:11-183:23)).

FDIC-Receiver looks to the Bankruptcy Code for support.  The FDIC-Receiver argues that if the TAA is a contract, it was an executory contract within the meaning of section 365 of the Bankruptcy Code that was rejected pursuant to BancGroup's Plan and, therefore, cannot be enforced by BancGroup.[51]  As a threshold matter, however, the FDIC-Receiver's argument fails because the TAA is not an executory contract.  As of the Petition Date, BancGroup's sole outstanding obligation vis-à-vis counterparty-Bank was payment of Bank's "separate return" tax refund.  Where the sole obligation is payment of money from debtor to creditor, contracts are not executory.  *See In re Peralta Food Corp.*, No. 07-16508, 2008 WL 190503, at *4-5 (S.D. Fla. Jan. 18, 2008) citing *In re Norquist*, 43 B.R. 224, 228 n. 2 (Bankr. D. Wash. 1984) ("Such contracts have <u>never been treated as executory for bankruptcy purposes</u> and their treatment as such would only cause procedural problems which might perpetrate inequities among creditors.") (emphasis in original).  Rather, the counterparty simply holds a bankruptcy claim alongside the debtor's other creditors.

Even assuming *arguendo* that the TAA were an executory contract, rejection of the TAA would not undo the debtor-creditor relationship that the parties established.  The Eleventh Circuit has stated:  "rejection does not embody the contract-vaporizing properties so commonly ascribed to it . . . rejection <u>has absolutely no effect upon the contract's continued existence</u>; the contract is not canceled, repudiated, rescinded, or in any other fashion terminated." *Thompkins v. Lil Joe Records, Inc.*, 476 F.3d. 1294, 1306-07 (11th Cir. 2007) (internal citations omitted) (emphasis added).  In other words, rejection of the TAA would not render the TAA unenforceable nor terminate the debtor-creditor relationship previously established by the parties upon entry into the TAA.

---

[51]   Brf. at 41.

Moreover, even if the TAA were executory and were rejected pursuant to BancGroup's Plan, any interests in property obtained by BancGroup under the TAA remains property of the bankruptcy estate.   *See Thompkins*, 476 F.3d at 1307-08 ("The rejection of a pre-petition executory contract pursuant to which the debtor acquired property does not obligate the debtor to return the property."); *see also Cohen v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 138 B.R. 687, 710 (Bankr. S.D.N.Y. 1992) (rejecting argument that rejection of executory contract voided counterparty's "legal title and the equitable interest" in escrowed stock obtained under the agreement).   In *Thompkins*, the Eleventh Circuit held that rejection did not undermine <u>ownership</u> of the underlying copyrights at issue even if it freed the debtor from the obligation to pay royalties.   *Thompkins*, 476 F.3d at 1306-08.   Here, BancGroup's interest in the Tax Refunds vested as of the Petition Date.   *See Segal v. Rochelle*, 382 U.S. 375, 379-81 (1966) (holding that loss carryback refund claim was property of the debtor's estate as of the petition date even though bankruptcy was commenced in the middle of the taxable year); *see also In re Flying J, Inc.*, No. 08-13384, 2009 WL 5215000 (Bankr. D. Del. Dec. 28, 2009) (same).   Thus, notwithstanding putative rejection of the TAA, BancGroup's interest in the Tax Refunds already vested as of the Petition Date and would not be eviscerated even if the TAA were executory.

Finally, advancing an argument completely irreconcilable with the foregoing, the FDIC-Receiver next argues that section 365(c)(2) of the Bankruptcy Code "prohibits a debtor from <u>assuming</u> any pre-petition contract to make a loan to the debtor . . . ."[52]   This argument is easily disposed of.   First, as established above, the TAA is not an executory contract and thus, section 365(c)(2) is inapplicable.   Second, even assuming the TAA is executory, BancGroup has never

---

[52]   Brf. at 42 (emphasis added).

sought to assume the TAA.  It need not do so in order to assert rights over its prepetition interest in the Tax Refunds.  For this reason too, section 365(c)(2) is inapplicable.

### D.  The Extrinsic Evidence Supports BancGroup's Position And At Most Establishes The Existence Of Genuine Issues Of Material Fact

1.  *The Undisputed Extrinsic Evidence Supports BancGroup's Ownership Of Tax Refunds*

The FDIC-Receiver focuses heavily on the conduct of BancGroup and Bank with respect to the payment of tax liabilities and tax refunds, seeking to further divert attention from the plain terms of the TAA.  As discussed above, however, "[w]here there is a written contract, the court looks no further than the four corners of the document to determine the intent of the parties." *Jefferson Cty.*, 756 F. Supp. 2d at 1335.  The Court should therefore reject the FDIC-Receiver's request to go beyond the TAA.  However, in the event the Court were to consider the course of dealing, contrary to the FDIC-Receiver's assertions, the parties' conduct only reinforces the terms of the TAA and further supports the existence of a debtor-creditor relationship.

First, there is no dispute that – in every instance – Bank paid its tax liabilities to BancGroup and never to the IRS.[53]  Bank employees utilized Accounts Payable Vouchers, naming BancGroup as the payee, or "Vendor."[54]  As confirmed by the entities' former Chief Accounting Officer, these payments were deposited into BancGroup's general operating account and commingled with other funds wholly unrelated to tax payments or refunds.[55]

---

[53]   FDIC-Receiver Statement of Facts ("FDIC SOF") at ¶¶ 23-24.

[54]   Clarke Dec. Exs. 16, 18.

[55]   Clarke Dec. Ex. 3 (Hicks Tr. at 153:12-156:22 (discussing payments received in BancGroup's general operating account from Bank and subsequent payments made by BancGroup to the IRS)).

Unsurprisingly, numerous transactions went in and out of the general operating account prior to and following Bank's payment.[56]

Second, in every instance, it was BancGroup, never Bank, that paid tax liabilities to the IRS.[57]   Thus, the parties' conduct with respect to tax payments reflects a debtor-creditor relationship as between the two.

Third, there is no dispute that in every instance the IRS issued tax refund checks payable to BancGroup – never to Bank.[58]  There is also no dispute that the subsequent 2008 Tax Refunds which were issued electronically were issued by the IRS payable to BancGroup – not Bank.[59] Even assuming BancGroup elected to deposit the Tax Refunds directly into Bank's account, this does not negate the fact that BancGroup possessed control over the Tax Refunds.   Under Eleventh Circuit law, funds under the control of the debtor (*i.e.*, BancGroup) are deemed property of the debtor even if not deposited into the debtor's bank account.  *See Bank of Am., N.A. v. Mukamai (In re Egidi)*, 571 F.3d 1156, 1161 (11th Cir. 2009) (holding that any funds under the <u>control</u> of the debtor, regardless of the source, are properly deemed to be the debtor's property even if not deposited into debtor's account).  In *Egidi*, the Eleventh Circuit held that funds advanced to the debtor via "convenience check" which the debtor elected to forward to a creditor in satisfaction of amounts owed that creditor constituted property of the debtor prior to

---

[56]   Clarke Dec. Ex. 3 (Hicks Tr. at 156:14-156:22 (being shown bank statements for BancGroup's "Cash Management Sweep Account")); *see also* Clarke Dec. Ex. 17.

[57]   Clarke Dec. Ex. 3 (Hicks Tr. at 158:1-158:4); *see also* FDIC SOF at ¶ 24.

[58]    Clarke Dec. Ex. 4 (Reimer Tr. at 147:8-147:12 (confirming tax refund checks were payable to BancGroup, not Bank); Clarke Dec. Ex. 15.

[59]   Clarke Dec. Ex. 4 (Reimer Tr. at 147:17-149:3 (discussing IRS transcripts showing wire tax refund payments made to BancGroup) and at 149:8-150:16 (reviewing supporting documentation for 2008 tax refund issued payable to BancGroup)); *see also* Campbell Dec. Ex. F (Internal Revenue Service Transcripts for Tax Years 2006 and 2007); *see also* Campbell Dec. Ex. G (June 18, 2009 email from Bill Mack to Jon Studstill, David Reimer, and Carla Lott attaching a screenshot showing an electronic transfer from the IRS to The Colonial BancGroup, Inc.).

the transfer.  571 F.3d at 1164.  *Egidi* is directly on point.  The fact that BancGroup may have elected to deposit the Tax Refunds (payable to BancGroup) into Bank's account as an efficient method of satisfying BancGroup's "separate tax return" liability owed Bank under the TAA is irrelevant and only confirms BancGroup's control over the tax refunds.[60]

In sum, the FDIC-Receiver cannot dispute that Bank paid its tax payments to BancGroup and that, upon receipt, BancGroup deposited such payments into its general operating account, commingling the payments with existing funds wholly unrelated to taxes.  Further, it cannot dispute that BancGroup made each and <u>every</u> payment to the IRS and that Bank itself <u>never</u> satisfied tax liabilities by paying the IRS.  Finally, the FDIC-Receiver cannot dispute that refund checks and electronic refund payments were issued payable to BancGroup and not Bank.  Thus, the course of dealing as between Bank and BancGroup confirms their general adherence to the TAA's provisions.  The Court should not consider this conduct, but if it were to do so, it affords no basis to disregard the TAA's plain language.

   2. *There Are Genuine Issues of Fact Concerning Certain Extrinsic Evidence*

Certain aspects of the parties' course of dealing constitute disputed issues of fact.  Thus, to the extent the Court determines such issues are relevant (and BancGroup submits they are not relevant to the BancGroup Tax Refund Motion), trial is necessary to resolves these disputes.

The FDIC-Receiver asserts that the Tax Refunds were always deposited or "sent" directly to a bank account in Bank's name.[61]  As discussed above, even assuming this is accurate, the fact that BancGroup elected to deposit such funds in a Bank account does not change the fact that the

---

[60] Clarke Dec. Ex. 3 (Hicks Tr. at 194:4-194:13 ("Q.  When funds came in from the United States Treasury to BancGroup and then BancGroup would put funds into the Bank's account, BancGroup was doing what was required under the tax allocation policy?  A.  I think I follow your question, so -- It's my understanding the depositing of these funds into a Bank account was appropriate under the intercompany tax policy, yes.  I think that's what you asked.")).

[61] *See, e.g.*, FDIC SOF at ¶¶ 29, 30, 34.

Tax Refunds were payable to and under BancGroup's control when received from the IRS (and therefore BancGroup property under Eleventh Circuit law).  In any event, however, contrary to the FDIC-Receiver's assertions, it appears that that the Tax Refunds were deposited into a shared account.[62]

Next, in an attempt to distance itself from the terms of the TAA, the FDIC-Receiver attempts to describe certain tax liability payments made by Bank to BancGroup as reimbursement payments for the use of BancGroup's tax benefits, rather than as being in satisfaction of Bank's "separate return liability" under the TAA.[63]  As an initial matter, even under the FDIC-Receiver's proffered interpretation, such payments were undeniably processed through the intercompany accounts payable system and undeniably represented amounts "due" from Bank to BancGroup, further evincing the debtor-creditor relationship between the parties.[64]  Irrespective of this, however, the evidence indicates that such payments were to satisfy Bank's "separate return" tax liability owed BancGroup as provided for under the TAA.[65]  The FDIC-

---

[62]   Clarke Dec. Ex. 4 (Reimer Tr. at 150:1-151:5 ("Q. And returning to the email chain, Mr. Reimer, . . . you directed Ms. Lot to 'put it to my tax account'?  A.  Yes.  Q.  Was that a Colonial Bank or Colonial BancGroup account?  A.  To be honest with you, it was both.")).

[63]   FDIC SOF at ¶ 26.

[64]   *See* Clarke Dec. Ex. 3 (Hicks Tr. at 101:3-101:7 (Q.  Do you know what this eight symbolizes?  A.  I believe the accounts payable staff used that when they entered it into the system so that they didn't enter them more than once."); *see also* Clarke Dec. Ex. 18; *see also* Campbell Dec. Ex. H (July 14, 2009 Email from D. Reimer to B. Hicks re: "June 2009 Mgmt Fees" asking, "Is there anything due from Bank to BancGroup as of June 30th on the intercompany tax allocation?") (emphasis added)).

[65]   Clarke Dec. Ex. 4 (Reimer Tr. at 146:20-146:24 (Q. But generally, I mean -- but the general purpose for that payment, I just want to confirm, was to either fulfill its obligations under the tax sharing agreement to pay separate return liability?  A. Correct.") andat 155:3-155:9 ("Q.  If Bank had only made that first payment, it wouldn't be satisfying its obligation to pay what it would owe on a separate-return basis?  A.  Correct.  Q.  It's only after its -- it made Payment 1 and Payment 2 did it satisfy that obligation?  A.  Correct.")).

Receiver omits this evidence presumably because it is entirely consistent with the terms of the TAA.[66]

Finally, the FDIC-Receiver focuses heavily on the purported absence of intercompany accounting on the parties' books and records reflecting intercompany receivables and payables.[67] This is an issue of dispute. The testimony of BancGroup's former CFO, Ms. Moore, indicates that the Tax Refunds, like tax payments, were accounted for through the "due to/due from" intercompany accounting as between BancGroup and Bank.[68]

Moreover, the FDIC-Receiver attributes great significance to the purported fact that Bank listed a "Federal Income Tax Refunds Receivable" on its books and reported a similar receivable as an asset in its "Call Report" filed with bank regulators with respect to the Tax Refunds.[69] Even if accurate, however, such conduct would get the FDIC-Receiver nowhere. The IPS, which the FDIC-Receiver relies upon heavily even though it is not law, provides that "[r]egardless of the method used to settle intercorporate income tax obligations, when depository institution members prepare regulatory reports, they must provide for current and deferred income taxes in amounts that would be reflected as if the institution had filed on a separate entity basis." *See* 63 Fed. Reg. 64757 (emphases added). The IPS further states that each bank "reports as, a separate legal and accounting entity for regulatory purposes. Accordingly, each depository institution's applicable income taxes, reflecting either an expense or a benefit, should be recorded as if the

---

[66]  Campbell Dec. Ex. A (TAA at ¶¶ 2, 4).

