# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

-------------------------------------------------------------x
:
In re                                           :        Chapter 11
:
THE COLONIAL BANCGROUP, INC.,                   :        Case No.  2:10-cv-00409
:        (Bankr. Case No. 09-32303 (DHW))
Debtor.                                 :
:
-------------------------------------------------------------x
-------------------------------------------------------------x
:
:
THE COLONIAL BANCGROUP, INC.,                   :
:
Plaintiff,                              :
:
v.                                              :        Case No.  2:10-cv-00198
:
FEDERAL DEPOSIT INSURANCE                       :
CORPORATION, AS RECEIVER FOR                    :
COLONIAL BANK,                                  :
:
Defendant.                              :
:
-------------------------------------------------------------x

## REPLY IN FURTHER SUPPORT OF THE COLONIAL BANCGROUP, INC.'S MOTION FOR SUMMARY JUDGMENT REGARDING OWNERSHIP OF TAX REFUNDS AND REIT PREFERRED SECURITIES

## TABLE OF CONTENTS

Page

I.      PRELIMINARY STATEMENT ................................................................. 1

II.     ARGUMENT REGARDING TAX REFUNDS ............................................ 4

    A.   The Entire Premise Of The FDIC-Receiver's Position Is Flawed .................... 5

    B.   Even Under *Bob Richards*, The TAA Provides That BancGroup Owns
         The Tax Refunds ................................................................................ 9

        1.   The TAA Establishes That The Tax Refunds Are Property Of
             BancGroup's Estate .................................................................. 10

        2.   The Absence Of Trust Language Confirms The Tax Refunds
             Are Property Of BancGroup's Estate ........................................... 15

        3.   The Parties' Supposed Course Of Conduct Is Irrelevant To
             BancGroup's Motion .................................................................. 19

        4.   Section 1823 Does Not Bar The Court's Consideration Of The
             TAA ........................................................................................ 19

        5.   The IPS Is Not Incorporated In The TAA ..................................... 29

        6.   Consideration Of Section 371 Does Not Alter The Plain
             Language Of The TAA ............................................................... 33

    C.   Bankruptcy Law Does Not Eviscerate BancGroup's Interest In The
         Tax Refunds ..................................................................................... 36

III.    ARGUMENT REGARDING REIT PREFERRED SECURITIES ................. 38

    A.   There Is No Disputed Issue Of Fact Material To BancGroup's Motion
         – BancGroup Owns the RPS ................................................................. 38

        1.   Constructive Delivery Is Not Available ........................................ 40

        2.   BancGroup Never Acknowledged It Held RPS For Bank ................ 44

        3.   BancGroup Owned The RPS Following The Conditional
             Exchange Pursuant To The Exchange Agreement .......................... 45

    B.   The Automatic Stay Precludes Florida REIT From Now Registering
         Bank As Owner Of The RPS ................................................................ 47

      C.      The FDIC-Receiver's Waiver Argument Fails ................................... 49

      D.      The Court Should Not Entertain The FDIC-Receiver's Assertion Of
             Bankruptcy Code Sections 365(o) And 507(a)(9) Which Are
             Inapplicable To The FDIC-Receiver's Claim For The RPS In Any
             Event ..................................................................................... 53

IV.     SECTION 502(D) OF THE BANKRUPTCY CODE ............................... 59

V.      CONCLUSION ............................................................................... 60

## TABLE OF AUTHORITIES

**Page**

### Cases

*Alexandria Assocs. v. Mitchell Co.,*
2 F.3d 598 (5th Cir. 1993) ...........................................................................................22

*American Cas. Co. v. FSLIC,*
704 F. Supp. 898 (E.D. Ark. 1989)...............................................................................52

*American Cas. Co. of Reading, PA. v. FDIC,*
713 F. Supp. 311 (N.D. Iowa 1988) ..............................................................................52

*Andrews v. Troy Bank & Trust Co.,*
529 So. 2d 987 (Ala. 1988)...........................................................................................42

*Armstrong v. First Nat'l Bank (In re Clothes, Inc.),*
40 B.R. 997 (D. N.D. 1984)...........................................................................................34

*Asher Candy Co. V. MAFCO Holdings, Inc. (In re Marvel Entm't Grp., Inc.),*
273 B.R. 58 (D. Del. 2002).............................................................................................24

*Atherton v. FDIC*
519 U.S. 213 (1997) .........................................................................................................7

*Bank of Am., N.A. v. Mukamai (In re Egidi),*
571 F.3d 1156 (11th Cir. 2009) ................................................................................9, 18

*Bank One Tex. Nat'l Ass'n v. Morrison,*
26 F.3d 544 (5th Cir. 1994) ..........................................................................................28

*In re Bates,*
58 B.R. 915 (Bankr. W.D. Tenn. 1986).........................................................................34

*Baumann v. Savers Fed. Sav. & Loan Assoc.,*
934 F.2d 1506 (11th Cir. 1991) ..............................................................................25, 26

*Bell v. Killian,*
93 So. 2d 769 (Ala. 1957)..............................................................................................18

*Black Horse Capital LP et al., v. JPMorgan Chase Bank, N.A., et al (In re Washington Mutual, Inc.),*
442 B.R. 297 (Bankr. D. Del. 2011)..........................................................................46, 47

*Boyle Co. v. Wells (In re Gustav Schaeffer Co.),*
103 F.2d 237 (6th Cir. 1939)
...........................................................................................................................................50

*Brandt v. Fleet Capital Corp. (In re TMCI Elecs.),*
279 B.R. 552 (Bankr. N.D. Cal. 1999) ...........................................................................8

*Branning v. CNA Ins. Co.*,
  721 F. Supp. 1180 (W.D. Wash. 1989) ................................................................51

*BSD Bancorp, Inc. v. FDIC*
  No. 94-1341-IEG (S.D. Cal. Feb. 28, 1995)..................................................*passim*

*Bufman Org. v. FDIC*,
  82 F.3d 1020 (11th Cir. 1996) ..............................................................22, 23, 25

*Butler v. MaxiStorage, Inc.*,
  33 So. 3d 1221 (Ala. Civ. App. 2009)................................................................42

*Butner v. United States*,
  440 U.S. 48 (1979) ..............................................................................................7

*Capital Bancshares, Inc. v. FDIC*,
  957 F.2d 203 (5th Cir. 1992) ......................................................................*passim*

*Cohen v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*,
  138 B.R. 687 (Bankr. S.D.N.Y. 1992).............................................................37

*Cohen v. Un-Ltd. Holdings, Inc. (In re Nelco, Ltd.)*,
  264 B.R. 790 (Bankr. E.D. Va. 1999) ..............................................................11

*Corporacion Venezolana de Fomento v. Vintero Sales Corp.*,
  452 F. Supp. 1108 (S.D.N.Y. 1978) ................................................................42

*D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.*,
  315 U.S. 447 (1942) ........................................................................................20

*E.I. Du Pont de Nemours and Co. v. FDIC*,
  45 F.3d 458 (D.C. Cir. 1995)...........................................................................26

*E.I. du Pont de Nemours & Co. v. FDIC*,
  32 F.3d 592 (D.C. Cir. 1994)...........................................................20, 21, 22

*Ennis v. Phillips*,
  890 So. 2d 313 (Fla. Dist. Ct. App. 2004) ..............................................39, 41, 42

*In re Eye Contact, Inc.*,
  97 B.R. 990 (Bankr. W.D. Wis. 1989) ............................................................59

*Faircloth v. Paul (In re Int'l Gold Bullion Exch., Inc.)*,
  60 B.R. 261 (Bankr. S.D. Fla. 1986) ...............................................................51

*Faro v. Corporate Stock Transfer, Inc.*,
  883 So. 2d 896 (Fla. Dist. Ct. App. 2004) .......................................................42

*FDIC v. Amtrust Fin. Corp.*,
  No. 10-01298 (N.D. Ohio Jan. 31, 2011) ........................................................51

*FDIC v. Brandt (In re Florida Park Banks, Inc.)*,
  110 B.R. 986 (Bankr. M.D. Fla. 1990)..........................................................8, 13

*FDIC v. Govaert (In re Geri Zahn),*
  25 F.3d 1539 (11th Cir. 1994) ..................................................................22, 24, 25

*Fid. & Dep. Co. of Md. v. Jefferson County Comm'n,*
  756 F. Supp. 2d 1329 (N.D. Ala. 2010)...........................................................35, 36

*First Union Nat'l Bank v. Hall,*
  123 F.3d 1374 (11th Cir. 1997) ......................................................................28, 29

*In re Flying J, Inc.,*
  No. 08-13384, 2009 WL 5215000 (Bankr. D. Del. Dec. 28, 2009) .......................38

*Fraley v. Cincinnati Ins. Co.,*
  No. 05-0006, 2006 WL 2583572 (M.D. Ala. Sept. 7, 2006)............................*passim*

*Franklin Savings Corporation v. Office of Thrift Supervision,*
  303 B.R. 488 (D. Kan. 2004) ...................................................................................57

*Franklin Sav. Corp. v. Franklin Sav. Ass'n (In re Franklin Sav. Corp.),*
  159 B.R. 9 (Bankr. D. Kan. 1993) ...........................................................................27

*Franklin Sav. Corp. v. Franklin Sav. Ass'n (In re Franklin Sav. Corp.),*
  182 B.R. 859 (D. Kan. 1995)............................................................................10, 14

*Gordon Sel-Way, Inc. v. United States (In re Gordon Sel-Way, Inc.),*
  270 F.3d 280 (6th Cir. 2001) ...................................................................................50

*Gower v. Farmers Home Admin. (In re Davis),*
  785 F.2d 926 (11th Cir. 1986) .................................................................................50

*Guthartz v. Park Ctr. W. Corp.,*
  409 Fed. Appx. 248 (11th Cir. 2010) ..................................................................39, 41

*Hunter v. Wilshire Credit Corp.,*
  927 So. 2d 810 (Ala. 2006)......................................................................................58

*Indep. BankGroup, Inc. v. FDIC (In re Indep. BankGroup, Inc.),*
  217 B.R. 442 (Bankr. D. Vt. 1998).......................................................................8, 25

*Island Place Apartments LLC v. First Home View Corp. (In re Greater Miami Neighborhoods,
  Inc.),*
  Adv. No. 08-01186, 2008 WL 2444530 (Bankr. S.D. Fla. Jun. 16, 2008).............48

*John v. RTC,*
  39 F.3d 773 (7th Cir. 1994) .....................................................................................21

*Jones v. Cole,*
  2010 WL 5015307 (D. Kan. Dec. 3, 2010) ...........................................................42, 44

*Joseph v. Hopkins,*
  158 So. 2d 660 (Ala. 1963)......................................................................................19

*Kallop v. McAllister,*
  678 A.2d 526 (Del. 1996)......................................................................................42, 44

*Kennedy v. Polar-BEK & Baker Wildwood P'ship*,
   682 So. 2d 443 (Ala. 1996) ................................................................................................16

*Kessler v. Nat'l Enters.*,
   165 F.3d 596 (8th Cir. 1999) ..............................................................................................21

*Krazalic v. Republic Title Co.*,
   314 F.3d 875 (7th Cir. 2002) ..............................................................................................32

*Longley v. Patton*,
   86 So. 2d 820 (Ala. 1956) ...................................................................................................16

*Lubin v. FDIC*
   No. 10-00874, 2011 U.S. Dist. LEXIS 21391 (N.D. Ga. Mar. 2, 2011) ....................8, 12, 13

*Mahon v. Stowers*,
   416 U.S. 100 (1974) ............................................................................................................44

*McClellan v. Pennington*,
   895 So. 2d 892 (Ala. 2004) .................................................................................................16

*McMath v. FDIC*,
   No. 10-0021, 2011 U.S. Dist. LEXIS 34650 (M.D. Ala. Mar. 31, 2011) ............................23

*Montgomery v. Aetna Cas. & Sur. Co.*,
   898 F.2d 1537 (11th Cir. 1990) ..........................................................................................14

*In re Norquist*,
   43 B.R. 224 (Bankr. D. Wash. 1984) ..................................................................................37

*Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*,
   813 F.2d 1177 (11th Cir. 1987) ............................................................................................9

*O'Melveny & Myers v. FDIC*,
   512 U.S. 79 (1994) ...............................................................................................................7

*OPS Shopping Ctr., Inc. v. FDIC*,
   992 F.2d 306 (11th Cir. 1993) .................................................................................21, 22, 25

*Office of Thrift Supervision v. Overland Park Fin. Corp. (In re Overland Park)*,
   236 F.3d 1246 (10th Cir. 2001) ..........................................................................................57

*In re Peralta Food Corp.*,
   No. 07-16508, 2008 WL 190503 (S.D. Fla. Jan. 18, 2008) ...................................................37

*Resolution Trust Corp. v. Firstcorp, Inc. (In re Firstcorp)*,
   973 F.2d 243 (4th Cir. 1992) ..............................................................................................57

*Resolution Trust Corp. v. Midwest Fed. Sav. Bank*,
   4 F.3d 1490 (9th Cir. 1993), *amended on other grounds, reh'g denied*,
   *Resolution Trust Corp. v. Midwest Fed. Sav. Bank*, 36 F.3d 785 (9th Cir. 1993) ...................28

*Riverside Park Realty Co. v. FDIC*,
   465 F. Supp. 305 (M.D. Tenn. 1978) ..................................................................................28

*Rodgers v. County of Monroe (In re Rodgers)*,
    333 F.3d 64 (2d Cir. 2003) ...................................................................................48

*RTC v. Oak Apartments. Joint Venture*,
    966 F.2d 995 (5th Cir. 1992) .................................................................................28

*Sackett v. Shahid*,
    722 So. 2d 273 (Fla. Dist. Ct. App. 1998) ....................................................39, 41

*Segal v. Rochelle*,
    382 U.S. 375 (1966) .............................................................................................38

*Seidman v. Office of Thrift Supervision (In re Seidman)*,
    37 F.3d 911 (3d Cir. 1994) ...................................................................................32

*Shopmen's Local Union No. 455 v. Kevin Steel Products, Inc.*,
    519 F.2d 698 (2d Cir. 1975) .................................................................................50

*Simonds v. Simonds*,
    45 N.Y.2d 233 (N.Y. 1978) .................................................................................17

*Smith v. Citicorp Pers.-to-Pers. Fin. Ctrs., Inc.*,
    477 So. 2d 308 (Ala. 1985) ..................................................................................19

*Southtrust Bank of Alabama v. Thomas (In re Thomas)*,
    883 F.2d 991 (11th Cir. 1989) .............................................................................49

*Stanfill v. State*,
    384 So. 2d 141 (Fla. 1980) ..................................................................................41

*Superintendent of Ins. v. First Cent. Fin. Corp. (In re First Cent. Fin. Corp.)*,
    269 B.R. 481 (Bankr. E.D.N.Y. 2001) .......................................................*passim*

*Superintendent of Ins. v. Ochs (In re First Cent. Fin. Corp.)*,
    377 F.3d 209 (2d Cir. 2004) ........................................................................*passim*

*In re Trans World Airlines, Inc.*,
    No. 01-0056, 2001 Bankr. LEXIS 722 (Bankr. D. Del. Mar. 16, 2001) ...............51

*Tanner v. Robinson*,
    411 So. 2d 240 (Fla. Dist. Ct. App. 1982) .....................................................41, 42

*In re Team Fin. Inc.*,
    No. 09-5084, 2010 Bankr. LEXIS 1493 (Bankr. D. Kan. 2010) ...................*passim*

*In re The Colonial BancGroup, Inc.*,
    Case No. 09-32303 (DHW) (Bankr. M.D. Ala. Jan. 24, 2011) .............................49

*In re The Colonial BancGroup, Inc.*,
    436 B.R. 713 (Bankr. M.D. Ala. 2010) .......................................................54, 56, 58

*Thompkins v. Lil Joe Records, Inc.*,
    476 F.3d 1294 (11th Cir. 2007) ......................................................................37, 38

*Tidwell v. Atlanta Gas Light Co. (In re Georgia Steel, Inc.),*
  38 B.R. 829 (Bankr. M.D. Ga. 1984) ................................................................ 59

*Twin Constr., Inc. v. Boca Raton, Inc.,*
  925 F.2d 378 (11th Cir. 1991) ...............................................................23, 28

*U.S. Fid. and Guar. Co. v. Bass,*
  619 F.2d 1057 (5th Cir. 1980) .................................................................... 18

*United Dominion Indus. v. United States,*
  532 U.S. 822 (2001) ...........................................................................5, 6

*United States v. MCorp Fin. Inc. (In re MCorp Fin. Inc.),*
  170 B.R. 899 (S.D. Tex. 1994) ..............................................................10, 14

*United States v. Ron Pair Enters, Inc.,*
  489 U.S. 235 (1989) ............................................................................ 55

*United States v. Whiting Pools,*
  462 U.S. 198 (1983) ............................................................................ 50

*W. Dealer Mgmt., Inc. v. England (In re Bob Richards Chrysler-Plymouth Corp.),*
  473 F.2d 262 (9th Cir. 1973),
  *cert. denied,* 412 U.S. 919 (1973) ..........................................................*passim*

*In re Washington Mut., Inc.,*
  No. 08-12229, 2011 WL 57111 (Bankr. D. Del. Jan. 7, 2011) .............................. 57

*Weaver v. Aquila Energy Marketing Corp.,*
  196 B.R. 945 (S.D. Tex. 1996)
  *aff'd,* No. 96-20592, 1997 WL 336190 (5th Cir. May 30, 1997) ........................... 50

*Wolkowitz v. FDIC (In re Imperial Credit Industries, Inc.),*
  527 F.3d 959 (9th Cir. 2008) ................................................................... 57

*Woods v. Christensen Shipyards, Ltd.,*
  2005 WL 5654643 (S.D. Fla.) (S.D. Fla. Sept. 23, 2005) ..................................... 53

*Zucker v. FDIC (In re NetBank, Inc.),*
  Adv. No. 08-00346 (Bankr. M.D. Fla. Sept. 30, 2010) ....................................*passim*