[67]  FDIC SOF at ¶ 37.

[68]  Clarke Dec. Ex. 1 (Moore Tr. at 215:5-215:23 (noting that Tax Refunds, "through the [T]ax [A]llocation [P]olicy, was a due to/due from. It did not run through capital . . . that was just a routine receivable/payable. It was not a capital transaction. Q. And how was it handled? A. I believe it was handled through the due to/due from accounts. Q. Was cash paid? A. Those accounts were settled.") (emphasis added)).

[69]  Brf. at 32.

institution had filed on a separate entity basis." *Id.* (emphasis added).  Compliance with this "as if" policy does not alter the underlying substance.

In sum, the conduct of the parties is irrelevant to the Court's determination of their intent with respect to allocation of tax attributes.  The TAA governs.  However, the FDIC-Receiver's motion should not be granted in any event because much of the conduct that the FDIC-Receiver argues in putative support of the imposition of a trust or an agency relationship actually militates in favor of recognizing the debtor-creditor relationship provided for by the TAA.  The FDIC-Receiver's motion should similarly be denied because certain of the conduct on which the motion is premised is the subject of genuine factual disputes for which a trial is necessary (if the Court deems such conduct relevant to its determination, which it should not).

E.   **The FDIC-Receiver's Reliance On The "Bob Richards Rule" Is Misplaced**

The FDIC-Receiver's motion should also be denied because the FDIC-Receiver's proffered "general rule" upon which its motion is premised – that a "tax refund resulting solely from off-setting the losses of one member of a consolidated filing group against the income of that same member in a prior or subsequent year should inure to the benefit of that member," Brf. at 18, – has been undercut by subsequent Supreme Court caselaw and, in any event, emanates from a Ninth Circuit decision which conflicts with the Eleventh Circuit's "control" test.[70]

*In Bob Richards*, the Ninth Circuit Court of Appeals held that in the absence of an express or implicit tax sharing agreement to the contrary, under certain circumstances, a parent holds tax refunds attributable to the losses of its subsidiary in trust for the benefit of its subsidiary.  The Ninth Circuit's premise in *Bob Richards* – that a subsidiary member of a

---

[70]   Bancgroup has submitted this position in the BancGroup Tax Refund Brief.  So as not to burden the Court, BancGroup incorporates Section IV.B. of the BancGroup Tax Refund Brief and includes only a summary of its position here.

consolidated tax-filing group actually possesses independent tax benefits – has been expressly undercut by a subsequent U.S. Supreme Court decision, wiping out any precedential value of the portion of *Bob Richards* upon which the FDIC-Receiver relies.  *See United Dominion Indus. v. United States,* 532 U.S. 822, 829-831 (2001).

In *Bob Richards,* the Ninth Circuit held that:

> a tax refund resulting solely from offsetting the losses of one member of a consolidated filing group against the income of that same member in a prior or subsequent year should inure to the benefit of that member.  Allowing the parent to keep any refunds arising solely from a subsidiary's losses simply because the parent and subsidiary chose a procedural device to facilitate their income tax reporting unjustly enriches the parent.

*Bob Richards*, 473 F.2d at 265 (emphases added).  Subsequent to the *Bob Richards* decision, however, the Supreme Court considered the Treasury Regulations associated with the 1986 Internal Revenue Code pertaining to consolidated tax groups and found they did not contemplate the existence of "separate" NOLs for each entity in a group.  *See United Dominion Indus.*, 532 U.S. at 829-831.  The Supreme Court flatly declared that "[t]he Code and regulations governing affiliated groups of corporations filing consolidated returns provide only one definition of NOL: 'consolidated' NOL."  *Id.* at 829.  The Court stated its conclusion bluntly:  "the concept of separate NOL 'simply does not exist.'"  *Id.* at 830 (emphasis added); *see also In re Marvel Entm't Grp., Inc.*, 273 B.R. at 83-85 (holding that subsidiary member could not seek to avoid purported transfers of separate tax attributes such as net operating losses during the period it was part of consolidated filing group because member held no cognizable interest in theoretical asset).  The *Marvel* court ruled that, under *United Dominion*, any of the member's separate tax benefits were simply a "legal fiction" and therefore the member was not able to premise a fraudulent transfer claim on the loss of such a "hypothetical" asset.  *Id.* at 83-85.

Concluding that tax refunds are property of the parent/tax-filer is also consistent with the Eleventh Circuit's view of property of the bankruptcy estate.   Under well-settled Eleventh Circuit law, "any funds under the <u>control</u> of the debtor, regardless of the source, are properly deemed to be the debtor's property . . . ."   *In re Egidi*, 571 F.3d at 1160 (*citing Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*, 813 F.2d 1177, 1181 (11th Cir. 1987) (emphasis added)).   In *Bob Richards*, the tax refund at issue was paid by the government to the agent of the parent/tax-filer, WDM.   *Bob Richards*, 473 F.2d at 263.   Under the Eleventh Circuit's control test, in the event that WDM were a debtor in bankruptcy, the refund would have comprised WDM's property, contrary to the ultimate holding in *Bob Richards*.   Similarly, as of the Petition Date, as set forth in BancGroup's Tax Refund Brief, the Tax Refunds were payable exclusively to BancGroup and the Tax Refunds were therefore under its exclusive control.   *See* 26 C.F.R. § 1.1502-77(a)(2)(v) (2006, amended 2009).[71]

Finally, *Bob Richards* rested on a theory of unjust enrichment (notably, without any analysis of pertinent California state law).   *See Bob Richards*, 473 F.2d at 265 ("Allowing the

---

[71]   Post-Petition Date, any attempt by the FDIC-Receiver to somehow cause the IRS to issue the Tax Refund payable to the FDIC-Receiver, notwithstanding 26 C.F.R. § 1.1502-77(a)(2)(v), would constitute a willful "act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" in violation of the Bankruptcy Code's automatic stay.   *See* 11 U.S.C. § 362(a)(3); *Net Bank*, slip op. at 33-34 (finding the filing by the FDIC-Receiver of its own tax returns violated the automatic stay).   Such actions would be deemed void *ab initio*.   *See United States v. White*, 466 F.3d 1241, 1244 (11th Cir. 2006) ("A debtor who has filed for Chapter 11 bankruptcy enjoys an automatic stay against actions to enforce, collect, assess or recover claims against the debtor or against property of the estate. It is the law in this Circuit that actions taken in violation of the automatic stay are void and without effect.") (citing *Borg-Warner Acceptance Corp. v. Hall*, 685 F.2d 1306, 1308 (11th Cir. 1982)).   The FDIC-Receiver asserts that, "[i]n an order entered on September 3, 2010, the bankruptcy court ruled that the automatic stay provided for under the Bankruptcy Code would not prohibit the FDIC-Receiver from making such filings."   FDIC SOF at ¶ 10.   Provisionally, that is a mischaracterization.   The order to which the FDIC-Receiver refers was an agreed-upon order, settling the FDIC-Receiver's motion for relief from the automatic stay consensually, and it made clear that the order was "without prejudice to any arguments of either the Debtor or the FDIC-Receiver as to the entitlement of either to all or any portion of any Tax Refund . . . ."   [Bankr. No. 09-32303, D.I. 880.]

parent to keep any refunds arising solely from a subsidiary's losses simply because the parent and subsidiary chose a procedural device to facilitate their income tax reporting unjustly enriches the parent.").   Alabama law governs in this case and unjust enrichment under Alabama law requires some finding of unconscionable conduct, mistake, or fraud.  *See Morrow v. Green Tree Servicing, L.L.C.*, 360 F.Supp.2d 1246, 1251, n.13 (M.D. Ala. 2005) (Thompson, J.) ("In order to substantiate a claim of unjust enrichment under Alabama law, a plaintiff may show that the donor of the benefit . . . acted under a mistake of fact or in misreliance on a right or duty, or (2) the recipient of the benefit . . . engaged in some unconscionable conduct, such as fraud, coercion, or abuse of a confidential relationship.") (internal quotation omitted).   In *Bob Richards*, it was the member-subsidiary that was bankrupt, while the parent/tax-filer – the party found to be unjustly enriched – was a solvent entity operating as a going concern.  *Id.* at 263.  In contrast to *Bob Richards*, the parent/tax-filer here, BancGroup, is insolvent and therefore a finding that the Tax Refunds are property of BancGroup's estate would not result in BancGroup being unjustly enriched.  Nor could it result in a finding that the FDIC-Receiver has been inequitably treated.  Rather, it would simply be treated as every other creditor in BancGroup's bankruptcy.  There are no grounds for an unjust enrichment finding under Alabama law.

It is no answer that *Bob Ric*hards provides overriding federal common law.  Because *Bob Richards* does not even purport to interpret a federal statute or administrative rule, the Supreme Court instructs that it must not override state law.  *See Atherton v. F.D.I.C.*, 519 U.S. 213, 218-19 (1997) (holding that in setting forth "rules of federal common law, the guiding principle is that a significant conflict between some federal policy or interest and the use of state law . . . must first be specifically shown.  Indeed, such a 'conflict' is normally a precondition.") (internal quotation and citation omitted).

For all of these reasons, the FDIC-Receiver's motion should be denied even irrespective of the TAA.

      F.      **BancGroup's Other Tax-Related Claims**

The FDIC-Receiver asks this Court to deny BancGroup's unliquidated tax-related claims because "BancGroup has not provided detail with regard to this generalized claim."[72]   In fact, the FDIC-Receiver only recently served pertinent discovery concerning these claims on August 19, 2011.  In its response, BancGroup identified five proofs of claim asserted against BancGroup by various taxing agencies for interest, penalties, and taxes in the approximate, aggregate amount of $12.7 million.  Those publicly-filed proofs of claim are asserted by:  (i) Alabama Department of Revenue [Claim No. 1], (ii) Manatee County, FL Tax Collector [Claim Nos. 2 and 3], (iii) Marilyn E. Wood, Revenue Commissioner, Mobile County, Alabama[Claim No. 50], (iv) the Texas Comptroller of Public Accounts [Claim No. 174]; and (v) the Montgomery County Revenue Commissioner's Office [Claim No. 177].[73]   Bank owes BancGroup for the entirety of these amounts as "separate return" liabilities under the TAA as it was Bank's operations primarily that generated these liabilities.[74]   Alternatively, to the extent these claims are allowed and subsequently paid in BancGroup's bankruptcy, BancGroup possesses a reimbursement claim against the FDIC-Receiver.

### IV.    SUMMARY JUDGMENT SHOULD BE DENIED WITH RESPECT TO INSURANCE PROCEEDS CLAIMS

      A.      **The Plain And Unambiguous Language Of The Policies Entitles BancGroup To The Insurance Proceeds**

---

[72]   Brf. at 42.

[73]   All claims *available at*:  https://ecf.almb.uscourts.gov/cgi-bin/SearchClaims.pl?125900771871343-L_1_0-1.

[74]   Campbell Dec., Ex. A (TAA ¶¶ 4, 7 (providing for state tax liabilities owed on a "separate return basis, as though each subsidiary were dealing directly with State or Federal taxing authorities.")).

Despite the FDIC-Receiver's attempts to supplement the plain language of the insurance policies at issue with extrinsic evidence, the language of the policies clearly affords entitlement to payments under the policies to BancGroup exclusively, not Bank.

The insurance policies at issue are:

- Federal Insurance Company Financial Institution Bond Form A (81158390 DFI), which had an effective period from March 1, 2009, to March 1, 2010, and a $25 million single loss limit of liability with a $1 million deductible ("Bond Form A");[75]

- Federal Insurance Company Financial Institution Bond Form B (81910594 DFI), which had an effective period of July 16, 2009, to July 16, 2010, and a $500,000 single loss limit of liability with a $30,000 deductible ("Bond Form B");[76] and

- Federal Insurance Company Financial Institution Electronic and Computer Crime Policy (91260198 DFI), which had a policy period of March 1, 2009, to March 1, 2010, and a $25 million single loss of liability with a $1 million deductible ("Crime Policy")[77]

(hereinafter collectively referred to as "Policies").

The Policies are very clear that BancGroup exclusively – as "first named assured" under all three Policies – is entitled to receive any payment of Policy proceeds.  Each of the Policies contain nearly identical language concerning the joint assureds and payments under the Policies. All three Policies provide[78]:

Only the first named ASSURED (BancGroup) shall be deemed to be the sole agent of the others for all purposes under this [Bond/Policy], including but not limited to the giving or receiving of any notice or proof required to be given and for the purpose of effecting or accepting any amendments to or termination of this [Bond/Policy].  Each and every other ASSURED shall be conclusively deemed to

---

[75]   Hassey Dec. Ex. B at 24.

[76]   Hassey Dec. Ex. C at 61.

[77]   Hassey Dec. Ex. D at 108.

[78]   It is undisputed that BancGroup is the "first named assured."  The bracketed portions of the cited language depend on whether the language applies to Bond Forms A and B ("Bond") or the Electronic Computer or Crime Policy ("Policy").

have consented and agreed that none of them shall have any direct beneficiary interest in or any right of action under this [Bond/Policy] and neither this [Bond/Policy] nor any right of action shall be assignable.  (emphasis added.)

. . . .

All losses and other payments, if any, payable by the COMPANY shall be payable to the first named ASSURED without regard to such ASSURED'S obligations to others, and the COMPANY shall not be responsible for the application by the first named ASSURED of any payment made by the COMPANY.  If the COMPANY agrees to and makes payment to any ASSURED other than the one first named, such payment shall be treated as though made to the first named ASSURED.  The COMPANY shall not be liable for loss sustained by one ASSURED to the advantage of any other ASSURED.[79]  (emphasis added).