## **Rules/Statutes**

11 U.S.C. § 362(a)(3) ................................................................................ 47

11 U.S.C. § 502(d) .................................................................................. 59

11 U.S.C. § 507(a)(9) ............................................................................... 55

11 U.S.C. § 541(a)(1) .........................................................................9, 49, 51

12 U.S.C. § 91 ...................................................................................... 34

12 U.S.C. § 504 ..................................................................................... 34

12 U.S.C. § 1441a(y)(3) ....................................................................................34

12 U.S.C. § 1467a(f) .........................................................................................34

12 U.S.C. § 1468(c) ..........................................................................................34

12 U.S.C. § 1818 ...............................................................................................34

12 U.S.C. § 1818(i)(2) .......................................................................................34

12 U.S.C. § 1823(e) ..........................................................................................20

12 U.S.C. § 1823(e)(3) ......................................................................................21

12 U.S.C. § 1823(e)(c) ......................................................................................24

63 Fed. Reg. 64578 ....................................................................................26, 31

Fed. R. Evid. 704 ..............................................................................................14

Fla. Stat. § 671.102 cmt. 2 ...............................................................................46

Fla. Stat. § 671.102 .........................................................................................46

Fla. Stat. § 678.3011 ..................................................................................39, 44

Fla. Stat. § 678.3021 cmt. 2 .............................................................................46

Treas. Reg. § 1.1502-77(a) .................................................................................7

Treas. Reg. § 1.1502-77(a)(2)(v) ........................................................................9

Treas. Reg. § 301.6402 - 7 .................................................................................6

Treas. Reg. § 301.6402 - 7(a)(1) ........................................................................6

Treas. Reg. § 301.6402 - 7(j) ..............................................................................6

Treas. Reg. § 301.6402 - 7(k) .............................................................................6

### <u>Other Authorities</u>

Restatement, The Law of Restitution, ch. 9, § 160 ..........................................16

The Colonial BancGroup, Inc. ("BancGroup") hereby submits this reply in further support of its Motions for Summary Judgment under Federal Rule of Civil Procedure 56 Regarding Ownership of Tax Refunds (the "BancGroup Tax Refund Motion," as supported by the "BancGroup Tax Refund Brief") and REIT Preferred Securities (the "BancGroup RPS Motion," as supported by the "BancGroup RPS Brief"), and in response to the consolidated memorandum of law in opposition to the motions (the "Opposition" or "Opp.") filed by the Federal Deposit Insurance Corporation (the "FDIC"), in its capacity as receiver (the "FDIC-Receiver") for Colonial Bank ("Bank"), and respectfully requests a ruling that BancGroup owns (i) the approximately $250 million in tax refunds to be issued by the Internal Revenue Service (the "IRS") in respect of consolidated filings BancGroup made with the IRS on behalf of it and Bank for losses incurred in the 2008 and 2009 tax years (the "Tax Refunds"), and (ii) certain preferred securities (the "RPS") issued by BancGroup's former indirect subsidiary, Florida REIT.

## I.   PRELIMINARY STATEMENT[1]

The FDIC-Receiver's Opposition does not dispute any of the facts BancGroup submitted in connection with its summary judgment motions and includes two critical concessions confirming that such motions should be granted: (1) With respect to the Tax Refunds, the FDIC-Receiver does not dispute that the Intercorporate Tax Allocation Policy (the "TAA") is unambiguous. (2) With respect to the RPS, the FDIC-Receiver admits that Florida REIT, the issuer, never recorded any transfer from BancGroup to Bank. Two respective conclusions flow

---

[1]   Capitalized terms not defined herein shall have the meanings ascribed to them in the BancGroup Tax Refund Brief or the BancGroup RPS Brief.

Separately, the FDIC-Receiver has filed a cross motion for summary judgment solely in Case No. 2:10-cv-00198 (the "FDIC-Receiver Motion," supported by the "FDIC-Receiver Summary Judgment Brief" and the FDIC-Receiver Statement of Facts ("FDIC SOF"). BancGroup filed its opposition to the FDIC-Receiver Motion (the "BancGroup Opposition") on September 22, 2011.

from this as a matter of law.  First, there is not even an alleged reason to look beyond the plain terms of the TAA, which establishes a debtor-creditor relationship between BancGroup and Bank such that the Tax Refunds are property of BancGroup's estate.  Second, under governing Florida law, BancGroup never transferred the RPS and they remain property of its estate. Summary judgment is therefore appropriate in BancGroup's favor.

Rather than allege any ambiguity, the FDIC-Receiver instead ignores, attempts to alter, and seeks to legally bar consideration of the TAA.  However, its attempts to ignore or obfuscate the TAA by putting forth extrinsic evidence, such as the parties' supposed course of conduct, should not be considered by the Court and are thus irrelevant to BancGroup's motion.  The FDIC-Receiver's efforts to alter the TAA should similarly be rejected.  The TAA speaks for itself and it does not incorporate the language the FDIC-Receiver has cherry-picked from an interagency policy statement which is not entitled to any legal deference and which encourages debtor-creditor relationships in any event.  Finally, its statutory attempts to erase the very existence of the TAA fail.  Even assuming there were a Bank asset to "diminish", 12 U.S.C. § 1823(e) does not bar consideration of unsigned tax sharing agreements.  To the extent it does, as the FDIC has itself acknowledged, it is appropriate to consider the TAA executed based upon its attachment to Board resolutions signed by Bank and BancGroup's respective chairmen and secretaries.  The Bankruptcy Code similarly does not remove the TAA from the equation.  The TAA is not executory so it need not be rejected.  And if it were, it is well settled that rejection would not eviscerate the TAA nor strip BancGroup of its ownership rights to the Tax Refunds. The TAA clearly and unambiguously establishes a debtor-creditor relationship and includes no language indicating any agency or trust relationship.  Pursuant thereto, the Tax Refunds are owned by BancGroup.

When the FDIC-Receiver finally turns to the TAA's terms and provisions, its argument is essentially that BancGroup's reading cannot be accurate because of the Ninth Circuit's *Bob Richards* holding. This argument is not only irreconcilable with *Bob Richards* itself, which defers to the terms of a tax sharing agreement, it fails because *Bob Richards* purports to determine the parties' interest in property not based upon any federal statute or rule and without any analysis of state law. Therefore, *Bob Richards* is an improper attempt to create federal common law (which was never binding on this Court in any event). The Ninth Circuit's theory of unjust enrichment cannot be squared with Alabama law (just as the Second Circuit found it could not be squared with congruent New York law in *Superintendent of Ins. v. Ochs,* 377 F.3d 209, 218 (2d Cir. 2004)). There is no unjust enrichment in view of BancGroup's role marshalling estate assets to generate fair but not full returns for all of its creditors, spreading amongst them equally the pain of bankruptcy. Absent *Bob Richards*, even irrespective of the TAA, the Tax Refunds comprise property of BancGroup's estate because they were payable to and therefore under BancGroup's control as of the Petition Date.

In line with its opposition to the BancGroup Tax Refund Motion, the substantial majority of the FDIC-Receiver's opposition to the BancGroup RPS Motion is besides the point. Under Florida's adoption of the Uniform Commercial Code ("UCC"), delivery is required to effectuate any transfer of securities. The FDIC-Receiver concedes that the issuer, Florida REIT, did not recognize any putative transfer from BancGroup to Bank as is required to establish delivery. Thus, no transfer occurred. Moreover, the caselaw holds that the requirements under Florida's common law are congruent with those under the UCC, foreclosing the FDIC-Receiver's assertion of "constructive" delivery. Thus, purported evidence of the parties' supposed intent is irrelevant to the question before the Court: whether a transfer occurred. The FDIC-Receiver's

attempts to comb the UCC for possible exceptions comes up empty. And the fact that the FDIC-Receiver resorts to arguing (errantly) that BancGroup too does not own the RPS is telling as to the weaknesses of its other arguments in view of the fact that the RPS must go through BancGroup to have ever been contributed to Bank.

In essence, the FDIC-Receiver asks this Court to ignore BancGroup's role as consolidated group tax-filer, party to the TAA, and issuer of preferred stock to former investors in exchange for the RPS. BancGroup is a separate legal entity from Bank, possessing independent rights and obligations which cannot be stripped away simply because the FDIC-Receiver proclaims certain assets to be Bank property without any basis in law. Similarly, the FDIC-Receiver's calls to fairness and equity ignore that BancGroup and its stakeholders supported Bank for years, providing it with executive management and access to capital markets only to be left insolvent and without its banking operations. The FDIC-Receiver may be disappointed in Bank's failure (as are BancGroup's stakeholders), but its legal relationship with BancGroup requires more than post-bankruptcy disappointment to convert that relationship from debtor-creditor into something the FDIC-Receiver would otherwise prefer. Summary judgment should be granted in BancGroup's favor.

## II.    ARGUMENT REGARDING TAX REFUNDS

The Opposition is premised entirely on the Ninth Circuit's holding in *W. Dealer Mgmt., Inc. v. England (In re Bob Richards Chrysler-Plymouth Corp.)*, 473 F.2d 262, 264 (9th Cir. 1973), *cert. denied*, 412 U.S. 919 (1973) which concluded that, in the absence of a tax allocation agreement, principles of unjust enrichment dictate that when a subsidiary generates earnings and pays taxes, and suffers net operating losses that may generate a refund, the subsidiary is entitled to the resulting tax refund. Even assuming Bank and BancGroup had not entered into the TAA,

the *Bob Richards* holding should not be applied here for two, independent reasons. First, the predicate for the decision – the notion that members of a consolidated group retain their separate and independent tax benefits – has been deemed non-existent by the Supreme Court in *United Dominion Indus. v. United States*, 532 U.S. 822, 829-831 (2001). Second, the *Bob Richards* holding represents an inappropriate exercise of federal common law which, in any event, is not controlling over this Court and is irreconcilable with Alabama principles of unjust enrichment. Absent *Bob Richards*, the FDIC-Receiver has no ownership claim to the Tax Refunds. Under the Eleventh Circuit's "control" test, tax refunds owed consolidated groups are property of debtor tax-filers' estates. That is the result here.

Significantly, even were this Court to follow *Bob Richards*, the Tax Refunds are property of BancGroup's estate. *Bob Richards* expressly defers to the terms of an express or implicit tax sharing agreement. Under the TAA, BancGroup and Bank agreed that (i) the IRS would owe and pay tax refunds to BancGroup, (ii) BancGroup (and not the IRS) would owe Bank tax refunds, and (iii) Bank would owe BancGroup (and not the IRS) tax liabilities.

For the reasons discussed below, nothing in the Opposition alters these independent, but congruent, conclusions.

A.    **The Entire Premise Of The FDIC-Receiver's Position Is Flawed**

As discussed in the BancGroup Tax Refund Brief, the Supreme Court in *United Dominion* held that the central premise underlying the *Bob Richards* holding, a member's separate net operating losses, "simply does not exist." *Id.* at 830 (emphasis added). Given this ruling, the holding of *Bob Richards*, affording ownership to a member based upon a legal fiction, has been undercut.

The FDIC-Receiver argues that *United Dominion* has no implications in a banking context because IRS regulations expressly reference the separate losses of failed banks and other

members of consolidated groups.[2]   The *United Dominion* Court already considered this argument.  Based upon Treas. Reg. § 1.1502-79, the Court of Appeals for the Fourth Circuit found that the concept of separate net operating losses did exist.  *United Dominion Indus.*, 532 U.S. at 832-33.  However, the Supreme Court rejected this argument, finding that the regulation "unbakes the cake for only one reason":  to allow an affiliate member to carry back losses to a year in which the member was not part of the consolidated group.  *Id.* at 833.  The Supreme Court was not convinced that separate net operating losses exist simply because a Treasury regulation utilized the concept for a limited purpose.  Treas. Reg. § 301.6402 – 7, on which the FDIC-Receiver relies, only concerns "payment" of a refund.  Treas. Reg. § 301.6402 – 7(a)(1).  Importantly, the regulation does not alter the refund owed the consolidated group in any way and "is not determinative of ownership of any such amount among current or former members of a consolidated group."  Treas. Reg. § 301.6402 – 7(j); *see also* § 301.6402 – 7(k) ("Any refund or tentative carryback adjustment paid to the fiduciary discharges any liability of the Government to the same extent as payment to the common parent under §1.1502 – 77 or §1.1502 – 78 of this chapter.  Furthermore, any refund or tentative carryback adjustment paid to the fiduciary is considered a payment to all members of the carryback year group.").  Thus, the simple fact that Treas. Reg. § 301.6402 – 7 references a separate net operating loss for a limited, expressly non-substantive purpose does not alter the *United Dominion* holding regarding the absence of any substantive concept of separate net operating losses.[3]

---

[2]   Opp. at 12.

[3]   The FDIC-Receiver attempts to limit the *United Dominion* holding by asserting that *United Dominion* is "silent" as to which member owns the refunds.  However, BancGroup relies on *United Dominion* solely to discredit any *Bob Richards* federal common law default rule and not to affirmatively determine Tax Refund ownership.  As discussed below, both Eleventh Circuit law and the TAA accomplish this.

It is the FDIC-Receiver which wrongly attempts to put forward an IRS Regulation as determinative of ownership.  *See* Opp. at 2-3 ("BancGroup is designated by [IRS] regulation as the 'sole agent' for

The *Bob Richards* holding is also problematic in so much as it determines a debtor's interest in property without regard to (or even any analysis of) state law. *See Butner v. United States*, 440 U.S. 48, 54 (1979) (holding that Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law). Moreover, *Bob Richards* does not purport to interpret a federal statute or administrative rule. In that regard, *Bob Richards* sets forth putative federal common law. However, because it articulates no conflict between federal policy and state law, its holding is invalid. *See Atherton v. FDIC*, 519 U.S. 213, 218-19 (1997) (holding that in setting forth "rules of federal common law, the guiding principle is that a significant conflict between some federal policy or interest and the use of state law . . . must first be specifically shown. Indeed, such a 'conflict' is normally a 'precondition.'") (internal quotation and citation omitted). *Bob Richards* made no mention of the Deposit Insurance Fund or any other special banking considerations which, in any event, would not comprise one of the "few and restricted" instances which justify federal common law. *See O'Melveny & Myers v. FDIC*, 512 U. S. 79, 87-88 (1994) ("there is no federal policy that the fund should always win").

Attempting to reconcile the *Bob Richards* holding with Alabama unjust enrichment law (because it must), the FDIC-Receiver argues that BancGroup could not own the Tax Refunds "in equity and good conscience" simply because other courts have applied *Bob Richards* against a bankrupt debtor. Yet, in two of the cases cited by the FDIC-Receiver, the parties had entered

---

Colonial Bank . . . for all federal tax matters including refunds, *see* Treas. Reg. § 1.1502-77(a), an indisputable fact that BancGroup fails to mention."). As even the FDIC-Receiver's lead case states: "there is nothing in the [Internal Revenue] Code or Regulations that compels the conclusion that a tax saving must or should inure to the benefit of the parent company or of the company which has sustained the loss that makes possible the tax saving." *Bob Richards*, 473 F. 2d at 264 (alteration in original).

The FDIC-Receiver's only response to *Marvel* is that it is wrong under *Bob Richards*. Opp. at 12. It is unremarkable that *Marvel*, applying *United Dominion*, is in conflict with *Bob Richards*. That only reflects the fact that *United Dominion* undercut the core premise of *Bob Richards*.

into tax sharing agreements and therefore the *Bob Richards* default was not applied.[4]  The balance of the cases chose to follow *Bob Richards* without any analysis of state law and are thus similarly flawed.[5]

Rather, only *Superintendent of Ins. v. Ochs (In re First Cent. Fin. Corp.)*, 377 F.3d 209, 218 (2d Cir. 2004) includes an assessment of state law which would be helpful to the Court here. There, the court considered New York state law.  Just like Alabama law, unjust enrichment under New York law requires, generally, "[that] a party hold property 'under such circumstances that in equity and good conscience he ought not to retain it.'" *See id.* at 214.[6]  The Second Circuit did not follow *Bob Richards*, instead concluding that because the bankruptcy trustee "marshals the assets of the estate under judicial supervision, for distribution according to federal law, under circumstances in which unsecured creditors receive fair but not full returns", the estate "may have been enriched, [but] was not unjustly enriched" by retaining ownership of the tax refunds. *Id.* at 218.  Similarly, under Alabama law, BancGroup's ownership of the Tax Refunds would not "<u>unjustly</u> enrich" its estate.

The FDIC-Receiver argues that "equity is on the side of the FDIC-Receiver."[7]  This misstates the standard.  Alabama unjust enrichment law does not proscribe a balancing test. Rather, it requires a showing that the Tax Refunds "in equity and good conscience, belong[] to

---

[4]   *See Lubin v. FDIC*, No. 10-00874, 2011 U.S. Dist. LEXIS 21391 (N.D. Ga. Mar. 2, 2011); *BSD Bancorp, Inc. v. FDIC*, No. 94-1341, slip-op. (S.D. Cal. Feb. 28, 1995).

[5]   *See Capital Bancshares, Inc. v. FDIC*, 957 F.2d 203 (5th Cir. 1992), *Brandt v. Fleet Capital Corp. (In re TMCI Elecs.)*, 279 B.R. 552 (Bankr. N.D. Cal. 1999) (over which *Bob Richards* controlled); *Indep. BankGroup, Inc. v. FDIC (In re Indep. BankGroup, Inc.)*, 217 B.R. 442 (Bankr. D. Vt. 1998); *FDIC v. Brandt (In re Florida Park Banks, Inc.)*, 110 B.R. 986 (Bankr. M.D. Fla. 1990).

[6]   *Compare with Fraley v. Cincinnati Ins. Co.*, No. 05-0006, 2006 WL 2583572, at *4 (M.D. Ala. Sept. 7, 2006) (noting that under Alabama law unjust enrichment exists where a party "holds money which, in equity and good conscience, belongs to the plaintiff or holds money which was improperly paid . . . because of mistake or fraud.").