Thus, according to the clear, unambiguous language of the Policies, (i) "other Assureds" such as Bank "consented and agreed" they would have no direct beneficiary interest under the Policies and that the right to bring an action under the Policies could not be assigned to them, and (ii) all payments under the Policies are payable to BancGroup, not Bank (or the FDIC-Receiver).  There is nothing in the Policies which would indicate that Bank (or the FDIC-Receiver) is entitled to be paid under the Policies under any circumstances absent BancGroup's consent.  Nor is there is any language in the contracts which provides that, following payment to BancGroup, the proceeds are to be held in trust or in escrow for the benefit of Bank.  There are no use restrictions whatsoever.  Rather, the proceeds are under the sole dominion and control of BancGroup.

Alabama law is clear on the construction of unambiguous contractual language.  "Courts generally enforce contracts as written."  *Ervin v. Stackhouse*, 64 So. 3d  666, 671 (Ala. Civ. App. 2010).  "[I]t is axiomatic that 'contract interpretation is guided by the intent of the parties, which, absent ambiguity, is evidenced by the plain language of the contract.'"  *United Land Corp. v.*

---

[79]   In addition, Bond Form A states that payment may be made to others only on claims "in which the Federal National Mortgage Association, the Federal Home Loan Mortgage Company, or the Government National Mortgage Association has an interest . . . " provided three conditions are met.  This exception to the general provision is inapplicable to the FDIC-Receiver.

*Drummond Co., Inc.*, 990 So. 2d 858, 866 (Ala. 2008) (quoting *Woodman of the World Life Ins. Soc'y v. Harris*, 740 So. 2d 362, 368 (Ala. 1999); *see also Gwaltney v. Russell*, 984 So. 2d 1125, 1133 (Ala. 2007) ("[T]he intention of the parties must be gathered from the four corners of the contract interpreted in the light of the occasion which gave rise to the contract, the relation of the parties and the objective to be accomplished.") (quoting *Ingalls Iron Works Co. v. Ingalls*, 53 So. 2d 847, 849 (Ala. 1951)).  "When interpreting a contract, this Court must first look to the plain language of the contract and determine whether that language is ambiguous.  'A court should give the terms of the agreement their clear and plain meaning and should presume that the parties intended what the terms of the agreement clearly state.'"  *See, e.g.*, *Ex parte Textron, Inc.*, No. 1100032, 2011 WL 118255, at *9 (quoting *Turner v. West Ridge Apartments, Inc.*, 893 So. 2d 332, 335 (Ala. 2004)).  The court should not define words it is construing based on technical or legal terms.  *See Liggans R.V. Ctr. v. John Deere Ins. Co.,* 575 So. 2d 567, 570 (Ala. 1991).

Alabama Rules of contract construction are, almost without exception, similarly applied to insurance policies by an overwhelming majority of jurisdictions.  45 C.J.S. Insurance § 568 states:

> The rules governing the construction of contracts in general ordinarily apply to the construction of a policy or contract of insurance.  A policy containing standard provisions required by statute should be construed as a voluntary contract, and not as a legislative enactment, although there is authority to the contrary.  The rules governing the construction and interpretation of contracts in general ordinarily apply in construing policies or contracts of any of the various kinds of insurance.  Thus, contracts of insurance ordinarily are subject to the same rules of construction as are other contracts.  A court reviewing an insurance policy dispute must look first to the language of the insurance policy, and interpret the terms in accordance with well-established principles of contract construction. If an insurance policy is unambiguous, the intention of the parties and the meaning of the contract are determined from the instrument itself.   An unambiguous insurance policy is interpreted in accordance with that unambiguous meaning, and the courts may resort to construction of a contract of insurance only when the language of the

> contract, in its ordinary meaning, is indefinite, ambiguous, or equivocal.
> Thus, a court should consider the plain meaning of insurance policy
> language, and should not search for a nonexistent ambiguity.

Here, the Policies unambiguously state that any proceeds paid under the Policies belong to, and are under the dominion and control of, BancGroup exclusively.  The Court need go no further.  *See Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*, 813 F.2d 1177 (11th Cir. 1987) (applying a "dominion and control" test to determine "property of the debtor").  Accordingly, the FDIC-Receiver is not entitled to a summary judgment declaring it the owner of the insurance proceeds paid under the Policies.  Rather, judgment should be rendered in BancGroup's favor, finding that it is entitled to any proceeds payable under the Polices.

Finally, it is notable that the other party to the contract, the insurance provider, Federal Insurance Company ("Federal Insurance") interprets the Policies as BancGroup does.  In another case pending before this Court (*Federal Deposit Insurance Corporation, as Receiver for Colonial Bank and The Colonial BancGroup, Inc. v. Federal Insurance Company*, 2:11-cv-00610-MHT–WC), Federal Insurance recently filed its Answer, wherein it recites in its "Sixth Defense" the policy language set out, *supra*, and states "Accordingly, FDIC-R, is not a proper party to this action, because Colonial Bank has previously appointed CBG as its sole agent for purposes of notice to Federal and for bringing of any actions in connection with the Bonds."[80]

## B.   The FDIC-Receiver's Arguments In Support Of Summary Judgment Are Misplaced

Realizing that a reading of the contract as a whole proves that it has no interest in proceeds from the Policies, the FDIC-Receiver attempts to obfuscate the issue by offering evidence which has no bearing on the specific language contained in the Policies and strained

---

[80]   Campbell Dec. Ex. I (FDIC Answer, Defenses and Counterclaim [No. 11-00610, D.I. 32] at 5 (emphasis in original.)).

interpretations of the Policies.   Of course, the FDIC-Receiver's arguments ignore the fundamental principles of Alabama law which instruct that the Court should interpret the parties' intent from the four corners of the contract and that the provisions of a contract must be read together as a whole.   The fact that the FDIC-Receiver does not introduce any evidence indicating ambiguity or even argue that the Policies are ambiguous or were written by mistake is fatal to its Motion.

1.   <em>The Facts Cited by the FDIC-Receiver Are Unremarkable</em>

The FDIC-Receiver's asserted facts concerning the relationship between Bank and BancGroup should not be considered by the Court.   However, even if the Court were to consider these facts, they are unremarkable and do nothing to either alter the Policies' unambiguous language or help the Court interpret the parties' rights thereunder.

In support of the Motion, the FDIC-Receiver argues that it is entitled to payment under the Policies because:

- Bank was BancGroup's largest subsidiary;

- The types of losses insured by the Policies are the types of losses which would be suffered by Bank, not BancGroup;

- Bank paid the premiums for the Policies; and

- The actual injury under the Policies was committed by agents of Bank, not BancGroup.

These facts are completely unremarkable given the holding company/operating subsidiary relationship between BancGroup and Bank.   As is typical of holding companies, BancGroup provided management and supervised the activities of its subsidiaries.[81]   All the facts

---

[81]   Clarke Dec. Ex. 1 (Moore Tr. at 17:15-17:19).

listed above relating a parent holding company to its subsidiaries are common practice within the banking industry and were certainly known to both parties at the time the Policies were procured. [82]   Therefore, they were within the contemplation of the parties to the contract. Moreover, the fact that Bank paid the premiums was customary in the ordinary course of dealing between the parties for all expenses.[83]   Fraudulent actions which would give rise to claims under the Policies were always more likely to be committed by BancGroup's primary operating subsidiary and, in view of the fact that Bank was BancGroup's largest asset, it is not surprising at all that BancGroup would seek protection against such events.   In sum, it is totally unremarkable that the parties to the Policies declared unambiguously that BancGroup was the sole beneficiary of payments under the Policies.[84]

> 2.   *The "Sole Agent" Language In The Policies Cannot Alter or Override BancGroup's Exclusive Right To Receive And Distribute Proceeds*

Next, the FDIC-Receiver argues that the use of the term "sole agent" reflects the parties' intent that BancGroup was to possess no actual interest in Policy proceeds.   This assertion is

---

[82]   The FDIC served as Bank's primary federal regulator for over a year prior to Bank's closure.   The FDIC-Receiver has introduced no evidence that the FDIC (in its corporate capacity) took issue with Bank's insurance coverage.

[83]   Clarke Dec. Ex. 1 (Moore Tr. at 244:21-245:5 ("Well, most -- accounts payable was actually a Colonial Bank function.   And so just to ease administration of paying invoices, most payments were made by Colonial Bank.   And then BancGroup expenses were then determined, you know, out of the payments made what was a BancGroup expense, what was a Brokerage expense.")).

[84]   BancGroup finds it curious that the FDIC-Receiver repeats its assertion that BancGroup "previously informed the bankruptcy court that it was not aware of any claim" BancGroup had under the policies. Brf. at 47.   The FDIC-Receiver selectively cites to a motion BancGroup filed two months in to its bankruptcy case to support the averment that BancGroup has admitted it did not suffer any losses covered by the Policies.   Yet during those two months, and for almost two years thereafter, the FDIC-Receiver consistently impeded BancGroup's access to practically every record relevant to the financial affairs of BancGroup and its subsidiaries.   With this fact in mind, not only does the full citation to the motion not support the averment the FDIC-Receiver makes, BancGroup can hardly be blamed for not being aware of matters the FDIC-Receiver actively conceals.   *See* Bankr. No. 09-32303, D.I. 242 at p. 4, ¶ 10 ("While the Debtor is unaware of any claim that can be asserted under this Policy, a determination of whether cancelling this Policy is in the best interests of the Debtor and its estate has not yet been made as the Debtor is still evaluating whether claims may be made under this Policy.") (emphasis added).

simply impossible to reconcile with the more specific language in the Policies which provides the entitlement to payment of proceeds to BancGroup exclusively.  Such arguments should be rejected under Alabama law.  *Hall v. Gulledge*, 173 So. 2d 571 (Ala. 1965) (terms "should be construed *in pari materia* and the construction should be adopted which will give effect to all the words").

The sentence including the "sole agent" language which the FDIC-Receiver focuses on, provides:  "Only the first named ASSURED shall be deemed to be the sole agent of the others for all purposes of this Bond, including but not limited to the giving or receiving of any notice or proof required to be given and for the purpose of effecting or accepting any amendments to or termination of the Bond."[85]   The foregoing sentence indicates that, for Federal Insurance's benefit, BancGroup and its subsidiaries  agreed that BancGroup had the power to bind its subsidiaries in acting vis-à-vis Federal Insurance and that Federal Insurance need not deliver notices or agree on any amendments to the Policies with any parties other than BancGroup.  The examples set forth in the pertinent sentence as well as the word "only" support this.  And, importantly, this interpretation does not conflict with more specific provisions in the Policies elsewhere.  There is no support in the Policy for an interpretation that BancGroup agreed to act as Bank's agent and disclaim any interest in the Policies' proceeds.

The FDIC-Receiver goes on to argue that an agent must not "deal with the principal's property" as its own or commingle such property with its own.[86]   However, the Policies also provide that Bank has "consented and agreed" that it would have no "direct beneficiary interest in or any right of action under" the Policies.  Thus, there is no property of any principal that BancGroup could even arguably mistreat.  In fact, the FDIC-Receiver's own case indicates that

---

[85]   Hassey Ex B. at 7 (emphasis added).

[86]   Brf. at 49.

an agent is free from impinging upon any general duties "where the principal has <u>full knowledge</u> <u>and gives consent</u>."  *See Naviera Despina, Inc. v. Cooper Shipping Co.*, 676 F.Supp. 1134, 1141 (S.D. Ala. 1987) (emphasis added).   In sum, the FDIC-Receiver's argument that the language in the Policies naming BancGroup the "sole agent" operates as a BancGroup disclaimer of any direct beneficiary interest is belied by the very sentence in which the language is found and is simply irreconcilable with the other provisions of the Policy.

3.     *The FDIC-Receiver's Cases Regarding Other Joint Assured Provisions Are Easily Distinguishable*

The FDIC-Receiver cites *New Amsterdam Cas. Co. v. W.D. Felder & Co.*, 214 F.2d 825, 826 (5th Cir. 1954) in support of the proposition that it has standing to bring a claim under the Policies, notwithstanding their plain language precluding such a result. *New Amsterdam* is inapposite for two critical reasons.  First, it was not a dispute between the first named assured and another, competing assured party.  In fact, the court noted expressly that "no rights of the [ ] first named assured in the bond are jeopardized" by its holding.  *Id.*  Second, unlike the Policies here, it appears that the policy at issue in New Amsterdam did not include an express non-assignability clause or waiver of any "direct beneficiary interest."  Thus, the court did not need to override any plain language in the policy to arrive at its holding.  For the very same reasons, *Lumbermen's Mut. Cas. Co. v. Norris Grain Co.*, 343 F.2d 670 (8th Cir. 1965), is not compelling.  It was not a dispute between the named assured possessing the express right to bring an action and another assured.  And there was no disclaimer of an interest or non-assignability clause in the policy at issue.  In fact, in *Lumbermen's*, the first named assured actually assigned its rights under that policy in writing to another assured.  *Id.* at 675, 680.  The FDIC-Receiver might prefer if the *New Amsterdam* and *Lumberman's* policies were at issue in

this case, but they are not. It cannot escape the terms of the Policies and for this reason the Motion should be denied and judgment rendered in BancGroup's favor.

The recent case *Lubin v. Cincinnati Ins. Co.*, while superficially similar, is also inapposite. No. 09-02985, 2010 WL 5313754 (N.D. Ga. Dec. 17, 2010). In *Lubin*, a trustee of a bank holding company sought to recover under a crime and fraud policy which provided that the holding company <u>only</u> was an insured and the coverage extended to harm <u>only</u> to the holding company. Thus, the reason the trustee's claim was rejected was because he alleged only harm to the holding company's subsidiary, the bank, which was insufficient under the plain language of the policy. *Id.* at 5. Unsurprisingly given that BancGroup and all of its subsidiaries are insured, the Policies here do not restrict the harm to BancGroup.