[7]   Opp. at 14.

the [FDIC-Receiver]" or that payment of Tax Refunds to BancGroup would be the result of "mistake or fraud." *Fraley*, 2006 WL 2583572, at *4. That cannot be said in view of (i) BancGroup's status as bankrupt debtor, (ii) the *United Dominion* holding governing the effect of electing to form a consolidated filing group, and (iii) the parties' willful entry into the TAA. Moreover, even if the standard were an equitable balancing test, BancGroup would prevail. The FDIC-Receiver asks this court for a ruling which would transfer to it the entirety of the Tax Refunds to the exclusion of all of BancGroup's other creditors. In contrast, affording ownership to BancGroup will allow the FDIC-Receiver to assert a claim to share in the Tax Refunds with BancGroup's other creditors, including bondholders, employees, and trade creditors.

In the absence of *Bob Richards*, even without consideration of the TAA, the Tax Refunds are property of BancGroup's estate because they were under BancGroup's control as of the Petition Date. Under well-settled Eleventh Circuit law, "any funds under the <u>control</u> of the debtor, regardless of the source, are properly deemed to be the debtor's property . . . ." *Bank of Am., N.A. v. Mukamai (In re Egidi)*, 571 F.3d 1156, 1160 (11th Cir. 2009) (holding funds payable to debtor but directed to third party constitute property of the estate prior to transfer) (*citing Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*, 813 F.2d 1177, 1181 (11th Cir. 1987) (emphasis added). As of the Petition Date, the date when property of the debtor's estate is determined under 11 U.S.C. § 541, the Tax Refunds were payable only to the consolidated group's tax filer, BancGroup. *See* 26 C.F.R. § 1.1502-77(a)(2)(v) (2006, amended 2009). Thus, because the *Bob Richards* holding has been undercut by the Supreme Court, is inappropriate federal common law, and is irreconcilable with Alabama unjust enrichment law, the Tax Refunds are property of BancGroup's estate under the Eleventh Circuit's control test.

B.   **Even Under *Bob Richards*, The TAA Provides That BancGroup Owns The Tax Refunds**

1.   *The TAA Establishes That The Tax Refunds Are Property Of BancGroup's Estate*

Even if the Court were to elect to follow *Bob Richards*, there is no dispute that affiliated companies may enter into tax sharing agreements to accomplish the allocation of tax liabilities and ownership rights to tax refunds and that such agreements govern the nature of the relationship between the parties. *See Bob Richards*, 473 F.2d at 264-65 ("[n]ormally, where there is an explicit agreement, or where an agreement can fairly be implied, as a matter of state corporation law the parties are free to adjust among themselves the ultimate tax liability" and "the ultimate disposition of the tax refund"). Here, Bank and BancGroup did just that under the TAA, establishing a debtor-creditor relationship which renders the Tax Refunds property of BancGroup's estate.[8] Because the FDIC-Receiver has implicitly conceded that the TAA is unambiguous, the terms of the TAA control, establishing a debtor-creditor relationship as between BancGroup and Bank such that the Tax Refunds are property of BancGroup's estate.

Rather than refute the substantial analysis included in the BancGroup Tax Refund Brief concerning the remarkable similarity between the TAA's terms and provisions and tax sharing agreements considered by other courts finding debtor-creditor relationships, *see, e.g., Franklin Sav. Corp. v. Franklin Sav. Ass'n (In re Franklin Sav. Corp.)*, 182 B.R. 859, 863 (D. Kan. 1995); *United States v. MCorp Fin. Inc. (In re MCorp Fin. Inc.)*, 170 B.R. 899, 902 (S.D. Tex. 1994); *In*

---

[8]   Only in a footnote does the FDIC-Receiver challenge the TAA as an enforceable contract under Alabama law. Opp. at 23 n.10. The FDIC-Receiver questions whether Bank received consideration for entering into the TAA. *Id.* However, the FDIC-Receiver's "consideration" argument is flawed. The FDIC-Receiver argues that Bank received nothing in exchange for its rights to the Tax Refunds. First, Bank willingly joined a consolidated group for tax filing purposes, relinquishing its individual tax rights in exchange for the benefits provided to all by the TAA. As the FDIC-Receiver concedes, "[m]aking such an election has benefits, including that losses suffered by one member of the group can be used to offset income earned by another member of the group resulting in a reduction of the group's consolidated tax liability." FDIC-Receiver Summary Judgment Brief at 17. Second, the FDIC-Receiver's argument ignores the terms of the TAA which affords Bank an intercompany receivable in an amount equivalent to Bank's "separate return" tax refund. Campbell Dec. Ex. A (TAA at BB&T 008880, ¶¶ 2, 4). That is dollar for dollar consideration.

*re Team Fin. Inc.,* No. 09-5084, 2010 Bankr. LEXIS 1493, *36-37 (Bankr. D. Kan. 2010); *Zucker v. FDIC (In re Netbank, Inc.),* Adv. No. 08-00346, slip op. at 17-18 (Bankr. M.D. Fla. Sept. 30, 2010);[9] *Superintendent of Ins. v. First Cent. Fin. Corp. (In re First Cent. Fin. Corp.),* 269 B.R. 481, 496-98 (Bankr. E.D.N.Y. 2001) *aff'd sub nom. Superintendent of Ins. v. Ochs,* 377 F.3d 209 (2d Cir. 2004), the FDIC-Receiver instead attempts to improperly raise the standard set forth by its own lead case, *Bob Richards,* and focuses on distinguishable caselaw that only further supports BancGroup's position.

Seeking to manufacture an artificial hurdle, the FDIC-Receiver asserts that the TAA is not a "clear and explicit" agreement.[10] This language is lifted from *Cohen v. Un-Ltd. Holdings, Inc. (In re Nelco, Ltd.),* 264 B.R. 790, 809 (Bankr. E.D. Va. 1999), which cites to *Bob Richards* and *Capital Bancshares* in support thereof. However, both of these decisions expressly state that a tax sharing agreement may be <u>implicit</u>. *See Capital Bancshares, Inc. v. FDIC,* 957 F.2d 203, 207 (5th Cir. 1992); *Bob Richards,* 473 F. 2d at 264. And there is no argument that the *Nelco* court was seeking to revise or elevate the "general rule for allocation of tax refunds" because the court was not even presented with an agreement that addressed "the allocation of tax refunds among the consolidated group." *In re Nelco, Ltd.,* 264 B.R. at 809. In any event, as the comparative chart included in the BancGroup Tax Refund Brief reflects, the TAA is as "clear and explicit" as each of the other tax sharing agreements courts have reviewed and determined to have established a debtor-creditor relationship.[11]

---

[9] Campbell Dec. Ex. B (The slip opinion of *Zucker v. FDIC (In re Netbank, Inc.),* Adv. No. 08-00346 (Bankr. M.D. Fla. Sept. 30, 2010)).

[10] Opp. at 23.

[11] BancGroup Tax Refund Brief at 26-27.

Next, the FDIC-Receiver argues that *BSD Bancorp* and *Lubin* support a conclusion that the TAA established an agency-principal relationship.[12] Those decisions only strengthen the conclusion that the TAA establishes a debtor-creditor relationship.

The FDIC-Receiver's discussion of *BSD Bancorp* omits entirely the basis for the court's decision that the tax sharing agreement established an agency relationship. The tax sharing agreement included an express provision to be exercised in "remote" and "unusual" circumstances pursuant to which the parent had the option to borrow tax refunds from the subsidiary. *Id.* at 5, 11. Therefore, by negative inference, the court determined that the inclusion of this express exception reflected that "<u>except</u>" in the circumstances where the loan option was elected, the parties otherwise intended that the parent act solely as agent to the subsidiary. *Id.* at 11-12 (emphasis added). The *BSD Bancorp* tax sharing agreement provided that when this loan option was not exercised (and it was not), "the agreement required [the parent/tax-filer] to give the [subsidiary-bank] its share of the refund in cash and <u>immediately</u>." *Id.* at 11 (emphasis added). Because the TAA includes none of the foregoing provisions upon which the *BSD Bancorp* decision is expressly premised (and in fact provides for a thirty-day term on the intercompany receivable), the decision does not support finding an agency relationship under the TAA.

The FDIC-Receiver's omission in discussing *Lubin* – another case in which the court examined the plain language of the tax sharing agreement – is even more significant. The *Lubin* tax sharing agreement provided:

> "If the Holding Company receives a tax refund from a taxing authority, these refunds <u>are obtained as agent</u> of the consolidated group <u>on behalf of the individual group members</u>. This allocation agreement as well as other corporate policies should not be

---

[12] Opp. at 24-25.

> intended to consider refunds attributable to the subsidiary banks,
> which are received by the Holding Company from the taxing
> authority, as the property of the Holding Company."

*Lubin, 2011 U.S. Dist. LEXIS 21931* at *15-16 (emphasis added). The court's holding was based on this express language establishing an agency relationship and disclaiming any parent ownership of tax refunds. The TAA includes nothing of the sort.

In *Florida Park Banks*, the court found there was no agreement between the parties "as to the allocation of tax refunds." 110 B.R. at 989. The court did not consider policy statements to comprise binding agreements due to "questions regarding the effective date of the agreement" and because it perceived that the term "tax benefit" was too vague. *Id.* at 988. Here, as set forth in the BancGroup Tax Refund Brief,[13] there is no question about the TAA's effective date – it was approved annually and repeatedly for the impending 12-month period. And the TAA does not use vague language. Rather, it expressly provides for the payment of "tax refunds" and "tax liabilities" and reimbursement of "tax losses" as between BancGroup and Bank.[14]

In order to rebut the plain language of the TAA establishing a debtor-creditor relationship, the FDIC-Receiver refers to the foregoing decisions. But these cases do not "demonstrate [that] the use of words like 'payment' and 'remit' in the [TAA] do not indicate an intent to establish" a debtor-creditor relationship.[15] Rather, these cases turn on the absence of a pertinent tax sharing agreement (*Nelco*), a tax sharing agreement that included express evidence of an intent to establish an agency relationship (*Lubin* and *BSD Bancorp*), or a tax sharing agreement which the court could not be certain was effective (*Florida Park Banks*). The Court is not faced with *any* of this in considering the TAA and as discussed in the BancGroup Tax

---

[13]   BancGroup Tax Refund Brf. at 6-10 (discussing annual adoption, affirmation, and ratification of the TAA by the Boards of Directors of Bank and BancGroup).

[14]   Campbell Dec. Ex. A (TAA at BB&T 008880).

[15]   Opp. at 26.

Refund Brief, the terms of the TAA do in fact reflect a debtor-creditor relationship. *See In re Franklin Sav. Corp.*, 182 B.R. at 863 (finding use of "reimbursement" and "credit" language established debtor-creditor protocol); *MCorp Fin. Inc.*, 170 B.R. at 902 (finding tax allocation agreement language regarding "[c]ash settlement between [parent] and the Subsidiary" establishes "an account between MCorp as the taxpayer and its subsidiaries as its constituents"); *In re Team Fin. Inc.*, No. 09-5084, 2010 Bankr. LEXIS 1493, *36-37 (Bankr. D. Kan. 2010) (considering "payment" language as establishing "ordinary contractual obligations"), *In re First Cent. Fin. Corp.*, 269 B.R. at 496-98 (considering "payment" terms reflective of debtor-creditor relationship).

Finding no support in the caselaw, the FDIC-Receiver seeks to create its own legal support with the report of William Leese Castleberry.[16]   Mr. Castleberry's report "concludes" that the TAA "reflects an agency relationship."[17]   It is well settled that a putative expert witness may not testify as to his opinion regarding ultimate legal conclusions. *See, e.g., Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) ("[a]n expert may testify as to his opinion on an ultimate issue of fact [but] may not, however, merely tell the jury what result to reach") citing FED. R. EVID. 704 (internal citation omitted).[18]   Mr. Castleberry's report amounts to nothing more than a legal conclusion – whether "under the general rule established in the *Bob Richards* case" the TAA establishes a debtor-creditor or agency relationship between Bank and

---

[16]   Opp. at 25; 9/22 Clarke Dec. Ex. 2.

[17]   Opp. at 25.

[18]   In an appeal brief filed with this Court in a related matter, the FDIC-Receiver has stated: "The [Bankruptcy Court] properly excluded the opinion and testimony of the Debtor's proposed expert, Herbert A. Biern, as an expert in the contested matters below.  [Citing] A45 ('any opinion by [Mr. Biern] on the legal issue of whether the debtor made a 'commitment' within the meaning of 11 U.S.C. § 365(o) shall not be considered by the court')."  Brief of Appellant FDIC-Receiver, Case No. 1:10-cv-0877 (MHT) [Dkt. No. 21], at 46 (internal citation omitted).

BancGroup – and is, therefore, inadmissible.[19]  Moreover, Mr. Castleberry, a practicing tax lawyer, appears to have no experience in bankruptcy or insolvency law and is thus not qualified as an expert on these legal issues.  In any event, the report adds nothing beyond what is already set forth in the FDIC-Receiver's Opposition.[20]

### 2. The Absence Of Trust Language Confirms The Tax Refunds Are Property Of BancGroup's Estate

In the BancGroup Tax Refund Brief, BancGroup discussed the complete absence of language in the TAA indicating an intent to establish a trust relationship and the lack of any segregation or use restrictions as further reflecting the parties' intent to establish a debtor-creditor relationship.[21]  In response, the FDIC-Receiver refers the Court back to *Bob Richards*, arguing that under this "presumption," BancGroup was already deemed trustee or agent under "common law" and therefore the absence of pertinent terms in the TAA means nothing.[22]  The FDIC-Receiver ignores the fact that *Bob Richards* (and the other cases cited to by the FDIC-Receiver) expressly defer to an agreement between the parties to allocate tax liabilities and refunds as they see fit.  *Bob Richards*, 473 F.2d at 264-65; *Capital Bancshares*, 957 F.2d at 207.  Because these cases instruct courts to interpret the parties' agreement, the FDIC-Receiver's argument that these same cases may establish an agency relationship irrespective of the TAA is meritless.[23]

---

[19] *See* 9/22 Clarke Dec. Ex. 2 at 2.

[20] Mr. Castleberry also opines on the validity of BancGroup's "worthless stock deduction," asserting that the "requirements . . . were not satisfied."  9/22 Clarke Dec. Ex. 2 at 5.  The IRS and not Mr. Castleberry will make that determination.  To the extent the IRS recognizes BancGroup's worthless stock deduction, the Tax Refunds will be generated by losses which the FDIC-Receiver cannot argue were derived from Bank's operations.

[21] BancGroup Tax Refund Brief at 21-25.

[22] Opp. at 31.

[23] The FDIC-Receiver attempts to distinguish decisions finding the absence of trust language significant by asserting that those courts made no attempt to "address" or "reconcile" their holdings with *Bob*

Conceding that the TAA here includes no language evincing an intent to establish any sort of trust relationship, the FDIC-Receiver next turns to the doctrines of resulting and constructive trusts. Neither doctrine is applicable here.

Resulting trusts are plainly inapposite. Under Alabama law, resulting trusts are divided into two categories: "(1) those arising on a failure of an express trust and (2) those arising as the result of a conveyance of property to one person on a consideration from another, commonly referred to as a purchase-money resulting trust." *McClellan v. Pennington*, 895 So. 2d 892, 896 (Ala. 2004). There is no express trust here that could have failed. And neither Bank nor BancGroup "purchased" the Tax Refunds from the IRS such that they might be subject to a resulting trust. Resulting trusts have no application to these facts.

There is no constructive trust here either. "[A] quasi-contractual obligation and a constructive trust closely resemble each other, the chief difference being that the plaintiff in bringing an action to enforce a quasi-contractual obligation seeks to obtain a judgment imposing a merely personal liability upon the defendant to pay a sum of money, whereas the plaintiff in bringing a suit to enforce a constructive trust seeks to recover specific property." *Longley v. Patton*, 86 So. 2d 820, 823 (Ala. 1956) (quoting Restatement, The Law of Restitution, ch. 9, § 160). The Alabama Supreme Court has proclaimed "that where an express contract exists between two parties, the law generally will not recognize an implied contract regarding the same subject matter." *Kennedy v. Polar-BEK & Baker Wildwood P'ship*, 682 So. 2d 443, 447 (Ala. 1996). Thus, it follows that the FDIC-Receiver may assert Bank's contractual claim under the

---

*Richards*. Opp. at 33. It is impossible to discern the FDIC-Receiver's argument. Each of the bankruptcy courts in *Team Financial*, *NetBank*, and *First Central* expressly cited the *Bob Richards* decision and its deference to a tax sharing agreement. *See In re First Cent.Fin. Corp.*, 269 B.R. at 490; *NetBank* slip op at 14; *In re Team Fin., Inc.*, 2010 Bankr. LEXIS 1493, at *24. The fact that the Second Circuit's decision in *First Central* did not refer to *Bob Richards* only underscores the merit of BancGroup's argument discussed above that *Bob Richards* is wrongly decided because it is irreconcilable with state law concerning constructive trusts and unjust enrichment and their intersection with bankruptcy.[23]

TAA, but a constructive trust is not sustainable because of the existence of the TAA. *See In re First Cent. Fin. Corp.*, 377 F.3d at 215-16, 218 (holding failed insurance company could not assert constructive trust over tax refunds because it entered into tax sharing agreement which provided adequate legal remedy notwithstanding that "FCIC, like many other creditors, will not, in all probability, be made whole in the [bankruptcy]").