The *Lubin* court went on to find that the FDIC could assert a claim for harm to the bank, but only after considering undisputed evidence showing that the parties made a <u>mistake</u> in failing to specifically add the bank as a named insured. *Id.* at 11. Significantly, <u>only after reforming the policy</u>, did the court find that the FDIC could even potentially bring a claim. *Id.* at 11. Moreover, the court still would not have allowed the FDIC to bring such a claim in view of language in the policy which directed the holding company to act on behalf of all insureds, <u>except</u> for language which indicated that the parties "anticipated" a second insured bringing a claim, and the fact that "the Bond does not restrict [the bank] from bringing a claim on its own behalf." *Id.* at 11. Thus, *Lubin* expressly relies on the absence of a prohibition exactly the sort of which is found in the Policies. The Policies expressly prohibit assignment of the right to bring an action to anyone other than BancGroup. *Lubin* respected the plain language of the contract and thus is of no use to the FDIC-Receiver.

      4.     *Paying The Proceeds To BancGroup Would Not Subvert The Subrogation Clauses In The Bonds*

The FDIC-Receiver argues that the "subrogation clauses in the Bonds would be meaningless if payment were not made to the FDIC-Receiver, as Colonial Bank's successor."  In support of this argument, the FDIC-Receiver relies heavily upon a proof of claim filed by Federal Insurance in TBW's chapter 11 case.  Federal Insurance filed that claim in response to the FDIC-Receiver's purported submission of a proof of loss.  Therein, Federal Insurance asserts "contingent" subrogation rights "in the event" that Federal Insurance makes any payment "in connection with the claim of the FDIC."[87]  What the FDIC-Receiver omits from its brief is that elsewhere in the proof of claim Federal Insurance states that "[a]t the present time [Federal Insurance] is in the process of investigating the claims of the FDIC . . . . [and n]o determination has been made as to whether any coverage exists."[88]  Indeed, as discussed above, subsequently Federal Insurance made such a determination, rejecting the FDIC-Receiver's ability to institute proceedings with respect to the proof of loss for the very same reason BancGroup asserts it is the proper owner of the proceeds:  "FDIC-R is not a proper party to this action, because Colonial Bank has previously appointed CBG as its sole agent for purposes of notice to Federal and for bringing of any actions in connection with the Bonds."  Federal Insurance's position does not at all support the FDIC-Receiver's argument.

The FDIC-Receiver's other argument is also meritless, arguing that the subrogation clause could not operate if the proceeds were paid to BancGroup.  This argument, unsupported by case-law or statute, requires a strained interpretation of the subrogation provision and also implies that the subrogation provision somehow usurps the Policies' unambiguous language

---

[87]   Brf at 53; Clarke Dec. Ex. 32.

[88]   Clarke Dec. Ex. 32.  Indeed, in the Answer filed by Federal Insurance discussed in the text, Federal Insurance does not even acknowledge that it received a proof of loss from the FDIC-Receiver, but only that BancGroup "issued a communication to [Federal Insurance] concerning [BancGroup's] alleged claim.  Campbell Dec. Ex. I (FDIC Answer, Defenses and Counterclaim [No. 11-00610, D.I. 32] at 45).

establishing the exclusive rights of BancGroup, as first named assured, to the proceeds.  The subrogation clause provides that in the event of a payment under the Policies, Federal Insurance "shall be subrogated to all of the ASSURED's rights of recovery … to the extent of such payment."[89]  The term "Assured" includes collectively BancGroup and its subsidiaries.  Federal Insurance is free to pursue its subrogation rights under the Policies regardless of which assured receives payments.  Simply because the FDIC-Receiver does not like this result does not mean that what the parties agreed to makes "no sense."  The FDIC-Receiver may, and, in fact, has asserted a claim for its allocable share of the Policies' proceeds in BancGroup's bankruptcy.  That claim, however, is a general unsecured claim at best.  There is simply nothing in the governing Policies which can be said to transfer ownership of the proceeds to Bank from BancGroup's estate.

C.      **Even If The Court Finds The Terms Of The Contract "Ambiguous," The Issue Of The True Meaning Of The Contract Is An Issue For The Jury**

Notwithstanding the fact that the FDIC-Receiver has not asserted as much, if the Court determines the Policies are ambiguous, interpretation becomes a matter for the jury.  In *Miles College, Inc. v. Oliver,* 382 So. 2d 510, 511 (Ala. 1980), the Court stated:

> [s]hould the trial court determine a contract to be ambiguous, yet not void for uncertainty, the question of the true meaning of the contract becomes an issue for the jury to decide.  To aid the jury in this determination, evidence of facts and circumstances *aliunde* (from another source) or *in pais* (outside the record of the contract) may be introduced to aid the jury in its clarification of the terms of the contract; it then becomes the province the jury to draw inferences and ascertain those facts from which the true meaning of the contract's terms can be determined.

Therefore, even assuming *arguendo* the Court decides an ambiguity exists, the FDIC-Receiver's motion for summary judgment is due to be denied.

---

[89]   Hassey Ex B. at 21.

## V. THE FDIC-RECEIVER'S MOTION SHOULD BE DENIED WITH RESPECT TO CLAIMS RELATED TO REIT PREFERRED SECURITIES

### A. The RPS Comprise Property Of BancGroup's Estate

1. *The FDIC-Receiver's Motion Should Be Denied And BancGroup's RPS Motion Should Be Granted Because No Downstream Contribution Occurred As A Matter of Law*

The FDIC-Receiver's motion and its attendant statement of facts confirm there are no material disputed issues of fact with respect to ownership of the RPS. Based on the undisputed facts, the FDIC-Receiver's Motion should be denied for the same reason that the BancGroup RPS Motion should be granted: as a matter of law, the automatic exchange of RPS for a like amount of BancGroup preferred stock occurred (the "Conditional Exchange"), but a subsequent contribution of the RPS from BancGroup to Bank did not (a "Downstream Contribution"). This means the RPS are owned by BancGroup. More specifically, the FDIC-Receiver does not contend that the Downstream Contribution was automatic (and it is not) and none of the facts put forward by the FDIC-Receiver establishes that the RPS were contributed by BancGroup to Bank following the occurrence of a Conditional Exchange. Thus, the FDIC-Receiver's Motion only serves to confirm the merit of the BancGroup RPS Motion.

As set forth in the BancGroup RPS Brief, the Conditional Exchange and the Downstream Contribution are two, distinct transactions.



In the BancGroup RPS Brief, BancGroup showed that the plain language of the governing Exchange Agreement provides that the Conditional Exchange would occur automatically, but that the Downstream Contribution required subsequent steps.[90]  The FDIC-Receiver agrees the Conditional Exchange occurred automatically and, in its Brief, the FDIC-Receiver tacitly concedes that the Downstream Contribution was not automatic and that it required subsequent steps.[91]  The steps required by governing law did not occur and the RPS were not transferred to Bank.

Under applicable law, delivery is required to effectuate a transfer of securities.[92]  The Conditional Exchange rendered the RPS uncertificated.[93]  Under Article 8, delivery of an uncertificated security to a purchaser occurs only when:  (1) the issuer registers the purchaser as the registered owner, upon original issue or registration of transfer; or (2) another person, other

---

[90]   BancGroup RPS Brief § IV.B is incorporated herein.

[91]   *See* Brf. at 54 ("BancGroup Irrevocably Committed to Contribute the Securities to Colonial Bank if an Exchange Event Occurred"); *see also* Brf. at 56 ("the following actions would occur <u>or be required</u> . . . ."); *see also* Brf. at 58 (senior officers of BancGroup conferred with one another and with outside counsel to ensure that BancGroup <u>took the steps</u> that were called for under the governing documents") (all emphases added).

[92]   *See* BancGroup RPS Brief at 18-23 for a more detailed discussion of governing law.

[93]   Clarke Dec. Ex 40 at § 2(e).

than a securities intermediary, either becomes the registered owner of the uncertificated security on behalf of the purchaser or, having previously become the registered owner, acknowledges that it holds for the purchaser.  Fla. Stat. § 678.3011.

It is undisputed that the issuer of the RPS, Florida REIT, has never registered Bank or the FDIC-Receiver as owner of the RPS.  Similarly, Florida REIT has never registered any third party as registered owner on behalf of Bank or the FDIC-Receiver.  Thus, the requirements of Article 8 were unfulfilled as of the Petition Date.  Because delivery did not occur, any prospective transfer was not consummated and the RPS are owned by BancGroup.  *See Guthartz v. Park Ctr. W. Corp.,* 409 Fed. Appx. 248, 250 (11th Cir. 2010) (affirming judgment that no transfer of common shares was effected for failure to "conform to the requirements of the Uniform Commercial Code for transferring unregistered stock" which "exist to prevent situations . . . where one party asserts that a transfer was made based on some document not reflected in the corporate records"); *Ennis v. Phillips*, 890 So. 2d 313 (Fla. Dist. Ct. App. 2004) (finding no securities were transferred because possession was not taken of certificated security and no registration of uncertificated security was effectuated); *see also Frierdich v. Mottaz (In re Frierdich)*, 294 F.3d 864, 868-69 (7th Cir. 2002) (applying substantially similar Illinois law, holding that a transfer of an interest in a security requires delivery under the UCC and that failure to record notations in the applicable registers resulted in finding that debtor retained securities); *Butler v. MaxiStorage, Inc.*, 33 So. 3d 1221, 1228 (Ala. Civ. App. 2009) (holding "an effective transfer of stock requires physical possession in the transferee" and rejecting argument that "no stock certificates had been created, so there was nothing physical to obtain" because transferor could have had stock certificates issued in transferee's name to afford possession).

None of the facts put forward by the FDIC-Receiver alters this conclusion. The purported facts on which the FDIC-Receiver premises its argument that the Downstream Contribution occurred include the following: (i) senior officers of BancGroup "conferred" with one another; (ii) an accounting entry was made which was intended to "reflect" the Downstream Contribution; (iii) certain officers sent notice to the FDIC-Receiver indicating their belief that the Conditional Exchange had occurred.[94] But even accepting these facts as true, none of them is sufficient to comprise delivery under Article 8.

At best, the foregoing facts concern the intent of the parties. But as set forth more completely in BancGroup's RPS Brief, the parties' supposed "intent" is insufficient to replace delivery. *See Ennis,* 890 So. 2d at 314 (finding that "[i]ntention to transfer securities, even with extrinsic evidence of such intention, does not satisfy the requirement of the Uniform Commercial Code or the common law to effectuate such transfer"); *see also Guthartz,* 409 Fed. Appx. at 250 (holding no transfer of common shares under Florida common law or the UCC notwithstanding the mailing of "stock powers" for uncertificated shares of ownership); *see also Sackett v. Shahid*, 722 So. 2d 273, 276 (Fla. Dist. Ct. App. 1998) (discussing the import of formalities in corporate law and concluding that no transfer was effectuated irrespective of any extrinsic evidence of intent in the absence of evidence sufficient under Article 8).

In sum, the FDIC-Receiver's position is flawed because it ignores the delivery requirement under governing Florida law and asserts no facts that establish delivery of the RPS from BancGroup to Bank. The RPS are therefore owned by BancGroup.

      2.     *Assuming Arguendo The Parties' Intent Were Relevant To Whether A Downstream Contribution Occurred, Disputed Issues Of Fact Preclude Granting The FDIC-Receiver's Motion*

---

[94]   Brf. at 58-59.

Moreover, even assuming *arguendo* that the parties' intent were relevant to the issue of whether a Downstream Contribution occurred, the FDIC-Receiver's motion must still be denied because significant issues of fact exist as to what the parties actually understood or intended. As described in the BancGroup RPS Brief, the concepts of the Conditional Exchange and the Downstream Contribution are distinct. The former is automatic under the Exchange Agreement, but the latter is not. The FDIC-Receiver attempts to conflate the two transactions, seeking to offer evidence of the parties' understanding of the automatic nature of the Conditional Exchange as evidence of intent to effectuate the Downstream Contribution. However, the evidence indicates that the parties never had specific intent to contribute the RPS to Bank. Rather, the key officers only intended that what was automatic under the Exchange Agreement be effectuated.

For example, the FDIC-Receiver asserts imprecisely that Mr. Byrne and Mr. Hicks "understood these transactions had been recorded effective as of 8 A.M. on August 11, 2009, as required under the Exchange Agreement."[95] However, Mr. Byrne's testimony indicates that it was his view that the Conditional Exchange (as opposed to the Downstream Contribution) was effective at such time.[96]

The FDIC-Receiver also asserts that Mr. Hicks "sent an email to the FDIC's acting regional director reporting that the transactions had been completed."[97] However, inspection of the email to which the FDIC-Receiver refers indicates that Mr. Hicks relayed his opinion only

---

[95]   Brf. at 58 (emphasis added).

[96]   Clarke Dec. Ex. 2 (Byrne Tr. at 174:7-174:17 ("As I understood the documents -- i.e., the agreement -- the exchange -- and that is the declaration of an event -- had occurred. And at that point under the agreement the -- what occurred was automatic. Q. And was it your view that CBG and Colonial Bank would not have to take any additional steps to make the exchange effective? A. The -- My view is based on what the agreement says.") and at 191:1-191:2 ("The exchange by its terms was effective, I think, at 8 a.m. New York time.") (emphases added)).

[97]   Brf. at 58 (emphasis added).

that "[t]he exchange took effect under the terms of the Exchange Agreement."[98]   The email is titled "Notice of Exchange Event and Directive to Exchange Shares" and makes no reference to the Downstream Contribution.[99]

To the extent the FDIC-Receiver relies on the Accounting Entry to reflect an intent to consummate a Downstream Contribution, that argument fails because the parties did not intend it to be legally operative.   Mr. Hicks and Ms. Moore believed that it was entered merely to "reflect" the impact of the Conditional Exchange in the books and records of BancGroup and Colonial Bank.[100]   For his part, Mr. Byrne believed the Accounting Entry to be nothing more than "ministerial."[101]   Similarly, Mr. Hicks did not believe the Accounting Entry was operative or necessary to effectuate any exchange.[102]

The FDIC-Receiver goes on to assert that "the FDIC requested 'something more formal' to confirm that the transactions had been completed" and that Mr. Byrne "signed a certification . . .  attesting that the transactions had been recorded."[103]   However, the correspondence reveals that the FDIC was in fact "writing to confirm that the exchange has been executed."[104]   And the certificate merely states that "[t]he exchange took effect under the terms of the Exchange Agreement."[105]   Neither references any Downstream Contribution.   Moreover, the testimony

---

[98]   Clarke Dec. Ex. 43 (emphasis added).