Even assuming a constructive trust were a remedy available to the FDIC-Receiver, one should not be formed here given that BancGroup is seeking to "marshal the assets of the estate under judicial supervision, for distribution according to federal law, under circumstances in which unsecured creditors receive fair but not full returns." *First Cent. Fin. Corp.*, 377 F.3d at 218. Particularly in view of Bank's entry into the TAA, BancGroup does not own the Tax Refunds "under such circumstances that in equity and good conscience [it] ought not to retain [them]." *Id.* The FDIC-Receiver attempts to distinguish *First Central* on the grounds that it applies New York law,[24] but New York law and Alabama law on unjust enrichment are congruent.[25]

The FDIC-Receiver does not dispute the absence of any segregation requirements or use restrictions in the TAA or the fact that the *NetBank* and *First Central* courts found this to be critical evidence of the parties' intent to establish a debtor-creditor relationship.[26] Rather, the FDIC-Receiver again retreats to the parties' supposed conduct, alleging that tax refunds were always "segregated" by being deposited directly into Bank bank accounts. Accepting this as true

---

[24] Opp. at 32-33.

[25] *Compare Fraley*, No. 05-0006, 2006 WL 2583572, at *4 (noting that under Alabama law unjust enrichment exists where a party "holds money which, in equity and good conscience, belongs to the plaintiff or holds money which was improperly paid . . . because of mistake or fraud.") *with Simonds v. Simonds*, 45 N.Y.2d 233, 242 (N.Y. 1978) ("What is required, generally, is that a party hold property 'under such circumstances that in equity and good conscience he ought not to retain it'").

[26] Opp. at 33-34.

for the sake of argument, the argument should be rejected because it goes beyond the four corners of the TAA in conflict with Alabama laws of contract interpretation (discussed below). Moreover, under Eleventh Circuit law, BancGroup's election to deposit funds under its sole control into Bank's account as an efficient method of satisfying BancGroup's "separate tax return" liability under the TAA establishes that such funds were BancGroup's property in the first instance. *See In re Egidi*, 571 F.3d at 1164 (holding that funds advanced to the debtor via "convenience check" which the debtor did not deposit, instead forwarding to a creditor in satisfaction of amounts owed constituted property of the debtor prior to the transfer).[27]

In sum, the FDIC-Receiver's own lead case instructs that the TAA governs. It is no answer to seek to apply *Bob Richards* in a fictional world where the TAA does not exist. Under Alabama law (as well as the caselaw interpreting tax sharing agreements, *First Central, NetBank, Team Financial, Franklin Savings*), the absence of any use restrictions, trust language, escrow arrangement, segregation provisions, or provisions affording Bank control over BancGroup leads to the inescapable conclusion that the parties intended to establish a debtor-creditor relationship and not one of principal-agent.

---

[27] Continuing its discussion of extrinsic conduct, the FDIC-Receiver argues that even if the funds were commingled, Bank would still retain any interest it had in the funds. Opp. at 34. The FDIC-Receiver puts the cart before the horse. The case cited by the FDIC-Receiver instructs that Alabama law provides that "so long as trust property can be traced and followed, the property into which it has been converted remains subject to the trust." *Bell v. Killian*, 93 So. 2d 769, 779 (Ala. 1957) (emphasis added). In other words, Alabama law may extend an implied trust where there was first a finding of trust property. Here, the fact that the TAA did not prohibit commingling is relevant to the determination of whether there was a trust in the first instance. The FDIC-Receiver does not respond to the cases cited in the BancGroup Tax Refund Brief at 21-22, concerning Alabama law and leading to the conclusion that a debtor-creditor relationship exists. *See U.S. Fid. and Guar. Co. v. Bass*, 619 F.2d 1057, 1061 (5th Cir. 1980) (noting that in Alabama "[w]hen there is no obligation to return the identical money, but only a relationship of debtor or creditor, an action for conversion of the funds representing the indebtedness will not lie against the debtor"); *Fraley*, No. 05-0006, 2006 WL 2583572, at *5 ("where there is no evidence that leads the court to conclude that the subject money is or was in any manner segregated or identifiable, then the relationship between the [parties] . . . is akin to that of a debtor and creditor.") (internal quotation omitted)

3.  *The Parties' Supposed Course Of Conduct Is Irrelevant To BancGroup's Motion*

The FDIC-Receiver attempts to establish "BancGroup's understanding" in entering into the TAA by discussing the parties' supposed course of conduct.[28]  However, the FDIC-Receiver does not allege that the TAA is ambiguous.  Thus, under Alabama law, the parties' conduct is irrelevant.  *See Smith v. Citicorp Pers.-to-Pers. Fin. Ctrs., Inc.*, 477 So. 2d 308, 310 (Ala. 1985) ("when the parties reduce their agreements to writing, the writing – in the absence of mistake or fraud or ambiguity – is the sole expositor of the transaction and the intention of the parties") (quoting *Joseph v. Hopkins*, 158 So. 2d 660 (Ala. 1963)).

The FDIC-Receiver refers to the report of Mr. William A. Rogers who discusses the supposed "accounting evidence."[29]  Mr. Rogers' report is based entirely on the parties' supposed course of conduct and includes no analysis of (or even reconciliation of such conduct to) the TAA.  Mr. Rogers also does not argue that the TAA is ambiguous.  In fact, the only reference to the TAA in the entire report is where Mr. Rogers acknowledges that BancGroup's ownership claim of the Tax Refunds is "largely based" on the TAA.[30]  Notwithstanding this acknowledgement, he elects to ignore the TAA and its unambiguous terms and provisions.  Mr. Rogers' report is thus equally irrelevant.

4.  *Section 1823 Does Not Bar The Court's Consideration Of The TAA*

---

[28]  Opp. at 14-19.  As set forth in the BancGroup Opposition to the FDIC-Receiver Summary Judgment Brief, substantially all of the course of conduct in fact supports and conforms with the TAA's terms and provisions, while certain of the conduct is subject to dispute.  BancGroup Opposition at 35-40.

[29]  Opp. at 18.

[30]  9/22 Clarke Dec. Ex. 1 at 16.

The FDIC-Receiver argues that 12 U.S.C. § 1823(e) ("Section 1823")[31] precludes this Court from determining that the TAA establishes a debtor-creditor relationship between BancGroup and Bank because the TAA supposedly "was never executed by Colonial Bank."[32] As an initial matter, the FDIC-Receiver's argument again presumes the validity of the *Bob Richards* holding. As discussed above, because the Tax Refunds were under BancGroup's control as of the Petition Date (and because there are no grounds for an express or constructive trust under Alabama law), they are BancGroup's property and therefore not "any asset acquired by" the FDIC-Receiver within the meaning of Section 1823.

In any event, even under *Bob Richards*, the plain language and purpose of Section 1823 indicate it is inapplicable to disputes other than those governing "conventional loan transactions." *See E.I. du Pont de Nemours & Co. v. FDIC*, 32 F.3d 592, 597 (D.C. Cir. 1994). The Eleventh Circuit has not considered Section 1823 in the context of a tax sharing agreement. However, it would likely refuse to apply the statute given its well-settled exception to claims which are unrelated to "regular banking transactions," particularly when application of Section 1823 would not further the underlying policies of the *D'Oench* doctrine[33] that it has codified.

---

[31]   Section 1823 provides:  No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the [FDIC] unless such agreement —

(1) is in writing,

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(4) has been continuously, from the time of its execution, an official record of the depository institution. 12 U.S.C. § 1823(e).

[32]   Opp. at 22.

[33]   *D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.*, 315 U.S. 447 (1942). In *D'Oench, Duhme*, the Supreme Court held that the FDIC is not bound by agreements between borrowers and financial

*See OPS Shopping Ctr., Inc. v. FDIC*, 992 F.2d 306, 308-11 (11th Cir. 1993). In any event, even if Section 1823 is applicable, the TAA satisfies its requirements.

(a)     Section 1823 Is Inapplicable

"[T]he requirements of § 1823(e) effectively limit that provision to <u>conventional loan transactions</u>." *E.I. du Pont*, 32 F.3d at 597 (emphasis added). Cases from other Circuits are in accord. *See, e.g., Kessler v. Nat'l Enters.*, 165 F.3d 596, 599 (8th Cir. 1999) ("it is not realistic to apply the bar of § 1823(e) to <u>non-banking transactions</u>"); *John v. RTC*, 39 F.3d 773, 776 (7th Cir. 1994) ("By its language § 1823(e) applies only to <u>conventional loan activities</u> . . . the only sensible reading of § 1821(d)(9)(A) must limit its scope to the loan-related transactions covered by § 1823(e)."); 12 U.S.C. § 1823(e)(3) (referring to a depository institution's "<u>loan committee</u>") (all emphases added).

The FDIC has acknowledged that Section 1823 should not be applied in instances such as these. The FDIC has issued a policy and developed guidelines[34] which provide that "[t]he use of *D'Oench* or [Section 1823] should be limited in most circumstances to <u>loan transactions</u> and other <u>similar ordinary banking transactions</u>."[35] More specifically, the FDIC Policy & Guidelines state that "the FDIC, as a matter of policy, will not seek to bar claims which by their very nature do not lend themselves to <u>the enumerated requirements of section 1823(e)</u> [and t]o that end, the FDIC will continue to assert the protections of the *D'Oench* doctrine and FIRREA (sections 1821(d)(9)(A), 1823(e)) only in accordance with the Guidelines." *Id.* (emphasis added).

---

institutions that are not expressed in the written agreements between the parties. The *D'Oench* doctrine permits federal banking regulators to rely on a bank's records of regular banking transactions and to ensure mature consideration of unusual loan transactions by senior bank officials.

[34]   Campbell Dec. Ex. C (FDIC Law, Regulations, Related Acts, 5000 - Statement of Policy Regarding Federal Common Law and Statutory Provisions Protecting FDIC, as Receiver or Corporate Liquidator, Against Unrecorded Agreements or Arrangements of a Depository Institution Prior to Receivership, by Order of the FDIC Board of Directors, February 4, 1997).

[35]   *Id.* (emphasis added).

In accord with the FDIC Policy & Guidelines, the *E.I. du Pont* court found that Section 1823 was inapplicable to a claim against a depository institution arising from an escrow arrangement established by the institution because this claim did not relate to the bank's "conventional loan transactions." *E.I. du Pont,* 32 F.3d at 597. The court's decision was premised in part on one of the enumerated requirements of Section 1823: subsection (3)'s reference to "the loan committee." *Id.* Other courts have agreed, reasoning that inclusion of "non-banking transactions within the coverage of § 1823(e) and § 1821 could lead to absurd results." *See, e.g., Alexandria Assocs. v. Mitchell Co.,* 2 F.3d 598, 602 (5th Cir. 1993) ("each ordinary trade creditor of a bank would find it necessary to have its purchase order or other contract documents approved by the bank's directors and recorded in the Board's minutes if such creditor was to avoid potential uncollectibility under *D'Oench.*").

Neither the Eleventh Circuit nor any other Circuit court has considered whether Section 1823 is applicable to tax sharing agreements (which are inherently unrelated to a bank's regular banking transactions). However, in considering tort claims, the Eleventh Circuit has developed a well-settled "relatedness" exception to *D'Oench* and Section 1823 which turns on whether the claims at issue are sufficiently related to the failed bank's regular banking transactions such that application of Section 1823 furthers the underlying policies of *D'Oench. See Bufman Org. v. FDIC,* 82 F.3d 1020, 1025-29 (11th Cir. 1996) (conducting claim by claim analysis to determine whether each related to <u>regular banking transactions</u> and noting that a "regular banking transaction usually results in the acquisition of an asset, such as a note"); *FDIC v. Govaert (In re Geri Zahn),* 25 F.3d 1539, 1543-1544 (11th Cir. 1994) ("One obvious indicia of relatedness would be whether the oral representations were of matters that would generally be reflected in the records of <u>ordinary banking transactions</u>"); *OPS Shopping,* 992 F.2d at 310-11

(distinguishing claims concerning matters that would be found in "records of <u>regular banking transactions</u>" from claims concerning matters found in other records such as those found in departments handling bank personnel or the sale or transfer of the bank's stock); *McMath v. FDIC*, No. 10-0021, 2011 U.S. Dist. LEXIS 34650, at *29-31 (M.D. Ala. Mar. 31, 2011) (rejecting the FDIC- Receiver for Colonial Bank's "broad-brush analysis" of Section 1823 in favor of test which requires that claims arise from "<u>a regular banking transaction</u>") (all emphases added). Moreover, the Eleventh Circuit has contemplated an exception to Section 1823 where a party "has not lent itself to an arrangement that might mislead banking authorities." *See Twin Constr., Inc. v. Boca Raton, Inc.*, 925 F.2d 378, 382-83 (11th Cir. 1991) (contemplating certain "non-fraudulent activity . . . escap[ing] the reach of *D'Oench* and section 1823(e).").

The FDIC-Receiver cites *Twin Construction* – a case that pre-dates each of *Bufman Organization*, *Geri Zahn*, and *OPS Shopping* – for the proposition that Section 1823 is applicable to tax sharing agreements. However, the *Twin Construction* agreement concerned a mortgage loan owned by the failed bank (*i.e.*, one of the bank's conventional loan transactions) and the priority of that loan vis-à-vis competing debts. *Twin Constr., Inc.*, 925 F.2d at 380. Unsurprisingly, the document was found to be "included in [the failed bank's] records as one of the loan documents." *Id.* at 383. Thus, the document at issue in *Twin Construction* related to regular banking transactions.

Here the TAA concerns the allocation of tax liabilities and tax refunds between BancGroup and its affiliates. A bank's regular banking operations include accepting deposits and pooling those funds to provide credit to third parties either directly by lending, or indirectly by investing through the capital markets. *Cf. Bufman Org.*, 82 F.3d at 1025 (providing examples of "regular banking transactions" as acquisition of a note or extension of letter of credit). The

Tax Refunds are unrelated to the foregoing. The TAA is not a document that would have been presented to the Bank's loan committee as Section 1823(e)(c) expressly contemplates. Rather, it is a document relating to intercompany matters that would have been found in the tax department, not the Bank's loan origination or credit department.[36] Companies that have nothing to do with the banking industry – and therefore do not engage in regular banking transactions – utilize tax sharing agreements. *See, e.g., Superintendent of Ins. v. Ochs*, 377 F.3d at 211 (tax sharing agreement between parent and insurance company); *Asher Candy Co. v. MAFCO Holdings, Inc. (In re Marvel Entm't Grp. Inc.)*, 273 B.R. 58 (D. Del. 2002) (tax sharing agreement between parent and comic book operating subsidiary). Because the intercompany tax transactions underlying the TAA have nothing to do with conventional banking transactions, Section 1823 should not be applied. This is particularly true where the Tax Refunds – at least primarily – are generated not through losses arising from Bank's loan portfolio, but as a result of the extraordinary and enormous fraud enacted upon Bank by TBW.[37]

Application of Section 1823 to the TAA would not further the underlying policies of *D'Oench* as the Eleventh Circuit found pertinent in *Geri Zahn*. *See In re Geri Zahn*, 25 F.3d at 1543 (requiring that a claim "be sufficiently intertwined with <u>regular banking transactions</u>, such that exclusion of the alleged 'secret agreement' accords with the underlying policies of *D'Oench*") (emphasis added). The Eleventh Circuit has identified these purposes as: (i) allowing federal banking regulators such as the FDIC to rely on a bank's records of <u>regular banking transactions</u> when evaluating the institution's financial soundness; and (ii) "ensur[ing]

---

[36] *See* 8/15 Clarke Dec. Ex. 3 (July 26, 2011 Deposition Transcript of T. Brent Hicks ("<u>Hicks Tr.</u>") at 107:5-107:19 ("The policy was primarily owned by [corporate tax director] Mr. Reimer.").

[37] *See* 8/15 Clarke Dec. Ex. 2 (July 14, 2011 Deposition Transcript of David B. Byrne ("<u>Byrne Tr.</u>") at 245:20-246:3 ("Q. In your view was the Bank's total 2009 losses in large part directly attributable to Taylor-Bean's fraudulent activity? MR. HUGHEY: Object to the form. A. Not entirely. Q. In large part was the question. A. In large part, yes.")).

mature consideration of <u>unusual loan transactions</u> by senior bank officials", and to prevent fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure. *OPS Shopping*, 992 F.2d at 308-09, 311.[38] It is not surprising therefore that courts have determined the *D'Oench* doctrine does not bar judicial enforcement of tax sharing agreements. *See BSD Bancorp* at 7 (finding "agreement was sufficiently explicit that the FDIC could not have been misled as to Bancorp's potential right to 'borrow' the refunds" such that *D'Oench* did not preclude assertion of tax sharing agreement).

The FDIC-Receiver cites *Indep. Bankgroup v. FDIC (In re Indep. Bankgroup)*, 217 B.R. 442 (Bankr. D. Vt. 1998). In that case, the court held that a tax refund "in this instance" was sufficiently connected to banking activities for purposes of Section 1823. *Id.* at 447. The decision contains no reasoning underlying this conclusion. Notably, however, a written tax sharing agreement could not be located or produced by either party. *Id.* Thus, stretching the scope of Section 1823 arguably served the policies of *D'Oench* which guard against "secret agreements" as the Eleventh Circuit discussed in *Geri Zahn*. Here, where the Board-approved TAA cannot be said to be any sort of "secret agreement," it is impossible to conclude that the TAA is "sufficiently intertwined with regular banking transactions, such that exclusion of the alleged 'secret agreement' accords with the underlying policies of *D'Oench*." *In re Geri Zahn*, 25 F.3d at 1543.

In this case, one cannot fathom more "mature consideration" by more "senior bank officials" than that which occurred with respect to the TAA (*i.e.*, repeated annual Board review, adoption, affirmation, ratification, and approval). Moreover, the FDIC functioned as Bank's

---

[38] The Eleventh Circuit has determined that the purposes of *D'Oench* and Section 1823 are the same. *Bufman Org. v. FDIC*, 82 F.3d 1020, 1025 (11th Cir. 1996); *see also Baumann v. Savers Fed. Sav. & Loan Assoc.*, 934 F.2d 1506, 1515 (11th Cir. 1991).

primary regulator for more than a year prior to the Receivership Date and it has never been alleged that the FDIC was unaware of the TAA.[39]

And as discussed below, the Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure, November 1998 (the "IPS") – a statement the FDIC-Receiver touts throughout its Brief – expressly encourages institutions to enter into tax allocation agreements. *See* 63 Fed. Reg. 64758. Thus, the FDIC-Receiver cannot and has not argued[40] it was unaware of the TAA when deciding what course of action to take with respect to Bank upon receivership. There is no credible argument that the FDIC-Receiver could have been misled as to "the true obligations of the parties" or that BancGroup lent itself to a "scheme or arrangement whereby the banking authority . . . was or was likely to be misled." *See Baumann v. Savers Fed. Sav. & Loan Assoc.*, 934 F.2d 1506, 1517 (11th Cir. 1991); *see also E.I. Du Pont de Nemours and Co. v. FDIC*, 45 F.3d 458, 459 (D.C. Cir. 1995) ("We are aware of no court, however, having held that a failure to record prohibits recovery under *D'Oench* where the court has also concluded that a regulator was not, or was not likely to be, misled by the arrangement.") (emphasis added).