[99]   *Id.*

[100]   *See* Clarke Dec. Ex. 43; *see also* Campbell Dec. Ex. J (an August 11, 2009 email from Sarah Moore to Brent Hicks, copying Kamal Hosein *et al.*, regarding "Here is the Exchange agreement on the REIT").

[101]   *See* Clarke Dec. Ex. 2 (Byrne Tr. at 190:3-190:8).

[102]   Clarke Dec. Ex. 3 (Hicks Tr. at 169:2-169:9 and 170:7-170:11).

[103]   Brf. at 58 (emphasis added).

[104]   Clarke Dec. Ex. 43 (emphasis added).

[105]   Clarke Dec. Ex. 44 (emphasis added).

indicates that witnesses understood the distinction between the two transactions, the FDIC-Receiver's attempts to blur the boundaries notwithstanding.[106]

The FDIC-Receiver's proffered facts – at best – indicate that the parties intended or understood that "the transactions" occurred.   However, even assuming the parties' intent is relevant to delivery – and it is not – a genuine issue of fact exists as to whether the parties understood that the Conditional Exchange and the Downstream Contribution had occurred, or simply the Conditional Exchange.   For this reason too, the FDIC-Receiver's motion should be denied.

B.   **Assuming *Arguendo* The RPS Were Contributed To Bank, They Were BancGroup's Property Prior Thereto**

In addition to arguing that BancGroup contributed the RPS to Bank, the FDIC-Receiver argues that the RPS were "never 'property of the estate.'"[107]   The FDIC-Receiver's position is fundamentally flawed not only because the plain language of the Exchange Agreement and the RPS Offering Circular clearly provide that BancGroup owned the RPS following a Conditional Exchange, but because it is premised on an errant interpretation of the Eleventh Circuit's "control test."   *See In re Chase & Sanborn Corp.*, 813 F.2d 1177 (11th Cir. 1987).

In *Chase & Sanborn*, a bankruptcy trustee attempted to avoid a transfer as a fraudulent conveyance.   The issue presented to the Eleventh Circuit was whether the debtor or its ultimate equity holder should be deemed the transferor.   The debtor corporation, already defunct, had been reopened solely for the purpose of laundering the transferred funds.   *Id.* at 1179.   The equity holder reopened the debtor's account, deposited funds into the debtor's account, caused the

---

[106]   *See* Clarke Dec. Ex. 1 (Moore Tr. at 273:11-273:16 (Q.   And when you use the term automatic exchange, you're talking about the exchange of preferred stock in at that time Bank in exchange to the -- what the holders had; is that correct?  A.  That's correct.")).

[107]   Brf. at 60.

debtor to gratuitously transfer the money to a third party, and then closed the account. *Id.* at 1179. The Eleventh Circuit ruled that the debtor could not avoid the transfer because, prior to the transfer, the funds at issue were not the debtor's property because a third party, the equity holder – not the debtor – exercised control over the funds. *Id.* at 1182.

Here, the RPS were lawfully <u>owned and controlled</u> by BancGroup. The Exchange Agreement provides that upon the occurrence of a Conditional Exchange, "all of the [RPS] then outstanding shall be deemed to be owned by [BancGroup], without any action by [Florida REIT] or any other action being necessary or required by any other Person . . . ."[108] The Offering Circular similarly provides that "[a]fter the occurrence of the Conditional Exchange, the [RPS] will be owned by [BancGroup]."[109] With respect to control, the FDIC-Receiver makes no assertion that any third party controlled the RPS. BancGroup could exercise its control either by taking steps to contribute the RPS to Bank pursuant to the Exchange Agreement or electing to breach that obligation.

The FDIC-Receiver's assertions elsewhere in its brief are self defeating. In attempting to argue that the RPS were contributed to Bank (and they were not), the FDIC-Receiver actually describes BancGroup's control, enumerating the steps taken by <u>BancGroup</u> officers allegedly to contribute the RPS to Bank.[110] That is the antithesis of third party control. Following the Conditional Exchange, BancGroup lawfully owned and factually controlled the RPS. *Chase & Sanborn* has no application to these facts.

---

[108]   Clarke Dec. Ex 40, Exchange Agreement at §2(d).

[109]   Campbell Dec. Ex K (REIT Preferred Securities Offering Circular, dated May 15, 2007, at 57).

[110]   *See* Brf. at 58 ("senior officers of <u>BancGroup</u> conferred with one another and with outside counsel to ensure that <u>BancGroup took the steps</u> that were called for under the governing documents") (emphases added)). The fact that such steps were insufficient to consummate the Downstream Contribution is not relevant here.

The Court need look no further than *Chase & Sanborn* to reject the FDIC-Receiver's argument that BancGroup did not control the RPS because it was obligated to contribute the RPS to Bank. *Chase & Sanborn* – a case concerning fraudulent transfers – makes clear that the fact that BancGroup was under an obligation to transfer the RPS to Bank following a Conditional Exchange militates in favor of (and not against) concluding that BancGroup owned the RPS. In drawing a distinction between fraudulent transfer and preferential transfers (the latter being in satisfaction of an antecedent obligation), the Eleventh Circuit stated:

> Avoidable preferences arise in a situation in which <u>it is logical to presume that the debtor in fact controlled the funds paid out: the debtor, after all, was under an existing obligation to make the payment</u>. The presumption that the debtor controlled the payment is not similarly compelling where funds provided by a third party are transferred to a noncreditor. By definition, such transfers are not effected to repay an existing obligation of the debtor. Indeed, such transfers do not provide any benefit whatsoever to the debtor. Thus, as a general matter, it is as likely that the party providing the funds would instigate the transfer as it is that the debtor would do so.

*Id.* at 1181 (emphasis added).[111]

Elsewhere, the FDIC-Receiver asserts a similar argument with respect to the transfer of $166 million – the 2008 Tax Refunds.[112] As discussed *supra*, the FDIC-Receiver misrepresents the facts when it asserts that "those tax refunds were paid by the IRS directly to Colonial Bank . .

---

[111]   The second case cited by the FDIC-Receiver, *In re TOUSA, Inc.*, 444 B.R. 613 (S.D. Fla. 2011), only confirms this point. *TOUSA*, like *Chase and Sanborn*, concerns itself with an instance in which a <u>third party</u>, another debtor, "TOUSA," was found to control transferred funds, not the putative transferring debtor, the "Conveying Subsidiaries." *Id.* at 648. The court found that the Conveying Subsidiaries did not control the funds at issue because TOUSA "as the primary borrower, was the only party with actual authority under the New Loan documents to control the loan proceeds' distribution." *Id.* The fact that TOUSA was obligated to use the proceeds it received (and controlled) to satisfy a contemporaneous obligation to a third party did not preclude a finding that TOUSA and no one else controlled the funds. *Id.*

[112]   Brf. at 63-64.

. .″[113]   In reality, and as set forth in BancGroup's Tax Refund Brief, these 2008 Tax Refunds were issued by the IRS, <u>payable to BancGroup</u>, in June 2009.[114]   And even assuming the 2008 Tax Refunds were not deposited into a BancGroup bank account (a disputed issue), under controlling Eleventh Circuit authority, that does not change the fact the 2008 Tax Refunds were under BancGroup's control and therefore comprised property of BancGroup.  *In re Egidi*, 571 F.3d at 1161 (rejecting argument that transferred funds were not under debtor's property simply because they were never deposited into debtor's account); *In re Model Imperial*, 250 B.R. 776, 795-96 (Bankr. S.D. Fla. 2000) (noting the fact that initial transferee voluntarily endorsed a check issued to transferee to a third party was no different than if transferee "deposited the checks into its checking account and used the money for another purpose . . . ").  Here, even under the FDIC-Receiver's version of the facts, BancGroup directed the payment of the 2008 Tax Refunds immediately to Bank.[115]   Thus, the 2008 Tax Refunds were BancGroup property under Eleventh Circuit law.

## VI.   SUMMARY JUDGMENT SHOULD BE DENIED WITH RESPECT TO BANCGROUP'S AVOIDANCE CLAIMS

### A.   <u>At A Minimum, Section 1828(u) Has No Application To BancGroup's Avoidance Actions Concerning Transfers Which Occurred Prior To June 15, 2009</u>

As it did in connection with its motion pursuant to Federal Rule of Civil Procedure 12(c) (the "<u>12(c) Motion</u>"), the FDIC-Receiver continues to argue that 12 U.S.C. § 1828(u) ("<u>Section 1828</u>")[116] bars BancGroup's avoidance actions challenging transfers made on or after December

---

[113]   Brf. at 63.

[114]   BancGroup Tax Refund Brief at 10-11.

[115]   *See* FDIC SOF at ¶¶ 32-33.

[116]   Section 1828 provides, in pertinent part:  "No person may bring a claim against any Federal banking agency (including in its capacity as conservator or receiver) for the return of assets of an affiliate or controlling shareholder of the insured depository institution transferred to, or for the benefit of, an insured

15, 2008.  Section 1828 bars the assertion of a claim against the FDIC-Receiver for the return of assets in connection with a transfer that occurred when the failed bank was subject to "any direction issued in writing . . . to increase its capital."  12 U.S.C. § 1828(u).  However, Bank was not subject to a cease and desist order until June 15, 2009 (the "Bank C&D").[117]  The FDIC-Receiver's argument is premised on elevating Bank's memorandum of understanding dated December 15, 2008 (the "Bank MOU"), to the level of a written "directive" within the meaning of Section 1828.[118]  As briefed in BancGroup's opposition to the FDIC-Receiver's 12(c) Motion (the "12(c) Opposition"), the FDIC-Receiver's argument is meritless.  To avoid unnecessary duplication, Bancgroup incorporates its arguments asserted in the 12(c) Opposition herein as summarized below.

A memorandum of understanding, such as the Bank MOU, is a form of "informal action."  FDIC, COMPLIANCE EXAMINATION MANUAL § II-8.1 (June 2009).[119]  Informal actions such as memoranda of understanding are voluntary which are "neither publicly disclosed nor legally enforceable."  *Id.*  Such memoranda represent "the final supervisory step before formal enforcement proceedings are initiated" and are therefore distinct from "formal enforcement actions," such as the Bank C&D, which are taken by the FDIC pursuant to Section 8 of the Federal Deposit Insurance Act and which are enforceable.  *Id.* (emphasis added).

---

depository institution by such affiliate or controlling shareholder of the insured depository institution, or a claim against such Federal banking agency for monetary damages or other legal or equitable relief in connection with such transfer, if at the time of the transfer— (A) the insured depository institution is subject to any direction issued in writing by a Federal banking agency to increase its capital . . . ."  12 U.S.C. § 1828(u).

[117]   FDIC SOF at ¶ 67; *see also* Clarke Dec. Ex. 46.

[118]   *See* Clarke Dec. Ex. 45.

[119]   FDIC, COMPLIANCE EXAMINATION MANUAL § II-8.1 (June 2009), *available at* http://www.fdic.gov/regulations/compliance/manual/index_pdf.html for a publicly available copy of the FDIC's Compliance Examination Manual.

The Bank MOU does not qualify as a "directive" entitled to enforcement under Section 1828(u).  Pursuant to the Federal Registry, in the area of capital maintenance or enhancement, a "directive" is defined as "a final <u>order</u> issued to a bank that fails to maintain capital at or above the minimum leverage capital requirement" as set forth in Sections 325.3 and 325.4 of the Code of Federal Regulations.  12 C.F.R. § 325.6(a) (emphasis added).  Moreover, a "directive" is equivalent in formality and enforceability to a cease and desist order under 12 U.S.C. § 1818(b).  *Id.* ("A directive issued pursuant to this section . . . is enforceable in the same manner and to the same extent as a final cease-and-desist order issued under 12 U.S.C. 1818(b)).  The Bank MOU is obviously not a cease-and-desist order.  Rather, it purports to be nothing more than an agreement by Colonial Bank's directors to "move in good faith" to cause Colonial Bank to comply with the corrective program set forth in the Bank MOU.[120]  Therefore, by its regulatory design and wording, and in clear contrast to the Bank C&D, the Bank MOU does not rise to the level of a "directive" of any type, much less one to increase an insured depository institution's capital within the meaning of Section 1828.

Thus, the FDIC-Receiver's argument that transfers which occurred prior to the date of the Bank C&D (*i.e.*, June 15, 2009) are barred by Section 1828 should be rejected.

### B.   BancGroup May Assert Avoidance Actions For Transfers Subsequent To June 15, 2009 Defensively Notwithstanding Section 1828(u)

It is irrelevant whether Section 1828 bars BancGroup from obtaining any <u>affirmative recovery</u> from the FDIC-Receiver on account of certain avoidable transfers which occurred subsequent to the Bank C&D on June 15, 2009; what matters is nothing in Section 1828(u)'s language or legislative history indicates that the statute precludes BancGroup from <u>avoiding</u> (as

---

[120]   *See* Clarke Dec. Ex. 45 at 1; *see also* FDIC, RISK MANAGEMENT MANUAL OF EXAMINATION POLICIES § 13.1, Memorandums of Understanding (February 2005), *available at* http://www.fdic.gov/regulations/safety/manual/section13-1.html.

opposed to <u>recovering</u>) those transfers for the purpose of disallowing a transferee's claim under Section 502(d) of the Bankruptcy Code.  As discussed more fully in the 12(c) Opposition, there is a statutory distinction between "avoidance" and "recovery" – a distinction found in both in the Bankruptcy Code and elsewhere in title 12 of the United States Code ("<u>Title 12</u>").  For example, sections 544 and 548 of the Bankruptcy Code, and section 1821(d)(17)(A) of Title 12 each provide for the <u>avoidance</u> of fraudulent transfers, while section 550 of the Bankruptcy Code and section 1821(d)(17)(B) of Title 12 each provide for the <u>recovery</u> of the property transferred, to the extent such transfer is avoided.  By separately providing for the avoidance of fraudulent transfers, and for recovery on account of avoided transfers, Congress has distinguished between the two concepts.