Finally, applying Section 1823 to tax sharing agreements would render an entire body of caselaw meaningless. Many of the decisions concerning ownership of tax refunds have opined that an implicit agreement is sufficient to provide that a parent is the owner of tax refunds as opposed to a failed bank in receivership. *See Capital Bancshares, Inc.,* 957 F.2d at 207 (court

---

[39]   In fact, Ms. Maria Smith of the FDIC was present at the January 21, 2009 BancGroup Board meeting at which the TAA was adopted, affirmed, and ratified. Finestone Dec. Ex. L (January 21, 2009 Minutes of the Meeting of the Board of Directors of The Colonial BancGroup, Inc. at CBGR 18 12509, 12544).

[40]   The FDIC-Receiver references different "forms" of the TAA and certain "typographical errors." Opp. at 23. Although the FDIC-Receiver includes vague references to "confusion and uncertainty," it does not assert that it was ever confused or misled as to the TAA's terms or which "form" was effective. The fact that the TAA was Board-approved annually precludes such an argument. Each of the pertinent witnesses had no trouble at all identifying the TAA. 8/15 Clarke Dec. Ex. 2 (Byrne Tr. at 84:4-84:10 and 222:3-222:8); 8/15 Clarke Dec. Ex. 4 (July 28, 2011 Deposition Transcript of David Reimer ("Reimer Tr.") at 94:14-94:21); 8/15 Clarke Dec. Ex. 1 (May 3, 2011 Deposition Transcript of Sarah H. Moore ("Moore Tr.") at 182:11-183:23).

"will not question [] allocation" of tax refund which results from express or <u>implied agreement</u> between the affiliated companies); *see also Bob Richards,* 473 F. 2d at 264 (same); *see also BSD Bancorp, Inc.,* No. 09-05084, at *10 (considering the question of whether the parties "expressly or impliedly" override *Bob Richards*"); *Franklin Sav. Corp. v. Franklin Sav. Ass'n (In re Franklin Sav. Corp.),* 159 B.R. 9, 29 (Bankr. D. Kan. 1993) ("where an agreement can fairly be <u>implied</u> . . . the parties are free to adjust among themselves the ultimate tax liability") (internal citation omitted) (emphasis added). Each of these cases post-date Section 1823's enactment. Implicit agreements, by definition, could never be signed or included as an official bank record and would therefore never satisfy Section 1823's requirements. Yet, these courts contemplated an implicit tax sharing agreement being dispositive over the ownership of tax refunds.

> (b)   Assuming *Arguendo* Section 1823 Is Applicable To The TAA, The Statutory Requirements Have Been Met

There is no dispute that the TAA is in writing, was approved annually by Bank's Board, and was an official Bank record. And there is no dispute that the Board resolutions approving the TAA were themselves executed and that the TAA was attached thereto.[41] The FDIC has recognized that it is "appropriate" to consider the TAA with the Board resolutions in determining the agreement for purposes of Section 1823. *See* FDIC Policy & Guidelines ("it may be appropriate to consider all of the failed institution's books and records in determining the agreement, <u>not just an individual document</u>") (emphasis added).

In order to avoid anomalous and inequitable results where parties are not attempting to advance "secret" side agreements against bank regulators, courts have found that documents may

---

[41]   Campbell Dec Ex. A (April 21, 2008 Meeting Minutes of the Board of Directors of Colonial Bank, N.A. and the attached TAA at BB&T 008881, BB&T 008887, BB&T 008879, and BB&T 008880); Campbell Dec. Ex. D (April 10, 2008 email sent by David Rogers to Pam Chestnutt, copying Brent Hicks and Tamara Stidham, excerpting the attachments by attaching the TAA and related Board Resolution); Campbell Dec. Ex. E (April 16, 2008 Resolutions of the Board of Directors of The Colonial BancGroup, Inc attaching a copy of the TAA).

satisfy Section 1823's requirements where they are incorporated by reference in another document. *See, e.g., Riverside Park Realty Co. v. FDIC*, 465 F.Supp. 305, 313 (M.D. Tenn. 1978) (rejecting FDIC's assertion of Section 1823 against enforcement of unexecuted loan agreement incorporated by reference in separate deed of trust such that FDIC was clearly on notice); *BSD Bancorp* at 7 (rejecting FDIC's argument that Section 1823 precluded consideration of tax sharing agreement attached to board materials given that tax portion was "incorporated by reference . . . and it appears that an explicit incorporation by reference suffices for § 1823(e)"). Other courts have recognized that "neither *D'Oench, Duhme* nor § 1823(e) requires that the agreement between the parties be confined to one document; rather, a collection of official bank documents can reflect the agreement reached." *See Bank One Tex. Nat'l Ass'n v. Morrison*, 26 F.3d 544, 550 (5th Cir. 1994); *see also Resolution Trust Corp. v. Midwest Fed. Sav. Bank*, 4 F.3d 1490, 1501 (9th Cir. 1993), *amended on other grounds, reh'g denied, Resolution Trust Corp. v. Midwest Fed. Sav. Bank*, 36 F.3d 785, 798 (9th Cir. 1993) ("the fact that an agreement between the failed lender and the borrower is manifested in more than one document does not automatically imply a deceptive secret agreement") (*citing RTC v. Oak Apartments. Joint Venture*, 966 F.2d 995, 999 (5th Cir. 1992)).

*Twin Construction* does not hold to the contrary. *Twin Construction* held that "executed" must mean "signed." 925 F.2d at 384. However, the document at issue there was simply unsigned and was not attached to <u>executed</u> and dated board minutes like the TAA in this case. Nothing in *Twin Construction* precludes or even militates against considering the Board minutes and the TAA together.[42]

---

[42]   Considering the Board minutes with the TAA as the agreement is not relying on extrinsic evidence as the FDIC-Receiver asserts. Opp. at 22. In *First Union Nat'l Bank v. Hall*, 123 F.3d 1374 (11th Cir. 1997), the Eleventh Circuit refused to consider an after-the-fact, made-for-litigation affidavit concerning a bank employee's purported <u>intent</u> to authenticate a letter agreement. *Id.* at 1380. *First Union* does not

The Board-approved TAA was attached to signed Board resolutions which "unanimously approved" and "incorporated [the TAA] herein by reference."[43] David Reimer, the corporate tax director who "owned"[44] the TAA, stated that "there wasn't a signed copy because the board approval was the -- was the execution."[45] Mr. Reimer stated that the only reason the TAA was not signed again (on top of the Board's execution) was because "the board wasn't going to go through and sign everything there was in the board minutes. It was all included."[46]

The TAA, "all included" with the Board minutes, satisfies all of Section 1823's requirements. Particularly in view of the fact that none of the policy considerations underlying *D'Oench* or Section 1823 is present, assuming *arguendo* that the Court finds that Section 1823 is applicable to the TAA, the statute is nonetheless satisfied. The Court can and should enforce the TAA in accordance with its terms.

### 5.   *The IPS Is Not Incorporated In The TAA*

Seeking to alter the terms of the TAA to serve its interests in this litigation, the FDIC-Receiver argues that the IPS was somehow incorporated into the TAA. As an initial matter, the plain language of the TAA does not incorporate the IPS. In any event, much of the content

---

preclude a court from considering more than one document as an agreement. Here, the Board minutes and TAA together, annually executed, adopted, affirmed, ratified, and approved, easily satisfy the Eleventh Circuit's interpretation of "sign" in *First Union*: "to make a mark 'with the present intent to authenticate'" *Id.* at 1380.

[43]   *See* Campbell Dec Ex. A (April 21, 2008 Meeting Minutes of the Board of Directors of Colonial Bank, N.A. and the attached TAA); *see also* 8/15 Clarke Dec. Ex. 2 (Byrne Tr. at 220:16-227:18, quoted language at 222:3-223:13 ("Q. And, in fact, the Exhibit A is what I've marked as Exhibit 31 here, and that's the intercorporate tax allocation policy that was approved as reflected in the minutes; correct?   A. To my knowledge, yes, sir.   Q. And it was, in fact, unanimously approved; correct?   A. Yes, sir.")).

[44]   8/15 Clarke Dec. Ex. 3 (Hicks Tr. at 107:5-107:19 ("The policy was primarily owned by [corporate tax director] Mr. Reimer.")).

[45]   8/15 Clarke Dec. Ex. 4 (Reimer Tr. 129:18-129:20 (emphasis added)).

[46]   8/15 Clarke Dec. Ex. 4 (Reimer Tr. 129:5-129:12 (emphasis added)).

included in the IPS which the FDIC-Receiver strives to incorporate into the TAA is entirely consistent with the debtor-creditor relationship established by the TAA.

The TAA does not "incorporate" anything. Rather, it simply provides that the TAA was "elected . . . under IRD regulation 1.552 & 1.1502, Bank Holding Company Rules and Regulations, OTS Holding Company Regulatory Handbook (Section 500), and FDIC 1978 Statement of Policy as a method of allocating the consolidated federal tax liability to each respective subsidiary in the consolidated group."[47]  If the parties sought to incorporate by reference certain terms from these materials, they would have stated so.

Moreover, even assuming the parties intended to incorporate terms by reference, the IPS is not referenced at all. Rather, the IPS's predecessor, the "FDIC 1978 Statement of Policy" (the "1978 Policy") is referenced.[48]  The FDIC-Receiver concedes this in a footnote, but submits that the IPS "does not materially change any of the guidance" provided in the 1978 Policy.[49] However, inspection of the 1978 Policy reveals that the policy does not include the language which the FDIC-Receiver underscores in its brief: "an organization's tax allocation agreement . . . should not purport to characterize refunds attributable to a subsidiary depository institution that the parent receives from a taxing authority as the property of the parent."[50]

In fact, the 1978 Policy provides that "the establishment of a formal tax allocation agreement between the bank and the parent holding company would be consistent with the responsibilities of the bank's board of directors."[51]   And the 1978 Policy encourages the

---

[47]  Campbell Dec. Ex. A (TAA  at BB&T 008880, ¶ 1 (emphasis added)).

[48]  Campbell Dec. Ex. A (TAA  at BB&T 008880, ¶ 1).  A copy of the FDIC 1978 Statement of Policy is attached hereto as Ex. A.

[49]  Opp. at 27, n.12.

[50]  Opp. at 27-28.

[51]  Ex. A at 1.

establishment of a debtor-creditor relationship, providing that "a bank which incurs a taxable loss <u>shall be reimbursed</u> in cash by the holding company to the extent there is a tax benefit arising from these losses in the consolidated return . . . ."[52]  In view of the foregoing, it is unremarkable that the TAA states it was "elected under" the 1978 Policy.  Indeed, the IPS too expressly encourages institutions to enter into tax allocation agreements.[53]

The FDIC-Receiver compares IPS language stating that a bank should receive "no less favorable treatment . . . than if it had failed its income tax return as a separate entity" with TAA language providing that Bank is to be treated as if it "were dealing directly with State or Federal taxing authorities" and is to pay its "separate return" tax liabilities and receive "separate return" tax refunds.[54]  The FDIC-Receiver attempts to create a false dichotomy, but similarities between the TAA and the IPS do not give rise to agency relationship.  Rather, the fact that the intercompany liabilities agreed to by Bank and BancGroup were to be calculated based upon Bank's theoretical "separate return" calculations, and the fact that Bank's right to payment from BancGroup is not dependent on BancGroup's receipt of tax refunds from the IRS or even BancGroup's entitlement to such receipt only reflects a debtor-creditor relationship.  *See, e.g.*, *In re First Cent. Fin. Corp.*, 269 B.R. at 498 (noting the fact that tax sharing agreement "expressly provides that FCIC is entitled to the refund amount it would have received if it had filed on a stand-alone basis" indicates a debtor-creditor relationship); *NetBank* at 24 (finding debtor-

---

[52]  Ex. A at 1 (emphasis added).

[53]  *See* 63 Fed. Reg. 64578 ("A holding company and its subsidiary institutions are encouraged to enter into a written, comprehensive tax allocation agreement tailored to their specific circumstances . . . . Although each agreement will be different, tax allocation agreements usually address certain issues common to consolidated groups.  Therefore, such an agreement should: . . .- Discuss the amount and timing of the institution's payments for current tax expense, including estimated tax payments;- Discuss reimbursements to an institution when it has a loss for tax purposes; . . . ."); *see also In re Team Fin., Inc.*, 2010 Bankr. LEXIS 1493, at *27 ("In fact, [the IPS] encourages these agreements").

[54]  Opp. at 27-28.

creditor relationship based on tax sharing agreement which provided bank was to be paid an amount "equal to the amounts to which [bank] would have been entitled if it had filed separately"). Indeed, the IPS itself cements this conclusion:

> An institution incurring a loss for tax purposes should record a current income tax benefit and receive a refund from its parent <u>in an amount no less than the amount the institution would have been entitled to receive as a separate entity</u>. The refund should be made to the institution within a reasonable period following the date the institution would have filed its own return, <u>regardless of whether the consolidated group is receiving a refund</u>. If a refund is not made to the institution within this period, the institution's primary federal regulator may consider <u>the receivable</u> as either an extension of credit or a dividend from the subsidiary to the parent.

IPS at 64758 (emphasis added). Thus, even the policy statement the FDIC-Receiver seeks to have incorporated into the TAA characterizes the relationship between holding company and bank as one of debtor and creditor.

The FDIC-Receiver next seeks to utilize the IPS as a blanket distinction for the series of cases finding debtor-creditor relationships when faced with tax sharing agreements with terms strikingly similar to the TAA.[55] Whether or not those cases predate the IPS or concerned bank holding companies is irrelevant however, because the IPS is entitled to no deference whatsoever. *See Seidman v. Office of Thrift Supervision (In re Seidman)*, 37 F.3d 911, 931-32 (3d Cir. 1994) (noting that a policy statement was "just that – a policy statement, not a regulation," and that it did not have the "force of law."); *Krazalic v. Republic Title Co.*, 314 F.3d 875, 881 (7th Cir. 2002) ("A simple announcement is too far removed from the process by which courts interpret statutes to earn deference. A simple announcement is all we have here. One fine day the policy statement simply appeared in the Federal Register. No public process preceded it . . . ."). Courts

---

[55]   Opp. at 28-29 (seeking to distinguish *First Central, MCorp, Franklin Savings Corp.*, and *Team Financial*).

have repeatedly rejected the FDIC-Receiver's attempts to advance the IPS in support of its argument that failed banks own tax refunds.[56]

In any event, such distinctions are inapplicable to *NetBank* which was decided after the IPS and which rejects these same arguments entirely. *NetBank* slip op at 29-31.[57] There, in contrast to the TAA, the tax sharing agreement actually evinced an intent to incorporate the IPS, providing that it was "intended to allocate the tax liability in accordance with the [IPS]." *NetBank* at 30. Still, in view of the substantial language in the IPS concerning the "separate return" basis on which the amount owed the bank should be calculated (discussed above), the court found that any reference to the IPS referred only to the similar provisions in the tax sharing agreement. *Id*. at 30-31. Thus, even assuming the IPS were incorporated in the TAA (and it is not), in view of the substantial language in the IPS describing a debtor-creditor relationship based upon Bank's "separate return" calculations, the similar terms in the TAA, and the reasoning of *NetBank*, there are no grounds on which to find evidence of an intent to establish an agency or trust relationship.

In sum, the TAA does not expressly incorporate the terms of any of the materials it references. To the extent it does, it refers to the IPS's predecessor which does not include the language on which the FDIC-Receiver focuses regarding "characterization" of refunds. Even assuming that the TAA does incorporate the IPS, however, as the *NetBank* court found, the IPS is substantially consistent with a debtor-creditor relationship between BancGroup and Bank.

      6.    *Consideration Of Section 371 Does Not Alter The Plain Language Of The TAA*

---

[56] *See In re NetBank, Inc.*, slip op. at 29 (rejecting FDIC's reliance on the IPS in tax refund ownership dispute because it "does not constitute a rule or regulation or have the force of law"); *In re Team Fin. Inc.*, 2010 Bankr. LEXIS 1493, at *25-28 ("Not even the FDIC asserts that this policy statement has the force of law.").

[57] The FDIC-Receiver offers only that the *NetBank* court "misses the point." Opp. at 30.

Rather than focus on the plain language of the TAA, the FDIC-Receiver next argues that consideration of sections 23A and 23B of the Federal Reserve Act (*see* 12 U.S.C. § 371c, 371c-1, together, "Section 371c")) indicates that the TAA must not establish a debtor-creditor relationship. In essence, the FDIC-Receiver asserts that because the TAA does not expressly provide for payment of interest accruing on tax refunds owed from BancGroup to Bank, the TAA's plain language should be ignored. Alabama law on contract interpretation instructs otherwise.