Section 1828 prohibits a person from bringing a claim seeking the "return of assets," payment of "monetary damages," or "other legal or equitable relief" in connection with such transfer.  12 U.S.C. § 1828(u)(1).  Section 1828 does <u>not</u> purport to prohibit the <u>avoidance</u> of transfers.

BancGroup seeks to avoid certain post-June 15, 2009 transfers solely for the purpose of disallowing the FDIC-Receiver's Proof of Claim pursuant to Section 502(d) of the Bankruptcy Code and not for the "return of assets."  Section 502(d) requires that the Court disallow the claim of any entity "that is a transferee of a transfer that is avoidable" under, *inter alia*, sections 544, 547, or 548 of the Bankruptcy Code.  11 U.S.C. § 502(d).  It is irrelevant whether the debtor has sought, or even can seek, recovery against the transferee on account of the avoidable transfer.  *See, e.g.*, *United States Lines, Inc. v. U.S. (In re McLean Inds., Inc.)*, 196 B.R. 670, 675 (S.D.N.Y. 1996) (permitting the "defensive" use of Section 502(d), determining that preferential

transfer was still "avoidable" even though statute of limitations had run on proceeding seeking to recover preferential transfer).

Without citing any caselaw, the FDIC-Receiver argues that Section 1828's reference to "other legal or equitable relief" bars avoidance.  However, where Congress has intended to "safe harbor" certain, specific types of transfers from <u>avoidance</u>, it has done so expressly.  *See, e.g.*, 11 U.S.C § 546(e) ("Notwithstanding sections 544, . . . 547, 548(a)(1)(B), and 548(b) of this title, the trustee may <u>not avoid</u> a transfer that is a margin payment . . . ."); 11 U.S.C § 546(f) ("the trustee may <u>not avoid</u>"); 11 U.S.C. § 546(g) (same); 11 U.S.C § 546(i) (same); 11 U.S.C § 546(j) (same); (emphases added).  Notably sub-sections 546(e), (f), and (g) of the Bankruptcy Code pre-date enactment of Section 1828 in 1999, while sub-sections 546(i) and (j) of the Bankruptcy Code were enacted in 2005, following the enactment of Section 1828.  Had Congress sought to preclude avoidance under Section 1828 it would have done so expressly as it did so both before and after Section 1828's enactment.

C.     <u>**Genuine Issues Of Fact Exist Concerning BancGroup And Bank's Insolvency**</u>

The FDIC-Receiver argues that BancGroup's constructive fraudulent transfer claims concerning capital contributions made during 2008 fail because the "undisputed evidence establishes that Colonial Bank was solvent at the time of every one of the challenged capital contributions to Colonial Bank in 2008." [121]   Amazingly, the FDIC-Receiver makes this conclusion with <u>no mention</u> of the massive fraud conducted from 2002 to August 2009 by Lee Bentley Farkas (and certain Bank officers) through his company, TBW – a large independent mortgage company and significant "customer" of Bank's mortgage warehouse lending

---

[121]   Brf. at 66.

division.[122]  It has been revealed that a staggering amount of the Bank's reported assets simply never existed or were sold to another party.  In fact, elsewhere the FDIC-Receiver has reported that the impact of the TBW fraud on Bank was "enormous."[123]  Yet, in support of its specious claim that "[t]here is no doubt" that Bank was solvent throughout 2008, the FDIC-Receiver refers solely to financial statements which <u>predate</u> the exposure of the TBW fraud, and testimony of BancGroup's CFO concerning her opinion of Bank's financial position at a time when she was without knowledge of the TBW fraud.[124]  In view of the TBW fraud and the "enormous" impact on Bank and BancGroup's purported assets, the financial position of Bank and, therefore, BancGroup, is at best from the FDIC-Receiver's perspective a disputed issue of fact.

While it is true that downstream transfers to a <u>solvent</u> subsidiary are generally considered to be for reasonably equivalent value, *see Branch v. FDIC*, 825 F. Supp. 384, 399 (D. Mass. 1993), any such presumption falls away where the subsidiary is insolvent, because any benefit conferred upon the subsidiary benefits only the subsidiary's creditors and not the transferring parent.  *Branch*, 825 F. Supp. at 399. (recognizing constructive fraudulent transfer claims seeking avoidance of capital contributions from bank holding company to subsidiary banks where the subsidiaries were insolvent due to inevitability of FDIC takeover and assertion of cross guarantee claims); *see also In re Duque Rodriguez*, 77 B.R. 937, 939 (Bankr. S.D. Fla. 1987) (ruling that a transfer made by insolvent parent corporation for the benefit of wholly-owned subsidiary did not confer reasonably equivalent value upon the parent because the subsidiary was insolvent and filed for bankruptcy), *aff'd*, 895 F.2d 725 (11th Cir. 1990); *see also In re First City*

---

[122]  *See* Clarke Dec. Ex. 1 (Moore Tr. at 280:10-280:18).

[123]  Campbell Dec. Ex. L (June 30, 2011 Sentencing Transcript in the matter styled *United States of America v. Lee Bentley Farkas*, No. 10-CR-00200 (E.D. Va. 2010) (the "<u>Farkas Sentencing Tr.</u>") at 47:23-48:1 ("Rather, we want the Court to understand our position with respect to the impact of this fraud scheme on Colonial Bank and the FDIC.  And by any measure, that impact is enormous.")).

[124]  Brf. at 66.

*Bancorporation*, No. 392-39474-HCA-11, 1995 Bankr. LEXIS 1683, at *34 n. 9 (Bankr. N.D. Tex. May 15, 1995) (same).  Thus, to the extent BancGroup made capital contributions to Bank at a time when Bank was insolvent (or receivership inevitable), BancGroup did not receive reasonably equivalent value in exchange.

Here, the facts overwhelmingly indicate that Bank was indeed insolvent and its receivership inevitable.  The TBW fraud was one of the largest bank fraud schemes in this country's history.  As the United States of America describes it:

> Farkas spearheaded the sale of more than $1.5 billion in fake mortgage assets to Colonial Bank, ultimately leaving a deficit of more than $500 million in its Assignment of Trade ("AOT") financing facility.  He directed the misappropriation of more than $1.5 billion from Ocala Funding, a commercial-paper vehicle set up by TBW to finance mortgage purchases and funded by Deutsche Bank ("DB") and BNP Paribas ("BNP").  He oversaw the triple-selling of mortgage loans, worth approximately $900 million, to Colonial Bank, Ocala Funding, and Freddie Mac.  He led an effort to fraudulently obtain another $553 million from the government's Troubled Asset Relief Program ("TARP").  His scheme contributed significantly to the failure of Colonial Bank, wiping out shareholder value in its public parent company, Colonial BancGroup.

*See United States of America v. Lee Bentley Farkas*, Case No. 1:10-CR-00200, (E.D. Va. 2010) *Position of the United States With Respect to Sentencing*, D.I. 295, at 1-2.[125]  In the Farkas criminal proceeding (pursuant to which Farkas was found guilty on each of the 14 counts ultimately advanced by the United States and has been sentenced to 30 years in prison),[126] the United States's witnesses presented sworn testimony revealing, among other things, that:  (i) there was a "hole" in the AOT facility as of December 31, 2008 of approximately $670 million;

---

[125]   Campbell Dec. Ex. M (*Position of the United States With Respect to Sentencing* in the matter styled *United States of America v. Lee Bentley Farkas*, No. 10-CR-00200 (E.D. Va. 2010) [Cr. No. 295] at 1-2).

[126]   Judgment in a Criminal Case, June 30, 2011, *United States of America v. Lee Bentley Farkas*, Case No. 10-CR-00200, (E.D. Va. 2010) [D.I. 301].

(ii) TBW sold the same uncollateralized loans in approximate amounts of $889 million to Bank, Ocala Funding, and Freddie Mac and $772 million to Ocala Funding and either Bank or Freddie Mac; and (iii) Colonial suffered from a "collateral shortfall" of approximately $1.8 billion.[127]

Indeed, the *Final Reconciliation Report of Debtor Taylor, Bean & Whitaker Mortgage Corp.* (the "TBW Report"), filed in TBW's chapter 11 case (and "blessed" by the FDIC-Receiver),[128] confirms, among other things, that: (i) "there were 4,928 loans, with a cumulative advance balance of $909.6 million, that had been 'sold' to Ocala Funding and delivered to LGTS, its collateral agent, for which Colonial had not been paid"; (ii) "there were 124 pools of loans assigned to the Colonial AOT facilities with a purported cumulative balance of $1,473,868,368 [none of which were] actual, pending transaction[s and for which] there is no value . . . ."; and (iii) "there were 9,304 individual loans assigned to the AOT facilities [certain of which] having a cumulative unpaid principal balance of $488.5 million [for which the] actual value of these loans is substantially less than the unpaid principal balance."[129]

---

[127]   Campbell Dec. Ex. N (U.S. Trial Ex. 001-700-001, in the matter styled *United States of America v. Lee Bentley Farkas*, No. 10-CR-00200 (E.D. Va. 2010) at 5, 12); Campbell Dec. Ex. O (April 13, 2011 Trial Transcript from the trial of Lee Farkas in the matter styled *United States of America v. Lee Bentley Farkas*, No. 10-CR-00200 (E.D. Va. 2010) ("Farkas Tr.") at 1880:14-1880:16).

[128]   Campbell Dec. Ex. P (Final Reconciliation Report of Debtor Taylor, Bean & Whitaker Mortgage Corp. in the matter styled *In re Taylor, Bean & Whitaker Mortgage Corp., et al.*, Case No. 3:09-bk-07047-JAF (M.D. Fla. 2009) at Summary of Findings, pp 1-9); *see also* Campbell Dec. Ex. O (Farkas Tr. Testimony of Neil Luria, TBW Chief Restructuring Officer, at 1876:1-1876:17 ("We had a -- after the bankruptcy filing, we ended up entering into an agreed -- agreement with the FDIC to enter, enter into a large reconciliation of all of Taylor Bean's assets as they related to Colonial Bank and certain of the other lenders at the time. Q. And how can you be sure that your reconciliation is accurate? A. It was a very long, arduous process that the -- we worked in tandem with the FDIC, and the FDIC blessed the reconciliation. Q. And do you know what the FDIC does with respect to Colonial Bank? A. They are currently the receiver of Colonial Bank. Q. And so the FDIC, Colonial Bank, and TBW are sharing information? A. Yes. Q. Do you use that information to help reconcile liabilities and assets? A. Yes.") (emphasis added)).

[129]   Campbell Dec. Ex. P (Final Reconciliation Report of Debtor Taylor, Bean & Whitaker Mortgage Corp. in the matter styled *In re Taylor, Bean & Whitaker Mortgage Corp., et al.*, Case No. 3:09-bk-07047-JAF (M.D. Fla. 2009), at 7-8) (emphases added).

Thus, the Farkas criminal proceedings and the TBW Report reveal that the fraud orchestrated upon Bank and BancGroup likely resulted in a staggering overstatement of assets in an approximate amount of $2.3 billion.   This corresponds with the findings reported by government agencies in the wake of Bank's failure.   Indeed, at the hearing concerning Farkas' restitution, the FDIC-Receiver stated its view that Bank had suffered a $1.8 billion loss at the hands of TBW as a result of "fictitious, bogus" loans and trades.[130]

In April 2010, the Office of the Inspector General issued its Loss Report on Colonial Bank.[131]   Among other things, the Loss Report notes that the FDIC-Receiver estimated the loss to the Deposit Insurance Fund at October 24, 2009 to be $2.7 billion, which is the magnitude of Bank's inability to pay its outstanding deposit obligations.   Additionally, at the end of the calendar year 2010, the FDIC-Receiver filed its Colonial Bank Receivership Balance Sheet Summary (Unaudited) for the Period Ending March 31, 2011 (the "FDIC Balance Sheet").[132] The FDIC Balance Sheet shows an even greater shortfall of over $4.8 billion relating to the

---

[130]   Campbell Dec. Ex. Q (August 9, 2011 Lee Farkas Restitution Hearing Transcript in the matter styled *United States of America v. Lee Bentley Farkas*, No. 10-CR-00200 (E.D. Va. 2010) ("Rest. Tr.") at 39 ("Yes. Your Honor, I speak only to correct what appears to be a misinterpretation concerning the FDIC restitution claim in this matter, $1.8 billion.  That is not based on the law -- the failure of Colonial Bank. That is based on particular loans that were part of the AOT facility and part of the COLB facility for which the bank lost money, the double-pledge loans, the loans that were funded by Colonial Bank but Colonial Bank never received payment for, and on the AOT line, the trades and loans that were fictitious, bogus, and the like, for which the collateral base was nowhere near the amount of the loss.  So the 1.8 billion total that the FDIC sought as receiver for Colonial Bank is not based on the failure of the bank. It's based on particular losses resulting from the fraud --THE COURT: It's the failure of the collateral really.  MR. O'BRIEN: Yeah, the collateral that the bank had, yes, Your Honor.") (emphasis added)). Indeed, in support of its claim to BancGroup's insurance proceeds in connection with this Motion, the FDIC-Receiver purportedly submitted a proof of loss in which it states that the "cost of Bank's failure to the FDIC's Deposit Insurance Fund was estimated at the time the Bank closed to be $2.8 billion" and that the Bank suffered significant losses in an amount of $1.773 billion due to the fraudulent scheme perpetrated by certain Bank employees in concert with TBW.  *See* Declaration of Thomas O' Brien Ex. 1 (("O'Brien Dec.") at 1, 15 [No. 10-00198, D.I. 115]).