As an initial matter, even if Section 371c were applicable to a BancGroup debt owed Bank on account of tax refunds (and the FDIC-Receiver cites no precedent in which Section 371c was found to apply to a tax sharing agreement), nothing in Section 371c provides that any "loan" or "extension of credit" made in violation of the statute is void *ab initio* or gives rise to anything other than an enforceable debtor-creditor relationship. Rather, the statute plainly contemplates civil penalties (*see* 12 U.S.C. §§ 504 & 1818(i)(2)) or regulatory action, such as "cease and desist" orders (*see* 12 U.S.C. §§ 1468(c) & 1818), as the sole remedies for violations of Section 371c. This stands in clear contrast to other provisions whereby Congress made its intent clear to render certain transactions void or invalid. *See, e.g.*, 12 U.S.C. §§ 91, 1441a(y)(3) & 1467a(f). Courts have confirmed this point. *See Armstrong v. First Nat'l Bank (In re Clothes, Inc.)*, 40 B.R. 997, 1000 (D.N.D. 1984) (rejecting bankruptcy trustee's argument that "failure to comply with the statute makes the loan instruments unenforceable" because "while the extension of credit . . . was not proper procedure, the loan is not voidable . . ." under title 12); *In re Bates*, 58 B.R. 915, 916-17 (Bankr. W.D. Tenn. 1986) (rejecting argument that notes purportedly issued in violation of title 12's "Regulation O" were "voidable" and noting that "the exclusive sanctions provided for violation of this regulation" are the imposition of civil penalties under 12 U.S.C. §

504).  Thus, even if the intercompany liabilities under the TAA could potentially give rise to a

violation of Section 371c (to the extent they were not collateralized or did not accrue interest –

which the FDIC-Receiver does not establish), this does not eviscerate the fact that a debtor-

creditor relationship was established by the TAA.

Moreover, to the extent the FDIC-Receiver is arguing that the Court should read terms

establishing an agency relationship into the TAA so as not to offend Section 371c, that argument

too should be rejected.  The FDIC-Receiver cites *Fid. & Dep. Co. of Md. v. Jefferson County

Comm'n*, 756 F. Supp. 2d 1329, 1337 (N.D. Ala. 2010) for the proposition that "an interpretation

of a contract which gives a reasonable, lawful and effective meaning to all of the terms is

preferred to an interpretation which leaves a part unreasonable, unlawful or with no effect."[58]

The District Court in *Jefferson County* was interpreting two agreements between parties and was

therefore simply stating a general theory of contract interpretation when dealing with conflicting,

express provisions.  *Jefferson County*, 756 F. Supp. 2d at 1334-35, 1337 (interpreting and

reconciling language in the "Performance Bond" and "Construction Contract" between plaintiff

and defendant, the latter having been incorporated by reference in the former).  *Jefferson County*

did not concern a putative violation of an unreferenced regulation and is inapposite.  First, the

TAA does not incorporate by reference Section 371c.  Second, the TAA contains no language

suggesting a trust or agency relationship which the Court must reconcile with the balance of the

TAA's terms.  *Jefferson County* certainly does not stand for the proposition that a contract's

plain terms should be forsaken to avoid even the suggestion of a violation of a regulation that is

not incorporated into the contract and which finds no support within the four corners of the

document.  In fact, *Jefferson County* states clearly the rule that "[w]here there is a written

---

[58]  Opp. at 34-35.

contract, the court looks no further than the four corners of the document to determine the intent of the parties." *Id.* at 1335.

The FDIC-Receiver asserts that BancGroup's officers were aware of Section 371c and "took great efforts to comply with their requirements."[59] But the proffered testimony does not at all concern the intent of the parties in entering into the TAA. In fact, if anything, the testimony indicates an understanding that intercompany tax liabilities did in fact exist and that they were "probably" collateralized.[60] In any event, and notwithstanding that it supports BancGroup's position, this extrinsic evidence is irrelevant as it goes beyond the four corners of the unambiguous TAA.

C.   **Bankruptcy Law Does Not Eviscerate BancGroup's Interest In The Tax Refunds**

As a last-ditch effort, and notwithstanding that its position seeking to take from BancGroup's estate and its competing creditors is anathema to the equities of bankruptcy, the FDIC-Receiver looks to the Bankruptcy Code for support. The FDIC-Receiver argues that if the TAA is a contract, it was an executory contract within the meaning of section 365 of the Bankruptcy Code that was rejected pursuant to BancGroup's Plan and, therefore, cannot be enforced by BancGroup.[61] As a threshold matter, however, the FDIC-Receiver's argument fails

---

[59]   Opp. at 36.

[60]   *See* 8/15 Clarke Dec. Ex. 3 (Hicks Tr. at 110:2-110:11 ("Q.  Did Colonial BancGroup ever post collateral to Colonial Bank for any intercompany tax liabilities?  A.  There was a posting of collateral as I recall in general terms for a broad group of transactions between the companies.  Taxes.  I don't recall if they were specifically included or excluded from that.  My recollection would be that they were probably included, but I'd have to see documents to recall.")); 8/15 Clarke Dec. Ex. 2 (Byrne Tr. 163:6-163:17 (Q. And what discussions did you have with the chief financial officer on the topic of whether or not transfers of funds under the tax allocation policy were transactions that should be reflected on one of these questionnaires [concerning Section 371c and extension of credit among Bank and its affiliates]?  A. Certain allocations of funds under the policy may or may not have triggered consideration requiring one of the questionnaires.  But I can't tell you today whether or not it was done each and every time.") (emphases added)).

[61]   Opp. at 37.

because the TAA is not an executory contract. As of the Petition Date, BancGroup's sole outstanding obligation vis-à-vis counterparty-Bank was payment of Bank's "separate return" tax refund. Where the sole obligation is payment of money from debtor to creditor, contracts are not executory. *See In re Peralta Food Corp.*, No. 07-16508, 2008 WL 190503, at *4-5 (S.D. Fla. Jan. 18, 2008) citing *In re Norquist*, 43 B.R. 224, 228 n. 2 (Bankr. D. Wash. 1984) ("Such contracts have never been treated as executory for bankruptcy purposes and their treatment as such would only cause procedural problems which might perpetrate inequities among creditors.") (emphasis in original). Rather, the counterparty simply holds a bankruptcy claim alongside the debtor's other creditors.

Even assuming *arguendo* that the TAA were an executory contract, rejection of the TAA would not undo the debtor-creditor relationship that the parties established. The Eleventh Circuit has stated: "rejection does not embody the contract-vaporizing properties so commonly ascribed to it . . . rejection has absolutely no effect upon the contract's continued existence; the contract is not canceled, repudiated, rescinded, or in any other fashion terminated." *Thompkins v. Lil Joe Records, Inc.*, 476 F.3d. 1294, 1306-07 (11th Cir. 2007) (internal citations omitted) (emphasis added). In other words, rejection of the TAA would not terminate the debtor-creditor relationship previously established by the parties upon entry into the TAA.

Moreover, even if the TAA were a rejected executory contract, any interests in property obtained by BancGroup under the TAA remains property of the bankruptcy estate. *See Thompkins*, 476 F.3d at 1307-08 ("The rejection of a pre-petition executory contract pursuant to which the debtor acquired property does not obligate the debtor to return the property."); *see also Cohen v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 138 B.R. 687, 710 (Bankr. S.D.N.Y. 1992) (rejecting the argument that rejection of executory

contract voided counterparty's "legal title and the equitable interest" in escrowed stock obtained under the agreement). In *Thompkins*, the Eleventh Circuit held that rejection did not undermine ownership of the underlying copyrights at issue even if it freed the debtor from the obligation to pay royalties. *Thompkins*, 476 F.3d at 1306-08. Here, BancGroup's interest in the Tax Refunds vested as of the Petition Date. *See Segal v. Rochelle*, 382 U.S. 375, 379-81 (1966) (holding that loss carryback refund claim was property of the debtor's estate as of the petition date even though bankruptcy was commenced in the middle of the taxable year); *see also In re Flying J, Inc.*, No. 08-13384, 2009 WL 5215000, at *4 (Bankr. D. Del. Dec. 28, 2009) (same). Thus, notwithstanding putative rejection of the TAA, BancGroup's interest in the Tax Refunds already vested as of the Petition Date and would not be eviscerated even if the TAA were executory and rejected.

Finally, advancing an argument completely irreconcilable with its last one, the FDIC-Receiver argues that section 365(c)(2) of the Bankruptcy Code "prohibits a debtor from assuming any pre-petition contract to make a loan to the debtor . . . ."[62] As established above, the TAA is not an executory contract and thus, section 365(c)(2) is inapplicable. Even assuming the TAA is executory, BancGroup has never sought to assume the TAA. It need not do so in order to assert rights over its interest in the Tax Refunds.

### III.   ARGUMENT REGARDING REIT PREFERRED SECURITIES

### A.   There Is No Disputed Issue Of Fact Material To BancGroup's Motion – BancGroup Owns the RPS

In the BancGroup RPS Brief, BancGroup asserts that following the automatic Conditional Exchange, the RPS were never transferred to Bank because, under applicable law, delivery is required to effectuate a transfer of securities. BancGroup discussed the Accounting

---

[62]   Opp. at 37 (emphasis added).

Entry, the Conditional Exchange Certificate, and the 8-K Filing and how each was insufficient to constitute delivery of securities under governing Florida law. In its Opposition, the FDIC-Receiver does not contest that Florida law governs and puts forth no facts which constitute delivery. Thus, summary judgment is appropriate.

Under Chapter 678 of Florida Statutes, Uniform Commercial Code, Investment Securities ("Article 8"),[63] delivery of an uncertificated security to a purchaser occurs only when: (1) the issuer registers the purchaser as the registered owner, upon original issue or registration of transfer; or (2) another person, other than a securities intermediary, either becomes the registered owner of the uncertificated security on behalf of the purchaser or, having previously become the registered owner, acknowledges that it holds for the purchaser. FLA. STAT. § 678.3011. The caselaw instructs that no transfer is effective under Article 8 or Florida common law until and unless these delivery requirements have been satisfied. *See Guthartz v. Park Ctr. W. Corp.*, 409 Fed. Appx. 248, 250 (11th Cir. 2010) (affirming judgment that no transfer of common shares was effected under Florida common law or the UCC for failure to "conform to the requirements of the Uniform Commercial Code for transferring unregistered stock" which "exist to prevent situations . . . where one party asserts that a transfer was made based on some document not reflected in the corporate records" notwithstanding the mailing of "stock powers" for uncertificated shares of ownership); *Ennis v. Phillips*, 890 So. 2d 313, 314 (Fla. Dist. Ct. App. 2004) ("[i]ntention to transfer securities, even with extrinsic evidence of such intention, does not satisfy the requirement of the Uniform Commercial Code or the common law to effectuate such transfer"); *Sackett v. Shahid*, 722 So. 2d 273, 276 (Fla. Dist. Ct. App. 1998) (discussing the

---

[63] Article 8 as adopted by the State of Florida, *available at*: http://www.leg.state.fl.us/statutes/index.cfm?App_mode=Display_Statute&URL=0600-0699/0678/0678.html.

import of formalities in corporate law and concluding that no transfer was effectuated irrespective of any extrinsic evidence of intent in the absence of evidence sufficient under Article 8).

The FDIC-Receiver has expressly conceded that the issuer of the RPS, Florida REIT, has never registered Bank, the FDIC-Receiver, or any third party as owner of the RPS.[64]  Thus, the requirements of Article 8 were unfulfilled as of the Petition Date with respect to any putative RPS transfer from BancGroup to Bank (*i.e.*, a Downstream Contribution).  Therefore, no transfer occurred.  The FDIC-Receiver floods the Opposition with content supposedly reflecting the parties' intent to transfer the RPS to Bank.  As discussed in the BancGroup Opposition to the FDIC-Receiver Motion, those factual assertions are disputed.[65]  For purposes of the BancGroup RPS Motion, however, those facts are simply irrelevant.  Because delivery did not occur, any prospective Downstream Contribution was not consummated and the RPS are owned by BancGroup.

### 1.    *Constructive Delivery Is Not Available*

In view of the fact that delivery did not occur, the FDIC-Receiver asks this Court to recognize and apply the doctrine of "constructive delivery."[66]  Constructive delivery does not help the FDIC-Receiver for two reasons.  First, both the Eleventh Circuit and Florida Court of Appeals have foreclosed this argument, holding that the requirements under the common law mirror those under Article 8.  The FDIC-Receiver's only response is that the courts are

---

[64]    Opp. at 40 (". . . it is accurate that CBG Florida REIT's transfer agent, [BNY], has not made that change in the transfer records . . . ."), at 45 ("The name change never was recorded in CBG Florida REIT's transfer records.").

[65]    *See* BancGroup Opp. at 59-62.

[66]    Opp. at 41.

"mistaken."[67] Second, even if the doctrine were applicable, the Court should not apply it here because, as the cases cited by the FDIC-Receiver reveal, the doctrine should be applied only where the delivery was as close to "perfect as the circumstances reasonably permit."

The cases are clear that Florida common law requires the same level of formality as does Article 8. *See Guthartz,* 409 Fed. Appx. at 250 ("The [Article 8] requirements apply with equal force to gifts."); *Ennis,* 890 So. 2d at 314 ("Even where the UCC is not applicable . . . the common law looks to formalities in determining if a transfer has been effectuated requiring the securities be delivered or a transfer be made on the corporate books and records."); *Sackett,* 722 So. 2d at 276 ("We note that the provisions of the Uniform Commercial Code are not exclusive and do not undercut the validity of a gift of securities which is otherwise effective under common law standards.  Under the common law, however, transfer of a gift of securities also requires delivery of the securities, . . . or transfer on the corporate books and records.") (internal citation and quotation omitted).

The FDIC-Receiver argues that the foregoing law may be traced back to a "mistake" in *Sackett.*[68] Thus, the FDIC-Receiver's position is that the Florida Court of Appeals again erred in deciding *Ennis* and the Eleventh Circuit erred in deciding *Guthartz.*  Not only does this argument strain the limits of credibility, such decisions, even if "mistaken," are the law of the (pertinent) land and must be applied.  *Stanfill v. State,* 384 So. 2d 141, 144 (Fla. 1980) ("decisions of the district courts of appeal represent the law of Florida unless and until they are overruled by th[e] [supreme] court").[69]

---

[67]  Opp. at 42, n.26.

[68]  Opp. at 42, n.26.

[69]  Even if correct, the FDIC-Receiver's suggestion doesn't change the result.  The FDIC-Receiver argues *Sackett* misread *Tanner v. Robinson,* 411 So. 2d 240, 242 (Fla. Dist. Ct. App. 1982), asserting that *Tanner* endorsed constructive delivery.  Opp. at 42, n.26.  However, *Tanner* was expressly limited to the "validity

Additionally, even assuming Florida law did not require satisfaction of Article 8's delivery requirements irrespective of the parties' intent, and that the doctrine of constructive delivery were applicable to a putative transfer of securities such as the Downstream Contribution, the Court should refuse to apply it here because, as the FDIC-Receiver's own (inapplicable) cases instruct, "[t]o effectuate a constructive delivery, the delivery must be as perfect as the circumstances reasonably permit." *Kallop v. McAllister*, 678 A.2d 526, 531 (Del. 1996).

Here, the circumstances did not preclude the parties from causing Florida REIT to register Bank as owner and the FDIC-Receiver does not assert to the contrary. Instead, the FDIC-Receiver relies heavily upon the conduct of Mr. Hicks and the parties' supposed intent.

---

of a gift of securities which is otherwise effective under common law standards." *Tanner*, 411 So. 2d at 242 (premising ruling on a Michigan decision based on "the common law rule relating to inter vivos gifts"). Such an exception would not apply to a Downstream Contribution which would have been made in satisfaction of the obligation under the Exchange Agreement (*i.e.*, for consideration and not a gift). Moreover, Article 8 is not applicable to gifts of securities in any event. *See Ennis*, 890 So. 2d at 314; *cf. Faro v. Corporate Stock Transfer, Inc.*, 883 So. 2d 896, 898 (Fla. Dist. Ct. App. 2004) ("Florida's and other states' adoption of the U.C.C., however, abrogated common law where adopted, thus having the salutary effect of encouraging more honesty and fair dealing by transfer agents (and others).").

The FDIC-Receiver's citation to *Andrews v. Troy Bank & Trust Co.*, 529 So. 2d 987, 990 (Ala. 1988) for the proposition that Alabama law (which is inapplicable in any event) applies constructive delivery to a transfer of securities is also misleading. *See Butler v. MaxiStorage, Inc.*, 33 So. 3d 1221, 1227-28 (Ala. Civ. App. 2009) (noting exceptions under Alabama law to the UCC's requirements are limited to "(1) when the transferor attempts to transfer only partial ownership so that he or she becomes a co-owner with his or her transferee, and (2) when an identified security to be delivered is still in the possession of a third person when that third person acknowledges that he or she holds the security for the purchaser."). *MaxiStorage* holds that absent such inapplicable circumstances, "the law as stated in *Morris*, and acknowledged by the court in *Andrews* — *i.e.*, that an effective transfer of stock requires physical possession in the transferee — controls." *Id.* The other cases cited by the FDIC-Receiver do not apply Florida law. *See Jones v. Cole*, 2010 WL 5015307 (D. Kan. Dec. 3, 2010) (applying Kansas law); *Kallop v. McAllister*, 678 A.2d 526 (Del. 1996) (applying Delaware law in the context of gift of securities); *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 452 F.Supp. 1108 (S.D.N.Y. 1978) (New York law).

As the FDIC-Receiver asserts, Mr. Hicks was Florida REIT's treasurer.[70]  Apparently, Mr. Hicks took no steps to record Bank as registered owner.[71]

The FDIC-Receiver now asserts that Ms. Lisa Free was instructed to contact BNY to "cause the necessary ownership changes to be recorded in the transfer records of [Florida REIT].[72]  BancGroup understands that, if called to testify, Ms. Free would state that she was instructed to work with BNY only in connection with the Conditional Exchange (*i.e.*, to get notice out to the former holders of the RPS).  Inspection of the email submitted by the FDIC-Receiver reveals that Ms. Free was contacting BNY Mellon "to assist [BancGroup] with the exchange of [RPS] for [the BancGroup Preferred Stock].[73]  Neither Ms. Free's email, nor the attached August 11. 2009 letter of intent (entitled "Colonial BancGroup, Inc. CBG Florida REIT Exchange for Stock"), the 14-page draft Exchange Agent Agreement, or 10-page Service Agreement for Transfer Agent Services include any reference to a Downstream Contribution or making any change to any share registry to reflect Bank as owner of the RPS.[74]  Unsurprisingly, as head of investor relations for BancGroup, no one tasked her with anything concerning a Downstream Contribution.[75]  Even if she were, however, the FDIC-Receiver's story simply ends

---

[70]  Opp. at 40 n. 24, at 44, at 49.