[131]   Ex. 2, Appendix to 12(c) Opposition, [No. 10-198, D.I. 59 (brief), D.I. 60 (exhibits)].

[132]    Colonial Bank Receivership Balance Sheet Summary (Unaudited) for the Period Ending March 31, 2011, *available at*: http://www2.fdic.gov/drrip/bal/balancesheet.asp for a publicly available copy of the FDIC Balance Sheet.

Deposit Insurance Fund. According to this document, the Colonial Bank receivership has $754,453,000 in total assets. The FDIC Balance Sheet further shows a liability owed to the FDIC, a "FDIC Subrogated Deposit Claim," of $5,826,813,000.

The FDIC-Receiver asserts that Bank was solvent by an amount of $1.44 – $2.47 billion in 2008 based upon the financial position Bank reported without taking into account the massive TBW fraud.[133] Adjusting for the TBW fraud based upon the facts that have to date been discovered, it appears that this equity value was never really there and that Bank was insolvent even without marking to fair market value Bank's "legitimate" loan portfolio, which was concentrated in very troubled real estate markets such as Georgia, Nevada, and Florida.[134] In fact, in response to BancGroup's interrogatories, the FDIC-Receiver itself tacitly asserts Bank's insolvency as far back as 2007, asserting that $624.5 million in "unlawful dividends" were transferred from Bank to BancGroup in 2007.[135] Under Alabama law, dividends are unlawful either when "(1) [t]he corporation would not be able to pay its debts as they become due in the usual course of business; or (2) [t]he corporation's total assets would be less than the sum of its total liabilities plus, unless the articles of incorporation permit otherwise, the amount that would be needed, if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution." Code of Al. of 1975, Section 10A-2-6.4 (2009).

The evidence put forward by the FDIC-Receiver – because it does not take into account the TBW fraud – should be discarded. *See VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 632

---

[133]   Brf. at 66-68.

[134]   At Farkas' sentencing hearing, the FDIC-Receiver took the position that while the TBW "fraud . . . made a significant contribution" to Bank's failure, Bank "was already on the ropes." *See* Campbell Dec. Ex. L (Farkas Sentencing Tr. at 48:15-48:17).

[135]   Campbell Dec. Ex. R (Responses and Objections of the FDIC-Receiver to Plaintiff's Second Continuing Interrogatories at 8).

(3d Cir. 2007) (noting that financial figures based on improper manipulations "was not good evidence of value" and agreeing with district court's election "not to rely on VFI's market capitalization at the time of the spin, precisely because of Campbell's manipulation, and instead looked at market capitalization several months later, when the truth of VFI's situation had become clear"); *Coated Sales Inc. v. First Eastern Bank (In re Coated Sales Inc.)*, 144 B.R. 663, 668 (Bankr. S.D.N.Y. 1992) ("it is not improper hindsight for a court to attribute 'current circumstances' which may be more correctly defined as 'current awareness' or 'current discovery' of the existence of a previous set of circumstances. The finding of false accounts receivable, nonexistent inventory and illegal transfers must be taken into account in accurately determining [debtor's] financial condition at the transfer date").

The FDIC-Receiver's references to Ms. Moore's statements concerning Bank's financial position are similarly irrelevant.[136] Ms. Moore confirmed that her capital assessments referenced in the FDIC-Receiver's Brief did not take into account the TBW fraud, because her department was not aware of the fraud and that such testimony "related to the time" before discovery.[137] Ms. Moore recognized that the TBW fraud spanned over the time period from 2002-2009 (capturing each of BancGroup's transfers for which it seeks avoidance) and stated that the TBW fraud was of a sufficient magnitude to materially affect any solvency assessment she or her team might have made.[138] Ms. Moore further testified that a hypothetical TBW fraud of one billion dollars

---

[136] Brf. at 66-67.

[137] Clarke Dec. Ex. 1 (Moore Tr. 293:14-16 ("We were not aware of the fraud; therefore, there was nothing recorded related to the fraud."), at 295:3-295:21 ("Q. So when you stated today your beliefs, at those times when you engaged in that  methodology and made those decisions, those were based on the information available at that time when the exercise occurred; correct? A. Yes. Q. And if there was a fraud that rendered some of the figures used in that exercise inaccurate, that wouldn't have been considered in your testimony? A. That's correct. My testimony related to the time.")).

[138] *See* Clarke Dec. Ex. 1 (Moore Tr. 284:19-295:14,  291:11).

would have required restatement of Bank's and BancGroup's financial statements.[139]  In sum, all of the facts on which the FDIC-Receiver premises its assertion of Bank's solvency are subject to significant dispute due to the emergence of the TBW fraud (which the FDIC-Receiver omits from its briefing).

"By any standard, a fictitious uncollectable loan should not remain on the balance sheet as an asset."  *DuVoisin v. Anderson (In re Southern Indus. Banking Corp.)*, 71 B.R. 351, 257, 359, 375-76 (Bankr. E.D. Tenn. 1987) (adjusting debtor's "untrustworthy" balance sheet for "forged and fictitious" loans which allowed debtor to hold "itself out for a long period of time as a solvent institution . . . 'with mirrors'").  Only by ignoring one of the largest bank frauds in the history of this country is the FDIC-Receiver able to state that "there is no evidence that Colonial Bank was insolvent at the time of any of the 2008 capital contributions."[140]  For this reason, its motion should be denied.

Additionally, the FDIC-Receiver's motion should be denied because it is premature.  As referenced in the FDIC-Receiver's Brief, BancGroup's avoidance actions are subject to the 12(c) Motion.  In view of the pendency of the 12(c) Motion, <u>by joint motion</u>, the parties requested that the Court modify the Uniform Scheduling Order such that the parties were relieved from "having to deliver expert reports or identify experts by the deadlines" provided in the Uniform Scheduling Order until "after the Court has ruled on the Rule 12(c) Motion."  *Order Modifying Scheduling Order*, March 14, 2011, [No. 10-198, D.I. 53-1].

"[A] finding on the issue of insolvency often depends upon the factual inferences and conclusions of expert witnesses which, when controverted, do not lend themselves readily to summary judgment resolution."  *Klein v. Tabatchnick*, 610 F.2d 1043, 1048 (2d Cir. 1979).  The

---

[139]   *See* Clarke Dec. Ex. 1 (Moore Tr. 297:4-298:15).

[140]   Brf. at 68.

Court should have the benefit of expert testimony before resolving the factual issue of insolvency. For this reason too, the FDIC-Receiver's motion should be denied.[141]

D.   **The FDIC-Receiver's Argument Concerning The 2007 Citrus & Chemical Transaction Focuses On The Wrong Transfer**

The FDIC-Receiver asserts that BancGroup's claim for avoidance of a transfer from BancGroup to Bank in connection with BancGroup's acquisition of Citrus & Chemical Bancorporation fails because: (i) Bank and BancGroup were solvent in December 2007; (ii) Ms. Moore believed that Bank and BancGroup were solvent; and (iii) Bank was not a transferee of any BancGroup transfer. The FDIC-Receiver's first two arguments should be rejected for the reasons discussed above. Like the FDIC-Receiver's arguments concerning the 2008 capital contributions, they fail to take into account any of the facts concerning the TBW fraud and its undeniable effect upon Bank and BancGroup's financial position. The FDIC-Receiver's third argument fails because the FDIC-Receiver simply mischaracterizes or misunderstands the Citrus & Chemical transaction and the transfer BancGroup seeks to avoid.

The FDIC-Receiver states that the "2007 transaction . . . was in fact an acquisition by BancGroup (not Colonial Bank) of a bank holding company called Citrus & Chemical Bancorporation."[142]   The FDIC-Receiver is correct. What the FDIC-Receiver omits from its

---

[141]   Even assuming *arguendo* the TBW fraud did not render Bank insolvent as of the date of certain of BancGroup's capital contributions, it appears it was at least sufficient to have triggered a closing of Bank, rendering BancGroup's equity interest worthless. The Federal Reserve has adopted regulations which provide for minimum risk-based and leverage capital guidelines for bank holding companies. The prompt corrective action provisions of the federal banking statutes establish five capital categories ("well capitalized", "adequately capitalized", "undercapitalized", "significantly undercapitalized" and "critically undercapitalized"). For example, even if the TBW fraud only depleted Bank's assets such that it had a ratio of tangible equity to total assets that is equal to or less than 2.0 percent, it would have been deemed "critically undercapitalized" by the FDIC and would likely have been closed when the fraud was unearthed. *See* 12 C.F.R. § 325.103. In such instances, where the closing of Bank was inevitable, BancGroup would not have received any reasonably equivalent value for its contributions, even if the Bank were technically solvent.

[142]   Brf. at 69.

discussion, however, is that <u>after</u> BancGroup's acquisition of Citrus & Chemical Bancorporation,

it contributed its newly-owned subsidiary, Citrus and Chemical Bank, by merger, into its

already-owned subsidiary, Bank, which was to be the surviving corporate entity.[143]   In addition

to the governing agreements so providing, the testimony of Ms. Moore confirms that the

transaction was structured as a BancGroup to Bank contribution.[144]   Thus, to the extent that Bank

was insolvent as of the time of the contribution, BancGroup's contribution is avoidable as

constructively fraudulent.   At the very least, significant issues of fact exist as to Bank's solvency

requiring denial of the FDIC-Receiver's motion.

## VII.   SUMMARY JUDGMENT SHOULD BE DENIED WITH RESPECT TO BANCGROUP'S OTHER CLAIMS

### A.   **BancGroup's Intercompany Receivable**

The FDIC-Receiver asserts that BancGroup's claim for an intercompany receivable in the

amount of $514,420.78 should be rejected at summary judgment due to a purported "evidentiary

problem."[145]   The FDIC-Receiver's position is fiction.   BancGroup's former CFO, Ms. Moore,

testified that "as a part of looking at the status of intercompany accounts as of August 25th,

2009," Bank owed BancGroup an intercompany receivable.[146]   And, at her deposition, Ms.

Moore recognized the documents which support the $514,420.78 amount alleged.[147]

---

[143]   Campbell Dec. Ex. S (July 17, 2007 Agreement of Merger Between Citrus & Chemical Bank and Colonial Bank, N.A. at ¶¶2(a) (providing for the merger of Citrus and Chemical Bank into Bank), at ¶3(b) (providing that Bank's common stock would survive the merger and continue to be owned by BancGroup); at ¶5(c) (making clear that BancGroup's merger with Citrus & Chemical Bancorporation was a condition precedent to merger of respective banking subsidiaries) (emphasis in original).

[144]   Clarke Dec. Ex. 1 (Moore Tr. at 28:22-29:2 ("Q.  Did BancGroup transfer to Bank any money in connection with this merger?  A.  It contributed the assets out of Citrus & Chemical Bank to Colonial Bank.")).

[145]   Brf. at 70-71.

[146]   Clarke Dec. Ex. 1 (Moore Tr. at 246:15-246:23).

[147]   Clarke Dec. Ex. 1 (Moore Tr. at 251:12-252:20).

The FDIC-Receiver also alleges that notwithstanding Bank's $514,420.78 intercompany payable, separately, "more than $20 million in unwarranted tax-related payments" were made by Bank to BancGroup which should defeat BancGroup's claim.[148]  As a significant aside, in arguing that these tax-related payments should give rise to a setoff defense against the intercompany receivable asserted by BancGroup, the FDIC-Receiver tacitly concedes that BancGroup and Bank functioned under a debtor-creditor relationship with respect to tax attributes.  *In re Patterson*, 967 F.2d 505, 508 (11th Cir. 1992) ("Setoff is an established creditor's right to cancel out <u>mutual debts</u> against one another in full or in part.") (emphasis added).  Moreover, all the FDIC-Receiver puts forward in support of this purported defense is deposition testimony of Mr. Hicks and Mr. Reimer.  But, Mr. Hicks' testimony expressly defers to Mr. Reimer and the tax department.[149]  For his part, Mr. Reimer testified that the purpose for the payments referenced by the FDIC-Receiver was simply to "fulfill its obligations under the tax sharing agreement to pay [Bank's] separate return liability."[150]

In sum, Bank's and BancGroup's former CFO testified that an intercompany receivable as alleged by BancGroup is in fact outstanding and payable.  At best, the FDIC-Receiver has established some issue of factual dispute concerning a potential defense to this claim.  Summary judgment in the FDIC-Receiver's favor is inappropriate.

B.    **Deposit Claims**

BancGroup does not dispute that the issue of whether the Bankruptcy Court was correct that the Bankruptcy Code prohibits the FDIC-Receiver's attempt to re-incur deposit liabilities owed BancGroup in order to exercise purported setoff rights will be determined by this Court in

---

[148]   Brf. at 71.

[149]   Clarke Dec. Ex. 3 (Hicks Tr. 100:18-103:10).

[150]   Clarke Dec. Ex. 4 (Reimer Tr. 146:20-24).

the context of the FDIC-Receiver's separately-pending appeal.  No trial is necessary for such claims in this action.

The FDIC-Receiver goes on to argue, however, that certain Bankruptcy Court orders protect it from any claim that it wrongfully sought to exercise control over BancGroup's deposits in violation of the Bankruptcy Code's automatic stay.[151]  *See* 11 U.S.C. § 362(a)(3).  The FDIC-Receiver ignores the undisputed fact that it exercised its wrongful "hold" on BancGroup's deposits during the period commencing on the Petition Date through September 18, 2009. Additionally, the FDIC-Receiver wrongfully asserted its "hold" on BancGroup's deposits during the period commencing December 7, 2010 (*i.e.,* the date when the FDIC-Receiver objected to BancGroup's second motion seeking use of its own cash) through January 28, 2011 (*i.e.,* the date when the matter was resolved consensually).  None of the Bankruptcy Court orders referenced by the FDIC-Receiver cleanse these time periods when the FDIC-Receiver, as determined by the Bankruptcy Court, wrongfully exercised its "hold" on BancGroup's funds.[152]  In seeking to gain access to such funds in order to administer its estate, BancGroup incurred approximately $60,000 in legal fees, and the Official Committee of Unsecured Creditors appointed in BancGroup's bankruptcy case incurred an additional approximate $11,000 in legal fees, both as a direct result of the FDIC-Receiver's actions in violation of the automatic stay.[153]  Thus, the FDIC-Receiver's

---

[151]   Brf. at 72.