[71]  8/15 Clarke Dec. Ex. 3 (Hicks Tr. at 170:1-170:11 ("Q.  So there was no assignment agreement that was entered into to effectuate a contribution of any securities from BancGroup to the Bank; right?  MR. CLARKE:  Objection to form.  MR. GLENOS:  Same objection.  A.  I'm not sure I know what an assignment agreement is, but I'm not aware of any -- anything that had to occur to contribute those preferred shares back down to the Bank.")).

[72]  Opp. at 45.

[73]  Opp. at 45; 9/22 Clarke Dec. Ex.7 at COL-FDIC-R-068984.

[74]  Opp. at 45; 9/22 Clarke Dec. Ex.7 starting at COL-FDIC-R-068984.

[75]  As pointed out in the BancGroup RPS Brief, BNY Mellon's role as stock transfer agent, from the beginning, never contemplated taking any steps in connection with a Downstream Contribution.  *See* BancGroup RPS Brf. at 6 (citing to Finestone Dec. Ex. E (Stock Transfer Agency Agreement Article I, § 4, governing transfer of "Shares" which are defined to mean the RPS prior to, and the BancGroup Preferred Stock following, a Conditional Exchange.).  Thus, following a Conditional Exchange, BNY

with the conversation being "sidetracked."[76]  Neither Mr. Hicks nor anyone else followed-up with BNY thereafter.[77]  More than two weeks passed in between the occurrence of the Conditional Exchange and the Petition Date.

Accepting the FDIC-Receiver's purported facts as accurate, they do not qualify for constructive delivery.  In the cases cited by the FDIC-Receiver, delivery was an impossibility. *See Jones v. Cole*, 2010 WL 5015307, at *3 (D. Kan. Dec. 3, 2010) ("transfer of the stock at the time of the purchase agreement was not possible because it was held as collateral by a bank"); *Kallop v. McAllister*, 678 A.2d at 532 (noting "Citibank's possession of his stock certificate []  thwarted the transfer of its physical possession").  Here, the FDIC-Receiver's own facts indicate that the parties allowed delivery to be simply "sidetracked."

The FDIC-Receiver may be disappointed that it possesses only a claim on account of the RPS to be administered in BancGroup's bankruptcy, but as the Supreme Court has stated:  "an ordinary debtor-creditor relationship requires more than the post-bankruptcy disappointment of the creditor to convert it into a trust relationship." *Mahon v. Stowers*, 416 U.S. 100, 105 (1974).

### 2.   *BancGroup Never Acknowledged It Held RPS For Bank*

The FDIC-Receiver also asserts that delivery was in fact effectuated under Article 8, arguing that BancGroup "acknowledged that it held the RPS for Bank" within the meaning of Article 8.[78]  This argument fails for two, independent reasons.

---

Mellon's services were to concern the BancGroup Preferred Stock, not the RPS.  BNY Mellon was never retained to assist with any Downstream Contribution.

[76]   Opp. at 45.

[77]   *See* Opp. at 45.

[78]   Opp. at 48-49.  FLA. STAT. § 678.3011 provides that "[d]elivery of an uncertificated security to a purchaser occurs when . . . "another person, other than a securities intermediary, either becomes the registered owner of the uncertificated security on behalf of the purchaser or, having previously become the registered owner, acknowledges that it holds for the purchaser" (emphasis added).

First, even presuming the truth of the FDIC-Receiver's purported "acknowledgements," at best, all they indicate is that Mr. Byrne and Mr. Hicks intended to transfer the RPS to Bank or believed the transfer occurred automatically. Seeking to take steps to transfer securities to a recipient or believing that such a transfer occurred, is the antithesis of acknowledging that one "holds" securities for such recipient. The plain language of the statute is unsatisfied. Moreover, if seeking to effectuate a transfer were equivalent to "acknowledging" that one "holds" securities for the transferee, intent alone would be sufficient to effectuate delivery under Article 8 and each of the Florida cases discussed above would have been wrongly decided.

Second, the FDIC-Receiver omits from its discussion that the statute applies only to "another person" that is also a "registered owner." As discussed in the immediately following section, BancGroup owns the RPS, but not as a "registered" owner. Thus, even if BancGroup had somehow acknowledged it held the RPS for Bank, it still would not be available to the FDIC-Receiver.

> 3.   *BancGroup Owned The RPS Following The Conditional Exchange*
> *Pursuant To The Exchange Agreement*

Finally, the FDIC-Receiver advances an "if I can't have them, you can't have them" argument, asserting that constructive delivery must be applicable here because that is the premise on which BancGroup stakes its ownership claim to the RPS. The FDIC-Receiver is wrong. As explained in the BancGroup RPS Brief, BancGroup came to own the RPS pursuant to the Conditional Exchange.[79] The fact that Florida REIT's share registry was not revised to reflect BancGroup as owner is not a bar to its ownership (as it is to Bank) because Article 8 (i) allows parties to vary its provisions by contract, and (ii) does not apply to an involuntary automatic transfer such as the Conditional Exchange.

---

[79]   BancGroup RPS Brief at 7-8, at 20 n.50.

First, the Exchange Agreement provides that if BancGroup is not recorded as the owner of the RPS in Florida REIT's share registry, "all of the [RPS] then outstanding will be deemed to be owned by BancGroup, without any action by [BancGroup] or any other action being necessary or required . . . ."[80] Article 8 provides that "the effect of provisions of this code may be varied by agreement." FLA. STAT. § 671.102; *see also* FLA. STAT. § 671.102 cmt. 2 ("But an agreement can change the legal consequences which would otherwise flow from the provisions of the Act."); *Black Horse Capital LP v. JPMorgan Chase Bank, N.A. (In re Washington Mut., Inc.)*, 442 B.R. 297, 305 (Bankr. D. Del. 2011) (holding that conditional exchange was exempt from UCC due to exchange agreement which "provide that the ownership of the TPS will occur automatically, even before delivery of new certificates, upon the direction of the OTS after the occurrence of an Exchange Event"). The parties varied the effect of Article 8 under the Exchange Agreement with respect to the Conditional Exchange. There is no similar provision in the Exchange Agreement with respect to the Downstream Contribution.

Second, the Exchange Agreement provides that if the OCC, or any successor United States Federal bank regulatory agency that is the primary supervisory agency for Bank (*i.e.*, the FDIC), so directs upon the occurrence of an Exchange Event, a Conditional Exchange is to occur, and each RPS then outstanding shall be "<u>automatically</u>" exchanged for one share of BancGroup Preferred Stock.[81] Article 8 is also not applicable to involuntary <u>automatic</u> transfers such as the Conditional Exchange. *See* FLA. STAT. § 678.3021 cmt. 2 (Article 8 does not apply to transfers by operation of law because they are not voluntary). Courts have recognized that the Conditional Exchange is not subject to the UCC due to its automatic nature. *Washington Mut.*,

---

[80]   Finestone Dec. Ex. F (Exchange Agreement at 3, § 2(d)).

[81]   Finestone Dec. Ex. A (Offering Circular at 8), Finestone Dec. Ex. F (Exchange Agreement at 3-4, §§ 2-3).

442 B.R. at 305-06 (noting that "while the initial issuance and purchase of the TPS might have been a voluntary transaction, it does not result in the Conditional Exchange being voluntary.").

Thus, Article 8 does not apply to the Conditional Exchange, but applies to the Downstream Contribution. And under Florida law governing transfer of securities, Article 8 must be satisfied. BancGroup owns the RPS subject to a claim held by the FDIC-Receiver under the Exchange Agreement.

B. **The Automatic Stay Precludes Florida REIT From Now Registering Bank As Owner Of The RPS**

The FDIC-Receiver next argues that an "instruction" under Article 8 was given to Florida REIT to register Bank as owner of the RPS and therefore Florida REIT should be granted an exemption from bankruptcy's automatic stay so that it can now register Bank as owner.[82] However, even assuming the Exchange Agreement qualifies as an "instruction" under Article 8 (a proposition that is not at all clear from the FDIC-Receiver's papers), any change to Florida REIT's share registry would be subject to the automatic stay as an "act to obtain possession of property of the estate." *See* 11 U.S.C. §362(a)(3) (prohibiting "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate").

The FDIC-Receiver seeks to characterize a prospective change to Florida REIT's share registry as "ministerial" in order to get around the automatic stay.[83] In doing so, the FDIC-Receiver argues that BancGroup "contributed all of the [RPS] to the Bank."[84] However, for all the reasons discussed above and in the BancGroup RPS Brief, the RPS are not contributed until and unless delivery is accomplished under Article 8. Only by assuming a favorable outcome on

---

[82]   Opp. at 49-51.

[83]   Opp. at 50.

[84]   Opp. at 50.

the essence of this entire dispute is the FDIC-Receiver able to lay a predicate for its argument that changes to the share registry are "ministerial."

Unsurprisingly, the FDIC-Receiver cites to no caselaw supporting the notion that acts of an issuer, such as Florida REIT, in seeking to register a transfer of securities, are exempt from the automatic stay. In fact, the FDIC-Receiver cites to no caselaw concerning the transfer of securities whatsoever. Rather, the FDIC-Receiver cites to inapposite real property caselaw in which the courts were very careful to determine that the transfer had indeed <u>occurred</u>, leaving the debtor with neither equitable nor legal rights. In *Rodgers v. County of Monroe (In re Rodgers)*, 333 F.3d 64, 67 (2d Cir. 2003), the court was faced with the question of whether a debtor's estate included real property which had been sold prepetition, but for which the corresponding deed had not transferred. The court's determination that the real property was not property of the estate was expressly premised on its conclusion that "under New York law, a tax foreclosure sale occurs when the property is 'struck down' at auction, rather than when the deed is conveyed to the purchaser, and this sale extinguishes the debtor's interests in the property, unless a right to redeem exists." *Id.* at 66-67. Contrary to the FDIC-Receiver's misleading description of *Rogers*, the court found that the transfer had occurred leaving the debtor with neither legal nor equitable ownership of the property. *Id.* at 68-69. Tellingly, the *Rodgers* court looked to state law to determine if and when the transfer occurred. Under *Rogers*, because applicable Florida law instructs that the Downstream Contribution has not occurred, the RPS are property of BancGroup's estate and are protected by the automatic stay.[85]

---

[85]   *Island Place Apartments LLC v. First Home View Corp. (In re Greater Miami Neighborhoods, Inc.)*, Adv. No. 08-01186, 2008 WL 2444530, at *7 (Bankr. S.D. Fla. Jun. 16, 2008) is exactly the same. The court found that a post–petition recording of the certificate of title following a prepetition foreclosure sale was not an unauthorized transfer of property of the estate because, <u>as a matter of Florida real property law</u>, "the Debtor lost its right of redemption and all of its interest in the Property" prepetition. *Id.* at *7. Again, *Greater Miami* looked to state law to determine whether the debtor had any interest in the asset.

It is a fundamental and unassailable principle of bankruptcy law that BancGroup's estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). The nature and existence of these interests is determined by looking at state law. *Southtrust Bank of Ala. v. Thomas (In re Thomas)*, 883 F.2d 991, 995 (11th Cir. 1989). Under Article 8 and Florida common law, BancGroup owned the RPS and Bank had no interest therein as of the Petition Date. "Unfortunately for the FDIC, in the instant case, bankruptcy intervened." *See In re The Colonial BancGroup, Inc.*, Case No. 09-32303 (DHW), at 20 (Bankr. M.D. Ala. Jan. 24, 2011) (rejecting FDIC-Receiver's request to incur BancGroup's deposit accounts post-petition in order to seek to setoff BancGroup's deposits). Making changes to Florida REIT's share registry would purportedly transfer the RPS out of BancGroup's estate for the benefit of the FDIC-Receiver. That is not "ministerial." This argument runs afoul of bankruptcy law and should be rejected.

C.   **The FDIC-Receiver's Waiver Argument Fails**

Repackaging its "intent"-based argument, the FDIC-Receiver argues that as a result of the Accounting Entry, BancGroup "waived" its claim to the RPS. As a threshold matter, such conduct cannot comprise a waiver. Under such a theory, each of the cases discussed above in which delivery, and therefore a transfer, was found not to have occurred notwithstanding a showing of extrinsic evidence of intent would have resulted in a waiver. They did not so hold. Particularly in view of the fact that BancGroup is a debtor in possession seeking to establish its ownership of the RPS for the benefit of its creditors, these are not the facts on which this Court should make new law.

It is not surprising that none of the cases cited by the FDIC-Receiver in support of its "waiver" argument is in the bankruptcy context. That is because bankruptcy trustees and debtors in possession are distinct legal entities from prepetition debtors, the former bringing their claims

in the discharge of their fiduciary duties for the benefit of creditor and equity constituencies. *Gordon Sel-Way, Inc. v. United States (In re Gordon Sel-Way, Inc.)*, 270 F.3d 280, 290 (6th Cir. 2001) ("The debtor-in-possession is considered to be a separate legal entity from the debtor himself."); *Shopmen's Local Union No. 455 v. Kevin Steel Prods., Inc.*, 519 F.2d 698, 704 (2d Cir. 1975) ("A debtor-in-possession under Chapter XI or under Chapter X, a trustee under the latter chapter, or a trustee in a straight bankruptcy proceeding is not the same entity as the pre-bankruptcy company.").[86]

Even assuming that BancGroup representatives took steps to cause a Downstream Contribution (which is disputed in the BancGroup Opposition), courts have refused to bind trustees seeking to recover value and enhance creditor recoveries for the benefit of the estate to the representations and acts of a prepetition debtor. *See Gower v. Farmers Home Admin. (In re Davis)*, 785 F.2d 926, 927 (11th Cir. 1986) ("Since the trustee's claims are for the benefit of the creditors, the fraud of the bankrupt does not require them to be forfeited."); *Boyle Co. v. Wells (In re Gustav Schaeffer Co.)*, 103 F.2d 237, 241 (6th Cir. 1939) ("The trustee represents the general creditors and in this capacity may assert claims, avoid preferences and collect assets where the bankrupt, if bankruptcy had not intervened, would be estopped."), *cert. denied*, 308 U.S. 579, 60 S.Ct. 96 (1939); *Weaver v. Aquila Energy Mktg. Corp.*, 196 B.R. 945, 958 (S.D. Tex. 1996) (rejecting estoppel defense noting that "the Trustee, a distinct legal person from the debtor, is not bound by a debtor's representations") *aff'd*, No. 96-20592, 1997 WL 336190 (5th Cir. May 30, 1997); *In re Trans World Airlines, Inc.*, No. 01-0056, 2001 Bankr. LEXIS 722, at *5 (Bankr. D. Del. Mar. 16, 2001) ("the right of a debtor in possession, in the discharge of its fiduciary duty to the creditor and interest holder constituencies, could not be bound by a

---

[86]   The Supreme Court has recognized that, with minor exceptions, the debtor in possession has the same functions and obligations as a trustee. *See United States v. Whiting Pools*, 462 U.S. 198, 200 n.3 (1983).

prepetition waiver of such a fundamental bankruptcy law right as executory contract rejection--a right designed for the benefit of the bankruptcy estate"); *Faircloth v. Paul (In re Int'l Gold Bullion Exch., Inc.)*, 60 B.R. 261, 264 (Bankr. S.D. Fla. 1986) (refusing to impute debtor's fraudulent acts on trustee because ". . . a trustee, like a debtor-in-possession, is conceptually separate for purposes of bankruptcy law; indeed, it is well established that even a debtor-in-possession which is, in actuality, the same entity as the debtor is nevertheless deemed to be separate and distinct from the debtor under bankruptcy law and is armed with Section 544 powers without regard to any notice or knowledge of the Debtor's practices.").

Upon the Petition Date, any assets and claims belonging to BancGroup automatically, by operation of law, become property of the bankruptcy estate.    11 U.S.C. § 541(a)(1). BancGroup's claim of RPS ownership, asserted by the Plan Trustee established pursuant to BancGroup's chapter 11 plan, seeks to enhance BancGroup's estate for the benefit of the general creditor body.   It would therefore be improper and inequitable to bind BancGroup to the prepetition acts or representations of certain of its officers who (assuming for the sake of argument) sought to transfer assets from BancGroup to its insolvent subsidiary.

These principles should come as no surprise to the FDIC-Receiver.  Courts have relied on similar principles in finding that the FDIC-Receiver cannot be equitably estopped based upon the conduct of the FDIC, *see FDIC v. Amtrust Fin. Corp.*, No. 10-01298, slip. op. at 38 [Dkt. No. 89] (N.D. Ohio Jan. 31, 2011) (finding FDIC-Receiver was not subject to equitable estoppel defense based upon lack of action on the part of the FDIC prior to receivership), and that bank regulators stepping into the shoes of failed banks were not subject to "insured v. insured" exclusions that would otherwise have barred the bank from pursuing insurance proceeds because they did not act for the benefit of the failed bank. *See Branning v. CNA Ins. Co.*, 721 F.Supp.

1180, 1184 (W.D. Wash. 1989) ("FSLIC does not merely stand in the shoes of Home Savings . . . FSLIC represents depositors, shareholders, creditors, and the federal insurance fund as well as the failed institution."); *Am. Cas. Co. v. FSLIC*, 704 F.Supp. 898, 901 (E.D. Ark. 1989) (". . . because the FSLIC is required to marshall the assets of a failed institution for the benefit of its depositors and creditors and to minimize payouts from the insurance fund, it is motivated to bring suit by interests distinctly different from that of an institution which has remained solvent"); *Am. Cas. Co. of Reading, PA. v. FDIC*, 713 F.Supp. 311, 316 (N.D. Iowa 1988) ("Courts which have analyzed the role of FDIC corporate have recognized for over forty years that FDIC does not strictly 'step into the shoes' of a failed bank.").