[152]   *See* Agreed Order Disposing of FDIC-Receiver's Emergency Motion for Stay Pending Appeal, [Bankr. No. 09-32303, D.I. 1067] at ¶9 ("Neither the FDIC-Receiver nor BB&T shall be deemed to be in violation of the automatic stay provided for under 11 U.S.C. § 362(a) with respect to any of the Debtor's deposit accounts at BB&T during the period from entry of this Order through the conclusion of the appeal of the Appealed Orders, provided that the FDIC-Receiver and BB&T comply with the terms of this Order.") (emphasis added).

[153]   *See* BancGroup's counsel's fee applications [Bankr. No. 09-32303, D.I. 489, 1043, and 1258], and counsel to the creditors' committee's fee applications [Bankr. No. 09-32303, D.I. 1040, 1041, 1253, and 1262], each filed with the Bankruptcy Court and providing detailed fee statements.

statement that there is "no basis for BancGroup to claim any consequential damages as the result of the FDIC-Receiver's . . . efforts" rings hollow.[154]

C.   **Other Claims**

1.   *Preferential Transfers*

The FDIC-Receiver seeks summary judgment on BancGroup's preference claims on the back of absolutely no showing whatsoever.  Section 547(b) of the Bankruptcy Code arms BancGroup with the power to avoid any transfer of its property (i) to or for the benefit of a creditor, (ii) for or on account of an antecedent debt, (iii) made while the debtor was insolvent, (iv) within one year before the Petition Date for an insider transferee such as Bank, and (v) which enables the creditor to receive more than he would receive under a Chapter 7 liquidation. *In re Installation Servs., Inc*., 101 B.R. 282, 283-84 (Bankr. N.D. Ala. 1989).  Discovery has revealed that, on or around January 23, 2009 and May 19, 2009, BancGroup paid, by check, intercompany amounts due to Bank in the amounts of $3,520,527.58 and $944,419.57, respectively. [155]   These payments, which clearly were made on account of antecedent obligations,[156] enabled Bank to receive more than it would have in a hypothetical Chapter 7 BancGroup liquidation.  And in view of the fact that they were paid by check, it appears the FDIC-Receiver has no "ordinary course of business" defense.[157]  With respect to these claims, at

---

[154]   Brf. at 72.

[155]   Campbell Dec. Ex. T (January 2009 payment request to settle due to/due from balance for December 2008 and May 2009 payment request to settle due to/due from balance for April 2009).

[156]   Clarke Dec. Ex. 1 (Moore Tr. at 245:14-245:16 ("Q.  And due to/due from are obligations, one owed to the other; correct?  A.  That's correct.")).

[157]   Clarke Dec. Ex. 1 (Moore Tr. at 215:20-216:3 ("A.  I believe it was handled through the due to/due from accounts.  Q.  Was cash paid?  A.  Those accounts were settled.  You know, there were pluses and minuses going in and out of that account, and I don't know when the last time it was settled.")).

best from the FDIC-Receiver's perspective, BancGroup's insolvency is a disputed issue of fact. Summary judgment in favor of the FDIC-Receiver is again not appropriate.

2.    *Vendor Claims And Administrative Claims*

The FDIC-Receiver similarly seeks to defeat BancGroup's claims for reimbursement for costs or obligations incurred to certain vendors exclusively for the benefit of Bank without any basis to do so.  The following service providers have filed proofs of claims in BancGroup's bankruptcy case:  (i) National Field Representatives, Inc. [Claim No. 13]; (ii) CIT Technology Financing Services, Inc. [Claim Nos. 35, 36 and 37]; (iii) Hewlett Packard [Claim No. 46]; (iv) Weingarten Nostat, Inc. [Claim No. 58]; (v) TITAN Technology Partners, Limited [Claim No. 134]; (vi) Fine Geddie & Associates, LLC [Claim No. 135]; (vii) ADT Security Services, Inc. [Claim No. 165]; (viii) SunGard Availability Services LP [Claim No. 169]; (ix) SunGard Bancware [Claim No. 170]; (x) The Risk Management Association [Claim No. 172]; (xi) BancWare LLC [Claim No. 173]; and (xii) IBM Corporation [Claim No. 178].[158]  Many of these publicly-available proofs of claims are for services in connection with an account in the name of Bank while others are clearly for services or goods provided to or for the benefit of Bank.  In the ordinary course, Bank would pay these vendors and look to BancGroup for a contribution only for a properly-allocable amount.[159]  To the extent any of these claims are ultimately allowed and paid in BancGroup's bankruptcy case, BancGroup possesses a claim for reimbursement of such costs and expenses against Bank.

3.    *Improper Asset Possession And Sales*

---

[158]    All claims *available at*: https://ecf.almb.uscourts.gov/cgi-bin/SearchClaims.pl?125900771871343-L_1_0-1.

[159]    Clarke Dec. Ex. 1 (Moore Tr. at 244:21-245:5 ("Well, most -- accounts payable was actually a Colonial Bank function.  And so just to ease administration of paying invoices, most payments were made by Colonial Bank.  And then BancGroup expenses were then determined, you know, out of the payments made what was a BancGroup expense, what was a Brokerage expense.")).

When BancGroup filed its complaint commencing the FIRREA Action, the FDIC-Receiver had wrongfully taken possession of, or exerted influence over, certain of BancGroup's automobiles, personal property found in the Colonial Bank headquarters building, and real property located in Orlando, Florida.   These matters have been resolved to BancGroup's satisfaction.

However, on September 21, 2011, BancGroup learned of the following improper possession of BancGroup property.  Prior to the Receivership Date, BancGroup and Bank jointly retained Promontory Financial Group, LLC ("Promontory") to provide business consulting services in connection with the Bank C&D.[160]   In connection with this engagement, BancGroup – and not Bank – paid Promontory a $500,000 retainer.[161]   Promontory provided services through the Receivership Date such that the retainer was reduced to $138,306.71.   Thereafter, the FDIC-Receiver requested and received these funds on or around September 29, 2009.[162]   The FDIC-Receiver has wrongfully deprived BancGroup of the use of its property giving rise to a claim for conversion under Alabama law.  *Johnson v. Northpointe Apartments,* 744 So. 2d 899, 904 (Ala. 1999) ("The intent required [for a conversion claim] is not necessarily a matter of conscious wrongdoing.  It is rather an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights.").   Moreover, the FDIC-Receiver's actions are in violation of the automatic stay.  *See* 11 U.S.C. § 362(a)(3) (a bankruptcy filing automatically stays "any act to obtain possession of property of the estate or of property from the estate or to

---

[160]   Campbell Dec. Ex. U (June 15, 2009 Engagement Letter Between The Colonial BancGroup, Inc., Colonial Bank, N.A., and Promontory Financial Group LLC).

[161]   Campbell Dec. Ex. V (accounts payable disbursement information extracted from the Colonial accounting system, exported by BB&T and provided to The Colonial BancGroup, Inc., evincing $500,000 payment to Promontory Financial Group LLC on June 16, 2009).

[162]   Campbell Dec. Ex. W (September 29, 2009 email from Carol Nichols to Michael Patriarca, copying Brent Hicks and Mark Schubring re: "Colonial Bank").

exercise control over property of the estate").   BancGroup is thus unable to "withdraw" these claims despite the FDIC-Receiver's suggestion.   Summary judgment must be denied.

### 4.   *Employee Related Costs*

The Pension Benefit Guaranty Corp. (the "PBGC") has filed proofs of claim in BancGroup's bankruptcy case in an aggregate amount exceeding $30,000,000.[163]  By the FDIC-Receiver's own admission,[164] the vast majority of the covered employees under the pertinent retirement plan were employees of Bank, not BancGroup.  To the extent this claim is allowed and paid in BancGroup's bankruptcy case, BancGroup possesses a claim for reimbursement of such costs and expenses against Bank.

### 5.   *Indemnification Claims*

The following former BancGroup directors and officers have filed proofs of claim in BancGroup's chapter 11 case:  (i) Hubert L Harris, Jr. [Claim No. 68]; (ii) Patrick F. Dye [Claim No. 69]; (iii) Robert S. Craft [Claim No. 70]; (iv) Augustus K. Clements, III [Claim No. 71]; (v) Jerry J. Chesser [Claim No. 72]; (vi) William Britton [Claim No. 73]; (vii) Lewis Beville [Claim No. 74]; (viii) Edward V. Welch [Claim No. 75]; (ix) Simuel Sippial, Jr. [Claim No. 76]; (x) James W. Rane [Claim No. 77]; (xi) William E. Powell, III [Claim No. 78]; (xii) Joseph D. Mussafer [Claim No. 79]; (xiii) Milton E. McGregor [Claim No. 80]; (xiv) John Ed Mathison [Claim No. 81]; (xv) Deborah L. Linden [Claim No. 82]; (xvi) Clinton O. Holdbrooks [Claim No. 83]; (xvii) Sheila P. Moody [Claim No. 151]; (xviii) Angie S. Parker [Claim No. 152]; (xix) Andrew Wilson [Claim No. 153]; (xx) Patti G. Hill [Claim No. 154]; (xxi) Robert E. Lowder [Claim No. 155]; (xxii) Harlan C. Parrish [Claim No. 156]; (xxiii) John C. H. Miller (Estate of)

---

[163]   All claims *available at*:  https://ecf.almb.uscourts.gov/cgi-bin/SearchClaims.pl?125900771871343-L_1_0-1.

[164]   FDIC SOF at ¶43 ("While BancGroup had only two or three employees, Colonial Bank had more than 4,000.").

[Claim No. 157]; (xxiv) Sarah H. Moore [Claim No. 161]; (xxv) T. Brent Hicks [Claim No. 162]; and (xxvi) Tamara A. Stidham [Claim No. 164].[165]  Certain of these former BancGroup directors and officers served as directors and officers of Bank contemporaneously.  To the extent any of these claims are ultimately allowed and paid in BancGroup's bankruptcy case, BancGroup possesses a claim for reimbursement of such indemnity against Bank.  The FDIC-Receiver offers no defense to such claims in its Brief.

D.  **Interest**

The FDIC-Receiver asks this Court to award it summary judgment on any claim for post-receivership interest first as a matter of law because Title 12's "strict scheme of priorities . . . does not provide for payment of interest."[166]  Significantly, the sections of Title 12 cited by the FDIC-Receiver do not prohibit the payment of interest.  Thus, it is unsurprising that the lone case cited by the FDIC-Receiver expressly recognizes that "the Supreme Court has long since recognized the general proposition that creditors to a liquidation are entitled to interest, just as any other judgment creditor, <u>even absent specific statutory authorization</u>."  *See Golden Pac. Bancorp. v. F.D.I.C.*, 375 F.3d 196, 203 (2d Cir. 2004) (emphasis added).

The FDIC-Receiver also argues that as a matter of fact interest will not be paid on any claims against the Receivership in view of the Receivership's "deficit of $4.8 billion."[167]  It is true that such assertions are in fact congruent with BancGroup's view of Bank's insolvency prior to the Receivership Date.  However, the FDIC-Receiver's website indicates that such a

---

[165]  All claims *available at*: https://ecf.almb.uscourts.gov/cgi-bin/SearchClaims.pl?125900771871343-L_1_0-1.

[166]  Brf. at 75.

[167]  Brf. at 75-76.

determination is premature, disclosing that "[n]o dividends have been declared at this time."[168] Until the FDIC-Receiver finishes administering the receivership's assets (including any litigation claims) and resolves Bank's receivership, resolution of this claim is premature.

     E.     **<u>Equity Claims</u>**

     In view of the facts that have come to light concerning Bank's insolvency prior to its receivership, and the advent of the receivership itself and its undeniable state of woeful insolvency, there is no need for a trial on BancGroup's "equity claims."

---

[168]     *See* Colonial Bank, Failed Bank Information, *available at* http://www.fdic.gov/bank/individual/failed/colonial-al.html#possible_claims.

## VIII.   CONCLUSION

For the reasons set forth above, BancGroup respectfully requests that the Court enter an order denying the Motion in its entirety and awarding such other relief as it deems just and proper.


Dated:  September 22, 2011


                                        /s/   Andrew Campbell
                                        One of the Attorneys for Plaintiff,
                                        The Colonial BancGroup, Inc.

                                        Andrew Campbell, Esq. (Bar. No. ASB-
                                        1555-L40a)
                                        Leitman, Siegal, Payne & Campbell
                                        420 20th Street North
                                        Suite 2000
                                        Birmingham AL 35203


                                        David L. Elsberg, Esq.
                                        Benjamin I. Finestone, Esq.
                                        Xochitl S. Strohbehn, Esq.
                                        QUINN EMANUEL URQUHART &
                                        SULLIVAN, LLP
                                        51 Madison Avenue
                                        New York, New York 10010
                                        Telephone: (212) 849-7000
                                        Facsimile: (212) 849-7100

## <u>CERTIFICATION</u>

The undersigned hereby certifies that a true and correct copy of the foregoing document was electronically served on August 15, 2011, by transmission of Notices of Electronic Filing generated by CM/ECF to persons registered as of issuance of filing as set forth below:

Charles B. Lee (clee@millermartin.com)

Jeremy R. Johnson (jeremy.johnson@dlapiper.com)

John J. Clarke, Jr. (john.clarke@dlapiper.com)

Michael A. Fritz, Sr. (bankruptcy@fritzandhughes.com)

Michael D. Hynes (michael.hynes@dlapiper.com)

Spencer D. Stiefel (spencer.stiefel@dlapiper.com)

Thomas R. Califano (thomas.califano@dlapiper.com)

 /s/ Andrew Campbell     
One of the Attorneys for Plaintiff,
The Colonial BancGroup, Inc.