Notwithstanding the foregoing, the FDIC-Receiver's "waiver" argument should be rejected because, as the FDIC-Receiver's own cases indicate, it must make out a "clear case" for waiver which it has not done.  As discussed in the BancGroup Opposition,[87] the evidence submitted by the FDIC-Receiver only indicates that the parties took steps in connection with the Conditional Exchange, but perhaps never had any specific intent to contribute the RPS to Bank. In its Opposition, the FDIC-Receiver continues to ignore the distinction between the Conditional Exchange and the Downstream Contribution.  The Hicks email relied upon by the FDIC-Receiver merely states that the "impact of the exchange" was being reflected in the books and records.[88]  And the Accounting Certificate merely states that "[t]he exchange took effect under the terms of the Exchange Agreement."[89]

---

[87]  BancGroup Opposition at 60-62.

[88]  Opp. at 48-49; 9/22 Clarke Dec Ex. 6 (emphasis added).

[89]  Opp. at 49; 8/15 Clarke Dec. Ex. 44 (emphasis added).

The FDIC-Receiver argues that Mr. Hicks and Mr. Byrne believed that BancGroup did "everything it needed to do in order to transfer ownership" of the RPS to Bank.[90]  But it is impossible to discern what exactly, if anything, they did to transfer the RPS.  The testimony of Mr. Byrne pointed to by the FDIC-Receiver concerns only the Accounting Entry.  But, Mr. Byrne believed the Accounting Entry to be nothing more than "ministerial."[91]  Similarly, Mr. Hicks states his belief that "it appeared that everything was automatic in terms of the previous REIT shareholders were now automatically shareholders in BancGroup preferred . . . ."[92]  This only describes the Conditional Exchange.  Mr. Hicks doesn't explain how the RPS were purportedly transferred to Bank or what steps he took to consummate such a transfer.  Like Mr. Byrne, Mr. Hicks refers only to the Accounting Entry, but also states that he did not believe the Accounting Entry was operative or necessary to effectuate any exchange.[93]  Additionally, for the reasons discussed above, the FDIC-Receiver's attempt to implicate Ms. Free's conduct is meritless, having nothing to do with a Downstream Contribution.

Thus, far from a "clear case," the FDIC-Receiver in fact does not point to any "unequivocal acts or conduct evincing an intent to waive." *See Woods v. Christensen Shipyards, Ltd.*, 2005 WL 5654643, *2 (S.D. Fla.) (S.D. Fla. Sept. 23, 2005).  If anything, the FDIC-Receiver only confirms that there is, at best from the FDIC-Receiver's perspective, substantial doubt that anyone took any steps to effectuate a Downstream Contribution.

### D.   The Court Should Not Entertain The FDIC-Receiver's Assertion Of Bankruptcy Code Sections 365(o) And 507(a)(9) Which Are Inapplicable To The FDIC-Receiver's Claim For The RPS In Any Event

---

[90]  Opp. at 49.

[91]  *See* 8/15 Clarke Dec. Ex. 2 (Byrne Tr. at 190:3-190:8).

[92]  8/15 Clarke Dec. Ex. 3 (Hicks Tr. at 120:1-10).

[93]  8/15 Clarke Dec. Ex. 3 (Hicks Tr. at 169:2-169:9 and 170:7-170:11).

The FDIC-Receiver argues that in the event this Court were to grant the BancGroup RPS Motion and find the RPS are property of BancGroup's estate, pursuant to section 365(o) of the Bankruptcy Code ("Section 365(o)"), BancGroup would be required to immediately "cure" a purported capital maintenance commitment and contribute the RPS to the FDIC-Receiver. As a threshold matter, this issue is entirely beyond the relief sought in the BancGroup RPS Motion and the FDIC-Receiver has not sought such a ruling in its competing FDIC-Receiver Motion. For this reason, the Court should not reach this issue in deciding the BancGroup RPS Motion.

However, in the event the Court elects to reach the issue, the FDIC-Receiver's argument should be discarded for several, independent reasons. First, the FDIC-Receiver's argument that BancGroup would be required to immediately contribute the RPS has been expressly rejected by the Bankruptcy Court's ruling in connection with the FDIC-Receiver's previous failed attempt to assert Section 365(o). *See In re The Colonial BancGroup, Inc.*, 436 B.R. 713, 738 (Bankr. M.D. Ala. 2010) ("§ 365(o) does not apply to a capital maintenance commitment where the commitment cannot be assumed and cured because the underlying depository institution is no longer operating."). Because it is undisputed that Bank was closed and was no longer operating as of BancGroup's Petition Date, Section 365(o) is inapplicable and the FDIC-Receiver's argument that granting BancGroup's Motion "would only [result in] a separate order directing BancGroup to redeliver the securities to the FDIC-Receiver" should be rejected.[94]

Second, even under related section 507(a)(9) of the Bankruptcy Code ("Section 507(a)(9)"), the FDIC-Receiver would not be entitled to a priority claim on account of the RPS because the purported "covenant" on which the FDIC-Receiver's argument is based is, on its face, not a "commitment by [BancGroup] to a Federal depository institutions regulatory agency .

---

[94] Opp. at 52.

. . to maintain the capital of [Bank]" as is required under Section 507(a)(9).   11 U.S.C. §

507(a)(9) (emphasis added); *see also United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241

(1989) ("Where . . . the language of the statute is plain, 'the sole function of the courts is to

enforce it according to its terms.'").

The FDIC-Receiver premises its argument on two letters sent by BancGroup's former

CFO, Ms. Sarah Moore, in April 2007 (the "April 2007 Letters") to the OCC and the Federal

Reserve Bank of Atlanta (the "Federal Reserve").[95]  By the April 2007 Letters, BancGroup was

not pledging or committing anything to the regulators.  Rather, the April 2007 Letters describe a

revision to the terms of the Exchange Agreement between and among Florida REIT, BancGroup,

and Bank.[96]   There is no language in the April 2007 Letters which can be interpreted as

BancGroup committing, pledging, or guaranteeing anything to the regulators, let alone ensuring

or guaranteeing to "maintain" Bank's capital at a certain level.  The "covenant" in the April 2007

Letters is expressly described as a term of the Conditional Exchange.  This "term" was provided

for in the Exchange Agreement – an agreement to which the regulators were not party.   The

April 2007 Letters do not request regulator-approval of such terms and do not represent that the

reported terms will not be altered.

Even if the FDIC-Receiver were correct that the regulators would not have "approved

Tier 1 capital treatment for the [RPS]" in the absence of BancGroup's obligation to contribute

the RPS to Bank,[97] that fact (assumed for the sake of argument) does not read into the April 2007

---

[95]   8/15 Clarke Dec. Exs. 35 and 36.

[96]   *See* 8/15 Clarke Dec. Exs. 35 and 36 ("The terms of the [RPS] issuance have been amended . . . ."); Finestone RPS Dec., Ex. F, Section 2(e).

[97]   Opp. at 54.  The testimony of Ms. Moore to which the FDIC-Receiver cites does not support this assertion.  In fact, the testimony only indicates that if the April 2007 Letters were a commitment of any sort, they were a commitment to maintain the capital at BancGroup, not at Bank.  *See* 8/15 Clarke Dec. Ex. 1 (Moore Tr. at 111:8-111:13 ("Q.  Do you have a recollection as to why that change [reflected in the

Letters any agreement, pledge, or commitment to a Federal depository institutions regulatory agency.

The FDIC-Receiver refers to the regulators' letters sent in response to BancGroup, but these only confirm the foregoing.[98]   Nothing in either letter refers to any Downstream Contribution, let alone any commitment to the OCC or Federal Reserve to consummate such a transaction in the event of a Conditional Exchange.  Neither letter includes any Bank capital levels that BancGroup must "maintain."  Nor does either letter refer to Section 507(a)(9) or Section 365(o).  *See In re The Colonial BancGroup, Inc.*, 436 B.R. at 722 ("[w]hen the Federal Reserve wanted to trigger 365(o), it knew how to do it, and it used exact language").

The Federal Reserve's letter simply states that "[b]ased on our review of the terms of the issuance, it appears that the proposed [RPS] will qualify as tier 1 capital . . . ."[99]  In fact, the letter goes on to qualify this statement, acknowledging the possibility that "the final terms of the offering" could be "materially different from those presented in your letter." *Id.*  The OCC's letter does not even reference the April 2007 Letters.  And, like the Federal Reserve Letter, it contemplates that the terms of the RPS issuance could change.[100]  This fact militates strongly against finding that a "commitment" had been made to the regulators.

The limited caselaw concerning Sections 365(o) and 507(a)(9) indicates that a commitment as contemplated by the statute has been found only in stipulations between the debtor and the regulatory agency or pursuant to an order or resolution issued by the regulator.

---

April 2007 Letters] occurred in the terms?  A.  I recall that the Federal Reserve required it to be at the <u>holding company level</u> in order for the instrument to receive Tier 1 capital treatment at the <u>holding company</u>.") (emphasis added)).

[98]   *See* 8/15 Clarke Dec. Ex. 37; *see also* 9/22 Clarke Dec. Ex. 9.

[99]   9/22 Clarke Dec. Ex. 9.

[100]   *See* 8/15 Clarke Dec. Ex. 37 (contemplating Tier 2 capital treatment and varying interest rates).

*See Wolkowitz v. FDIC (In re Imperial Credit Indus., Inc.)*, 527 F.3d 959, 964 (9th Cir. 2008) (finding commitment where debtor "absolutely, unconditionally and irrevocably guaranteed" to FDIC its bank's performance of capital restoration plan); *Office of Thrift Supervision v. Overland Park Fin. Corp. (In re Overland Park)*, 236 F.3d 1246, 1249 (10th Cir. 2001) (finding commitment where debtor "hereby stipulates to the Federal Savings and Loan Insurance Corporation [] that it will cause the net worth of [bank] to be maintained at a level consistent with that required by Section 563.13(b) of the Rules and Regulations for Insurance of Accounts . . . and where necessary, that it will infuse sufficient additional equity capital to effect compliance with such requirement . . ."); *Resolution Trust Corp. v. Firstcorp, Inc. (In re Firstcorp)*, 973 F.2d 243, 244 (4th Cir. 1992) (finding commitment in formal resolution issued by Federal Home Loan Bank Board imposing obligation upon debtor to maintain bank capital "at the greater of: (1) three percent of total liabilities . . . , or (2) a level consistent with that required by Section 563.13(b) of the Rules and Regulations for Insurance of Accounts . . ."); *Franklin Sav. Corp. v. Office of Thrift Supervision*, 303 B.R. 488, 491 (D. Kan. 2004) (stipulation between debtor and Federal Savings and Loan Insurance under which debtor agreed to "cause the net worth of [bank] to be maintained at a level consistent with that required of institutions insured twenty years or longer by Section 563.13(b) of the Rules and Regulations for Insurance of Accounts . . . .").[101]   In

---

[101]   The FDIC-Receiver cites *In re Washington Mut., Inc.*, No. 08-12229, 2011 WL 57111, at *12 (Bankr. D. Del. Jan. 7, 2011) to lend support for its argument that Section 365(o) is applicable here. It does not. The court there was assessing the merits of a multi-billion dollar settlement pursuant to which claims for similar securities were one of many components in order to determine if the settlement fell within the range of reasonableness.  The court did not find that Section 365(o) was applicable or even likely applicable to the FDIC-Receiver's claim.  Rather, the court noted that certain parties had raised, in addition to several other defenses, the specter of the statute's applicability and that the debtors disputed such applicability.  *Id.*  Moreover, the settlement at issue posed to pay creditors nearly in full. *Id.* at *4. Thus, whether the corresponding claim for the securities would have been entitled to priority status under Section 507(a)(9) or was to be treated simply as a general unsecured claim was largely irrelevant to the court's overall assessment of the debtors' claim. *Id.* at *12.  That is because the mere existence of a corresponding claim – irrespective of priority status – ensured that incremental value would not be obtained.

contrast, the April 2007 Letters do not comprise any stipulation with a regulator nor do the responsive letters from the regulators impose upon BancGroup any requirements to maintain the net worth of the Bank at any specific level, to infuse additional capital as necessary in order to achieve target ratios, or even to effectuate a Downstream Contribution following a Conditional Exchange. The caselaw instructs that something more is needed than simply reporting the terms of the RPS issuance to the regulators.

Additionally, the April 2007 Letters must not be commitments within the meaning of the statute because they are not enforceable. *See In re The Colonial BancGroup, Inc.*, 436 B.R. at 736 ("The court concurs that 11 U.S.C. § 365(o) embraces only enforceable commitments."). The April 2007 Letters are simply that, unilateral letters. Under Alabama law, enforceable contracts require (i) "an offer and acceptance", (ii) "consideration", and (iii) "mutual assent to terms essential to the formation of a contract." *Hunter v. Wilshire Credit Corp.*, 927 So. 2d 810, 813 (Ala. 2006). As discussed above, the April 2007 Letters do not offer anything. Rather, they simply present the terms of the RPS issuance. The responsive letters do not accept terms. Rather, they simply indicate that Tier 1 capital treatment will be afforded if such terms are indeed implemented. For this reason too, the April 2007 Letters do not constitute commitments within the meaning of the statute.

Finally, even if the Court were to reach this issue and find Section 507(a)(9) applicable based upon the April 2007 Letters, that is no reason not to grant the BancGroup RPS Motion. As referenced therein, any such claim would be subject to section 502(d) of the Bankruptcy Code ("Section 502(d)"), requiring that the FDIC-Receiver's claim be disallowed to the extent Bank "is a transferee of a transfer avoidable under" the Bankruptcy Code. Even if priority status were afforded the FDIC-Receiver's claim pursuant to Section 507(a)(9), this would not preclude

operation of Section 502(d). *See In re Eye Contact, Inc.*, 97 B.R. 990 (Bankr. W.D. Wis. 1989) (applying the disallowance provisions of Section 502(d) to a pre-petition priority claim under pre-BAPCPA § 507(a)(3)); *Tidwell v. Atlanta Gas Light Co. (In re Georgia Steel, Inc.)*, 38 B.R. 829, 839-840 (Bankr. M.D. Ga. 1984) (noting the "fact that Atlanta Gas' claim is for an administrative expense has no bearing" on application of Section 502(d)).

## IV.    SECTION 502(D) OF THE BANKRUPTCY CODE

The FDIC-Receiver's response to BancGroup's assertion of Section 502(d) is irrelevant. BancGroup is not asking the Court to disallow the FDIC-Receiver's claim (for Tax Refunds or the RPS) pursuant to Section 502(d) until and unless it is determined that Bank is a "transferee of a transfer avoidable under the Bankruptcy Code." 11 U.S.C. §502(d). BancGroup did not move for summary judgment on its avoidance action claims because of the factual-intensive issue of BancGroup and Bank's insolvency; such claims will be determined at trial. In the interval, it is the FDIC-Receiver's option whether such a determination will be necessary. *See Georgia Steel,* 38 B.R. at 839 ("Section 502 was not designed to punish, but to give creditors an option to keep their transfers (and hope for no action by the trustee) or to surrender their transfers and their advantages and share equally with other creditors."). To be clear, if the FDIC-Receiver agrees not to assert its claims for Tax Refunds or RPS (following a ruling that such assets are property of BancGroup's estate), or any other claims against BancGroup's estate, BancGroup will not advance its constructive fraudulent transfer claims.

## V.    CONCLUSION

For the reasons set forth above, BancGroup respectfully requests that the Court enter an order providing that the Tax Refunds and RPS are property of BancGroup's estate and awarding such other relief as it deems just and proper.

Dated:  October 6, 2011

> _/s/_  Andrew Campbell
> One of the Attorneys for Plaintiff,
> The Colonial BancGroup, Inc.
>
> Andrew Campbell, Esq. (Bar. No. ASB-1555-L40a)
> Leitman, Siegal, Payne & Campbell
> 420 20th Street North
> Suite 2000
> Birmingham AL 35203
>
> David L. Elsberg, Esq.
> Benjamin I. Finestone, Esq.
> Xochitl Strohbehn, Esq.
> QUINN EMANUEL URQUHART &
> SULLIVAN, LLP
> 51 Madison Avenue
> New York, New York 10010
> Telephone: (212) 849-7000
> Facsimile: (212) 849-7100

## CERTIFICATION

The undersigned hereby certifies that a true and correct copy of the foregoing document was electronically served on October 6, 2011, by transmission of Notices of Electronic Filing generated by CM/ECF to persons registered as of issuance of filing as set forth below:

Charles B. Lee (clee@millermartin.com)

Jeremy R. Johnson (jeremy.johnson@dlapiper.com)

John J. Clarke, Jr. (john.clarke@dlapiper.com)

Michael A. Fritz, Sr. (bankruptcy@fritzandhughes.com)

Michael D. Hynes (michael.hynes@dlapiper.com)

Spencer D. Stiefel (spencer.stiefel@dlapiper.com)

Thomas R. Califano (thomas.califano@dlapiper.com)

David L. Elsberg (davidelsberg@quinnemanuel.com)

Elizabeth V. Tanis (etanis@kslaw.com, madams@kslaw.com)

Geoffrey Michael Ezgar (gezgar@kslaw.com)

Jennifer B. Grippa (jgrippa@millermartin.com)

Kevin S. Reed (kevinreed@quinnemanuel.com)

Peter E. Calamari (petercalamri@quinnemanuel.com)

Tabor Robert Novack, Jr. (tnovak@ball-ball.com)

Jonathan W. Jordan (jjordan@kslaw.com)

Jeffrey E. Schmitt
Kathryn Norcross
FDIC
3501 Fairfax Drive
Arlington, VA 22226
703.562.2429


/s/ Andrew Campbell
One of the Attorneys for Plaintiff,
The Colonial BancGroup, Inc.